1  CUAUHTEMOC ORTEGA (Bar No. 257443)
   Federal Public Defender
2  MARGARET A. FARRAND (Bar No. 235295)
   (Email: Margaret_Farrand@fd.org)
3  Deputy Federal Public Defender
   321 East 2nd Street
4  Los Angeles, California 90012-4202
   Tel: 213-894-7528
5  Fax: 213-894-0081

6  John B. McEntire, IV
   *Senior Litigator*
7  (Email: Jay_McEntire@fd.org)
   FEDERAL DEFENDERS OF EASTERN
8  WASHINGTON AND IDAHO
   10 North Post Street, Suite 700
9  Spokane, Washington 99201
   Tel: 509-624-7606
10
   Proposed Attorneys for Petitioner
11 JOHN FRANKLIN FRIEDLANDER

12              **UNITED STATES DISTRICT COURT**

13              **CENTRAL DISTRICT OF CALIFORNIA**

14                    **EASTERN DIVISION**

15
   JOHN FRANKLIN FRIEDLANDER,       Case No. 5:23-cv-1603___
16
                    Petitioner,
17                                   **PETITION FOR A WRIT OF HABEAS
               v.                    CORPUS UNDER 28 U.S.C. § 2241**
18
19 JACOB DOERER, Warden, United States
   Federal Correctional Institute Victorville
20 Medium II
21
22               Respondent.
23
24
25
26
27
28

1    Petitioner John Franklin Friedlander, through proposed counsel of record,

2 respectfully petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C.

3 § 2241. A motion for appointment of counsel is concurrently filed.

4

5                                              Respectfully submitted,

6                                              CUAUHTEMOC ORTEGA
                                               Federal Public Defender
7

8 DATED: August 10, 2023          By   /s/ Margaret A. Farrand
                                        MARGARET A. FARRAND
9                                       Deputy Federal Public Defender

10                                      JOHN B. McENTIRE, IV
                                        Senior Litigator
11                                      FEDERAL DEFENDERS OF EASTERN
                                        WASHINGTON AND IDAHO
12

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................ 1

II.    JURISDICTION ................................................................................. 8

III.   BACKGROUND ................................................................................ 8

    A.   1970-1986: As a child, Mr. Friedlander endured one tragedy after another. ............................................................................................. 8

       1.   It started with a childhood car accident. ................................ 8

       2.   It continued with sexual abuse in the foster care system.............. 9

       3.   It continued with abuse after his adoption. ........................... 10

    B.   February 1987: as an abused and confused teenager, Mr. Friedlander made the tragic decision to shoot his adopted parents. ............................ 11

    C.   November 1987: the government prosecuted Mr. Friedlander as an adult, relying on an evaluation that found him beyond-redemption.......... 12

    D.   1988: that evaluation influenced the judge into imposing a life sentence, believing he'd be paroled "at an appropriate time." ................. 13

    E.   1995: Mr. Friedlander's accomplice went home. ..................................... 14

    F.   November 1996: Mr. Friedlander received his first parole hearing. ......... 14

    G.   February 1997: Mr. Friedlander became eligible for discretionary parole. ................................................................................................ 15

    H.   March 1997–July 2000: after the Commission rejected his request for parole, Mr. Friedlander struggled with substance abuse in prison. ........... 16

    I.   October 2000–June 2010: The Commission continued to deny release, and Mr. Friedlander's struggles with substance abuse and discipline continued. ............................................................................................ 16

    J.   January 31, 2012: the Commission conducted a 15-year review, denying Mr. Friedlander's release. ..................................................... 17

    K.   2013: The BOP diagnosed Mr. Friedlander with major depressive disorder.............................................................................................. 17

    L.   July 2014: Mr. Friedlander received an infraction for alcohol use............ 18

    M.   Late-2014: Mr. Friedlander received treatment and a turnaround begins. ................................................................................................ 18

    N.   February 2017: Mr. Friedlander became eligible for mandatory parole. ..19

    O.   March–April 2018: Mr. Friedlander's turnaround continued................... 19

i

P.    May 22, 2018: a hearing examiner supported Mr. Friedlander's release, but the Commission overruled it.................................... 20

Q.    February 13, 2020: Mr. Friedlander received a BOP infraction and disputed it—vigorously. ................................................ 22

R.    April 2020: a hearing examiner rejected Mr. Friedlander's latest request for release, leaving him "floating in open water, with no land in sight." ......................................................................... 22

S.    2021: a psychologist reviewed Mr. Friedlander's prior evaluations; she was appalled at their work, finding he presents a "low risk of reoffending." .............................................................. 23

T.    January 2022: Mr. Friedlander filed a sentence reduction request, but later withdraw it because he's ineligible for §3582 relief. ....... 24

U.    June 2022: a hearing examiner declined to review Mr. Friedlander's parole materials and denied release. ........................... 25

V.    September 2022: the NAB affirmed the examiner's decision, finding no issue with his failure to review the entire record. ............... 26

IV.   DISCUSSION .............................................................. 27

A.    How courts approach reviewing the Commission's decision-making. ..... 27

B.    Venue belongs in the Central District of California. ................ 28

C.    The Commission failed to follow its enabling statute, as well as its own rules. ............................................................ 28

      1.    It declined to review Mr. Friedlander's parole materials. ........... 28

      2.    It failed to inquire about positive things BOP staff had to say........ 36

      3.    It failed to hold parole hearings within 24-months of each other.... 36

      4.    It failed to provide Mr. Friedlander with the materials it relied on at the hearing.......................................................... 37

D.    The Commission violated Mr. Friedlander's Fifth Amendment due process rights by denying him an opportunity to be meaningfully heard. ............................................................... 39

      1.    Mr. Friedlander holds a constitutionally-protected liberty interest in parole................................................... 40

      2.    When the Commission failed to follow its own rules, it erroneously deprived Mr. Friedlander of his liberty interest.......... 41

      3.    The Government has no interest in keeping the existing procedure........................................................... 42

E.    The Commission violated Mr. Friedlander's Eighth Amendment rights by converting his sentence into life-without-parole.................... 42

F.    For relief, Mr. Friedlander asks for his unconditional release...................44

V.    CONCLUSION ...........................................................................................46

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Benedict v. Rodgers*,
748 F.2d 543 (10th Cir. 1984) .................................................................. 39

*Benites v. U.S. Parole Commission*,
595 F.2d 518 (9th Cir. 1979) ............................................................... 7, 38

*Benny v. U.S. Parole Com'n*,
295 F.3d 977 (9th Cir. 2002) ............................................................... 8, 27

*Drayton v. McCall*,
584 F.2d 1208 (2d Cir. 1978) .............................................................. 7, 41

*Dufur v. U.S. Parole Commission*,
34 F.4th 1090 (D.C. Cir. 2022) ............................................................... 16

*Evans v. Dillahunty*,
662 F.2d 522 (8th Cir. 1981) .................................................................. 40

*Furnari v. U.S. Parole Commission*,
218 F.3d 250 (3d Cir. 2000) ................................................................ 7, 38

*Gambino v. Morris*,
134 F.3d 156 (3d Cir. 1998) (Roth, C.J., concurring) ...................... 40, 41

*Garcia v. Neagle*,
660 F.2d 983 (4th Cir. 1981) ............................................................... 5, 27

*Hilton v. Braunskill*,
481 U.S. 770 (1987) .............................................................................. 44

*Jones v. Hendrix*,
143 S. Ct. 1857, 2023 WL 4110233 (June 22, 2023) ............................ 8

*Kindred v. Spears*,
894 F.2d 1477 (5th Cir. 1990) ............................................................... 40

*Lee v. Rios*,
360 Fed. Appx. 625 (6th Cir. 2010) ....................................................... 39

*Matthews v. Eldridge*,
    424 U.S. 319 (1976)............................................................ 7, 39

*McCallum v. Reilley*,
    2007 WL 2455662 (N.D. W. Va Aug. 24, 2007) ........................ 38

*Mickens-Thomas v. Vaughn*,
    355 F.3d 294 (3d Cir. 2004) ...................................................... 44

*Miller v. Alabama*,
    567 U.S. 460 (2012)....................................................... 7, 42, 43

*Morrissey v. Brewer*,
    408 U.S. 471 (1972)................................................................... 39

*Nunez-Guardado v. Hadden*,
    722 F.2d 618 (10th Cir. 1983) .................................................. 34

*Roper v. Simmons*,
    543 U.S. 551 (2005) .................................................................... 5

*Rumsfeld v. Padilla*,
    542 U.S. 426 (2004)................................................................... 28

*Sameena, Inc. v. U.S. Air Force*,
    147 F.3d 1148 (9th Cir. 1998) .................................................. 41

*Silderberg v. U.S. Parole Com'n*,
    483 F. Supp. 1280 (M.D. Pa. 1980)........................................... 38

*Solomon v. Elsea*,
    676 F.2d 282 (7th Cir. 1982) .................................................... 40

*Thompson v. Armontrout*,
    647 F. Supp. 1093 (W.D. Mo. 1986).......................................... 44

*U.S. v. Friedlander*,
    2:87-cr-308-WFN-1 (E.D. Wash.), ECF No. 17 ..................... 3, 24

*U.S. v. Friedlander*,
    2:97-cr-308-WFN-1 (E.D. Wash.), ECF No. 167 ...................... 24

*U.S. v. Hammons*,
    558 F.3d 1100 (9th Cir. 2009) .................................................... 1

*U.S. v. Harrington,*
    749 F.3d 825 (9th Cir. 2014) ................................................................. 40

*U.S. v. King,*
    24 F.4th 1226 (9th Cir. 2022) ...................................................... 3, 14, 24

*U.S. v. Torres,*
    995 F.3d 695 (9th Cir. 2021) ................................................................. 28

*U.S. v. Wright,*
    924 F.2d 545 (4th Cir. 1991) ................................................................. 42

*Wallace v. Christensen,*
    802 F.2d 1539 (9th Cir. 1986) ............................................................ 5, 27

**Statutes**

5 U.S.C. § 552 ......................................................................................... 17, 37

18 U.S.C. § 3553(a) ................................................................................... 1, 15

18 U.S.C. § 3582 ................................................................................ 3, 24, 42

18 U.S.C. § 4205(a) ...................................................................................... 15

18 U.S.C. § 4206 .................................................................................. *passim*

18 U.S.C. § 4207 ................................................................... 6, 31, 34, 36

18 U.S.C. § 4208 .................................................................................. *passim*

28 U.S.C. § 2241 .................................................................................. *passim*

*The Parole Commission and Reorganization Act.* Pub. L. 98–473, title II,
    § 218(a)(5), Oct. 12, 1984, 98 Stat. 2027 ........................................ 41, 42

**Regulations**

28 C.F.R. § 2.14 .......................................................................................... 36

28 C.F.R. § 2.19 ................................................................................. 6, 34, 36

28 C.F.R. § 2.20 ............................................................................ 15, 17, 39

28 C.F.R. § 2.23 .......................................................................................... 21

28 C.F.R. § 2.36 ................................................................................................ 15

28 C.F.R. § 2.53 ........................................................................................ 19, 40

**Constitutional Provisions**

U.S. Const., Amend V ................................................................................ 7, 39

U.S. Const., Amend VIII ........................................................................... 7, 42

**Other Authorities**

Parole Comm'n Rules & Proc. Manual at 2.14-01(a) (June 30, 2010),
    https://www.justice.gov/d9/uspc/legacy/2010/08/27/uspc-
    manual111507.pdf ................................................................................ 37

Charles D. Weisselberg, *Saving the People Congress Forgot*: *It is Time to
Abolish the U.S. Parole Commission and Consider All "Old Law" Federal
Prisoners for Release*, Federal Sentencing Reporter, vol. 35, No. 2
(December 2022). *available at* http://bit.ly/3y9y2Iv ........................... 4, 24, 42

**PETITION FOR WRIT OF HABEAS CORPUS UNDER 28 U.S.C. § 2241**

## I.    INTRODUCTION

At sentencing, our criminal justice system requires courts to consider materials provided by the defense. With that legal bedrock in mind, imagine the following:

A federal judge prepares to take the bench for a significant sentencing. Before the hearing begins, the judge tells defense counsel she reviewed Probation's presentence report, but didn't review any defense-submitted materials—not the memo addressing legal arguments, not the support letters, not the release plan, and not the expert report addressing recidivism risk. In response, defense counsel offers to provide a printed copy of these materials to the judge. She declines to take them. Instead, she proceeds to sentencing without evidence addressing the statutory factors[1] she's required to consider.

No judge would do this, but if one did, that judge would be reversed.[2]

That's what happened to John Friedlander—only the error wasn't committed by a federal judge, but rather the United States Parole Commission. And the error didn't happen in a federal courtroom, but rather at a prison lunch table. So Mr. Friedlander's imprisonment, which started when he was a kid and now continues into its 37th year, continues without end—even though he's nearly two decades beyond his suggested parole range.

The tortured history that culminated in this 2241 petition started long ago.

In 1974, at age 3, Mr. Friedlander went through a windshield during a car accident that claimed the lives of his mother and two siblings. After waking from a

---

[1] *See* 18 U.S.C. § 3553(a) (setting forth the statutory factors courts consider when imposing sentence).

[2] *See*, *e.g.*, *U.S. v. Hammons*, 558 F.3d 1100, 1105 (9th Cir. 2009) (finding plain error when the district court failed to consider §3553(a) sentencing factors).

1

coma, Mr. Friedlander was cast into the foster care system with his sole-surviving sister, Carolyn Lozier, and together they spent years suffering through physical and sexual abuse before being adopted by Clarence and Gloria White on the Spokane Indian Reservation in Eastern Washington.

The tragedy continued. The adoption placed Mr. Friedlander in a new school on a new reservation, and he endured years of additional torment from classmates for the facial scars caused by the car accident, as well as from his 68 IQ, which placed him in the "developmentally-disabled" category. While school abuse scarred him, so did abuse in his adopted home.

In 1987, Mr. Friedlander's surviving sister was hospitalized from an accident. When the accident happened, Mr. Friedlander, then just 16-years-old, was at a party and intoxicated. Others at the party told him about the accident, that the Whites were to blame, and that he needed to do something about it. So Mr. Friedlander, developmentally-disabled, intoxicated, and being pushed by friends to act, left the party, went to the Whites' home, and shot them. Clarence White survived; Gloria White did not.

Mr. Friedlander's friend, Guy Herman, was the driving force—he led the break-in, found the gun, and handed it to Mr. Friedlander with one instruction: "do it." Mr. Herman was charged as a juvenile, while Mr. Friedlander was charged as an adult. That decision came from a judge influenced by psychologists who labeled Mr. Friedlander an irredeemable sociopath.

That decision placed Mr. Friedlander on a different path. Mr. Herman was released from prison decades ago; Mr. Friedlander remains.

How wrong those psychologists were. Dr. Kele Kirschenbaum, a renowned UCLA psychologist, assessed Mr. Friedlander in 2021 and concluded that prior label—irredeemable sociopath—couldn't be further from the truth. She concluded that label came from opinions that were rushed, incomplete, and lacked the benefit of modern

2

research into how the adolescent brain works. He was never an irredeemable sociopath, but rather a developmentally-disabled child shaped by trauma.

In January 2022, Mr. Friedlander brought his story to a district judge in Eastern Washington,[3] laying out his extraordinary and compelling reasons for a sentence reduction.[4] Atop that list: Mr. Friedlander's legal status. The law classifies Mr. Friedlander as a wobbler, one of a handful of individuals alive in our country who committed his offense during the parole system (February 1987), but was sentenced after the then-mandatory Sentencing Guidelines went into effect (March 1988).

What a difference a few months makes. If Mr. Friedlander had committed his crime nine months later (after the Guidelines went into effect), he would have faced a 121–151 month range. Since that range was mandatory, Mr. Friedlander would have gone home *decades* ago—the law required it. So an arbitrary multi-month window meant Mr. Friedlander would serve an additional 24 years in prison—and counting.

While this story is compelling, the district judge in Eastern Washington never heard it. Less than two weeks after Mr. Friedlander filed his §3582 request, the Ninth Circuit held that old-law inmates like Mr. Friedlander cannot seek sentencing reductions and instead must trust the parole system.[5]

So, in June 2022, Mr. Friedlander brought his story to the Commission, an entity one expert described as an "obsolete, incompetent, and compromised agency" that serves as a "moribund barrier to any hope of release."[6] True to this description, the Commission

---

[3] *See U.S. v. Friedlander*, 2:87-cr-308-WFN-1 (E.D. Wash.), ECF No. 17 – Motion to Reduce Sentence.

[4] *See* 18 U.S.C. §3582(c)(1)(A) (allowing prisoners to seek sentence reductions based on extraordinary & compelling reasons).

[5] *See U.S. v. King*, 24 F.4th 1226 (9th Cir. 2022).

[6] Charles D. Weisselberg, *Saving the People Congress Forgot*: *It is Time to Abolish the U.S. Parole Commission and Consider All "Old Law" Federal Prisoners*

3

never read Mr. Friedlander's story. Literally. Before the parole hearing began, which occurred in USP Lompoc's lunchroom, defense counsel asked the hearing examiner (Chris Whitmer) if he had reviewed Mr. Friedlander's parole materials, which included a memorandum addressing the parole factors, Dr. Kirschenbaum's 2021 evaluation, and a release plan. He hadn't. When defense counsel offered Mr. Whitmer a printed copy of the materials, he declined to take them, choosing instead to review some short-form talking points defense counsel brought to the hearing as a reference.

Time wasn't the issue, as Mr. Friedlander was the only hearing that day.

Mr. Whitmer proceeded. When done, he sent Mr. Friedlander and defense counsel away (to different corners of the lunchroom) to deliberate. About five minutes later, Mr. Whitmer finished deliberating and denied parole. Due process denied—from a lunch table.

The Commission rubber-stamped Mr. Whitmer's decision. So, in August 2022, Mr. Friedlander brought his story to the National Appeals Board (NAB), an appellate body that consists of the *same* two people who are on the Commission.[7] So in an unsurprising twist, when the two Commissioners took off their parole-hats and donned their appeal-hats, they concluded they made no mistakes.

Mr. Friedlander now brings his story to this Court. Considering the Commission described Mr. Friedlander's situation as a man "floating in open water with no land in

_____

*for Release*, Federal Sentencing Reporter, Vol. 35, No. 2 at 107-08 (December 2022), *available at* http://bit.ly/3y9y2Iv, last accessed on July 3, 2023.

[7] Charles D. Weisselberg, *Saving the People Congress Forgot*: *It is Time to Abolish the U.S. Parole Commission and Consider All "Old Law" Federal Prisoners for Release*, Federal Sentencing Reporter, Vol. 35, No. 2 at 108 (December 2022) ("In 1996, Congress cut the number of authorized Commissioners to five; now the Agency has two. The National Appeals Board is comprised of these same two Commissioners, and therefore the Board is no longer separate from the first-level decisionmaker."), *available at* http://bit.ly/3y9y2Iv, last accessed on July 3, 2023.

sight,"[8] one thing is clear: without court intervention, Mr. Friedlander will die in prison. Condemning a developmentally-disabled child to die in prison not only strikes against "the evolving standards of decency that mark the progress of a maturing society,"[9] but also subverts the original sentencing judge's will, as he wanted Mr. Friedlander to be released.[10]

After nearly 37 years in prison, and 24 years beyond what would have been his Sentencing Guidelines range, that time is now. Mr. Friedlander respectfully asks the Court to grant this §2241 petition and release him from prison for the following reasons:

*First*, courts may review the Commission's decisions, including whether it acted outside its regulations or failed to follow them altogether. *See Wallace v. Christensen*, 802 F.2d 1539, 1551 (9th Cir. 1986) ("A court may consider whether the Commission has acted outside [its] statutory limits."); *Garcia v. Neagle*, 660 F.2d 983, 988 (4th Cir. 1981) ("In general, even where action is committed to absolute agency discretion by law, courts have assumed the power to review allegations that an agency exceeded its legal authority, acted unconstitutionally, or failed to follow its own regulations.").

Here, the Commission disregarded its enabling statute and regulations in four ways:

---

[8] Ex. 23 at 8-9 (2020 parole hearing transcript).

[9] *Roper v. Simmons*, 543 U.S. 551, 561 (2005).

[10] Ex. 20 at 6-7 (Findings of Fact and Conclusions of Law–Nov. 10, 1987).

5

(1)     it declined to review Mr. Friedlander's parole materials, which included a psychological evaluation, violating both its statutory directive (§4207),[11] as well as its own regulations (28 C.F.R. §2.19);[12]

(2)     it failed to inquire about positive things BOP staff had to say about Mr. Friedlander, violating both its statutory directive (§4207),[13] as well as its own regulations (28 C.F.R. §2.19);[14]

(3)     it failed to hold parole hearings within 24 months of each other, violating its statutory directive (§4208);[15] and

---

[11] *See* 18 U.S.C. §4207(5) (when making a parole decision, the Commission "shall consider" any "reports of physical, mental, or psychiatric examination of the offender").

[12] *See* 28 C.F.R. §2.19 (when making a parole decision, the Commission "shall consider" any "reports of physical, mental, or psychiatric examination of the offender," as well as "additional relevant information concerning the prisoner, including information submitted by the prisoner") (cleaned up).

[13] *See* 18 U.S.C. §4207(1) (when making a parole determination, the Commission "shall consider" any "recommendations which the staff of the facility in which such prisoner is confined may make").

[14] *See* 28 C.F.R. §2.19(a)(1) (when making a parole determination, the Commission "shall consider" any "recommendations which the staff of the facility in which such prisoner is confined may make").

[15] *See* 18 U.S.C. §4208(h)(2) (noting "[i]n any case in which release on parole is not granted, subsequent parole determination proceedings shall be held not less frequently than" "twenty-four months in the case of a prisoner with a term or terms of seven years or longer").

6

1

2

> (4)    it failed to provide Mr. Friedlander with the materials it relied on at the parole hearing, violating its statutory directive (§4208).[16]

3

4

5

6

7

8

When the Commission fails to follow its own rules, courts grant habeas relief. *See*, *e.g.*, *Benites v. U.S. Parole Commission*, 595 F.2d 518 (9th Cir. 1979) (affirming district court's habeas grant when the Commission applied the wrong criteria in determining youth offender's parole eligibility); *Furnari v. U.S. Parole Commission*, 218 F.3d 250, 252 (3d Cir. 2000) (directing district court to grant habeas relief when the Commission failed "to follow its regulation requiring a statement of reasons for denying parole").

9

10

11

12

13

14

15

16

17

18

19

> **Second**, the Parole Commission violated Mr. Friedlander's Fifth Amendment due process rights by denying him an opportunity to be heard in a meaningful manner. While due process protections vary, a "fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Matthews v. Eldridge*, 424 U.S. 319, 333 (1976) (cleaned up). At a minimum, courts recognize "[a] meaningful hearing requires a neutral and detached hearing body"—"one that is openminded" and fully-considers a prisoner's basis for parole. *Drayton v. McCall*, 584 F.2d 1208, 1219 (2d Cir. 1978). A hearing body fails to be openminded when it declines to review a prisoner's parole materials before deciding parole; and a hearing body fails to be neutral-and-detached when the NAB is no longer separate from the first-level decision-maker.

20

21

22

23

24

> **Third**, the Parole Commission violated Mr. Friedlander's Eighth Amendment rights by converting his juvenile sentence from life-*with*-parole to life-*without*-parole. *See Miller v. Alabama*, 567 U.S. 460, 479 (2012) (noting the Eighth Amendment "forbids a sentencing scheme that mandates life in prison without the possibility of parole for juvenile offenders"). This happened when the Commission said

25

26

27

28

---

[16] *See* 18 U.S.C. §4208(b) (noting "[a]t least thirty days prior to any parole determination proceeding, the prisoner shall be provided with" "reasonable access to a report or other document to be used by the Commission in making its determination.").

7

1 Mr. Friedlander's past BOP infraction history can always be used to deny his future

2 release—no matter how old those infractions are.

3                                         * * *

4        The full reasoning behind Mr. Friedlander's request is set forth below.

5 ## II.    JURISDICTION

6        This Court holds jurisdiction over this petition. *See, e.g.*, *Benny v. U.S. Parole*

7 *Com'n*, 295 F.3d 977, 981 (9th Cir. 2002) ("We have held that a §2241 habeas petition

8 is generally the proper method for obtaining judicial review of parole decisions.");

9 *Jones v. Hendrix*, 143 S. Ct. 1857, 2023 WL 4110233 at *6 (June 22, 2023)

10 (recognizing §2241 petitions are appropriate "when a petitioner challenges the legality

11 of his detention," including a claim "he has unlawfully been denied parole") (cleaned

12 up).

13 ## III.    BACKGROUND[17]

14 **A.   1970-1986: As a child, Mr. Friedlander endured one tragedy after another.**

15     **1.   It started with a childhood car accident.**

16        Mr. Friedlander was born to Colville Indian parents, Barbara and George

17 Friedlander, on September 1, 1970.[18]

18        Just before his third birthday, a car accident killed his mother and two young

19 sisters—8-months-old and 6-years-old. Also in the car and unbelted, Mr. Friedlander

20

21

22

23      [17] Because this case dates back decades, Mr. Friedlander struggled to obtain

24 records. The Clerk's Office didn't maintain Mr. Friedlander's file; it's too old. The

25 National Archives did, but those records are incomplete. If there's a recording or

26 transcript from Mr. Friedlander's original sentencing in 1988, the National Archives

27 didn't have it. Same with the sentencing materials. So when the Court reviews this

28 background, it should know many records remain missing.

     [18] Ex. 11 (Birth Certificate).

was ejected through the windshield on impact.[19] He fell into a coma, required a tracheotomy, and ultimately spent months in the hospital.[20]

Mr. Friedlander's injuries lasted beyond the hospital. He suffered severe scarring on his face, long-term speech impairments, and chronic pain.[21] And with a 68 IQ, doctors placed him in the "retarded range," although it's unclear if his low-level functioning pre-dated his accident.[22]

His injuries weren't just physical. Mr. Friedlander later learned his mother drove drunk that evening and intended to take her life, as well as the lives of her children— Mr. Friedlander included.[23]

### 2.    It continued with sexual abuse in the foster care system.

After leaving the hospital, Mr. Friedlander returned to living with his father and Carolyn Lozier, his sole-surviving sister.[24] But authorities deemed Mr. Friedlander's father to be an unfit parent, so they placed Mr. Friedlander and his sister in foster care.

That didn't go well. Mr. Friedlander and Ms. Lozier cycled through several families, suffering horrific physical and sexual abuse for years.[25]

---

[19] Ex. 12 at 9 (PSIR); Ex. 13 at 2, ¶¶ 3-4 (Decl. of Carolyn Lozier); Ex. 14 (article on accident).

[20] Ex. 15 at 6 (Dr. Kele Kirschenbaum's report); Ex. 16 at 2 (Dr. Charles Tappin's report).

[21] Ex. 12 at 6-7, 10 (Dr. Kele Kirschenbaum's report).

[22] Ex. 17 at 2 (Dr. Bruce Duthie's report).

[23] Ex. 12 at 6 (Dr. Kele Kirschenbaum's report).

[24] Ex. 12 at 6 (Dr. Kele Kirschenbaum's report).

[25] Ex. 13 at 2, ¶¶ 5-8 (Decl. of Carolyn Lozier); Ex. 12 at 6 (Dr. Kele Kirschenbaum's report).

9

### 3.    It continued with abuse after his adoption.

After years in the foster care system, Mr. Friedlander and Ms. Lozier were adopted by Clarence and Gloria White, enrolled members from the Colville and Spokane Tribes, respectively, and taken to live in Wellpinit, WA.[26] The adoption ended Mr. Friedlander and Ms. Lozier's sexual abuse. It did not, however, end Mr. Friedlander's physical abuse.

Outside the home, Mr. Friedlander's adoption placed him in the Spokane Tribe's school system. Even though Mr. Friedlander was an enrolled tribal member, he was from the Colville Indian Reservation, and so was treated by Spokane tribal members as an outsider.[27] His classmates abused him, calling him a "minority," a "sellout," "weak," and someone who didn't belong.[28] He was mocked for his extensive facial scarring and having a "cereal-bowl style haircut."[29] His peers would steal his belongings and physically assault him, including breaking his nose with bicycle handlebars.[30] He regularly returned home from school with blood-stained clothes from the bullying he received.[31] It was relentless.

This school-based trauma caused Mr. Friedlander to act up at home, and Clarence and Gloria's response to his misbehavior left Mr. Friedlander feeling unwelcome.[32] Clarence and Gloria White took their biological daughter on trips, leaving Mr. Friedlander and Ms. Lozier at home to do chores. Their biological daughter

---

[26] Ex. 13 at 2, ¶10 (Decl. of Carolyn Lozier).

[27] Ex. 15 at 10 (Dr. Kele Kirschenbaum's report).

[28] Ex. 15 at 10 (Dr. Kele Kirschenbaum's report).

[29] Ex. 15 at 10 (Dr. Kele Kirschenbaum's report).

[30] Ex. 15 at 8-10 (Dr. Kele Kirschenbaum's report).

[31] Ex. 15 at 10 (Dr. Kele Kirschenbaum's report).

[32] Ex. 13 at 2, ¶¶12-14 (Decl. of Carolyn Lozier).

also received regular love and attention, while Mr. Friedlander and Ms. Lozier often received less—or none at all.[33]

Wanting a home where they felt loved, Mr. Friedlander and Ms. Lozier took to running away. Ms. Lozier went first, fleeing to Spokane and then Olympia at age 13 to live with extended family.[34] Then Mr. Friedlander ran away, but was brought back by Mr. White.[35] After running away again, Colville Child Welfare Services became involved and transferred Mr. Friedlander's custody over to family in the Omak, WA, area.[36] Meanwhile, Ms. Lozier remained in the Whites' care.[37]

**B.** **February 1987: as an abused and confused teenager, Mr. Friedlander made the tragic decision to shoot his adopted parents.**

On February 13, 1987, Mr. Friedlander returned to Wellpinit.[38] He and three friends searched the town for his sister, including checking the high school.[39] Unable to locate her, Mr. Friedlander and his friends passed the time while they searched for her by drinking and using drugs.[40]

That night, while still intoxicated, Mr. Friedlander heard his sister was in a car accident that left her in critical condition.[41] His shock turned to rage, as he was

---

[33] Ex. 15 at 8 (Dr. Kele Kirschenbaum's report).

[34] Ex. 13 at 3 ¶¶19-20 (Decl. of Carolyn Lozier).

[35] Ex. 15 at 9 (Dr. Kele Kirschenbaum's report).

[36] Ex. 12 at 11 (PSIR).

[37] Ex. 15 at 9 (Dr. Kele Kirschenbaum's report).

[38] Ex. 12 at 2, 5 (PSIR).

[39] Ex. 12 at 2, 5 (PSIR).

[40] Ex. 12 at 5 (PSIR).

[41] Ex. 12 at 5 (PSIR); Ex. 18 at 2 (Dr. Lawrence Weathers's report).

11

incorrectly told the Whites' carelessness was to blame.[42] Mr. Friedlander's friends fanned the rage and pressured him "to do something about it."[43]

So together, they did. Mr. Friedlander, Guy Herman, Wendy Herman, and John Tsoodle drove to the Whites' residence and took two guns from the residence.[44] Although accounts differ on who first suggested shooting Mr. White, Guy Herman and Mr. Friedlander both agree Mr. Herman initially aimed the gun at Mr. White, but ultimately handed the gun over to Mr. Friedlander, who covered his eyes and fired.[45] Ms. White was shot next.[46] Mr. White survived, but Ms. White did not. Both boys were arrested shortly thereafter.[47]

**C.**     **November 1987: the government prosecuted Mr. Friedlander as an adult, relying on an evaluation that found him beyond-redemption.**

Although Mr. Friedlander was only 16-years-old at the time of the offense, the Government initiated federal criminal proceedings against him, seeking to charge Mr. Friedlander as an adult. To support the prosecution, the Government relied on a psychological evaluation from Dr. David G. Grubb, who met with Mr. Friedlander for an hour, reviewed an incomplete record, and concluded in a two-and-a-half-page report that Mr. Friedlander was an irredeemable sociopath with "no remorse."[48]

---

[42] Ex. 12 at 5 (PSIR); Ex. 18 at 2 (Dr. Lawrence Weathers's report).

[43] Ex. 18 at 2 (Dr. Lawrence Weathers's report).

[44] Ex. 12 at 2-3, 5-6 (PSIR).

[45] Ex. 12 at 5-7 (PSIR).

[46] Ex. 12 at 7 (PSIR).

[47] Ex. 12 at 3 (PSIR).

[48] Ex. 19 at 3 (Dr. David G. Grubb's report).

**D.**    **1988: that evaluation influenced the judge into imposing a life sentence, believing he'd be paroled "at an appropriate time."**

Judge Quackenbush struggled with how to handle Mr. Friedlander's case. On one hand, he found the idea of locking a child up in perpetuity "inappropriate."[49] On the other hand, Judge Quackenbush recognized that leaving Mr. Friedlander in the juvenile system would mean he would be "released at age twenty-one without any provisions for supervision or guidance," which he also found inappropriate.[50] Ultimately, Judge Quackenbush was influenced by psychological findings that Mr. Friedlander demonstrated no remorse.[51] So, on November 10, 1987, Judge Quackenbush allowed the Government to charge Mr. Friedlander as an adult.[52]

Two months later, January 20, 1988, Mr. Friedlander pleaded guilty in federal court to one count of second-degree murder (killing Gloria White), as well as one count of assault with intent to murder (shooting Clarence White).[53]

On March 11, 1988, Judge Quackenbush sentenced him to life, expecting that Mr. Friedlander would be paroled "at an appropriate time."[54]

---

[49] Ex. 20 at 6-7 (Findings of Fact and Conclusions of Law–Nov. 10, 1987).

[50] Ex. 20 at 6 (Findings of Fact and Conclusions of Law–Nov. 10, 1987).

[51] Ex. 20 at 5 (Findings of Fact and Conclusions of Law–Nov. 10, 1987) ("I am satisfied that the evidence shows Mr. Friedlander has an anti-social personality disorder as defined by the experts, and that is typified by the evidence of his manipulation and abuse of individuals without any particular guilt or remorse.").

[52] Ex. 20 at 6 (Findings of Fact and Conclusions of Law–Nov. 10, 1987).

[53] Ex. 12 at 2 (PSIR).

[54] Ex. 20 at 6 (Findings of Fact and Conclusions of Law–Nov. 10, 1987).

1

**E.     1995: Mr. Friedlander's accomplice went home.**

2

3            Mr. Friedlander didn't act alone.[55] Guy Herman talked an intoxicated and

4     developmentally-disabled Mr. Friedlander into driving to the Whites' residence for

5     revenge.[56] Mr. Herman helped Mr. Friedlander break into the Whites' residence.[57]

6     Mr. Herman located the firearms.[58] And Mr. Herman initially aimed the gun at

7     Clarence White before handing it over to Mr. Friedlander and telling him to "go do

      it."[59] Mr. Herman played a pivotal role in this crime.

8            Mr. Herman was held accountable—just differently. On April 2, 1987, he

9     pleaded guilty in Stevens County to burglary, first-degree murder, and first-degree

10    assault.[60] Mr. Herman was sentenced in juvenile court to 291-364 weeks in custody

11    (5.5-7 years), releasing from custody roughly 30 years ago.[61]

12

**F.     November 1996: Mr. Friedlander received his first parole hearing.**

13           On November 5, 1996, the Commission conducted an initial hearing for

14    Mr. Friedlander, who fell under the parole system since he was an "old-law prisoner."[62]

15    *See U.S. v. King*, 24 F.4th 1226, 1230 (9th Cir. 2022) (noting "old-law prisoners"

16    refers to "people whose crimes predate November 1, 1987").

17

18

19

20    _____

21           [55] Ex. 12 at 6-7 (PSIR).

22           [56] Ex. 18 at 2 (Dr. Lawrence Weathers's report).

23           [57] Ex.  12 at 5-7 (PSIR).

24           [58] Ex.  12 at 6 (PSIR).

25           [59] Ex. 18 at 2 (Dr. Lawrence Weathers's report).

26           [60] Ex. 12 at 3 (PSIR).

27           [61] Ex. 12 at 3 (PSIR).

28           [62] Ex. 21 at 4 (2018 parole hearing summary).

The Commission calculated his guideline range at "120+ months"[63] based on the nature and circumstances of his crimes, and then added 8 months to his range based on two BOP disciplinary incidents.[64] It denied release,[65] but it's unclear if the Commission considered Mr. Friedlander's young age, as it's required to do.[66]

Since the Commission denied release, it ordered that Mr. Friedlander should receive "statutory interim hearings" every two years, as required by law.[67]

## G.    February 1997: Mr. Friedlander became eligible for discretionary parole.

On February 14, 1997, ten years into his life sentence, Mr. Friedlander became eligible for discretionary parole. *See* 18 U.S.C. §4205(a) (noting old-law prisoners

---

[63] The parole system uses a guideline system that sets the "customary" range a prisoner should serve before being paroled. *See* 28 C.F.R. §2.20(b). That range accounts for various factors the Commission considers—something akin to the §3553(a) sentencing factors. *See* 28 C.F.R. §2.20(b) (noting the parole guideline range accounts for the offense, as well as the offender's characteristics). While the Commission may go outside that range, it must identify "good cause" for doing so. 18 U.S.C. §4206(c). In addition, it also may seem odd to have a range with no upper end (i.e., 120+ months). When a range contains no upper-end, the Commission must cite "pertinent case factors" if an inmate serves more than 48-months above the low-end range. *See* 28 C.F.R. §2.20, fn.1.

[64] Ex. 21 at 4 (2018 parole hearing summary). Under the parole system, guidelines get recalculated to account for disciplinary infractions. *See* 28 C.F.R. §2.36(a). The Commission refers to these as "rescission guidelines." *Id.*

[65] Ex. 21 at 4 (2018 parole hearing summary).

[66] *See* 28 C.F.R. §2.20(h) ("If an offender was less than 18 years of age at the time of the current offense, such youthfulness shall, in itself, be considered as a mitigating factor.").

[67] Ex. 21 at 4 (2018 parole hearing summary); *see also* 18 U.S.C. §4208(h) ("In any case in which release on parole is not granted, subsequent parole determination proceedings shall be held not less frequently than…twenty-four months in the case of a prisoner with a term or terms of seven years or longer.").

become eligible for parole "after serving ten years of a life sentence"). At this stage, the Commission grants parole on a discretionary basis, considering an individual's "behavior record while incarcerated, their offense conduct and criminal record, and whether release would promote disrespect for the law or jeopardize the public welfare." *Dufur v. U.S. Parole Commission*, 34 F.4th 1090, 1093 (D.C. Cir. 2022) (cleaned up); *see also* 18 U.S.C. §4206(a).

**H.    March 1997–July 2000: after the Commission rejected his request for parole, Mr. Friedlander struggled with substance abuse in prison.**

After the Commission rejected his request for parole, Mr. Friedlander was devastated, lonely, and struggling to adapt to an indeterminate future in prison.[68] To numb these feelings, he started abusing controlled substances,[69] using them on eight occasions between March 1997 and July 2000.[70] He also got into a fight with another inmate, although it was described as "horseplay."[71]

Mr. Friedlander "fully admitted" these violations, indicating "he gave into his addiction in lieu of applying" the principles he's learned on how to address "relapse when he is feeling bad about a situation."[72]

**I.    October 2000–June 2010: The Commission continued to deny release, and Mr. Friedlander's struggles with substance abuse and discipline continued.**

Between October 2000 and June 2010, the Commission held six additional statutory interim hearings, denying Mr. Friedlander's release at each one.[73]

---

[68] Ex. 15 at 14 (Dr. Kele Kirschenbaum's report).

[69] Ex. 15 at 14 (Dr. Kele Kirschenbaum's report).

[70] Ex. 21 at 5-7 (2018 parole hearing report).

[71] Ex. 21 at 7 (2018 parole hearing report).

[72] Ex. 21 at 6-7 (2018 parole hearing report).

[73] Ex. 21 at 4 (2018 parole hearing report).

16

During that same time window, Mr. Friedlander's substance abuse struggles continued, earning seven additional infractions for using controlled substances.[74] He also received one infraction for a fight, as well as one infraction for refusing to return to general population based on fear of being assaulted.[75]

**J.     January 31, 2012: the Commission conducted a 15-year review, denying Mr. Friedlander's release.**

On January 31, 2012, the Commission conducted a "15-year reconsideration hearing."[76] At that point, the Commission recalculated Mr. Friedlander's guideline range under the parole system, adjusting it based on his BOP disciplinary history. His new range: 222+ months.[77] At this point, Mr. Friedlander had served 299 months and 17 days, exceeding the parole range by 77 months.[78]

**K.     2013: The BOP diagnosed Mr. Friedlander with major depressive disorder.**

In late-2013, with his struggles continuing, Mr. Friedlander asked to see a mental health professional and was diagnosed with major depressive disorder.[79]

---

[74] Ex. 21 at 5-6 (2018 parole hearing report).

[75] Ex. 21 at 6 (2018 parole hearing report).

[76] Ex. 21 at 4 (2018 parole hearing report).

[77] Ex. 21 at 4 (2018 parole hearing report).

[78] It's unclear what "pertinent case factors" the Commission relied on to exceed Mr. Friedlander's range by 77 months, as the Commission never provided records in response to Mr. Friedlander's FOIA request. *See* 28 C.F.R. § 2.20, fn.1.

[79] Ex. 15 at 14 (Dr. Kele Kirschenbaum's report).

17

**L.     July 2014: Mr. Friedlander received an infraction for alcohol use.**

On July 26, 2014, the BOP cited Mr. Friedlander for using alcohol.[80] Like each of Mr. Friedlander's prior infractions, he admitted using alcohol to cope with his diagnosed—but still untreated—mental health issues.[81]

**M.     Late-2014: Mr. Friedlander received treatment and a turnaround begins.**

In late-2014, the BOP started treating Mr. Friedlander for his major depressive disorder—and it made all the difference. He broke free from his cycle of substance abuse and started down a path towards sobriety. Mr. Friedlander became involved in treatment in any way he could—group therapy, psychology courses, and self-study.[82]

This mental health treatment allowed Mr. Friedlander to reconnect with his religious practices, forcing him to reckon with memories of his foster parents and take responsibility for his crimes.[83] His church emphasized the importance of "worthiness and love for family and relationships."[84] He remembered the Whites tried to instill the same values in him.[85] Needless to say, Mr. Friedlander's conceptions of family were complicated, but through reflection, he came to recognize what he'd lost and "can never get [] back."[86] Life in foster care had been tough, but he finally understood the Whites cared for him in the "best way they could."[87]

---

[80] Ex. 21 at 5 (2018 parole hearing report).

[81] Ex. 21 at 5 (2018 parole hearing report).

[82] Ex. 15 at 13-15 (Dr. Kele Kirschenbaum's report).

[83] Ex. 23 at 23 (2020 parole hearing transcript); Ex. 15 at 15 (Dr. Kele Kirschenbaum's report).

[84] Ex. 15 at 15 (Dr. Kele Kirschenbaum's report).

[85] Ex. 23 at 23 (2020 parole hearing transcript).

[86] Ex. 15 at 15 (Dr. Kele Kirschenbaum's report).

[87] Ex. 15 at 8 (Dr. Kele Kirschenbaum's report).

These discoveries gave Mr. Friedlander the strength and motivation to stop abusing substances. He joined Narcotics Anonymous, Alcoholics Anonymous, and other treatment programs in custody.[88] Beyond helping him maintain sobriety, these programs "contribute[d] to his maturity" and helped him connect with fellow inmates who were "goal-oriented and disciplined."[89] When programming wasn't possible, Mr. Friedlander was undeterred—he continued programming through self-study.[90] This programming and treatment allowed Mr. Friedlander to attain and maintain sobriety for years, and he still values the supportive benefits of ongoing treatment.

**N.    February 2017: Mr. Friedlander became eligible for mandatory parole.**

On February 14, 2017, which was 30 years into his sentence, Mr. Friedlander became eligible for mandatory parole.[91] Once eligible, the law required the Commission to release him unless he "has seriously or frequently violated institution rules and regulations," or there's "a reasonable probability" he'll commit another crime.[92]

**O.    March–April 2018: Mr. Friedlander's turnaround continued.**

Mr. Friedlander's multi-year turnaround continued. In March 2018, he enrolled in an alternative-to-violence program through the BOP.[93] While sobriety "extinguished his aggression," the alternatives-to-violence program taught him to better control his emotions through "humility and empathy."[94] His instructor noted his enthusiasm and

---

[88] Ex. 15 at 14 (Dr. Kele Kirschenbaum's report).

[89] Ex. 15 at 14 (Dr. Kele Kirschenbaum's report).

[90] Ex. 15 at 14 (Dr. Kele Kirschenbaum's report).

[91] *See* 18 U.S.C. §4206(d) (noting any prisoner who has served more than 30 years in prison "shall be released on parole"); *see also* 28 C.F.R. §2.53(a) (same).

[92] *See* 18 U.S.C. §4206(d).

[93] Ex. 24 at 1 (BOP Education Report).

[94] Ex. 15 at 12-13 (Dr. Kele Kirschenbaum's report).

19

determination to actively participate and encourage other inmates' participation, despite his shy personality.[95] Shortly after completing the training program, in April 2018, Mr. Friedlander became a program facilitator, helping to share his insights with others.[96]

## P. May 22, 2018: a hearing examiner supported Mr. Friedlander's release, but the Commission overruled it.

His next hearing examiner recognized Mr. Friedlander's change. On May 22, 2018, Mr. Friedlander participated in a statutory interim hearing.[97] During that review, hearing examiner Oscar Vela pored over Mr. Friedlander's case and recommended release, grounding his recommendation in the following factors:

*First,* Mr. Vela said Mr. Friedlander's work supervisors spoke highly about him, noting he "applies his faith in all aspects of his life," "tries hard to better himself," "does whatever is asked of him," "follows the rules of the institution," "is considered a leader," and "does great work."[98]

*Second*, Mr. Vela said Mr. Friedlander's case manager also had positive things to say, noting he is "very respectful," "takes directions very well," "has applied himself regarding programming," and "maintains good behavior."[99]

*Third*, Mr. Vela recognized Mr. Friedlander's 19 disciplinary infractions, but was persuaded by his recent commitment to rehabilitative programming, including the

---

[95] Ex. 25 (Decl. of Brenda Challinor).

[96] Ex. 25 (Decl. of Brenda Challinor).

[97] Ex. 21 at 8 (2018 parole hearing report).

[98] Ex. 21 at 8 (2018 parole hearing report).

[99] Ex. 21 at 7 (2018 parole hearing report).

20

alternatives-to-violence program.[100] Mr. Vela recognized Mr. Friedlander's "past discipline will never change," but what "has changed is his attitude and behavior."[101]

**Fourth**, Mr. Vela pushed back against the notion Mr. Friedlander was a sociopath without remorse. To the contrary, Mr. Vela found Mr. Friedlander's testimony to be "genuine," and his remorse "truthful."[102] It was Mr. Vela's opinion that Mr. Friedlander should be released because "his risk is as low as it may ever be and there is not a reasonable probability that he will commit future crimes."[103]

Two weeks later, June 5, 2018, an "executive reviewer" (Mr. Pachloski) disagreed with Mr. Vela's recommendation, finding Mr. Friedlander's last prison infraction (using alcohol four years before) showed "there is a high probability" he'll recidivate.[104]

A disagreement between two examiners should normally trigger review by a third examiner, as parole determinations must have the "concurrence of two examiners" before proceeding to the Commissioner for final review. *See* 28 C.F.R. §§2.23(b)-(c), 2.24(b). But there's no indication that happened. Instead, on June 11, 2018, the Commission issued a Notice of Action, adopting Mr. Pachloski's findings in full and omitting any reference to Mr. Vela's belief that release was appropriate.[105]

---

[100] Ex. 21 at 9 (2018 parole hearing report).

[101] Ex. 21 at 9 (2018 parole hearing report).

[102] Ex. 21 at 9 (2018 parole hearing report).

[103] Ex. 21 at 9 (2018 parole hearing report).

[104] Ex. 21 at 10 (2018 parole hearing report).

[105] Ex. 2 at 92 (Parole Hearing Brief: 2020 Notice of Action).

21

**Q.      February 13, 2020: Mr. Friedlander received a BOP infraction and disputed it—vigorously.**

On February 13, 2020, BOP staff located a buprenorphine strip among Mr. Friedlander's clothing in his cell.[106] Mr. Friedlander denied the allegation, begging BOP staff to UA him, fingerprint the buprenorphine strip, and review surveillance footage, all of which would show he never knowingly possessed the strip.[107]

BOP staff told him fingerprinting wasn't possible, as the strip was destroyed.[108] And while it's unclear if BOP staff reviewed surveillance footage, they did administer a UA—it was clean.[109]

Despite a clean UA, no witnesses, and no ability to fingerprint the strip, BOP upheld the violation based solely on the strip's discovery in his clothing.[110]

**R.      April 2020: a hearing examiner rejected Mr. Friedlander's latest request for release, leaving him "floating in open water, with no land in sight."**

On April 20, 2020, Mr. Friedlander participated in another statutory interim hearing.[111] There, hearing examiner Scott Kubic asked Mr. Friedlander about the February 2020 infraction. Mr. Friedlander explained to Mr. Kubic that if he really relapsed, he'd own up to it, as he's never shied from accepting responsibility for violating BOP rules in the past.[112] Records confirm as much, as BOP staff note Mr. Friedlander has always been open with BOP staff and "ma[de] no excuses for his

---

[106] Ex. 22 at 6 (2020 parole hearing report).

[107] Ex. 23 at 15-16 (2020 parole hearing transcript).

[108] Ex. 23 at 15 (2020 parole hearing transcript).

[109] Ex. 15 at 12 (Dr. Kele Kirschenbaum's report).

[110] Ex. 23 at 16 (2020 parole hearing transcript).

[111] Ex. 22 (2020 parole hearing report).

[112] Ex. 22 at 8 (2020 parole hearing report).

22

actions," recognizing in prior relapses that he failed to use coping skills from his drug programming.[113]

Mr. Friedlander also told Mr. Kubic that "he would never risk his chance of freedom due to drug use/possessing," saying use was "not in his character."[114]

Based on this disputed infraction, the Commission denied release, holding Mr. Friedlander should "continue to expiration":[115]

<mark>Deny mandatory parole. Continue to Expiration.</mark>

When Mr. Friedlander asked what "continue to expiration" meant, Mr. Kubic explained the hopelessness of his situation using a metaphor: "you're now just kind of floating in open water. You know, I mean, there's no land in sight."[116]

At the time of the hearing, Mr. Friedlander had served 398 months in BOP custody.[117]

**S.    2021: a psychologist reviewed Mr. Friedlander's prior evaluations; she was appalled at their work, finding he presents a "low risk of reoffending."**

In early-2021, the Federal Defenders hired Dr. Kele Kirschenbaum, a clinical program manager and professor at UCLA Geffen School of Medicine, to evaluate Mr. Friedlander. Dr. Kirschenbaum spent days evaluating Mr. Friedlander at FCC Lompoc, as well as days poring over records and the prior reports from the mental health professionals who evaluated Mr. Friedlander back in 1987.

She was appalled at their conclusions. Specifically, Dr. Kirschenbaum noted these professionals spent little time with Mr. Friedlander, didn't review all the relevant

---

[113] Ex. 21 at 6-7 (2018 parole hearing summary).

[114] Ex. 22 at 8 (2020 parole hearing summary).

[115] Ex. 22 at 1 (2020 parole hearing summary).

[116] Ex. 23 at 8-9 (2020 parole hearing transcript).

[117] Ex. 22 at 9 (2020 parole hearing summary).

23

records, and made sweeping findings "based on weak tests results and while overlooking the devastating impact of repeated childhood trauma."[118] She rejected the idea Mr. Friedlander qualifies as an irredeemable sociopath; by her professional assessment, she found Mr. Friedlander to be a "***low risk*** of reoffending."[119]

**T.     January 2022: Mr. Friedlander filed a sentence reduction request, but later withdraw it because he's ineligible for §3582 relief.**

On January 13, 2022, Mr. Friedlander asked a different district judge[120] in the Eastern District of Washington to reduce his sentence based on extraordinary and compelling reasons.[121] Less than two weeks later, the Ninth Circuit shut the door on §3582 relief, holding old-law prisoners like Mr. Friedlander cannot obtain §3582 relief.[122] This meant that, of the 158,058 federal inmates in BOP custody,[123] 183 (the number of old-law prisoners still alive and serving time) cannot seek sentencing reductions.[124]

---

[118] Ex. 15 at 4-6 (Dr. Kele Kirschenbaum's report).

[119] Ex. 15 at 4 (Dr. Kele Kirschenbaum's report) (emphasis in original).

[120] On July 29, 2021, the Clerk's Office reassigned Mr. Friedlander's case to Senior Judge Wm. Fremming Nielsen, as the original sentencing judge (Quackenbush) retired. *See U.S. v. Friedlander*, 2:97-cr-308-WFN-1 (E.D. Wash.), ECF No. 167 (order reassigning case).

[121] *See U.S. v. Friedlander*, 2:97-cr-308-WFN-1 (E.D. Wash.), ECF No. 17 (§3582 motion).

[122] *See U.S. v. King*, 24 F.4th 1226 (9th Cir. 2022).

[123] BOP: Population Statistics, last accessed on July 3, 2023.

[124] Charles D. Weisselberg, *Saving the People Congress Forgot*: *It is Time to Abolish the U.S. Parole Commission and Consider All "Old Law" Federal Prisoners for Release*, Federal Sentencing Reporter, Vol. 35, No. 2 at 107-08 (December 2022). Available at http://bit.ly/3y9y2Iv, last accessed on June 8, 2023.

**U.    June 2022: a hearing examiner declined to review Mr. Friedlander's parole materials and denied release.**

On June 8, 2022, Mr. Friedlander appeared for a parole hearing before examiner Chris Whitmer at USP Lompoc.[125] Before the hearing, Mr. Whitmer acknowledged he didn't review Mr. Friedlander's submitted materials,[126] even though the Commission had them months beforehand.[127]

This meant Mr. Whitmer lacked lots of records, including the following: (1) Dr. Kirschenbaum's 2021 evaluation, including her opinion that Mr. Friedlander presented a low recidivism risk; (2) all of Mr. Friedlander's prior psychological evaluations; (3) comments from Judge Quackenbush about paroling Mr. Friedlander at the "appropriate time"; (4) insights from BOP employees into Mr. Friedlander's programming efforts; (5) details into Mr. Friedlander's release plan, which included placing him in a highly-monitored transitional housing program for a year; (6) evidence showing the surviving victim (Clarence White) forgave Mr. Friedlander; and (7) the latest research into juvenile brains, which reveals how juvenile offenders differ tremendously from adult offenders in terms of maturity, susceptibility, salvageability, and culpability.[128]

---

[125] Ex. 5 at 9 (2022 parole hearing summary).

[126] Ex. 5 at 9 (2022 parole hearing summary).

[127] Ex. 9 at 1-2 (April 1, 2022 e-mail from the Commission confirming receipt of materials).

[128] Ex. 2 (parole hearing brief and exhibits).

25

Mr. Friedlander offered Mr. Whitmer a printed copy of these materials, but he declined, accepting only a list of short-form talking points for defense counsel that wasn't meant for Mr. Whitmer.[129]

These materials didn't matter, as Mr. Whitmer denied parole minutes after the hearing finished. While Mr. Whitmer acknowledged Mr. Friedlander's BOP progress report had "some pretty positive things to say," Mr. Whitmer didn't give Mr. Friedlander's case manager or counselor an opportunity to speak.[130]

Ultimately, Mr. Whitmer rested his denial on the fact Mr. Friedlander failed to "own up" to the February 2020 infraction where a buprenorphine strip showed up in his clothing[131]—the same infraction he disputed and asked BOP staff to investigate.[132]

At that hearing, Mr. Friedlander had served 424 months in custody.[133]

## V.    September 2022: the NAB affirmed the examiner's decision, finding no issue with his failure to review the entire record.

On July 26, 2022, Mr. Friedlander appealed the Commission's decision to the National Appeals Board (NAB), laying out all the issues with the decision, including Mr. Whitmer's failure to review the submitted materials.[134]

On August 18, 2022, the NAB denied Mr. Friedlander's appeal.[135] In a curt, dismissive, 3-page opinion, the NAB found no fault with Mr. Whitmer's failure to review Mr. Friedlander's materials, claiming they these materials (including

---

[129] Ex. 5 at 9 (2022 parole hearing summary).

[130] Ex. 6 at 41 (2022 NAB appeal: Decl. of John B. McEntire, IV).

[131] Ex. 5 at 12 (2022 parole hearing summary).

[132] Ex. 15 at 12 (Dr. Kele Kirschenbaum's report).

[133] Ex. 5 at 8 (2022 parole hearing summary).

[134] Ex. 6 (2022 NAB appeal).

[135] Ex. 4 (2022 NAB Notice of Action).

1  Dr. Kirschenbaum's 2021 risk assessment) "have nothing to do with" whether "there is
2  a reasonable probability" he'll recidivate.[136]

3  And so here we are. As of the date Mr. Friedlander filed this §2241 petition, he's
4  served the following: over 36 years in prison; 18 years past his suggested parole (222
5  months); 25 years past when he became eligible for parole (1998); 6 years past when
6  he became eligible for mandatory parole (February 2017); and 24 years past what
7  would have been his Sentencing Guidelines range (121–151 months)—and there's no
8  end in sight.

### IV.   DISCUSSION

### A.   How courts approach reviewing the Commission's decision-making.

11  A court's ability "to review the Commission's decisions is limited"[137] to two
12  situations:

13  *First*, courts consider whether the Commission "acted outside" its regulations—
14  or failed to follow them altogether. *Wallace v. Christensen*, 802 F.2d 1539, 1551 (9th
15  Cir. 1986) ("A court may consider whether the Commission has acted outside [its]
16  statutory limits."); *see also Garcia v. Neagle*, 660 F.2d 983, 988 (4th Cir. 1981) ("In
17  general, even where action is committed to absolute agency discretion by law, courts
18  have assumed the power to review allegations that an agency exceeded its legal
19  authority" or "failed to follow its own regulations."). The Commission acts outside its
20  limits when it fails to consider "factors which by statute it is required to consider in
21  rendering its parole decision." *Wallace*, 802 F.2d at 1551. Because a "claim the
22  Commission has acted outside its statutory limits typically involves an issue of
23  statutory construction," courts apply "de novo" review. *Id.*

24  *Second*, courts consider whether "the Commission violated the Constitution." *Id.*
25  *at 1552.* And when it comes to evaluating constitutional questions, courts also apply de

---

27  [136] Ex. 4 at 1 (2022 NAB Notice of Action).

28  [137] *Benny v. U.S. Parole Com'n*, 295 F.3d 977, 981 (9th Cir. 2002).

27

novo review. *See*, *e.g.*, *U.S. v. Torres*, 995 F.3d 695, 701 (9th Cir. 2021) (Courts "review de novo whether a defendant's due process rights were violated.").

**B.    Venue belongs in the Central District of California.**

Prisoners generally bring §2241 petitions in the "district of confinement"—here, that's the Central District of California, as the BOP currently confines Mr. Friedlander at FCI Victorville Medium II.[138] *Rumsfeld v. Padilla*, 542 U.S. 426, 443 (2004) (noting the habeas statute's "plain language" confirms "jurisdiction lies in only one district: the district of confinement").

**C.    The Commission failed to follow its enabling statute, as well as its own rules.**

The Commission showed little regard for its enabling statute and regulations in four ways:

(1)    it declined to review Mr. Friedlander's parole materials, violating both its statutory directive, as well as its own regulations;

(2)    it failed to consider positive things BOP staff had to say about Mr. Friedlander, violating both its statutory directive, as well as its own regulations;

(3)    it failed to hold parole hearings within 24 months of each other, violating its statutory directive; and

(4)    it failed to provide Mr. Friedlander with the materials it relied on at the parole hearing, violating its statutory directive.

Each issue will be addressed in turn.

**1.    It declined to review Mr. Friedlander's parole materials.**

Mr. Friedlander provided the Commission with detailed materials for the June 2022 parole hearing, and the hearing examiner declined to review them.

---

[138] Inmate Locator (bop.gov), last accessed on July 3, 2023.

These materials were available to hearing examiner Chris Whitmer before the parole hearing. Mr. Friedlander (through counsel) provided the materials to the Commission on March 28, 2022—as requested.[139] Indeed, Commission staff-member Garth Ambersley sent an April 1, 2022 e-mail to Mr. Friedlander's attorney acknowledging he "received all the documents" for the June 2022 parole hearing.[140]

These materials were available to Mr. Whitmer at the parole hearing. Shortly before the parole hearing began, Mr. Friedlander's counsel asked Mr. Whitmer if he reviewed the materials. Mr. Whitmer advised counsel (and later confirmed in writing) that he "had no information related to [Mr. Friedlander's] submission."[141] Knowing these materials were central to Mr. Friedlander's request for parole, counsel asked Mr. Whitmer if he'd like to review the materials before proceeding with the hearing, as counsel "brought an extra copy."[142] Mr. Whitmer declined,[143] choosing instead to review a short-form list of talking points defense counsel brought before denying parole.[144]

---

[139] Ex. 6 at 30 (2022 NAB appeal: Decl. of John B. McEntire, IV) (noting the Parole Commission sent an e-mail to Mr. Friedlander's attorney, asking for all materials to be submitted "no later than early in the week of March 28, 2022").

[140] Ex. 9 at 1 (April 1, 2022 e-mail from Mr. Ambersley to Mr. Friedlander's counsel).

[141] Ex. 5 at 9 (2022 parole hearing summary).

[142] Ex. 6 at 31 (2022 NAB appeal: Decl. of John B. McEntire, IV).

[143] Ex. 6 at 31 (2022 NAB appeal: Decl. of John B. McEntire, IV).

[144] Ex. 5 at 9 (2022 parole hearing summary) ("I asked Mr. McIntyre [sic] if he could summarize what he submitted. He also gave me an abbreviated outline of the submission. [] [W]hile deliberating, this Examiner read the entire 3-page submission summary provided by Mr. McIntyre.").

29

A 3-page, short-form list of talking points is not the same as 145 pages of detailed materials.[145] This is especially true when those talking points were never drafted with the hearing examiner in mind; they were drafted as abbreviated reminders for defense counsel to reference at the hearing. Worse, these materials addressed the *exact* issues before the Commission. At the June 2022 parole hearing, the law required the Commission to release Mr. Friedlander unless it determined he "seriously or frequently violated institution rules and regulations," or there was "a reasonable probability" he'd recidivate. *See* 18 U.S.C. §4206(d). Here's a chart capturing what materials Mr. Friedlander submitted, as well as how these materials informed the Commission's statutory inquiry under §4206(d):

| Materials | Relevance |
|---|---|
| Dr. Kele Kirschenbaum's 2021 evaluation | - Notes Mr. Friedlander is "amenable to treatment," which speaks to any reasonable probability he'll recidivate. <br> - Notes Mr. Friedlander is a "***low risk*** of reoffending," which speaks to any reasonable probability he'll recidivate. <br> - Notes Mr. Friedlander's "adolescent impulsivity and difficulty with emotional control has changed," which speaks to any reasonable probability he'll recidivate. <br> - Disagrees with 1980s opinion that Mr. Friedlander suffers from anti-social personality disorder, which speaks to any reasonable probability he'll recidivate. <br> - Documents Mr. Friedlander's extensive childhood trauma, which helps explain his decision-making |

---

[145] Ex. 2 (parole hearing brief and exhibits).

| Materials | Relevance |
|---|---|
| | during the crime (i.e., he was a confused and traumatized teen, not a sociopathic danger), which speaks to any reasonable probability he'll recidivate. |
| | - Disagrees with 1980s opinion that Mr. Friedlander suffers from a conduct disorder, which speaks to any reasonable probability he'll recidivate. |
| | - Disagrees with 1980s opinion that Mr. Friedlander cannot be rehabilitated which speaks to any reasonable probability he'll recidivate. |
| | - This report is also information the Commission is statutorily required to consider.[146] |
| Briefing on February 2020 BOP infraction | - Noted Mr. Friedlander disputes his February 2020 infraction for several reasons: <br> o He stopped using controlled substances after receiving mental health help. <br> o He asked the BOP to fingerprint the suboxone strip (they didn't). <br> o He asked the BOP to review security footage to confirm he didn't possess the suboxone strip. <br> o He'd no longer risk release over substance use. <br> o The BOP tested him for unlawful drug use—he was clean. |

---

[146] *See* 18 U.S.C. §4207 (noting the Commission "shall consider" any "reports of physical, mental, or psychiatric examination of the offender").

31

| Materials | Relevance |
|---|---|
| | o His BOP counselor confirmed Mr. Friedlander "stays away from the troublemakers at USP Lompoc."[147]<br><br>o During his decades in BOP custody, he *always* owned up to infractions and accepted responsibility.<br><br>- All of this speaks to whether he seriously or frequently violated institution rules. |
| Briefing on how society's understanding of the adolescent brain has evolved since the 1980s | - Provided research showing childhood trauma shapes a person's ability to regulate emotion and behavior, but it's correctable, which speaks to any reasonable probability he'll recidivate.<br><br>- Provided research showing juveniles are vulnerable to peer pressure, which explains his offense behavior and speaks to any reasonable probability he'll recidivate.<br><br>- Provided research showing juveniles' transitory personalities means heinous acts committed at a young age don't equate to an irretrievably depraved character, which speaks to any reasonable probability he'll recidivate.<br><br>- Provided research showing juveniles' crimes are less of a product of their choices and more a product of their environment, which speaks to any reasonable probability he'll recidivate. |

---

[147] Ex. 6 at 31 (NAB appeal: Decl. of John B. McEntire, IV).

32

| Materials | Relevance |
|---|---|
| Program materials on the Adult & Teen Challenge Program | - Provided a detailed release plan, where Mr. Friedlander will be supervised 24 hours per day, receive substance abuse treatment, job training, and spiritual guidance, all of which speak to any reasonable probability he'll recidivate. |
| Declaration of Carolyn Lozier (Mr. Friedlander's sister) | - Provided a detailed account of the abuse Mr. Friedlander endured growing up, which provides context to his actions and speaks to any reasonable probability he'll recidivate.<br>- Confirmed Mr. Friedlander committed his crime under mistaken facts (thinking his sister was hurt or killed by Clarence and Gloria White), which speaks to any reasonable probability he'll recidivate.<br>- Confirmed Clarence White forgave Mr. Friedlander, which speaks to recidivism as well. |
| Mr. Friedlander's PATTERN score, which he poses a "low risk" of recidivism[148] | - The BOP's own scientifically-validated recidivism instrument supports Dr. Kirschenbaum's opinion: Mr. Friedlander presents a *low* recidivism risk, which speaks to any reasonable probability he'll recidivate. |
| Transcripts from court proceedings | - Confirm Judge Quackenbush (the sentencing judge) wanted Mr. Friedlander to be paroled, which not only touches on any reasonable probability he'll recidivate, |

---

[148] Ex. 26 (BOP Pattern Score).

33

| Materials | Relevance |
|---|---|
| | but also is information the Commission is statutorily required to consider. |

Besides these materials' logical relevance, the Commission's enabling statute requires it to consider psychological evaluations. *See* 18 U.S.C. §4207(5) (when making a parole decision, the Commission "shall consider" any "reports of physical, mental, or psychiatric examination of the offender"). It also requires the Commission to consider Judge Quackenbush's sentencing position. *See* 18 U.S.C. §4207(4) (when making a parole decision, the Commission "shall consider" any "recommendations regarding parole made at the time of sentencing by the sentencing judge").

So do the Commission's own regulations. Indeed, the Commission's rules require it to consider "additional relevant information concerning the prisoner," including "information submitted by the prisoner." 28 C.F.R. §2.19(b)(1). Ironically, the Commission "encourages the submission of relevant information concerning an eligible prisoner by interested persons." *Id.*

By declining to review Mr. Friedlander's materials before denying parole, the Commission violated its statutory directive (§4207), as well as its own rules (28 C.F.R. § 2.19). When Mr. Friedlander raised these violations with the NAB, the NAB improperly failed to address or engage with the problem, in at least two ways:

**First**, the NAB said "the Commission is presumed to have considered the entirety" of Mr. Friedlander's materials.[149] Although the NAB cited no authority for this proposition, Mr. Friedlander presumes it is sourced from dated authority saying the same. *See, e.g., Nunez-Guardado v. Hadden*, 722 F.2d 618, 621 (10th Cir. 1983) ("We cannot presume that the Commission ignored the information favorable to Nunez-

---

[149] Ex. 4 at 1 (2022 NAB Notice of Action).

34

Guardado."). It's odd for the NAB to invoke this presumption, especially since Mr. Whitmer admitted—both at the hearing and in his written report—that he didn't review Mr. Friedlander's materials before denying parole.[150]

**Second**, the NAB dismissed Mr. Friedlander's concerns, claiming "[t]he majority" of Mr. Friedlander's materials "have ***nothing to do***" with the questions before the Commission—namely, whether Mr. Friedlander either "seriously or frequently violated institution rules," or whether there's a "reasonable probability" he'll commit another crime.[151] The NAB also claimed it "fail[ed] to see" how Mr. Friedlander's unreviewed materials carry relevance, "with the exception" that he's "actually innocent" of his February 2020 BOP infraction.[152] So, in short, the NAB insisted the only relevant information Mr. Friedlander submitted related to whether he violated BOP rules in February 2020—that's it.

Not so. As captured in the chart above, Mr. Friedlander's materials—including two separate opinions stating he's unlikely to recidivate[153]—addressed the exact issues before the Commission. It's unclear why the NAB insists materials about recidivism and infraction history have nothing to do with recidivism and infraction history.

---

[150] Ex. 5 at 9 (2022 parole hearing summary).

[151] Ex. 5 at 4 (2022 NAB Notice of Action) (emphasis added); 18 U.S.C. §4206(d) (laying out the two central questions the Commission considers when deciding whether to release Mr. Friedlander).

[152] Ex. 4 at 2 (2022 NAB Notice of Action).

[153] The first opinion was from Dr. Kele Kirschenbaum; the second opinion was from BOP's PATTERN tool, a scientifically-validated instrument for measuring recidivism risk. Both opine Mr. Friedlander presents a low recidivism risk, which clears §4206(d)'s bar (asking whether there's a *reasonable probability* Mr. Friedlander will reoffend).

### 2.    It failed to inquire about positive things BOP staff had to say.

The Commission failed to ask Counselor Jorge Garcia and Case Manager Hildebrand about their views on Mr. Friedlander. The Commission's enabling statute requires it to consider BOP staff recommendations if they are "available." 18 U.S.C. §4207(1) (noting that, when making a release determination, the Commission "shall consider" any "reports and recommendations which the staff of the facility in which such prisoner is confined may make" if they are "available"). The Commission's rules require the same. *See* 28 C.F.R. §2.19(a)(1) (same).

Both men—Counselor Garcia and Case Manager Hildebrand—made themselves available for the hearing. Indeed, they were in the lunchroom.[154] And both men had positive things to say about Mr. Friedlander—especially Counselor Garcia, who would have stated "he doesn't have any issues with Mr. Friedlander," noting "he stays away from the troublemakers at USP Lompoc."[155] Despite being available, Mr. Whitmer never asked them any questions before denying parole.[156]

Mr. Friedlander raised this issue with the NAB,[157] but it didn't respond.

### 3.    It failed to hold parole hearings within 24-months of each other.

The Commission repeatedly failed to provide Mr. Friedlander with hearings every 24 months, as required by both statute and its own regulations. *See* 18 U.S.C. §4208(h) (noting the Parole Commission "***shall***" hold statutory interim hearings "***not less frequently than***" every 24 months to prisoners serving maximum sentences of seven or more years) (emphasis added); 28 C.F.R. §2.14(a)(1)(ii) (same). To meet these requirements, the Commission's Manual states hearings will occur one month

---

[154] Ex. 6 at 31 (NAB appeal: Decl. of John B. McEntire, IV).

[155] Ex. 6 at 31 (NAB appeal: Decl. of John B. McEntire, IV).

[156] Ex. 6 at 31 (NAB appeal: Decl. of John B. McEntire, IV).

[157] Ex. 6 at 12 (NAB appeal).

36

earlier "when the examiner(s) does not visit the institution during the specified month…."[158]

For Mr. Friedlander, the Commission violated this requirement multiple times over the years:

| Previous Hearing | Next Hearing | Interim Time |
|---|---|---|
| May 6, 2008 | June 23, 2010 | 25 months, 17 days |
| January 31, 2012 | June 11, 2014 | 28 months, 11 days |
| May 20, 2020 | June 8, 2022 | 24 months, 19 days |

Mr. Friedlander raised this issue with the NAB,[159] but it didn't respond.

### 4. It failed to provide Mr. Friedlander with the materials it relied on at the hearing.

The Commission denied Mr. Friedlander the right to inspect the materials it would rely on at the June 2022 hearing. The Commission's 2022 Hearing Summary references two letters from victims/concerned parties, as well as a May 9, 2022 "telephone slip" about a call with one of those parties.[160] These materials were never provided to Mr. Friedlander—either in response to counsel's correspondence with the Commission in the months leading up to the June 2022 hearing, or in FOIA requests made before the hearing.

---

[158] Parole Comm'n Rules & Proc. Manual at 2.14-01(a) (June 30, 2010), https://www.justice.gov/d9/uspc/legacy/2010/08/27/uspc-manual111507.pdf, last accessed on July 3, 2023.

[159] Ex. 6 at 21-22 (NAB appeal).

[160] Ex. 5 at 4 (2022 parole hearing summary).

37

By failing to provide these materials, the Commission violated its enabling statute. *See* 18 U.S.C. §4208(b) (noting that, at least 30 days before a hearing, the Commission "shall" provide a prisoner with "reasonable access to a report or other document to be used by the Commission in making its determination").

This isn't the first time the Commission violated this statute. At Mr. Friedlander's 2020 hearing, he also requested access to his file, but the hearing examiner noted "[i]t is unclear if he has been granted an opportunity to review his institutional file."[161]

\* \* \* \*

When the Commission fails to play by its own rules, courts grant habeas relief:

| Case | Outcome |
|------|---------|
| *Benites v. U.S. Parole Com'n*, 595 F.2d 518 (9th Cir. 1979) | Affirming district court's §2241 habeas grant when the Commission applied the wrong criteria in determining youth offender's parole eligibility. |
| *Furnari v. U.S. Parole Com'n*, 218 F.3d 250, 252 (3d Cir. 2000) | Directing district court to grant §2241 habeas relief when the Commission failed "to follow its regulation requiring a statement of reasons for denying parole." |
| *McCallum v. Reilley*, 2007 WL 2455662 (N.D. W. Va Aug. 24, 2007) | Granting §2241 habeas relief when "the conclusion is inescapable that the Commission violated applicable regulations" during a hearing. |
| *Silderberg v. U.S. Parole Com'n*, 483 F. Supp. 1280 (M.D. Pa. 1980) | Granting §2241 habeas relief when the "Parole Commission improperly utilized |

---

[161] Ex. 22 at 5 (2020 parole hearing summary).

| | its guidelines at 28 C.F.R. §2.20 in determining Silberberg's parole date." |
|---|---|
| *Benedict v. Rodgers*, 748 F.2d 543 (10th Cir. 1984) | Affirming district court's habeas grants when the Commission applied the wrong criteria in determining youth offenders' parole eligibility. |
| *Lee v. Rios*, 360 Fed. Appx. 625 (6th Cir. 2010) | Granting §2241 habeas relief when the Commission failed to follow its own regulations in denying parole. |

**D.  The Commission violated Mr. Friedlander's Fifth Amendment due process rights by denying him an opportunity to be meaningfully heard.**

The Commission denied Mr. Friedlander an opportunity to be meaningfully heard in two ways: (1) it didn't review his parole materials; and (2) his appeal was heard by the same commissioners who rejected his release. These acts rise to the level of a constitutional violation in the following way:

Due process, "unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Matthews v. Eldridge*, 424 U.S. 319, 334 (1976) (cleaned up). Rather, it's a "flexible" concept, calling for "such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). While procedural protections vary, "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Matthews*, 424 U.S. at 333. In determining whether due process was denied, courts consider three factors:

(1)  "the private interest that will be affected by the official action";

39

(2) "the risk of an erroneous deprivation of such interest through the procedure used, and the probable value, if any, of additional or substitute procedural safeguards"; and

(3) "the Government's interest in keeping the existing procedure."

*U.S. v. Harrington*, 749 F.3d 825, 828 (9th Cir. 2014).

Mr. Friedlander meets each factor.

### 1. Mr. Friedlander holds a constitutionally-protected liberty interest in parole.

Mr. Friedlander meets the first factor, as he holds a constitutionally-protected interest in parole. After a prisoner serves over 30 years in prison, as Mr. Friedlander has, he becomes eligible for "mandatory parole."[162] With this designation, courts hold the Commission to a "higher level of procedural protection,"[163] as "the presence of mandatory release language [in §4206] creates a constitutionally protectible liberty interest in parole." *Kindred v. Spears*, 894 F.2d 1477, 1481-82 (5th Cir. 1990); *see also Solomon v. Elsea*, 676 F.2d 282, 285 (7th Cir. 1982) (concluding the Commission's enabling statute "does create a constitutional liberty interest"); *Evans v. Dillahunty*, 662 F.2d 522, 526 (8th Cir. 1981) ("When one considers the specific limitation on the Commission's exercise of discretion and the presence of the mandatory word 'shall,' the conclusion that the federal parole statute creates a substantial expectation of parole follows."); *Harrington*, 749 F.3d at 828 (noting "the restraint on physical freedom experienced during incarceration is the quintessential deprivation of a person's liberty").

---

[162] *See* 18 U.S.C. §4206(d) (noting any prisoner who has served more than 30 years in prison "shall be released on parole"); *see also* 28 C.F.R. §2.53(a) (same).

[163] *Gambino v. Morris*, 134 F.3d 156, 170 n.16 (3d Cir. 1998) (Roth, C.J., concurring) ("While the amount of process owed a parolee by the Constitution is not clear, the Parole Commission's statutes and regulations bind it to a higher level of procedural protections.").

### 2. When the Commission failed to follow its own rules, it erroneously deprived Mr. Friedlander of his liberty interest.

Mr. Friedlander satisfies the second factor, as the Commission erroneously denied his liberty interest when it failed to follow its own rules and regulations. The deprivation played out—legally speaking—as follows:

The Commission is a federal agency. *See Gambino v. Morris*, 134 F.3d 156, 170 n.16 (3d Cir. 1998) (noting the Commission is a federal agency) (Roth, C.J., concurring) (citing *Marshall v. Lansing*, 839 F.2d 933, 941 (3d Cir. 1988)). As a federal agency, the Commission must "abide by the regulations it promulgates." *Sameena, Inc. v. U.S. Air Force*, 147 F.3d 1148, 1153 (9th Cir. 1998). This requirement makes sense, as an "agency's failure to follow its own regulations tends to cause unjust discrimination," especially when the "prescribed procedure is intended to protect the interests of the party before the agency" in question. *Id.* And as mentioned, Mr. Friedlander possessed a weighty liberty interest in a proper process given his mandatory-parole status.

But beyond his status as a mandatory parolee, a deeper due process protection exists: courts recognize "[a] meaningful hearing requires a neutral and detached hearing body"—"one that is openminded" and considers a prisoner's basis for parole. *Drayton v. McCall*, 584 F.2d 1208, 1219 (2d Cir. 1978). A hearing body fails to be openminded when it declines to review a prisoner's parole materials before denying release; and a hearing body fails to be neutral-and-detached when it (the NAB) is no longer separate from the first-level decision-maker. Indeed, as Professor Charles Weisselberg recently explained, the Commission is no longer "structured to operate independently or fairly, as the 1976 Parole Act requires.[164] In 1996, Congress reduces

---

[164] Charles D. Weisselberg, *Saving the People Congress Forgot*: *It is Time to Abolish the U.S. Parole Commission and Consider All "Old Law" Federal Prisoners*

41

the number of authorized Commissioners to five, and now the agency has two. *Id.* Since the NAB "is comprised of these same two Commissioners," the separation between the NAB and the first-level decision-maker is gone.

Together, these two lapses in procedural protections deprived Mr. Friedlander of a meaningful hearing.

### 3.    The Government has no interest in keeping the existing procedure.

Mr. Friedlander satisfies the third factor because the Government has no interest in preserving a procedure that ignores procedure—that is, the Commission disregarding both its enabling statute and own regulation.

There's also little interest in protecting the Commission generally, as the agency is taking its last legal breaths. While Congress originally planned to sunset the Commission in 1992, it continues to temporarily reauthorize the Commission, with the latest extension granted until October 31, 2023. *Id.* at 107. Suffice to say the Government has little interest in defending the procedures of an agency that Congress said contributes to the very "sentencing discrepancies" the Sentencing Reform Act was designed to address. *See*, *e.g.*, *U.S. v. Wright*, 924 F.2d 545, 548-49 (4th Cir. 1991).

### E.    The Commission violated Mr. Friedlander's Eighth Amendment rights by converting his sentence into life-without-parole.

Over many years, the Commission converted Mr. Friedlander's sentence from life-*with*-parole to life-*without*-parole, violating the Eighth Amendment.

Years ago, the Supreme Court held the Eighth Amendment "forbids a sentencing scheme that mandates life in prison without the possibility of parole for juvenile offenders." *Miller v. Alabama*, 567 U.S. 460, 479 (2012). It's understandable why: the Supreme Court recognized children are "constitutionally different" than adults given their "lack of maturity," "underdeveloped sense of responsibility," and vulnerability to

_____

*for Release*, Federal Sentencing Reporter, Vol. 35, No. 2 at 108 (December 2022). Available at http://bit.ly/3y9y2Iv.

42

"negative influences and outside pressures" in tense situations. *Id.* at 471. This conclusion was grounded "not only on common sense," but also "on science and social science as well." *Id.*

Mr. Friedlander's original sentence was constitutional (even after *Miller*), as he received life-*with*-parole. But at some point during the last 36+ years, the Commission effectively converted his sentence into life-*without*-parole, as it took the position Mr. Friedlander's prison infraction history requires this outcome. Indeed, at the 2020 parole hearing, examiner Scott Kubic explained as much to Mr. Friedlander in the following exchange:[165]

> Mr. Friedlander:  Yeah. I had another question. So every hearing all my shots for the last 33 years are going to be held against me?
>
> Mr. Kubic:  [] So technically speaking, to answer your question, yes. I mean, the Commission can hold those DHO-level infractions over your head and hold you responsible for them at every two-thirds parole hearing, statutory hearing—Statutory Interim Hearing that you have from this point forward.

Mr. Kubic also made clear that Mr. Friedlander's infractions will never age-out:[166]

> Mr. Kubic:  There's no statute of limitations that's provided by statute. And what I mean by that is there's no time limit that's set to say, you know, well, you can only consider something to be

---

[165] Ex. 23 at 8 (2020 parole hearing transcript).

[166] Ex. 23 at 8 (2020 parole hearing transcript).

43

> a serious or frequent violation for so many years before you
> can no longer consider it.

To be fair, Mr. Kubic indicated the Commission could "reverse course at some point in the future," but nothing requires it to do so.[167]

For all intents and purposes, the Commission converted the sentencing judge's wish for Mr. Friedlander to be paroled into a life sentence. After all, as Mr. Kubic explained to Mr. Friedlander, "just kind of floating in open water" with "no land in sight."[168]

## F. For relief, Mr. Friedlander asks for his unconditional release.

Federal courts possess "broad discretion" in fashioning habeas relief. *Hilton v. Braunskill*, 481 U.S. 770, 775 (1987). In the parole context, unconditional release is appropriate when administrative remand would be "futile." *Mickens-Thomas v. Vaughn*, 355 F.3d 294, 310 (3d Cir. 2004). Remand is futile if the agency demonstrates bad faith, willful noncompliance, retaliation, or vindictiveness. *See id.*; *see also Thompson v. Armontrout*, 647 F. Supp. 1093, 1098 (W.D. Mo. 1986), *aff'd*, 808 F.2d 28 (8th Cir. 1996) (ordering release after finding the state parole board refused to "make a reasoned parole decision").

Here, remand is futile. The Commission didn't violate Mr. Friedlander's due process on a technicality; it violated his due process at a basic level: the hearing examiner wasn't interested reviewing Mr. Friedlander's records before making up his mind. That's a complete dereliction of duty. It's also a dangerous dereliction of duty, as Mr. Friedlander has been imprisoned 18 years **beyond** what the Commission's own guidelines call for (222 months)—a number that accounts for all of Mr. Friedlander's BOP infractions.

---

[167] Ex. 23 at 8 (2020 parole hearing transcript).

[168] Ex. 23 at 8-9 (2020 parole hearing transcript).

44

Worse, the Commission's internal watchdog (the NAB) doesn't care either. It didn't reject Mr. Friedlander's appeal in a reasoned, well-cited, neutral approach that weighed his arguments; instead, it got defensive. In its decision, the NAB rejected Mr. Friedlander's argument (the examiner didn't review his materials) based on a legal presumption: examiners read everything before deciding parole.[169] Only Mr. Friedlander rebutted that presumption, as the examiner admitted he didn't read everything before deciding parole. Since that admission was documented in the Parole Commission's own materials, Mr. Friedlander is left with an inescapable conclusion: like the hearing examiner, the NAB also didn't review all the materials before ruling. Why else would the NAB invoke a presumption that doesn't apply? And why else would the NAB claim Mr. Friedlander's materials have almost "nothing to do" with recidivism and infraction history when that's exactly what all of Mr. Friedlander's materials discuss. Like the examiner, the NAB also didn't read Mr. Friedlander's materials.

If the Court sent Mr. Friedlander's case back to the Commission, the outcome is obvious: it would deny parole. It's easy to see why: the Commission now has a vested outcome in Mr. Friedlander's hearing. If the Commission paroled Mr. Friedlander, it would be admitting that its dereliction of duty (the failure to review his materials) was the reason he spent an extra year in prison—and counting. There could be administrative or professional consequences for those involved in this dereliction of duty. Simply, the Commission's staff now has skin in the game.

Since the Commission's staff has skin in the game, they are *personally* incentivized to say "Mr. Friedlander's materials wouldn't have changed a thing," lest they face consequences. That's the very definition of futility. It's also the very definition of bias, which is the last thing the Commission should be.

---

[169] Ex. 4 at 1 (2022 NAB Notice of Action) ("the Commission is presumed to have considered the entirety" of Mr. Friedlander's materials).

Because Mr. Friedlander cannot receive a fair hearing before the Commission, he asks this Court for his unconditional release.

### V.    CONCLUSION

For the reasons set forth above, Mr. Friedlander respectfully asks the Court to release him from custody, bringing this unfolding tragedy to an end.

Respectfully Submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: August 10, 2023          By   /s/ *Margaret A. Farrand*
MARGARET A. FARRAND
Deputy Federal Public Defender

JOHN B. McENTIRE, IV
Senior Litigator
FEDERAL DEFENDERS OF EASTERN
WASHINGTON AND IDAHO