# Appendix

# Saving the People Congress Forgot: It Is Time to Abolish the U.S. Parole Commission and Consider All "Old Law" Federal Prisoners for Release



CHARLES D.
WEISSELBERG
LINDA EVANS*

## I. Introduction

Lost among more than 150,000 federal prisoners is a small cohort of people who have served many decades in custody. They are some of the oldest and sickest individuals in the federal system, and the least likely to reoffend. Yet, even in COVID times, they are not able to ask a court for compassionate release. Instead, for most, any chance at freedom is controlled by the U.S. Parole Commission ("Commission"), now a shriveled and ineffective Agency. These are the people sentenced under the "old law"—that is, for offenses committed prior to November 1, 1987, when the Federal Sentencing Guidelines (the "new law") went into effect. There are several hundred old law individuals in custody, though the Commission has been unable to say with certainty just how many are under its jurisdiction and who they are.

This Article traces the history and plight of people sentenced under the old law, as well as the dysfunction of the Commission. In legislation passed in 1984 and 1996, Congress tried to abolish the Commission, but these efforts ultimately failed. In the decades that followed, the Commission's role and structure have been reduced, and it is no longer able to act independently, as the law requires. It is now time to end the Parole Commission once and for all, and transfer its remaining parole function to U.S. magistrate judges, applying standards more suited to this elderly population. We advocate other reforms as well, like amending the First Step Act of 2018[1] to make all old law people eligible for compassionate release, under the same procedures that apply to new law federal defendants, and giving them priority consideration for executive clemency.

Congress has forgotten the old law prisoners. For thirty years, it has reflexively extended the Parole Commission rather than seek a better alternative. We cannot allow people to languish and die in prison because they have fallen through the cracks of a flawed system. There is a better way forward.

## II. The 1976 Parole Act and the Process of Federal Parole

In contrast to probation, which is imposed in place of incarceration, parole is given after a term of incarceration. Parole means releasing an individual from custody after they have served a minimum term or a portion of their sentence.[2] It has a long history in the United States. By 1942, all states provided for parole.[3] In the federal system, parole was first established in 1910, and was administered by the former U.S. Board of Parole.[4] By the 1970s, however, federal parole was acknowledged to be ad hoc and arbitrary[5] and in 1976 Congress passed the Parole Commission and Reorganization Act (Parole Act).[6] The aim was to "provide[] an infusion of due process into Federal parole procedures" and address "the single most inequitable, potentially capricious, and uniquely arbitrary corner of the criminal justice map."[7]

The 1976 Parole Act made sweeping changes. It formalized a set of guidelines to govern the exercise of parole discretion and provided a highly structured decision-making process.[8] The new law created the U.S. Parole Commission as "an independent agency in the Department of Justice."[9] The new Agency had five Commissioners, each nominated by the President and confirmed by the Senate.[10] The country was divided into five geographic regions. Parole examiners conducted in-person hearings at prisons within the regions. Five members of the Agency served as "Regional Commissioners," reviewing recommendations by hearing examiners and making the initial parole decisions in cases within their respective regions.[11] Three Commissioners sat on the "National Appeals Board," which heard administrative appeals. One Commissioner was chair.[12]

There were (and still are) two paths to release under the 1976 Parole Act: "discretionary" and "mandatory" parole. One may think of these as parole decisions made at different stages of a sentence, applying different substantive standards. Most people sentenced under the old law are eligible for release on discretionary parole after serving one-third of a sentence, or after serving ten years of a life sentence or any sentence over thirty years.[13] Under § 4206(a) of the Parole Act, the Commission can release that person under the discretionary parole guidelines if they have substantially observed institutional rules, and if their release would not depreciate the seriousness of the offense, promote disrespect for the law, or jeopardize public welfare.[14] The Commission's discretionary parole guidelines take the form of a matrix, with characteristics of the person on one axis and offense behavior on the other.[15] If a person is not released, their case is reviewed every two years in an "interim" hearing to see if anything has changed.[16]

*Federal Sentencing Reporter*, Vol. 35, No. 2, pp. 106–116, ISSN 1053-9867, electronic ISSN 1533-8363.
© 2023 Vera Institute of Justice. All rights reserved. Please direct requests for permission to photocopy or reproduce article content through the University of California Press's Reprints and Permissions web page, https://www.ucpress.edu/journals/reprints-permissions. DOI: https://doi.org/10.1525/fsr.2022.35.2.106.

App. 2

Downloaded from http://online.ucpress.edu/fsr/article-pdf/35/2/106/768393/fsr.2022.35.2.106.pdf by University of California Berkeley user on 08 February 2023

Downloaded from http://online.ucpress.edu/fsr/article-pdf/35/2/106/769393/fsr.2022.35.2.106.pdf by University of California Berkeley user on 08 February 2023

After a person serves two-thirds of a sentence—or thirty years of a life term or any sentence over forty-five years—the statutory criteria shift. An individual is considered for release on "mandatory" parole under a different section of the Parole Act, § 4206(d). It has long been called mandatory parole because the statute creates a presumption of release: the person *shall* be released *unless* the Commission "determines that he has seriously or frequently violated institution rules and regulations or that there is a reasonable probability that he will commit any Federal, State, or local crime."[17] The mandatory parole section was intended to "provide[] more liberal criteria for release on parole for prisoners with long sentences."[18]

Mandatory parole is most relevant to people sentenced to parolable life sentences or to very lengthy fixed-term sentences, such as fifty years or more. Under the old law, anyone serving a fixed term earns "good time" credit for following institutional rules and completing their work assignments. Consequently, many people simply completed their fixed-term sentences as shortened by good time.[19] By contrast, old law people serving "life" do not earn good time credit because "life" is not considered a fixed-term sentence. Their only path to release is through the Parole Commission or executive clemency.

An additional group of people is serving old law sentences without the possibility of parole, including but not limited to individuals sentenced to life under the Continuing Criminal Enterprise statute.[20] Because they are not legally eligible for parole, these people are not under the jurisdiction of the Commission. There is currently no avenue for their release other than executive clemency;[21] later in the Article, we will suggest reforms relating to this population, too.

Virtually all of the old law people were already in federal custody when the Sentencing Reform Act of 1984 (SRA) was implemented. The SRA established the Federal Sentencing Guidelines and replaced indeterminate parolable sentences with determinate non-parolable sentences.[22] The SRA went into effect on November 1, 1987, for offenses committed on or after that date. It preserved the parole provisions and the Commission for five years—until November 1992—when the Agency was supposed to sunset.[23] Congress ordered the Commission to establish release dates for everyone under its jurisdiction before the Agency was to go out of business.[24]

### III. The Parole Commission Today: An Obsolete, Incompetent, and Compromised Agency, Responsible for an Elderly and Vulnerable Custodial Population

#### A. The Commission is obsolete

The Parole Commission did not terminate in 1992 as Congress originally planned, and release dates were not set for everyone under the Commission's jurisdiction. At the end of 1987, when the new law took effect, over 39,000 old law individuals were serving sentences of more than one year.[25] Because of the size of this population and the lack of

release dates, Congress did not abolish the Commission but instead began a pattern of reauthorizing the Agency for periods of two to five years.[26] Of course, the population of old law prisoners declined as people were released or died. At the end of FY1997, ten years after the Federal Sentencing Guidelines went into effect, about 6,000 old law people remained in federal custody.[27]

As the number of old law individuals dwindled, Congress again got serious about shuttering the Commission. The Parole Commission Phaseout Act of 1996 gave the Commission five more years and set a schedule to reduce the number of Commissioners to one by the end of 2001.[28] The Attorney General was directed to submit yearly reports to Congress on the most effective and cost-efficient way to carry out the Commission's functions.[29] Yet the Commission still did not die. Seeking solutions for issues in the District of Columbia, Congress did an about-face and gave the Agency additional responsibilities. In 1998, the Commission began conducting parole hearings for people convicted of felonies under local D.C. law.[30] Then the District of Columbia moved to a determinate sentencing system with terms of supervised release, and the Agency also assumed jurisdiction over their supervision and revocation decisions.[31] In addition, under a 1994 agreement with the Department of Defense, the Commission took on responsibility for individuals serving military code sentences within the Bureau of Prisons.[32]

These expansions allowed the Commission to survive, and the new cases swamped the old. The Commission recently reported a total of only 183 old law people under the Agency's jurisdiction who were still in custody as of July 2022, though there are reasons to question this figure.[33] At the end of FY2021, the Commission reported 2,104 D.C. Code and 233 military code individuals in custody, along with twenty defendants transferred pursuant to a foreign treaty.[34]

These numbers may drop quite soon. The Commission has been transferring military cases back to the service branches; the transfers were scheduled to be completed in May 2022.[35] The District of Columbia is actively planning to take over the remaining D.C. cases, though it is not clear what form that will take.[36] Delegate Eleanor Holmes Norton introduced legislation to transfer D.C. parole and supervision cases to local control.[37] Meanwhile, Congress has just extended the Commission's authorization for one more year, to October 31, 2023.[38] In our view, no further extensions should be granted.

Without the D.C. and military cases, it makes no sense to continue the Commission for the surviving old law people. The Commission should be allowed to sunset. Indeed, in a 2019 "Transfer of Duties Plan," the Commissioners themselves suggested that the Agency should be abolished after returning the military and D.C. cases to the Department of Defense and the District of Columbia.[39] In the last section of this Article, we propose that the old law cases move to the U.S. Courts, where they can be adjudicated efficiently and fairly. But even if it takes more time

**App. 3**

than anticipated to transfer the D.C. cases, Congress should act now to send old law matters to the courts. There are pressing reasons to end the Agency's control over old law people. For them, the Commission has failed to meet its most basic responsibilities and cannot carry out its role competently and independently, as the law requires.

### B. The Commission has demonstrated gross incompetence, and indifference to its Congressional reporting requirements

The Commission does not appear even to know who is still serving old law prison sentences, and has misreported the numbers to Congress.

The Commission's most basic task is to consider releasing old law people when they become eligible for parole. Whenever parole is denied to someone who is still in custody for an old law offense, the Commission must hold interim hearings every two years until they are released. Given this responsibility, it is essential for the Agency to know about and track all of the old law people in custody who are eligible for parole.

Every December, the Commission submits a report to Congress for the just-completed fiscal year. The number of people still in custody serving old law federal sentences has steadily decreased over time due to releases and deaths, as one would expect.[40] However, the Commission's FY2021 Congressional Report stated that the number of old law federal offenders in custody for parole-eligible offenses had *increased* by 69% over the previous year.[41] The Commission provided no explanation, even though old law people are a fixed cohort who were convicted decades ago. At the time, National Public Radio reported about the Commission[42] and advocates raised the issue with the Senate Judiciary Committee, White House, and Department of Justice.

The Commission responded in August 2022 with an "Addendum" to its FY2021 report, significantly revising its calculations of people in custody from what the Agency had told Congress at the end of each of the previous three fiscal years. The original and revised numbers, and the Commission's estimate of those in custody as of July 2022, are presented in Table 1.[43] That the Commission has just "found" these additional people suggests that it was previously unaware of their existence and was not giving them the parole hearings that the law demands. It also reflects an

apparent indifference to its duty to submit accurate reports to Congress.

Despite its faulty data, the Commission denies that anyone has been "'lost' or unaccounted for," asserting that old law people have been "tracked by [Commission] staff on an ongoing basis."[44] However, the Commission admits that it has only *just now* created a database of old law individuals under its jurisdiction. The Agency says it constructed the new database "by reviewing actual lists of prisoners in BOP custody who have a current or prior sentence for a U.S. Code offense that occurred before November 1, 1987," and isolating those with "at least one U.S. Code sentence which includes eligibility for parole or re-parole."[45] Since the Commission had not created or maintained a database previously, it is difficult to credit the Agency's claim that no old law person was overlooked. If the Commission had previously tracked all old law people accurately, there would have been no need to revise its reports to Congress—presumably, the Commission would have had the correct information at hand.

### C. The Commission has surrendered its independence

The Commission is not structured to operate independently or fairly, as the 1976 Parole Act requires.

For people sentenced under the old law, the Commission is a desiccated remnant, a moribund barrier to any hope of release. The regions are gone.[46] In 1996, Congress cut the number of authorized Commissioners to five;[47] now the Agency has two. The National Appeals Board is comprised of these same two Commissioners, and therefore the Board is no longer separate from the first-level decision-maker.[48] As a practical matter, this undermines a prisoner's statutory right to an appeal.[49]

Moreover, the uncomfortable truth is that the Commission cannot possibly act as "an independent agency" when it has to go to the Justice Department and Congress every few years to stay in business. As former Commission Chairman Isaac Fulwood recalled, describing the reauthorization process: "We had to go through Justice all the time. . . . Everything revolved around going through Justice."[50] DOJ is hardly a neutral entity. It brings every federal criminal case, and its prosecutors can and do take positions opposing release on parole.[51] The Commission is a vulnerable agency, highly responsive to DOJ and Congress. With the Commission unable to function as originally intended, a fix must come from Congress.

### D. Old law people are elderly, ill, unlikely to reoffend, and differ greatly from the population the Commission was created to oversee

According to the most recent data reported by the Parole Commission (February 2019), the median age of the old law people in custody was sixty-two; more than 25% were seventy or older.[52] All the surviving individuals are now almost four years older. Given that their offenses were all committed before November 1987, almost all have served at least thirty-five years in prison. Their health is much more

**Table 1. Number of People in Custody Serving Parole-Eligible U.S. Code Sentences**

| Date | People originally reported to Congress | Revised people as per August 2022 "Addendum" | Change |
|---|---|---|---|
| End of FY2019 | 195 | 309 | +114 (+58.5%) |
| End of FY2020 | 153 | 257 | +104 (+68.0%) |
| End of FY2021 | 258 | 215 | −43 (−16.67%) |
| July 2022 | – | 183 | – |

Downloaded from http://online.ucpress.edu/fsr/article-pdf/35/2/106/769393/fsr.2022.35.2.106.pdf by University of California Berkeley user on 08 February 2023

**App. 4**

Downloaded from http://online.ucpress.edu/fsr/article-pdf/35/2/106/769393/fsr.2022.35.2.106.pdf by University of California Berkeley user on 08 February 2023

precarious than that of individuals of the same age who have not suffered incarceration. People this old pose very little risk of recidivism. Nevertheless, the Commission has not altered its release criteria.

These are frail people whose health is vulnerable. Time in prison takes a toll on one's physical and mental health. Incarcerated people experience a "high degree of early-onset medical and social complexity," a process that is often termed "accelerated aging."[53] Studies show that "[o]lder incarcerated persons have rates of chronic illness and disability comparable to those of non-incarcerated people who are 10 to 15 years older."[54] For this reason, "[w]hile health-care professionals outside of the criminal justice system typically use the age of 65 to define which individuals are 'older adults' or 'geriatric,'" many criminal justice systems "consider individuals in their 50s to be 'older prisoners.'"[55] "On average, older prisoners nationwide have three chronic medical conditions and a substantially higher burden of chronic conditions like hypertension, diabetes and pulmonary disease than both younger prisoners and older non-prisoners."[56] Other geriatric syndromes that "contribute[] to an older adult's overall frailty and poor health outcomes" include "frequent falls, cognitive impairment and dementia, incontinency, sensory impairment and polypharmacy."[57]

With a median age of sixty-five now, and having already been imprisoned at least thirty-five years, old law people are significantly different from those serving federal sentences in 1976, when Congress passed the Parole Act. At that time, there were 24,430 people serving federal sentences. Their average sentence length was nine years and three months.[58] Their median age was twenty-nine years and eight months.[59] Old law people are also distinct from today's new law prisoner population. Currently, the median age of new law federal prisoners is between thirty-six and forty, almost thirty years younger than the median of the old law cohort.[60]

In considering release, age should make a difference. Elderly individuals pose little risk of reoffending after they are released from custody. According to The Sentencing Project, a "robust study of empirical literature shows that people released after decades of imprisonment, including for murder, have low recidivism rates. . . . Recidivism is particularly uncommon among older releasees, including those who committed violent crimes."[61] The U.S. Sentencing Commission examined rearrests for over 25,000 federal prisoners who were released to the community in 2005.[62] The Commission found that "[o]lder offenders were substantially less likely than younger offenders to recidivate."[63] These findings are consistent with "numerous recidivism studies [that] document well that older offenders are at lower risk for reoffending."[64] A later Sentencing Commission study of more than 32,000 people released in 2010 replicated these results.[65]

Affirming these findings about recidivism and older people is Maryland's experience with the "Unger group." Following a 2012 court ruling in *Unger v. State*, Maryland

released two hundred prisoners between 2013 and 2018 who, on average, were sixty-four years old and had served thirty-five years;[66] 84% were serving time for murder and 13% for rape.[67] As of April 2022, only 3% were arrested for any reason, including a technical violation of probation.[68]

Although the basic characteristics of the cohort under the Parole Commission's jurisdiction have changed dramatically over time, the Agency's release standards have not. Discretionary parole, typically considered earlier in a sentence, is still disproportionately based upon the seriousness of the offense. The Commission uses a guidelines matrix to decide whether to grant discretionary parole. One axis of the matrix is the severity of the original offense. The Commission also uses the characteristics of the offense to determine whether to go significantly above the guidelines range or to deny discretionary parole altogether.[69] The Commission thus gives far more weight to the offense than rehabilitation, health, age, and family and community support. Old law parole applicants are still being assessed using this system, even though they have had decades behind bars to rehabilitate, their health is often failing, and people of advanced age have much lower recidivism rates.

Mandatory parole, considered later in a sentence, may be denied if a parole candidate has committed a "serious" violation of an institution rule at any time during their sentence, despite the presumption of release clearly set forth in the statute.[70] The Parole Commission uses this provision to deny mandatory parole to people even if the infraction occurred decades earlier. Parole is also denied if the Commission predicts that a person may, in the future, commit "any Federal, State, or local crime" if released, regardless of whether this predicted crime involves an identifiable and specific risk of harm to any person or the community.[71]

Congress can amend the Parole Act and provide different standards for this elderly population. In theory, the Commission can also revise its parole guidelines and its application of the Parole Act through the rulemaking process. To date, neither has done so.

We need more suitable standards. After an old law prisoner has already served decades in custody, the offense of conviction should not be the focus of parole decision-making. Instead, we should evaluate who the person is today, what their medical condition might be, and whether they might pose a serious threat of physical injury to an individual if released. Parole decision-makers should also consider whether any feared risk might be ameliorated through social services, medical care, and parole conditions. It does not make sense to keep people incarcerated after they have served so many years, if they can live safely in the community or in a nursing facility. Nor should taxpayers shoulder the enormous expense of caring for a geriatric population in prison, when caring for them in the community is more humane as well as more cost-effective. The Office of the Inspector General found that the Bureau of Prisons lacked adequate staffing, physical infrastructure, and programming to address the needs of its aging

App. 5

Downloaded from http://online.ucpress.edu/fsr/article-pdf/35/2/106/769393/fsr.2022.35.2.106.pdf by University of California Berkeley user on 08 February 2023

population. Bureau officials have described the significant budgetary impact of this population, primarily due to medical care. In FY2013, the Bureau of Prisons spent 19% of its total budget to incarcerate aging people.[72]

## IV. Elderly Old Law Prisoners Cannot Ask a Court to Grant Compassionate Release

To compound the problem, old law people with debilitating medical conditions do not even have the same opportunity for compassionate release as those sentenced under the new law. With COVID-19 rampant in our federal prisons for almost three years now, this is simply cruel and inhumane. An elderly and ill person is elderly and ill, regardless of the law under which they were convicted.

For new law prisoners, the federal compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), allows a sentencing court to modify a sentence and grant compassionate release for "extraordinary and compelling reasons."[73] Prior to 2018, only the Bureau of Prisons could file a compassionate release motion with the court. The First Step Act amended the statute to allow a defendant to file such a motion after first requesting the Bureau for compassionate release and then exhausting all administrative remedies if the Bureau declines.[74] This direct-file provision has been successfully used by thousands of federal prisoners during the pandemic. As the Sentencing Commission reported, during fiscal years 2020 and 2021, courts decided 22,520 compassionate release motions and granted 3,867 (17.2%) of them.[75] Judges cited COVID-19 or the pandemic as reasons to afford relief in 61.6% and 50.2% of the granted cases in 2020 and 2021, respectively.[76] The data show the critical importance of allowing people to file motions themselves, rather than rely upon the Bureau of Prisons. In the more than 3,800 cases in which courts *granted* compassionate release, only forty-six (1.2%) were initiated by the Bureau or by an attorney for the government.[77] This is a stunning figure.

Yet this crucial judicial avenue for release is not available to old law people. Section 3582 was originally promulgated as part of the Sentencing Reform Act of 1984 and related to new law sentences. Courts have generally ruled that because the First Step Act amended a provision situated within that Act, its benefits do not apply to old law defendants.[78] In *United States v. King*, the court of appeals held that parole-eligible old law offenders are relegated to whatever relief may be available through the Parole Commission, pointing to what it called the "compassionate release" provision of § 4205(g) of the Parole Act.[79] However, § 4205(g) merely permits the Bureau of Prisons to move a court to reduce the period of time before a person may be legally eligible for the Commission to grant discretionary parole, such as if they have not yet served a third of their sentence.[80] If the motion is granted, the person's case will then be heard by the Commission on its next docket at the institution, applying its ordinary standards.[81] Section 4205(g) does not give a court the power to order anyone's parole. Of course, the Commission cannot release

someone unless the individual is serving a parole-eligible sentence in the first place. In *United States v. Jackson*, the court of appeals upheld the denial of compassionate release for an old law person serving a no-parole sentence, stating that he "retains only the possibility of commutation by the President."[82]

Besides the fact that different procedures apply to old law and new law people, release under the Parole Act is not the same as compassionate release under § 3582—the substantive standards differ. Even during the COVID-19 pandemic, the Commission has continued to apply its ordinary standards for discretionary and mandatory parole. In October 2021, the Commission amended its regulations to allow it to reopen a parole case for new "medical . . . or other extraordinary and compelling information."[83] The amended regulation permits the Commission to schedule a parole hearing or modify a previous decision, but does not purport to provide different substantive criteria for the grant of discretionary or mandatory parole. In *United States v. Joseph*, a district court judge explained the difference between old law parole and new law compassionate release:

> [Parole is] not a substitute for the additional avenue provided to "new law" prisoners under the First Step Act. Parole decisions center around "the details of the offense, prior criminal history, the guidelines which the Commission uses in making their determination, the offender's accomplishments in the correctional facility, details of a release plan, and any problems the offender has had to meet in the past and is likely to face again in the future." . . . To grant a motion for compassionate release, the court must find "extraordinary and compelling" circumstances . . . [that] include a serious medical condition, advanced age and deteriorating health, and family circumstances.[84]

Although the court found that Mr. Joseph would have met the § 3582 criteria for compassionate release, because he was convicted under the old law, he was relegated to seeking parole.[85] As this Issue of *FSR* goes to press, Mr. Joseph remains in prison.[86]

But no case shows the arbitrariness of our system more than that of William Underwood. Mr. Underwood was prominent in the drug trade in New York in the 1970s and '80s. Following his arrest in 1988, he was convicted of operating a continuing criminal enterprise, along with several other counts. Mr. Underwood sought to be sentenced under the old law, which would have afforded judicial discretion to impose a sentence of ten years to life. However, the trial judge found that the offense continued beyond November 1, 1987, and sentenced him under the new law to a mandatory term of life without parole.[87]

The choice to apply the harsher penalty saved him. Because Mr. Underwood was treated as a new law defendant, he was able to file a motion for compassionate release. In January 2021, the District Court reduced his sentence to

App. 6

Downloaded from http://online.ucpress.edu/fsr/article-pdf/35/2/106/769393/fsr.2022.35.2.106.pdf by University of California Berkeley user on 08 February 2023

time served, citing Mr. Underwood's personal transformation and excellent conduct over thirty-three years of incarceration, as well as his vulnerability to COVID. And as the judge noted, "[t]hough Underwood's crimes were violent and calculated, he committed them half his lifetime ago."[88] Mr. Underwood is currently a Senior Fellow at The Sentencing Project. He has testified twice before Congress on clemency, compassionate release, and other issues.[89]

From every indication, the exclusion of old law people from the First Step Act was merely an oversight. For three years, members of the House and Senate have worked across the aisle to fix this error, seeking to pass a technical amendment to the First Step Act to bring all old law people within § 3582(c)(1)(A).[90] A broad array of groups have supported the various versions of the COVID-19 Safer Detention Act containing this amendment, including organizations as diverse as Americans for Prosperity, FAMM, the Due Process Institute, the National Association of Criminal Defense Lawyers, The Sentencing Project, and the Verizon Corporation.[91] The Senate's COVID-19 Safer Detention Act of 2021, S.312, came closest to fruition. It was reported out of the Senate Judiciary Committee in June 2021, with strong bipartisan support.[92] While the Act did not advance to a floor vote, it was hoped that the technical amendment to the First Step Act would be part of a negotiated criminal justice package to be included in the December 2022 Omnibus (the Consolidated Appropriations Act, 2023).[93] We understand that the criminal justice measures were pulled from the Omnibus at the 11th hour, possibly due to disagreement about the treatment of crack and powder cocaine offenses, a key part of the negotiated package.[94]

It is unconscionable to deprive old law people of the same opportunity for compassionate release as is available to all others in the federal system. Elderly old law prisoners would be strong candidates for compassionate release. In a study of the compassionate release motions decided in FY2020, the Sentencing Commission found that "within each age bracket 45 years and older, a larger percentage of offenders sought relief compared to their respective proportion of the federal prison population, and a larger percentage of offenders were granted relief."[95] For people aged sixty-five to just under seventy-five, the grant rate was 48.3%; the rate climbs to 61.5% for those seventy-five and older.[96] In affording relief, the federal courts surely recognized what we all know to be true: older people pose little risk of reoffending, and they are medically vulnerable. Congress should amend § 3582 and provide them an opportunity for compassionate release.

## V. Recommendations

### A. Allow old law people to apply for compassionate release under the First Step Act

Legislators in the new Congress should again take up the technical amendment to the First Step Act. The text could be taken from either the House or Senate versions of the COVID-19 Safer Detention Act of 2021. Both versions

contained the critical language amending § 3582(1)(A) to provide that a person may file a motion for compassionate release in any case, including "any case involving an offense committed before November 1, 1987."[97] Under this provision, all old law people—including those currently serving non-parolable sentences—would be able to file a motion. The amendment would not require anyone's release. It would merely place old and new law people on the same legal footing.

If this passes, the old law people still in custody would need to be informed about the amendment and their new eligibility. This would mean identifying all those still serving parolable and non-parolable old law sentences. Defense-side groups and federal defender organizations would need to organize to provide representation. Many of the old law people in custody are too ill and debilitated or do not have the resources to file anything on their own. The Senate version of the 2021 Act also included a provision allowing courts to appoint counsel in compassionate release cases, which would help.[98] Amending the First Step Act is the first step toward equity for these elderly and vulnerable people.

### B. Abolish the Commission and transfer the old law cases to the courts

All old law parole cases should go to the federal courts, and the D.C. cases should be transferred to D.C. local control.

For old law U.S. Code offenders, the federal courts can administer the remaining cases much more efficiently and fairly than the Commission. The judiciary is independent of the Department of Justice and Congress; decision-makers in parole cases should be free from undue influence, which has not been the case under the Commission. Old law people still in custody generally receive an interim hearing every two years, and it is a brief proceeding, typically without outside witnesses. If federal courts handled these cases, the person seeking release on parole could be brought before a magistrate judge in the jurisdiction where they are held, or the judge could travel to the prison. With only a few hundred old law people still in custody, and 122 Bureau of Prisons institutions spread throughout the United States,[99] the caseload should be manageable for every district. Any appeal from a magistrate judge's decision could go to a district judge for a de novo review. This separation of first and second-level decision-makers would restore a meaningful right to an appeal.

There would need to be some training and transition. The Administrative Office of the U.S. Courts could assist in that task with a lean staff—and in a period of several months, not years. There will also be some parole revocation cases. These can be heard by the federal courts in the same way as alleged violations of probation or supervised release for individuals convicted under the new law.

The only alternative would be to retain the Parole Commission in some form to handle the dwindling number of old law cases. In their 2019 "Transfer of Duties

**App. 7**

Plan," the two remaining Commissioners laid out steps to "resolve the lingering issue of federal parole cases so that the [Commission] can be abolished according to the wishes of Congress in 1987."[100] However, the details of the plan showed that the Commissioners had no intention of allowing the Agency to be abolished. The plan proposed retaining three Commissioners and fifteen staff, and relocating the Agency within the Bureau of Prisons.[101]

This suggestion should be resoundingly rejected. Retaining the operational structure and staff of the Commission would do nothing to address the underlying issues of incompetence and bias. Adding an additional Commissioner would not change the fundamental flaws within the Agency.

Nor is the Bureau of Prisons an appropriate home; the Bureau is rife with mismanagement and abuse, and should not be given responsibility for another dysfunctional agency. On September 28, 2022, a bipartisan group of Senators introduced a bill, S. 4988, that would require comprehensive, risk-based inspections of the Bureau's 122 facilities and establish an ombudsman to investigate and report directly to the Attorney General and Congress. Announcing the legislation, Senator Durbin stated: "One investigation after another has revealed a culture of abuse, mismanagement, corruption, torture, and death that reaches to the highest levels."[102] Further, the minuscule number of compassionate release motions filed by the Bureau of Prisons—1.2% of the cases where courts granted relief—raises serious doubt about whether the Bureau would be capable of paroling individuals with meritorious cases.

Congress should enact legislation now to transfer the old law federal cases to the courts, and the D.C. cases to a court or entity under local D.C. control. The Commission should be abolished no later than October 31, 2023. The cases could be transferred either at once or in tranches. However the transfers are organized, it makes sense to start with the old law cases, at least until a new D.C. process is in place. We are now thirty years past the Commission's original end date of 1992. It is beyond time for the Agency to go.

### C. Amend the substantive standards for parole release, and extend the possibility of parole to all old law people

When Congress transfers old law cases to the federal courts, it should also revise the criteria for release on discretionary and mandatory parole. Instead of focusing on the offense conduct, the magistrate judge should assess the individual before them. The person should be released on discretionary parole unless the parole case record demonstrates there is a current and unreasonable risk that they will commit a serious federal or state crime if released, and that any such risk cannot be mitigated by parole supervision. As in the 1976 Parole Act, the criteria for mandatory parole should be more lenient, since they are applied much later in the sentence. Assessment of future risk should also

be more specific. Any new law should state that the individual *shall* be released on mandatory parole unless the court determines, by clear and convincing evidence, that the individual poses a current risk of serious, imminent physical harm to a reasonably identifiable person, and the risk cannot be mitigated.

For both discretionary and mandatory parole release, the court could impose a condition that the person not commit a federal or state crime, as well as other conditions reasonably related to the nature and circumstances of the offense and characteristics of the individual. If the individual is not released on parole, new hearings should regularly be conducted until the person is released.

Any appeal by a parole candidate should go to a district judge, who can affirm, modify or reverse the decision below, or decide the matter de novo. However, to protect the right to appeal, an appeal decision should not be less favorable to the individual than the initial decision by the magistrate judge.[103]

Finally, as part of the legislation, Congress should also provide for parole review for individuals currently serving non-parolable old law sentences. Given the excesses of drug and weapon sentences in the 1980s, this would be an appropriate change. Extending the possibility of early release to these individuals affords them the opportunity to seek parole based on the same criteria as everyone else sentenced under the old law.

Allowing these old law prisoners eligibility for release on parole through the courts would start the process of alleviating the particular cruelty of life sentences without the possibility of release. A recent study examined individuals who had already served twenty or more years in custody and compared health outcomes between those who had an expected parole or release date in the next twenty years and those who did not. The medical researchers found worse physical function and mental health among those without an expected release date, which "suggests that the added stress of knowing one will live the rest of his life in prison may, in and of itself, contribute to negative health outcomes."[104] Many describe the sentence as "a death sentence imposed in slow motion."[105] As The Sentencing Project recently noted, people serving life without parole typically emerge as models for other incarcerated people. Congress should grant this cohort of elderly people the chance to ask for parole release.

### D. Give old law people priority consideration for executive clemency

Another option for relief would be for President Biden to announce a priority review of clemency petitions for everyone sentenced under the old law. In order for this option to be equitably available to any old law prisoner, the National Association of Criminal Defense Lawyers has offered to help coordinate pro bono assistance for old law prisoners in filing a prioritized clemency petition if they do not already have one pending.

Downloaded from http://online.ucpress.edu/fsr/article-pdf/35/2/106/769393/fsr.2022.35.2.106.pdf by University of California Berkeley user on 08 February 2023

**App. 8**

Any clemency petition is directed to the Pardon Attorney for investigation and review. As part of the Department of Justice, the Pardon Attorney must prepare the Department's recommendation for the President before he will act. However, there are currently over 17,000 clemency petitions pending for its review.[106]

One factor compounding the clemency backlog is that many people released by the Bureau of Prisons to home confinement under the CARES Act[107] filed clemency applications. A Trump-era memo by the Office of Legal Counsel found that the law required that people on CARES Act home confinement be returned to prison a month after the pandemic ends.[108] The OLC finally reversed this finding in December 2021, allowing the Bureau discretion to keep them on home confinement.[109] In the interim, many individuals were advised to file clemency applications as the only way to avoid returning to prison, further adding to the backlog.[110]

The clemency applications that have been granted by the Biden administration appear to be limited to people convicted of nonviolent, drug-related crimes.[111] Many old law individuals were convicted of offenses considered more serious, but those original convictions no longer reflect their current behavior or their rehabilitation and self-transformation over the course of many decades. We know that committing even a violent crime does not indicate future lawlessness for elderly incarcerated people. Yet, under the criteria the Biden administration is using to date, many old law clemency applications will be denied outright. The criteria for clemency should reflect true mercy and humanity. We urge the President to base clemency decisions on a presumption of release unless the person currently poses a public safety risk.

As we have documented, old law prisoners are among the very oldest and longest-incarcerated in the federal system. Many are in their late fifties, sixties, even eighties; the youngest would be in their fifties. Their health has deteriorated with advancing age, and many have underlying health conditions like heart and lung disease, diabetes, and advanced cancer. With thousands of clemency petitions pending at the Office of the Pardon Attorney, how will these old law prisoners receive a review of their petitions before they die? Executive clemency may be their only remaining option: all of them are currently ineligible for compassionate release, and many have been unfairly and repeatedly denied parole.

The Biden administration should prioritize a review of all old law prisoners for executive clemency.

## VI. Conclusion

People serving old law federal sentences are the most elderly, most ill, and least likely-to-reoffend cohort in federal prisons. Some are not eligible to apply for parole. Their only path to release is through executive clemency. Those who are legally eligible for parole have been failed by the Parole Commission, which has not even kept track of who they are. It is time to shutter the Commission, transfer the

parole cases to the federal courts, make old law people eligible to apply for compassionate release and parole, and prioritize their cases for clemency review.

### Notes

* Weisselberg is Yosef Osheawich Professor of Law, University of California, Berkeley; Evans was convicted of political actions under the old law and served sixteen years in federal prison. The authors are part of a coalition of organizations and individuals advocating for old law people still in custody. Other advocates include the American Civil Liberties Union, the Due Process Institute, Federal and Community Defenders, the Leadership Conference on Civil and Human Rights, the National Association of Criminal Defense Lawyers, The Sentencing Project, and the Taifa Group. We are particularly grateful to Aamra Ahmad, Peter Goldberger, Kara Gotsch, Liz Komar, Kyle O'Dowd, Jason Pye, Patricia Richman, Nkechi Taifa, Bill Underwood, and Chloé White for their collaboration and support. Laurel Fletcher, Bryan Gaynor, Eve Goldberg, Monty Levenson, Amanda Rogers, Elisabeth Semel, Jonathan Simon, and Laura Whitehorn provided helpful comments on the manuscript. All views expressed here are our own.

1 Pub. L. 115–391, 132 Stat. 5194 (2018).

2 See William J. Genego, Peter D. Goldberger & Vicki C. Jackson, *Parole Release Decisionmaking and the Sentencing Process*, 84 Yale L.J. 810, 814 (1975).

3 See Miriam Krinsky & Monica Fuhrmann, *Building a Fair and Just Community Supervision System: Lessons Learned from State and Federal Reform Efforts*, 34 Fed. Sent'g Rep. 340 (2022).

4 See Douglas A. Berman, *Reflecting on Parole's Abolition in the Federal Sentencing System*, 81 Fed. Prob. 18 (2017); U.S. Dep't of Justice, U.S. Parole Comm'n, History of the Federal Parole System 1 (May 2003) (hereinafter "Parole Commission History"), https://www.justice.gov/sites/default/files/uspc/legacy/2009/10/07/history.pdf; Genego, Goldberger & Jackson, *supra* note 2, at 817.

5 See Genego, Goldberger & Jackson, *supra* note 2, at 815–16, 821–22, 846–48.

6 Pub. L. No. 94–233, § 2, 90 Stat. 219 (1976) (codified at 18 U.S.C. §§ 4201–4218; repealed effective 1987).

7 H.R. Rep. 94–184, 94th Cong. 1st Sess. 2 (1975).

8 See 18 U.S.C. §§ 4203(a)(1), 4205–4208 (1982).

9 18 U.S.C. § 4202 (1982).

10 *Id.*

11 18 U.S.C. §§ 4203(a)(2), (c), 4204(a)(5) (1982); 28 C.F.R. §§ 2.23, 2.24 (1977).

12 18 U.S.C. §§ 4202, 4204(a)(5) (1982).

13 18 U.S.C. § 4205(a) (1982). Alternatively, at sentencing, the judge could elect to make the individual eligible for release on discretionary parole at any time. See § 4205(b)(2).

14 18 U.S.C. § 4206(a) (1982).

15 28 C.F.R. § 2.20 (2021).

16 18 U.S.C. § 4208(h) (1982); 28 C.F.R. § 2.14(a) (2022).

17 18 U.S.C. § 4206(d) (1982).

18 S. Rep. No. 94–648, 94th Cong. 2d Sess. 27 (1976).

19 See 18 U.S.C. § 4161 (1982) (up to ten days per month for "statutory" good time), § 4162 (1982) (up to five more days per month for "extra" good time).

20 21 U.S.C. § 848. Section 848 was enacted as part of the Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub. L. No. 91–513, § 408, 84 Stat. 1237 (1970). In 1986, Congress added a new § 848(b) to provide for mandatory life imprisonment without parole for certain CCE defendants. See Anti-Drug Abuse Act of 1986, Pub. L. No. 99–570, § 1253, 100 Stat. 3207 (1986).

21 See *United States v. Jackson*, 991 F.3d 851, 853 (7th Cir. 2021) (no possibility of release except clemency for a person

Downloaded from http://online.ucpress.edu/fsr/article-pdf/35/2/106/768393/fsr.2022.35.2.106.pdf by University of California Berkeley user on 08 February 2023

**App. 9**

convicted under former 18 U.S.C. App. § 1202 (1984), which penalized possession of a firearm after three prior robbery or burglary convictions; the no-parole provision was added as part of the Armed Career Criminal Act of 1984, Pub. L. 98–473, § 1802, 98 Stat. 2185).

22  Pub. L. No. 98–473, tit. II, ch.2, 98 Stat. 1987 (1984).

23  *Id.,* § 235(b)(1).

24  *Id.,* § 235(b)(3).

25  *See* U.S. Dep't of Justice, Bureau of Justice Statistics, *Bulletin: Prisoners in 1988* 2 tbl.2 (1989), https://bjs.ojp.gov/content/pub/pdf/p88.pdf. Anyone in custody at the end of 1987 serving a sentence of over one year would, by definition, be an old law person.

26  *See* Judicial Improvements Act of 1990, Pub. L. No. 101–650, § 316, 104 Stat. 5089 (1990) (extending from 1992 to 1997); Parole Commission Phaseout Act of 1996, Pub. L. No. 104–232, § 2(a), 110 Stat. 3055 (1996) (extending from 1997 to 2002); 21st Century Department of Justice Appropriations Authorization Act, Pub. L. No. 107–273, § 11017(a), 116 Stat. 1758 (2002) (extending from 2002 to 2005); U.S. Parole Commission Extension and Sentencing Commission Authority Act of 2005, Pub. L. No. 109–76, § 2, 119 Stat. 2035 (2005) (extending from 2005 to 2008); U.S. Parole Commission Extension Act of 2008, Pub. L. No. 110–312, § 2, 122 Stat. 3013 (2008) (extending from 2008 to 2011); U.S. Parole Commission Extension Act of 2011, Pub. L. No. 112–44, § 2, 125 Stat. 532 (2011) (extending from 2011 to 2013); U.S. Parole Commission Extension Act of 2013, Pub. L. No. 113–47, § 2, 127 Stat. 572 (2013) (extending from 2013 to 2018); U.S. Parole Commission Extension Act of 2018, Pub. L. 115–274, § 2, 132 Stat. 4160 (2018) (extending from 2018 to 2020); Continuing Appropriations Act, 2021 and Other Extensions Act, Pub. L. 116–159, § 4202, 134 Stat. 709 (2020) (extending from 2020 to 2022).

27  *See* H.R. Rep. 104–789, 104th Cong., 2d Sess. 3 (1996), https://www.congress.gov/104/crpt/hrpt789/CRPT-104hrpt789.pdf.

28  Pub. L. 104–232, § 2, 110 Stat. 3055 (1996).

29  *Id.,* § 3.

30  *See* National Capital Revitalization and Self-Government Improvement Act of 1997, Pub. L. 105–33, § 11231(a), 111 Stat. 712, 745 (1997).

31  *See* Parole Commission History, *supra* note 4, at 33–34.

32  *See* Patricia K. Cushwa & Charles Massarone, U.S. Parole Commission Transfer of Duties Plan 2 (2019), https://n2t.net/ark:/85779/j4c088. The Parole Commission has not publicized this plan or its annual reports to Congress. We have therefore placed them all on the internet.

33  U.S. Parole Comm'n, Congressional Report FY2021 (Addendum) 2 (Aug. 2021) (hereinafter "2021 Addendum"), https://n2t.net/ark:/85779/j4v36w.

34  U.S. Parole Comm'n, Congressional Report FY2021 5 (Dec. 2021) (hereinafter "2021 Report"), https://n2t.net/ark:/85779/j4zt0s.

35  *Id.* at iv.

36  *See* Jenny Gathright, National Public Radio, *D.C. Could Take a Piece of the Criminal Justice System Back from Feds* (July 29, 2022), https://www.npr.org/local/305/2022/07/29/1114604386/d-c-could-take-a-piece-of-the-criminal-justice-system-back-from-feds.

37  H.R.658, 117th Cong., 1st Sess. (2021).

38  Congress initially passed two short extensions as part of stop-gap funding measures. *See* Continuing Appropriations and Ukraine Supplemental Appropriations Act, 2023, Pub. L. 117–180, Div. C, Title I, § 103(b), 136 Stat. 2112 (2022); Further Continuing Appropriations and Extensions Act, 2023, Pub. L. 117–229, Div. B, Title I, § 103(b), 136 Stat. 2308 (2022). The 2023 Omnibus then extended the Agency to

October 31, 2023. *See* Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat. 4459, Div. O, Title VIII, § 801(b) (2022).

39  *See* Transfer of Duties Plan, *supra* note 32, at 1.

40  *See* U.S. Parole Comm'n, Congressional Report FY2019 5 (Dec. 2019) (hereinafter "2019 Report"), https://n2t.net/ark:/85779/j4794m; U.S. Parole Comm'n, Congressional Report FY2020 5 (Dec. 2020), https://n2t.net/ark:/85779/j43m2q; 2021 Report, *supra* note 34, at 5.

41  *See* 2021 Report, *supra* note 34, at 5.

42  *See* Carrie Johnson, *Senior Citizens Serving Federal Sentences Have Fallen Through the Cracks*, National Public Radio, Morning Edition (Mar. 18, 2022), https://www.npr.org/2022/03/18/1086696046/senior-citizens-serving-federal-sentences-have-fallen-through-the-cracks.

43  *See* 2021 Addendum, *supra* note 33, at 2.

44  *Id.* at 3.

45  *Id.* at 2.

46  *See* Parole Commission History, *supra* note 4, at 32.

47  Parole Commission Phaseout Act of 1996, *supra* note 26, § 2(c).

48  *See* 28 C.F.R. § 2.26(b)(2) (2021) ("All Commissioners serve as members of the National Appeals Board, and it shall in no case be an objection . . . that the Commissioner who issued the decision from which an appeal is taken participated as a voting member on appeal.")

49  *See* 18 U.S.C. § 4215(a) (1984) (providing the right to appeal to the National Appeals Board).

50  Deposition of Isaac Fulwood, Bowers v. Drew, No. 1:08-CV-2095 (N.D. Ga.) (June 23, 2015), at 99.

51  *See* 28 C.F.R. § 2.13(b) (2021) (interested parties who oppose parole may have a representative appear at an initial parole hearing); § 2.19 (d) (2021) ("Recommendations and information from sentencing judges, defense attorneys, prosecutors, and other interested parties are welcomed by the Commission."); *see also* U.S. Parole Commission, *Rules and Procedures Manual* § 2.13-11(a) (2010) ("a criminal justice official (*e.g.*, U.S. Attorney, FBI or DEA agent) may attend a specific parole hearing to oppose parole without special permission"), https://www.justice.gov/sites/default/files/uspc/legacy/2011/12/30/uspc-manual111507.pdf. This is the most recent manual available on the Commission's website.

52  2019 Report, *supra* note 40, at 26.

53  Rachel Bedard, Lia Metzger & Brie Williams, *Ageing Prisoners: An Introduction to Geriatric Health-Care Challenges in Correctional Institutions*, 93 Int'l Rev. Red Cross 917, 919 (2016); *see also* Amanda Li, Brie Williams & Lisa C. Barry, *Mental and Physical Health of Older Incarcerated Persons Who Have Aged in Place in Prison*, 41 J. Applied Gerontology 1101 (2022).

54  Li, Williams & Barry, *supra* note 53, at 1101; *see also* Susan J. Loeb & Azza AbuDagga, *Health-Related Research on Older Inmates: An Integrative Review*, 29 Res. Nursing & Health 556, 557 (2006).

55  Bedard, Metzger & Williams, *supra* note 53, at 919. In studies of older inmates, age fifty and older is the most common criterion. Loeb & AbuDagga, *supra* note 54, at 561.

56  Brie A. Williams, James S. Goodwin, Jacques Baillargeon, Cyrus Ahalt & Louise C. Walter, *Addressing the Aging Crisis in U.S. Criminal Justice Healthcare*, 60 J. Am. Geriatric Soc'y 1150, 1151 (2012) (citations omitted).

57  Bedard, Metzger & Williams, *supra* note 53, at 923. *Polypharmacy* means the simultaneous prescription of medications that can lead to interactions and adverse effects. *See id.* at 926.

58  *See* Norman A. Carlson, Director, Federal Prison System, Statistical Report Fiscal Years 1976–1977 26 tbl.A-4.

59  *See id.* at 28 tbl.A-5.

60  *See* Federal Bureau of Prisons, *Inmate Statistics*, https://www.bop.gov/about/statistics/statistics_inmate_age.jsp (last

**App. 10**

Downloaded from http://online.ucpress.edu/fsr/article-pdf/35/2/106/769393/fsr.2022.35.2.106.pdf by University of California Berkeley user on 08 February 2023

Downloaded from http://online.ucpress.edu/fsr/article-pdf/35/2/106/769393/fsr.2022.35.2.106.pdf by University of California Berkeley user on 08 February 2023

accessed Dec. 21, 2022). The Bureau of Prisons reports age bands for old law and new law people combined. However, there are 28,280 individuals in the thirty-six-to-forty-year age band, so including the few hundred old law people does not alter the median age band.

61   Ashley Nellis, The Sentencing Project, Nothing but Time: Elderly Americans Serving Life Without Parole 17 (June 23, 2022), https://www.sentencingproject.org/reports/nothing-but-time-elderly-americans-serving-life-without-parole/.

62   *See* U.S. Sentencing Comm'n, The Effects of Aging on Recidivism Among Federal Offenders 6, 14 (Dec. 2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf.

63   *Id.* at 3. During the follow-up period, "13.4 percent of offenders age 65 or older at the time of release were rearrested compared to 67.6 percent of offenders younger than age 21 at the time of release." *Id.* For those sixty and older at the time of release, the rate was 16.4%. *Id.* at 22.

64   *Id.* at 10 (note omitted).

65   *See* U.S. Sentencing Comm'n, *Recidivism of Federal Offenders Released in 2010* 24 (Sept. 2021) (in an eight-year follow-up study, the "lowest rearrest rates were for offenders age 60 and older; 15.9 percent . . . were rearrested"), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210930_Recidivism.pdf.

66   *See* Michael Millemann, Jennifer Elisa Chapman & Samuel P. Feder, *Releasing Older Prisoners Convicted of Violent Crimes: The Unger Story*, 21 U. Md. L. J. Race Relig. Gender & Class 185, 185–86, 211 (2021), https://digitalcommons.law.umaryland.edu/rrgc/vol21/iss2/2. In *Unger v. State*, 48 A.3d 242 (Md. 2012), the court granted post-conviction relief to a person convicted under a jury instruction invalidated in 1980. This led to the release of individuals convicted in trials with the invalidated instruction.

67   *See* Millemann, Chapman & Feder, *supra* note 66, at 186.

68   *See id.* at 186, 223; Michael Millemann, Rebecca Bowman-Rivas & Elizabeth Smith, *Digging Them Out Alive*, 25 Clinical L. Rev. 365, 370 (2019); Remarks of Michael Millemann, Anchor Event—Ten Years and Counting: The Remarkable Ungers (Univ. of Maryland Francis King Carey School of Law, April 11, 2022).

69   *See* 28 C.F.R. § 2.20 (2021).

70   *See* 18 U.S.C. § 4206(d) (1982).

71   *Id.*

72   *See* Office of the Inspector General, U.S. Dep't of Justice, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* 1, 10, 16–19, 23–31 (rev. Feb. 2016), https://oig.justice.gov/reports/2015/e1505.pdf. The OIG defined people age fifty and older as "aging." *Id.* at 1 n. 2.

73   18 U.S.C. § 3582(c)(1)(A)(i) (2021). In addition to the ground of extraordinary and compelling reasons, the court may also grant compassionate release if the defendant is at least seventy years old, and the Bureau has determined that they are not a danger to the safety of any person or the community. § 3582(c)(1)(A)(ii). Before granting a motion on either ground, the court must consider the sentencing factors set forth in 18 U.S.C. § 3553(a), to the extent they are applicable, and any policy statements from the Sentencing Commission. § 3582(c)(1)(A).

74   First Step Act of 2018, *supra* note 1, § 603(b)(1).

75   U.S. Sentencing Comm'n, Compassionate Release Data Report Fiscal Years 2020 to 2021 tbl.3 (May 2022), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/compassionate-release/20220509-Compassionate-Release.pdf.

76   *Id.* at tbls.11 & 12.

77   *Id.* at tbl.5.

78   *E.g.*, *Jackson*, 991 F.3d at 852–53; United States v. King, 24 F. 4th 1226, 1229 (9th Cir. 2022).

79   *King*, 24 F.4th at 1228.

80   18 U.S.C. § 205(g) (1982).

81   *See* 28 C.F.R. § 571.62(b) (2021) (if a court grants the motion, "the Warden . . . shall schedule the inmate for hearing on the earliest Parole Commission docket.").

82   *Jackson*, 991 F.3d at 853.

83   U.S. Parole Comm'n, *Final Rule*, 86 Fed. Reg. 56645, 56646 (Oct. 12, 2021), amending 28 C.F.R. § 2.28(a).

84   United States v. Joseph, 2022 U.S. Dist. LEXIS 98854, *9-*10 (S.D. Fla. June 3, 2022) (citation omitted).

85   *Id.* at *5. Joseph had not yet served his minimum period for parole eligibility. The judge urged the Bureau of Prisons to file a motion under § 4205(g), so that Joseph could seek parole release. *Id.* at *8.

86   *See* Bureau of Prisons, Inmate Locator, https://www.bop.gov/mobile/find_inmate/index.jsp#inmate_results (last accessed Dec. 20, 2022).

87   *See* United States v. Underwood, 932 F.2d 1049, 1051, 1053–55 (2d Cir. 1991) (as amended).

88   United States v. Underwood, No. 88-Cr-822, 2021 U.S. Dist. LEXIS 8378, at *20 (S.D.N.Y. Jan. 15, 2021).

89   *See* Testimony of William R. Underwood, Oversight Hearing on Clemency and the Office of the Pardon Attorney, U.S. House of Representatives' Committee on the Judiciary, Subcommittee on Crime, Terrorism and Homeland Security (May 19, 2022), https://www.sentencingproject.org/wp-content/uploads/2022/05/Bill-Underwood-Testimony-Clemency.pdf. Mr. Underwood testified on June 17, 2021, and May 19, 2022.

90   The technical amendment was contained in several unsuccessful measures introduced during the past two Congresses. *See* The COVID-19 Safer Detention Act of 2021, S. 312, 117th Cong., 2d Sess., § 4 (2021) and H.R. 3669, 117th Cong., 2d Sess., § 4 (2021); The COVID-19 Safer Detention Act, S. 4034, 116th Cong., 2d Sess. § 4 (2020); The Emergency GRACE Act, S. 3698, 116th Cong., 2d Sess. § 3(e) (2020); *see also* The Heroes Act, H.R. 6800, 116th Cong., 2d Sess. § 191103(a)(4) (2020) (allowing old law people to seek compassionate release during a defined emergency period).

91   *See* Americans for Prosperity, Americans for Prosperity Urges Support for COVID-19 Safer Detention Act (July 30, 2020), https://americansforprosperity.org/americans-for-prosperity-urges-support-for-covid-19-safer-detention-act/; Due Process Institute, We Demand Congressional Action for Fairer and More Effective Federal Sentencing and Detention (Sept. 24, 2021), https://idueprocess.org; Kevin A. Ring, President, FAMM, Letter re COVID-19 Safer Detention Act (Sept. 28, 2021), https://famm.org/wp-content/uploads/FAMM-Senate-Letter-re-S.1014-S.312-S.601.pdf; National Association of Criminal Defense Lawyers, Letter re Support Bipartisan COVID-19 Safer Detention Act, S. 4034 (July 27, 2020), https://www.nacdl.org/getattachment/a01663b1-9aa3-4bfd-bf4f-69c656a974a1/letter-to-senate-on-executing-federal-prison-release-programs-in-covid-19-relief-package-july-2020-.pdf; Letter from Faith Groups (July 15, 2020), https://www.nae.net/wp-content/uploads/2020/08/COVID-19-Safer-Detention-Act-faith-sign-on-7.15.pdf; Craig Silliman, Verizon Corporation, Supporting the COVID-19 Safer Detention Act to Protect the Elderly (July 29, 2020), https://www.verizon.com/about/news/supporting-covid-19-safer-detention-act.

92   *See* All Actions S. 312—117th Congress (2021–2022), https://www.congress.gov/bill/117th-congress/senate-bill/312/all-actions (last accessed Aug. 3, 2022); Cosponsors: S. 312—117th Cong. (2021–2022), https://www.congress.gov/bill/117th-congress/senate-bill/312/cosponsors (last accessed Aug. 3, 2022) (Cosponsors were Republican Senators Grassley, Cramer, Wicker, Tillis and Blunt, along with Democratic

**App. 11**

Senators Durbin, Whitehouse, Coons, Booker and Brown). The House Bill was cosponsored by Democratic Representatives Nadler, Jackson Lee, Deutch, and Jeffries, and Republican Representatives Armstrong, Keller, Mace, Meijer, Moore and Cawthorn. Cosponsors: H.R. 3669—117th Congress (2021–2022), https://www.congress.gov/bill/117th-congress/house-bill/3669/cosponsors (last accessed Aug. 3, 2022).

93    *Supra* note 38.

94    *See* U.S. Attorney General, Memorandum for All Federal Prosecutors re Additional Department Policies Regarding Charging, Please and Sentencing in Drug Cases (Dec. 16, 2022), https://www.justice.gov/media/1265321/dl?inline; Senator Chuck Grassley, Statement on Justice Department's Usurpation of Legislative Authority, Disregard for Statutes as Written on Cocaine Prosecutions (Dec. 16, 2022), https://www.grassley.senate.gov/news/news-releases/grassley-statement-on-justice-departments-usurpation-of-legisla tive-authority-disregard-for-statutes-as-written-on-cocaine-prosecutions.

95    U.S. Sentencing Comm'n, Compassionate Release: The Impact of the First Step Act and COVID-19 Pandemic 22 (Mar. 2022), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220310_compassionate-release.pdf".

96    *Id.* at 23, fig.9.

97    S. 312, *supra* note 90, § 4; H.R. 3669, *supra* note 90, § 4.

98    S. 312, *supra* note 90, § 4 (adding a new § 3582(g) to permit appointment under the Criminal Justice Act, 18 U.S.C. § 3006A).

99    *See* Bureau of Prisons, Locations, https://www.bop.gov/locations/ (last accessed Aug. 3, 2022).

100   Transfer of Duties Plan, *supra* note 32, at 1.

101   *See id.* at 4.

102   Durbin, Ossoff, Braun Introduce Bipartisan Bill to Overhaul Federal Prison Oversight (Sept. 28, 2022), https://www.durbin.senate.gov/newsroom/press-releases/durbin-ossoff-braun-introduce-bipartisan-bill-to-overhaul-federal-prison-

oversight; *see also* S.4988—A bill to establish an inspections regime for the Bureau of Prisons, and for other purposes, https://www.congress.gov/bill/117th-congress/senate-bill/4988.

103   These suggested provisions are drawn from draft legislation prepared by the authors and by other individuals and organizations. We can provide the legislative language upon request.

104   *See* Li, Williams & Barry, *supra* note 53, at 1102, 1106, 1107.

105   *Id.*

106   *See* U.S. Dep't of Justice, Office of the Pardon Attorney, https://www.justice.gov/pardon. (last accessed Dec. 21, 2022).

107   Coronavirus Aid, Relief, and Economic Security Act, Pub. L. 116–136, § 12003(b)(2), 134 Stat. 281 (2020).

108   *See* U.S. Dep't of Justice, Office of Legal Counsel, Home Confinement of Federal Prisoners After the COVID-19 Emergency (Jan. 15, 2021), https://www.justice.gov/olc/file/1355886/download.

109   *See* U.S. Dep't of Justice, Office of Legal Counsel, Discretion to Continue the Home-Confinement Placements of Federal Prisoners After the COVID-19 Emergency (Dec. 21, 2021), https://www.justice.gov/olc/file/1457926/download.

110   *See* Sam Stein, *Biden Starts Clemency Process for Inmates Released due to Covid Conditions*, Politico (Sept. 13, 2021), https://www.politico.com/news/2021/09/13/biden-clemency-covid-inmates-511658"; *see also* Charlie Savage & Zolan Kanno-Youngs, *Biden Legal Team Decides Inmates Must Return to Prison After Covid Emergency*, N.Y. Times (July 20, 2021; updated Aug. 30, 2021), A12, https://www.nytimes.com/2021/07/19/us/politics/biden-prisoners-covid.html.

111   *See* U.S. Dep't of Justice, Office of the Pardon Attorney, Commutations Granted by President Joseph Biden (2021-Present), https://www.justice.gov/pardon/commutations-granted-president-joseph-biden-2021-present (last accessed Dec. 21, 2022). The principal exception seems to be arms dealer Viktor Bout, who was exchanged for Brittney Griner.

Downloaded from http://online.ucpress.edu/fsr/article-pdf/35/2/106/768393/fsr.2022.35.2.106.pdf by University of California Berkeley user on 08 February 2023

**App. 12**

## UNITED STATES PAROLE COMMISSION

# <u>CERTIFICATE</u>

I, Helen H. Krapels, Acting General Counsel in the Office of General Counsel for the United States Parole Commission, with offices at 90 K St., N.E., 3rd Floor, Washington, DC 20530, hereby certify that the attached exhibits are true copies of documents found in the U.S. Parole Commission's file pertaining to Bowers, Veronza, Federal Register Number 35316-136. This certificate supplements the certified record previously filed in the case containing Parole Commission exhibits 1 through 75, and begins with exhibit 76. As evidenced by the declaration of former U.S. Parole Commission General Counsel Rockne Chickinell dated December 23, 2011 (Exhibit 82), certain records were removed from the Parole Commission's file and from consideration of the Commission prior to the revote of December 2011 and maintained in a separate folder by Rockne Chickinell. These records were not part of the record considered by the Commission for its December 15, 2011 decision. The full record for the Commission's December 15, 2011 decision includes all exhibits from 1-107, except those documents identified in Mr. Chickinell's declaration.

IN WITNESS WHEREOF, I have signed this 19th day of December, 2014 and affixed the seal of the U.S. Parole Commission.

HELEN H. KRAPELS
Acting General Counsel
U.S. Parole Commission

**App. 13**

Index of Government Exhibits

Exhibit 76     Letter dated September 29, 2011

Exhibit 77     Order dated October 4, 2011

Exhibit 78     Notice of Action dated October 12, 2011

Exhibit 79     E-mail and letter from Theodore Frank dated October 14, 2011

Exhibit 80     Letter dated November 8, 2011

Exhibit 81     Letter dated November 21, 2011

Exhibit 82     Declaration of Rockne Chickinell

Exhibit 83     Order dated December 8, 2011

Exhibit 84     Notice of Action dated December 15, 2011

Exhibit 85     Letter dated January 13, 2012

Exhibit 86     Notice of Action on appeal

Exhibit 87     Petition for reconsideration

Exhibit 88     Letter dated October 14, 2011


Documents in parole file of Veronza Bowers and considered by Commission in 2011 decision to conduct revote and decision following revote


Exhibit 89     Bureau of Prisons progress report(redacted)

Exhibit 90     Letter dated September 25, 2007

Exhibit 91     Letter dated September 26, 2007

Exhibit 92     Letter dated November 15, 2007(available for in camera review)

Exhibit 93     Letter dated October 2, 2008

Exhibit 94     Memo dated October 15, 2008

**App. 14**

Exhbiit 95      Letter dated October 22, 2008

Exhbiit 96      Letter dated October 23, 2008

Exhibit 97      Letter dated April 8, 2009(redacted)

Exhibit 98      Memo dated August 30, 2011

Exhibit 99      Memo dated September 22, 2011

Exhibit 100     Letter dated October 1, 2011(available for in camera review)

Exhibit 101     Letter dated October 2, 2011(redacted)

Exhibit 102     Letter dated October 3, 2011(redacted)

Exhibit 103     Letter dated October 12, 2011

Exhibit 104     Letter dated October 13, 2011

Exhibit 105     Letter dated October 14, 2011

Exhibit 106     Letter dated October 16, 2011

Exhibit 107     Memo dated December 1, 2011

Exhibit 108     Original Jurisdiction Appeal Summary

# Memorandum



| Subject | Date |
|---|---|
| Bowers, Veronza<br>Reg. No. 35316-136 | December 1, 2011 |

| To | From *Rockne Chickinell* |
|---|---|
| Cranston J. Mitchell<br>Vice Chairman<br>U.S. Parole Commission | Rockne Chickinell<br>General Counsel<br>U.S. Parole Commission |
| Patricia K. Cushwa *PKC*<br>Commissioner | |
| J. Patricia Smoot<br>Commissioner | |

## Summary

This case is before the Commission after a decision to re-vote on whether Bowers should be granted mandatory parole under the criteria of 18 U.S.C. § 4206(d). Counsel for the prisoner and all interested persons and organizations have been given the opportunity to submit their views and recommendations concerning the re-vote. I recommend that the Commission deny Bowers mandatory parole because he committed a serious prison rule violation when he attempted to escape from FCI Lompoc in 1979.

## Facts and Procedural History

The relevant facts of Bowers's crime (the murder of Park Ranger Ken Patrick) and his prison record are described in the recent opinion from the U.S. Court of Appeals for the Eleventh Circuit in Bowers v. Keller, 651 F.3d 1277 (11th Cir. 2011) and will not be repeated here. The prisoner's parole file contains a copy of the opinion. The court of appeals determined that the Commission's voting process should return to the status of the case as of May 17, 2005, when the four voting Commissioners at the time were equally split in the decision for Bowers. The court stated that this vote result required the prisoner's parole unless the Commission started the re-determination of the parole case within 60 days of the court's decision, and acted in accordance with applicable laws and regulations. On October 4, 2011, the Vice Chairman and Commissioner Cushwa – the only two Commissioners remaining from the April-May 2005 voting -- ordered a re-vote of the case pursuant to the Commission's rule at 28 C.F.R. § 2.63(b)(3).

**Exhibit 107**

App. 16

## Discussion

The § 4206(d) criteria are well-known to the Commissioners. Given the statutory terms, the Commission must deny parole to Bowers if it finds, by a majority vote, that any of the criteria listed disqualify Bowers for parole. If a majority vote is not reached, the statute compels the prisoner's parole. Because Chairman Fulwood has recused himself from voting in this case, the finding on a disqualifying criterion, and therefore a parole denial, must be unanimous.

*Has Bowers seriously violated prison rules?*

In deciding the substantive merits of the case, the Commission should first examine the criterion of whether Bowers has seriously violated the rules of the institution during his incarceration. In my opinion, Bowers's 1979 attempted escape was a serious violation of institution rules and disqualifies him from parole under § 4206(d) even though this crime occurred more than 30 years ago. When Justice Department attorneys raised the issue of interpreting the word "seriously" in § 4206(d) in 2005, I conducted my own research on the use of the plain language rule of statutory interpretation and the principle that a statute should not be interpreted to reach an absurd result. I concluded that the plain language of the § 4206(d) did not permit the Commission to weigh a "serious" but dated rule infraction with a subsequent satisfactory disciplinary record and then disregard the serious infraction in ordering a mandatory parole for the prisoner. For this reason I concurred with Mr. Thiessen's recommendation that the Commission deny Bowers mandatory parole in October 2005 if the Commission found that Bowers committed a serious prison rule violation by attempting to escape. In the October 2005 decision, Vice Chairman Mitchell denied Bowers mandatory parole for the sole reason that the 1979 escape attempt constituted a serious institutional rule violation. Commissioner Cushwa concurred in this finding.[1]

In the subsequent defense of the Commission's October 2005 parole denial I drafted the portion of the government's argument that advances the statutory interpretation described above. In sum, the argument is that the plain language rule of statutory interpretation should be enforced to support the finding that the word "seriously" in § 4206(d) does not allow the Commission to consider the antiquity of a particular rule violation. The antiquity of a rule violation is covered by the term "frequently" in describing those infractions that may result in a denial of parole under the statute. Each word in the statute must be given its meaning so as not to render a word, clause or phrase superfluous. The words "serious" or "seriously" convey concepts of weight, gravity and significance, not concepts of time or interludes between events. The plain language rule of statutory interpretation may yield a harsh result, but it is not the function of a federal court to rewrite the law to mitigate the severe consequences of the law.

There are anomalies that result from this interpretation of the word "seriously" in § 4206(d). For example, a prisoner may be paroled under the criteria of § 4206(a) before the two-thirds date even

---

[1] Commissioner Cushwa also found that Bowers seriously violated prison rules by sending a letter to Ranger Patrick's widow in 1990. However, in making its decision on whether Bowers has seriously violated prison rules, I recommend that the Commission not rely on the 1990 incident. The institution made no finding that this act violated prison rules. In the absence of such a finding by a discipline hearing officer, the Commission normally does not use the alleged infraction in its decision-making. Nonetheless, this incident is arguably relevant in determining whether there is a reasonable probability that Bowers would commit another crime if paroled.

though he has committed serious escape early in his term of confinement. To obtain parole under § 4206(a), the Commission need only determine that the prisoner has "substantially observed" prison rules, which seems to allow for weighing an extended record of good conduct against an early serious violation of prison rules and deciding that the former justifies a parole grant. Another problem is that interim hearings after the denial of mandatory parole for a serious rule violation serve little purpose if the passage of time does not remove the significance of the rule violation for the Commission's decision. These anomalies show questionable draftsmanship in the crafting of § 4206, but they do not permit either the Commission or a federal court to rewrite the statute. Under the plain language of § 4206(d), the Commission is not authorized to grant mandatory parole to Bowers if it finds that he committed a serious prison rule infraction at any time in serving his life sentence.

The Commission's acceptance of this statutory interpretation in Bowers's case does not immediately lead to a parole denial. The Commission must still decide that the attempted escape was of sufficient gravity that he must be denied release. As Bowers's attorneys pointed out in their briefing to the appellate court, the Commission has granted mandatory parole to other escapees in recent years, citing to the cases of Zvonko Busic and Sara Jane Moore. (These files are available for the Commission's review.) In past decisions the Commission has refrained from categorizing all escapes as "serious" in applying the criteria for denying mandatory parole, and I recommend that the Commission continue this practice in re-assessing whether Bowers's 1979 offense is sufficiently serious to justify a parole denial under § 4206(d). Vice Chairman Mitchell and Commissioner Cushwa are not prevented by the court's decision to reach the same conclusions they did in October 2005 on the gravity of the escape attempt. They are also free to find that, in retrospect, the findings they made in October 2005 as to the severity of the attempt are not appropriate.

In making a decision on the severity of Bowers's escape attempt, there are several factors that the Commission may weigh in the prisoner's favor. Neither Bowers nor his accomplice possessed or used a weapon in the attempt, nor did they use force against prison personnel. They did not employ the assistance of persons outside the institution to make their escape. On the other hand, there are some aggravating circumstances of Bowers's crime. He and his accomplice attempted to escape from a secure prison by climbing a perimeter fence at a time when other prisoners were in the yard. They drew gunfire from the tower when they were trapped between the inner and outer fences, with the accomplice incurring a gunshot wound. The attempt had the potential of causing considerable turmoil within the institution.

## Has Bowers frequently violated prison rules?

At no time in 2005 did the Commission find that Bowers had frequently violated prison rules. He has a satisfactory prison conduct record since the last determination in October 2005. On the basis of the present record, there is no rational basis for a decision that Bowers must be denied mandatory parole for frequent rule violations.

## Is there a reasonable probability that Bowers would commit another crime if released?

The remaining criterion is whether there is a reasonable probability that Bowers would commit another crime if paroled. The voting Commissioners in 2005 split on this issue. The reasons for parole denial in the October 7, 2005 notice of action included the factual basis for this finding, given the record that existed at that time. But now six years have passed since this determination. (Nine years since the last event cited by the Commission in support of the finding.) The determination of risk of recidivism arguably depends on an evaluation of dynamic, as well as static, factors. The previous reasons for parole denial referred to the prisoner's malevolent beliefs and attitudes toward the United

**App. 18**

States Government as th. notivation for his previous crimina. Bowers should be given an opportunity to address this issue before the Commission makes another determination on whether he harbors such hatred for the United States Government and its officials that he poses a risk of further criminal behavior. In 2007 Bowers waived parole consideration. If the Commission does not find in the re-vote that Bowers has committed a serious prison rule violation, the Commission may nonetheless order a special reconsideration hearing to give Bowers the opportunity to be heard on whether his release would pose a risk of further criminal behavior.

*Letters opposing parole for the prisoner*

After the Commission informed the widow of Ranger Patrick and other interested persons and organizations of the possible re-vote for Bowers, the Commission received the following correspondence opposing parole for the prisoner: (1) a letter dated October 1, 2011 from Ranger Patrick's mother, Pansy Greer; (2) a letter dated October 2, 2011 from Bryant C. Watkins, a retired FBI agent; (3) a letter dated October 3, 2011 from Tomie Patrick Lee, Ranger Patrick's widow; (4) a letter dated October 10, 2011 from David Margolis of the Department of Justice; (5) a letter dated October 13, 2011 from Jonathan B. Jarvis, Director of the National Park Service; and (6) a letter dated October 14, 2011 from Chuck Canterbury, National President of the Fraternal Order of Police. These letters largely restate previously expressed opposition to Bowers's release.

*Letter from Bowers's attorneys*

In an October 14, 2011 letter, Bowers's attorneys object to the Commission's re-vote. The following analysis is an earlier, and shorter, version of a draft reply I prepared for the use of the U.S. Attorney's Office in Bowers's continuing litigation in the Northern District of Georgia. The draft is available for the Commission's review.

The attorneys first claim that the Eleventh Circuit's order does not permit the re-vote because the order requires the Commission to return the case to the status of proceedings as of May 17, 2005, and at that time the Commission had determined that there was insufficient new adverse information to reopen the grant of mandatory parole to Bowers. In their view, the vote in April and May 2005 was not a vote on the substantive merits of granting or denying parole to Bowers and they argue that the Commission must adhere to the mandatory parole grant issued in January 2005. This claim is unfounded. The court of appeals clearly gave the Commission the option of initiating new proceedings within 60 days of its order to determine whether Bowers should be granted parole, without restricting the Commission to an earlier decision. In granting Bowers partial relief, the court stated that "we are not deciding that the Parole Commission is barred from reconsidering its May 2005 original jurisdiction decision." The court added a footnote to this sentence noting that the Commission had revised its rules to permit a re-vote to resolve a tie vote or other impasse in making a parole decision. *Bowers* v. *Keller*, *supra*, at 1296, n. 21. The court's order required Bowers's release only if the Commission did nothing to initiate the reconsideration of the case within 60 days of the order. The Commission has ordered a re-vote.

The prisoner's representatives next assert that the re-vote regulation does not apply here, and that if it does apply, the regulation cannot apply retroactively to Bowers without violating the constitutional ban against ex post facto laws. They argue that former Commissioner Spagnoli's vote against parole in April 2005 cannot be counted because of her bias toward Bowers. Without Spagnoli's vote, the Commission vote in April-May 2005 is now 2-1 in favor of paroling Bowers. A tie vote no longer exists and there is no basis on which to order a re-vote. But the persuasive value of this argument depends on an event that occurred 6 years after the initial vote, i.e., the court's

**App. 19**

determination that Spagn... id not exercise impartial judgment in... ting on the second reopening of Bowers's case in June 2005. Using the same logic, another vote in May 2005 that favored parole for Bowers, made by former Chairman Reilly, now cannot be counted because of developments after this vote. Chairman Reilly retired from the Commission in November 2009. Of those Commissioners remaining from the April-May 2005, they are equally split in their votes on granting parole to Bowers. It is also worth noting here that the court of appeals only found that former Commissioner Spagnoli acted without impartiality in voting to reopen Bowers's case on June 14, 2005, and made no finding regarding her vote on April 19, 2005.

On the ex post facto claim, the attorneys argue that the use of the re-vote regulation creates a significant risk of prolonging Bowers's incarceration. In their view, the re-vote rule inexorably leads to a parole denial for a prisoner who is being considered for mandatory parole and whose case first results in a tie vote. But Bowers's constitutional claim depends on his ability at the time of his crime to invoke the statutory command of 18 U.S.C. § 4206(d) that he must be paroled in the absence of finding of one of the disqualifying criteria. This he cannot do because the mandatory parole statute was not in existence when he committed his murder in August 1973. Second, courts have been reluctant to apply the ex post facto prohibition to changes in commutation or parole voting procedures. E.g., Pennsylvania Prison Society v. Cortes, 622 F.3d 215, 246-47 (3rd Cir. 2010); Roller v. Gunn, 107 F.3d 227, 236-37 (4th Cir. 1997). Third, with or without the rule change at 28 C.F.R. § 2.63(b)(3), the Commission members could have agreed to a re-vote in May 2005 to resolve the tie vote. The new rule on a re-vote only sought to make the Commission's authority to choose this option "explicit." 75 FR 81458 (Dec. 28, 2010). Finally, the Commission's rules at the time Bowers committed his crime in August 1973 stated that "the Board [U.S. Board of Parole] may, on its own motion, reconsider any case prior to [the prisoner's] release and may reopen and advance, postpone, or deny a parole which has been granted." 28 C.F.R. § 2.20 (1973). This rule placed no restriction on the Board's authority to reconsider a parole grant and Bowers cannot claim that the re-vote rule somehow substantially risk an increase in his punishment.

Bowers's representatives also contend that in a re-vote the Commission is restricted to consideration of the administrative record as it existed on May 17, 2005 and may not consider any documents submitted after that date, with the possible exception of reports on new disciplinary rule violations. They argue that the Eleventh Circuit order, the re-vote rule and the Administrative Procedure Act all prohibit the Commission's use of information sent in after that date. The court order does state that the district court shall return the case to the Parole Commission "in its posture as of May 17, 2005, the date of the last Parole Commission action taken before Commissioner Spagnoli's unlawful actions." Bowers v. Keller, supra at 1295. As I advised in my September 22, 2011 memorandum, I do not believe that the court of appeals intended to freeze the administrative record as of May 17, 2005, since such an action would violate the limited standard of judicial review of agency actions that the court otherwise espoused in its opinion. The court only wanted to wind back the Commission's votes and resulting actions to a point before Commissioner Spagnoli sent her memorandum to the Justice Department recommending that the Attorney General appeal the mandatory parole grant to Bowers.

The Commission's rule on re-votes does not limit the information that may be considered at the subsequent vote. The attorneys argue that permitting the review of information sent in after May 2005 somehow converts the re-vote rule from a procedural rule (which does not require notice and comment under the APA) to a rule affecting substantive rights (which does require notice and comment). But it is hard to imagine a rule that is more associated with the internal workings and organization of an administrative agency than a rule on the voting process used by its members. Use of the procedural rule may have a significant consequence for a person, organization or segment of the general public

**App. 20**

but that does not transfor  the rule into a substantive rule that  ires notice and comment in the rulemaking process. JEM Broadcasting Co., Inc. v. FCC, 22 F.3d 320, 327 (D.C. Cir. 1994). The rule on resolving tie votes and on re-votes did not change the substantive standards for granting or denying parole, and this is the critical fact for determining whether the Commission was required to give notice and allow public comment before promulgating the new rule. Id.

The attorneys next object that the re-vote rule makes no provision for Bowers to receive disclosure of new information submitted in the re-vote process. In most cases when a re-vote is ordered, it is expected that little time will pass between the first and second round of votes and the second round will be based on the same record that existed in the initial voting. Of course, in Bowers's case 6 years have passed since the last parole consideration so it seemed appropriate to give Bowers's representatives and those persons opposing his parole the opportunity to again give their views and recommendations on the parole decision. The submissions of those persons opposing parole largely mirror the same comments made in 2005 against releasing the prisoner. None of the submissions provide any new facts on the attempted escape in 1979. We forwarded copies of the letters to Bowers's attorneys for their comments. We withheld one letter and portions of another to protect the confidentiality of the submission. The attorneys submitted responsive comments in a letter dated November 21 along with a copy of their opposition to the government's motion to dismiss the Georgia litigation.

Finally, the representatives contend that if a re-vote is held, the Commission must take "affirmative steps" to purge the taint of former Commissioner Spagnoli's actions and ensure that Bowers's parole determination is conducted by fair and impartial decision-makers. However, the court of appeals did not find that the other voting Commissioners in 2005 were tainted by the actions of former Commissioner Spagnoli and did not accept Bowers's claim that he could not receive a fair and impartial determination from the Commission if the case were remanded to the Commission: "Finally, contrary to Bowers' claim, we believe Bowers will receive a fair and impartial hearing if any further action is, in fact, taken by the Parole Commission. Commissioner Spagnoli resigned in 2007, and there is no evidence any of the current Parole Commissioners would act outside the confines of the Parole Act or the Parole Commission's rules and regulations." Bowers v. Keller, supra, at 1296. The court did not order that the Commission take any extraordinary procedural steps to isolate the former Commissioner's analyses from the present Commissioners on a re-vote. Nonetheless, I have removed from the file several memoranda that Commissioner Spagnoli prepared after the initial reopening of the case in February 2005, including her memoranda of April 19, 2005, June 1, 2005 (to the Deputy Attorney General) and October 5, 2005. There is no need, in my view, to disqualify from the re-voting process any Commissioner or staff member who may have agreed with one or more of Commissioner Spagnoli's reasons for denying Bowers parole in 2005. This drastic step would only be justified if the court of appeals had found that Commissioners other than Ms. Spagnoli could not exercise fair and impartial judgment on a re-vote.

## Recommendation

I recommend that the Commission find that Bowers committed a serious institutional rule violation in 1979 when he attempted to escape from a secure institution. For this reason, he should be denied mandatory parole. I do not recommend a finding that Bowers committed any other serious rule infraction, or that he has frequently violated prison rules. Finally, I recommend that the Commission refrain from making any decision on the criterion on whether there is a reasonable probability that Bowers would re-engage in criminal behavior if he were paroled. A decision on this ground should only be made after a hearing with the prisoner and affording him the opportunity to discuss his current

attitudes toward the United States and its officials and any other matters that are relevant to determining the likelihood of recidivism.

# UNITED STATES PAROLE COMMISSION



# CONGRESSIONAL REPORT

# FY 2021

TABLE OF CONTENTS:

INTRODUCTION...................................................................................................... 1

DATA SOURCES ................................................................................................... 3

PAROLE COMMISSION REPORT – FY 2021 ....................................................... 4

 (1) The number of offenders in each type of case over which the Commission has jurisdiction, including the number of Sexual or Violent Offender Registry offenders and Tier Levels offenders.....5

(2) The number of hearings, record reviews and National Appeals Board considerations conducted by the Commission in each type of case over which the Commission has jurisdiction. .........................7

(3) The number of hearings conducted by the Commission by type of hearing in each type of case over which the Commission has jurisdiction. ...........................................................................8

(4) The number of record reviews conducted by the Commission by type of consideration in each type of case over which the Commission has jurisdiction........................................................10

(5) The number of warrants issued and executed compared to the number requested in each type of case over which the Commission has jurisdiction. .......................................................11

(6) The number of revocation determinations by the Commission in each type of case over which the Commission has jurisdiction. ...............................................................................12

(7) The distribution of initial offenses, including violent offenses, for offenders in each type of case over which the Commission has jurisdiction. ..................................................................13

(8) The distribution of subsequent offenses, including violent offenses, for offenders in each type of case over which the Commission has jurisdiction. .............................................................14

(9) The percentage of offenders paroled or re-paroled compared with the percentage of offenders continued to expiration of sentence (less any good time) in each type of case over which the Commission has jurisdiction.................................................................................................15

(10) The percentage of cases (except probable cause hearings and hearings in which a continuance was ordered) in which the primary and secondary examiner disagreed on the appropriate disposition of the case (the amount of time to be served before release), the release conditions to be imposed, or the reasons for the decision in each type of case over which the Commission has jurisdiction...........16

(11) The percentage of decisions within, above, or below the Commission's decision guidelines for Federal initial hearings (28 CFR 2.20) and Federal and D.C. Code revocation hearings (28 CFR 2.21). ............................................................................................................17

(12) The percentage of revocation and non-revocation hearings in which the offender is accompanied by a representative in each type of case over which the Commission has jurisdiction. .......................18

(13) The number of administrative appeals and the action of the National Appeals Board in relation to those appeals in each type of case over which the Commission has jurisdiction.............................19

**App. 24**

**(14) The projected number of Federal offenders that will be under the Commission's jurisdiction as of October 31, 2021.**.................................................................................................................................*20*

**(15) An estimate of the date on which no Federal offenders will remain under the Commission's jurisdiction.**........................................................................................................................................*21*

**(16) The Commission's annual expenditures for offenders in each type of case over which the Commission has jurisdiction.**...........................................................................................................*22*

**(17) The annual expenditures of the Commission, including travel expenses and the annual salaries of the members and staff of the Commission.**.............................................................................*23*

**App. 25**

**FY 2021 Agency Achievements, Workload Summary and Cost Savings Initiatives**

The U.S. Parole Commission is highlighting the following accomplishments/workload reduction and cost savings initiatives during Fiscal Year 2021

A.   Reduction in Staff and Office Space

By the end of Fiscal Year 2021, the USPC had reduced its total employee count to 43 based largely on efforts to streamline workload, increasing use of videoconferencing for its parole hearings and decreasing the number of warrants being issued.

Based on the reduced staff, in August 2021, the USPC relinquished 40% of its office space at 90 K Street, NE Washington, DC. This reduction in office space will save taxpayers $900,000 annually.

B.   Lowering the number of persons re-incarcerated for administrative violations of supervision

During FY 2021, the USPC reduced the population of prisoners held at local correctional facilities in the District of Columbia. This number has been gradually reduced over the years starting with 2011 when there were over 750 persons held on violations of supervision in the District of Columbia. At the beginning of the pandemic in March 2020, there were 270 persons held in DC on parole or supervised release violations.  This number has continued to decrease based on diversion efforts by the agency aimed toward non-violent offenders in custody for administrative violations of supervision.  As of 12/15/2021, only 81 persons were held in the District of Columbia on violations of supervision while over 2,500 remain on community supervision in Washington, DC.

C.   Reducing the number of warrants issued and revocation hearings conducted

The agency issued 39% fewer warrants for violation of parole and supervised release in FY 2021 than in FY 2020.  The overall hearing workload was reduced by 50% mostly based on efforts to divert lower risk offenders to treatment or sanctions less than revocation. The Commission views both of these as positive developments especially during the pandemic. The USPC continued to issue warrants and revoke supervision for violent offenders who committed new crimes while substantially lowering the number of persons revoked for non-criminal violations of supervision.

D.   Reduction in the number of administrative appeals of parole/revocation decisions.

In FY 2021, only 48 parole/revocation decisions of the Commission were appealed to the USPC's National Appeals Board compared to 70 in FY 2019 and 69 in FY 2020. 2/3 of the administrative appeals were filed on behalf by U.S. Code or military offenders while

only 1/3 by DC Code offenders. Of note is that, of 281 DC Code supervised release revocation decisions made by USPC during FY 2021, only 8 (3%) were appealed.

### E.   Removing lower risk offenders from supervision

In FY 2021, the Commission reviewed the cases of persons on supervision with an emphasis on older federal offenders and lower risk District of Columbia offenders with a year or less remaining on supervision. Based largely on these efforts, the number of persons on U.S. Code parole supervision was reduced to 125 by the end of Fiscal Year 2021.

### F.   Electronic Transfer of Military Records

During FY 2021, USPC securely transferred nearly 400 records of military prisoners or parolees to the United States Disciplinary Barracks in Leavenworth, KS. This was in preparation of the final transfer of paroling/revocation authority for these offenders to the respective services branches. This transfer of authority will occur in May 2022.

### G.   Overall summary of agency hearing workload

Supervised Release cases in the District of Columbia represented 71% of overall hearing workload and 78% of the revocation hearing workload. DC Code cases (parole and supervised release) represented 88% of the hearing workload while U.S. Code cases represented 8% of hearing workload and military cases 4%.

# INTRODUCTION

**Purpose**:

The United States Parole Commission Extension Act of 2018, Public Law No. 115-274, reauthorized the Parole Commission through 10/31/2021.  As part of this reauthorization, Congress required a report answering 17 specific questions regarding the agency's workload and budget due by 12/31/2021.

**Agency Mission**:

The mission of the U.S. Parole Commission is to promote public safety and strive for justice and fairness in the exercise of its authority to release and revoke offenders under its jurisdiction.

**Agency Vision**:

The vision of the U.S. Parole Commission is to build an organization that balances justice through fair and equal treatment with dignity and respect for offenders, staff, and the community we serve.

**Agency Background**:

The Parole Commission is an independent agency within the Department of Justice that is responsible for the release and re-incarceration of federal, military, transfer treaty[*], WITSEC[**], and District of Columbia offenders.  Additional background information can be found on the agency website (https://www.justice.gov/uspc).

The Sentencing Reform Act of 1984 ("SRA") abolished the federal parole system and instituted a determinate sentencing system for federal offenders (Supervised Release).  This created a distinction between "old-law" offenders whose offense date was prior to November 1, 1987 and "new-law" offenders whose offense date was on or after November 1, 1987.  Congress anticipated that a transition period was necessary to provide for the orderly processing of parole-eligible "old-law" offenders.  Old-law offenders must retain their parole eligibility due to the constitutional prohibition on ex post facto laws.

Congress addressed the old-law offender issue in §235(b) of the SRA, providing that the Parole Commission would be extended for five years after the new sentencing system took effect.  The Parole Commission was set to expire on November 1, 1992; however, Congress recognized that

---

[*] The USPC is only responsible for the release of Transfer Treaty cases, not the re-incarceration.

[**] WITSEC (Witness Security Program) is a program operated by the U.S. Marshals Service to provide for the safety and security of government witnesses.



U.S. PAROLE COMMISSION
FY 2021

- 1 -

**App. 28**

the five-year transition period was unrealistic and the Parole Commission was extended until November 1, 1997.  In 1996, Congress again extended the Commission for five years and required a Congressional report from the Attorney General regarding the efficacy of continuing the Parole Commission's functions.

The Parole Commission's role was greatly expanded in 1997 following the abolition of the District of Columbia Board of Parole.   The Parole Commission assumed the duties of making release and re-incarceration decisions for all felony offenders convicted under the old indeterminate sentencing system in Washington, DC.  In addition, the Parole Commission was given authority over offenders sentenced under the new determinate sentencing system for DC offenders (Supervised Release).  The Parole Commission's authority included the power to set release conditions and revoke supervised release by imposing a new term of imprisonment followed by a new term of supervised release.  This represented a dramatic shift—instead of overseeing a dwindling population of old-law offenders—the Parole Commission was now overseeing an enduring population of local offenders.

Congress extended the Parole Commission in 2002 for an additional three years.   Notably, this was the last time that the Attorney General provided a transition plan under the 1996 extension.

In lieu of a transition report, Congress requested that the Attorney General report on a long-term plan for the most efficient and cost-effective entity capable of handling the responsibilities for D.C. supervised release cases that are presently handled by the Parole Commission.  In 2004, the Attorney General reported to Congress that retaining the Parole Commission was the most cost-effective and efficient option to carry out the supervised release functions for D.C. offenders.

Since 2002, Congress extended the Parole Commission five times.  The Parole Commission was extended for three-year periods in 2005 and 2008.  Set to expire in 2011, Congress extended the Parole Commission for an additional two-year period with an additional requirement that the Parole Commission make a report to the Committees on the Judiciary of the Senate and House of Representatives.  Then in 2013, Congress extended the Parole Commission for a five-year period and instructed the Government Accountability Office to analyze whether any other criminal justice agencies were capable of assuming the U.S. Parole Commission's duties.  The GAO completed the report in 2015[1]  and concluded that transferring jurisdiction "is not feasible without altering an existing or establishing a new entity."  Congress extended the Parole Commission in 2018 for the ninth time by providing for two years of authorization.  Most recently, Congress extended the Parole Commission for two years as part of a Continuing Resolution under the United States Parole Commission Extension Act of 2020.  The Parole Commission is now set to expire on 10/31/2022.

---

[1] *Number of Offenders under Its Jurisdiction Has Declined; Transferring Its Jurisdiction for D.C. Offenders Would Pose Challenges*, GAO-15-359 (May 28, 2015), available at https://www.gao.gov/products/GAO-15-359.



## DATA SOURCES

The data contained in this report reflects the compilation and analysis of data submissions from the U.S. Parole Commission (USPC), Administrative Office of the U.S. Courts, Court Services and Offender Supervision Agency (CSOSA), and the Bureau of Prisons (BOP). The USPC attempted to secure the best performance data possible within the construct of its budgetary, research, and data collection capabilities.

**PAROLE COMMISSION REPORT – FY 2021**

**Patricia K. Cushwa**
Chairman, United States Parole Commission
December 2021



**The Honorable Jerrold Nadler**
Chairman, House Committee on the Judiciary



**The Honorable Richard Durbin**
Chairman, Senate Committee on the Judiciary



1. **The number of offenders in each type of case over which the Commission has jurisdiction, including the number of Sexual or Violent Offender Registry offenders and Tier Levels offenders.**

### Number of Offenders by Type

| Type | In Custody | Released on Supervision | Total |
|---|---|---|---|
| US Code | 258 | 125 | 383 |
| DC Code (Parole) | 533 | 742 | 1275 |
| DC Code (SRAA) | 1571 | 2295 | 3866 |
| Military | 233 | 187 | 420 |
| Transfer Treaty | 20 | 0 | 20 |

*Source:* Bureau of Prisons, U.S. Probation, Court Services and Offender Supervision Agency

**Comments:**

- These numbers are an estimate based on the data provided by U.S. Courts, The Bureau of Prisons and The Court Services and Offender Supervision Agency.
- The 1,571 SRAA cases held in custody are not eligible for parole and, other than setting release conditions prior to their release from custody, do not impose a significant burden on agency workload. For example, during FY2021 the USPC reviewed and set conditions for 374 cases.

**Definitions:**

- DC Code: Refers to persons who committed Federal crimes prior to 11/01/1987.
- DC Code (Parole): Refers to persons who committed DC Code crimes prior to 08/05/2000.
- DC Code (SRAA): Refers to persons who committed DC Code crimes on or after 08/05/2000 and were sentenced under the Sentencing Reform Amendment Act of 2000 (SRAA), who are not eligible for parole, but who come under USPC's jurisdiction when they begin serving court ordered terms of supervised release.
- Military: refers to persons who have been convicted in military court, but who transferred to the Federal Bureau of Prisons prior to their release from their sentence.
- Transfer Treaty: Refers to prisoners who were sentenced in other countries but transferred to the United States and for whom the USPC makes a release decision.

**Offenders under USPC Jurisdiction (In Custody) by Offense Classification**

|  | US Code | DC Code (Parole) | DC Code (SRAA) | Foreign Treaty | Military |
|---|---|---|---|---|---|
| **Violent Offenses** | 168 | 414 | 1057 | 12 | 123 |
| **Property Offenses** | 8 | 15 | 107 | 0 | 0 |
| **Drug Offenses** | 16 | 7 | 26 | 6 | 0 |
| **Sex Offenses** | 22 | 71 | 146 | 2 | 109 |
| **Weapons Offenses** | 5 | 19 | 201 | 0 | 0 |
| **Other Offenses** | 39 | 7 | 24 | 0 | 1 |



*source:* Bureau of Prisons (as of 9/25/2021)

**Comments:**

- Information on cases under the USPC's jurisdiction is not readily available with respect to Violent Registry or Tier Level Offenders.
- The statistics provided by the Bureau of Prisons are intended to serve as a substitute.
- Information for this question is only available for those offenders held in custody.
- For Transfer Treaty cases, the USPC only has jurisdiction over the initial release decision.  Once a treaty offender is released, they are supervised by the nearest U.S. Probation office and subject to the jurisdiction of the federal court system.

**2. The number of hearings, record reviews and National Appeals Board considerations conducted by the Commission in each type of case over which the Commission has jurisdiction.**

### Type of Consideration by Jurisdiction

| Jurisdiction | Hearings | Record Reviews | Appeals |
|---|---|---|---|
| **Federal** | 99 | *378 | 19 |
| **DC Code (Parole)** | 285 | 244 | 8 |
| **DC Code (SRAA)** | 886 | 1600 | 8 |
| **Military** | 56 | *- | 13 |
| | | | |
| **Total** | **1,326** | **2,222** | **48** |

*Source:* Internal USPC Data



**Type of Consideration by Jurisdiction**

| | Federal | DC Code (Parole) | DC Code (SRAA) | Military |
|---|---|---|---|---|
| ■ Hearing | 99 | 285 | 886 | 56 |
| ■ Record Reviews | 378 | 244 | 1600 | |
| ■ Appeals | 19 | 8 | 8 | 13 |

**Comments:**

*USPC data is not able to distinguish military record reviews from federal data and thus the column for record reviews is a combined total of federal and military cases. We are able to distinguish military and federal hearings and appeals.

3. **The number of hearings conducted by the Commission by type of hearing in each type of case over which the Commission has jurisdiction.**

### Number of Hearings Conducted by Type of Hearing

| Jurisdiction | Revocation | Parole Release | Treaty | Parole Termination | Probable Cause |
|---|---|---|---|---|---|
| **Federal** | 22 | 73 | 0 | 4 | 0 |
| **DC Code (Parole)** | 51 | 132 | 0 | 17 | 85 |
| **DC Code (SRAA)** | 266 | 0 | 0 | 0 | 620 |
| **Military** | 3 | 53 | 0 | 0 | 0 |
| | | | | | |
| **Total** | **342** | **258** | **-** | **21** | **705** |



Number of Hearings Conducted by Type of Hearing

| | Federal | DC Code (Parole) | DC Code (SRAA) | Military |
|---|---|---|---|---|
| Revocation | 22 | 51 | 266 | 3 |
| Parole Release | 73 | 132 | 0 | 53 |
| Treaty | 0 | 0 | 0 | 6 |
| Parole Termination | 4 | 17 | 0 | 0 |
| Probable Cause | 0 | 85 | 620 | 0 |

**Definitions:**

- Revocation hearings include actual hearings to determine whether parole or supervised release is revoked in addition to cases where the prisoner accepts a revocation decision prior to the final revocation hearing.
- Parole release hearings refer to any hearing, other than a revocation hearing, where the prisoner's parole or re-parole is being considered. These hearings do not apply to DC supervised release cases who are not eligible for parole or re-parole.

- Treaty hearings are hearings to determine release dates for prisoners sentenced in foreign countries and transferred to the United States pursuant to treaty for whom the USPC has the authority to set release dates. No prisoners were transferred during this Fiscal Year due to the pandemic.
- Termination refers to hearings to consider early termination of parole after the releasee has served five years on parole supervision. These hearings are statutorily required for both U.S. Code and DC Code parolees. These hearings are not required for DC supervised release cases and military cases. USPC has no authority to terminate a military sentence.
- Probable Cause Hearings are hearings conducted to determine whether probable cause exists for persons alleged to have violated conditions of a DC Code parole term or DC supervised release term who have not been convicted of a new crime. The USPC is required to conduct these hearings only for persons arrested in the District of Columbia area. Outside of the District of Columbia, the authority for these hearings has been delegated to United States Probation Officers.

4. **The number of record reviews conducted by the Commission by type of consideration in each type of case over which the Commission has jurisdiction.**

### Number of Record Reviews

| Jurisdiction | Record Reviews |
|---|---|
| Federal | 378 |
| DC Code (Parole) | 244 |
| DC Code (SRAA) | 1600 |
| | |
| **Total** | **2,222** |



**Comments:**

- For the purpose of this report, the USPC considers a Record Review to be any action that requires action by a Commissioner that is not a hearing, an administrative appeal or a warrant.
- The USPC is not able to distinguish the exact number of record review decisions for military cases. The total number in the "Federal" category includes both U.S. Code and military prisoners/releasees.

5. **The number of warrants issued and executed compared to the number requested in each type of case over which the Commission has jurisdiction.**

### Warrants

| Jurisdiction | Warrants Requested | Warrants Issued | Warrants Executed |
|---|---|---|---|
| **Federal** | 41 | 21 | 34 |
| **DC Code (Parole)** | 190 | 107 | 112 |
| **DC Code (SRAA)** | 1125 | 658 | 668 |
| | | | |
| **Total** | **1,356** | **786** | **814** |

*Source:* Internal USPC Data.  (See COMMENTS for additional information)

**Comments:**

- Warrants are not necessarily requested, issued and executed in the same Fiscal Year. Thus, the above numbers are not determinative of the percentage of warrant requests that are denied.

6. **The number of revocation determinations by the Commission in each type of case over which the Commission has jurisdiction.**

**<u>Revocations</u>**

| Jurisdiction | Revocations |
|---|:---:|
| **Federal** | 22 |
| **DC Code (Parole)** | 51 |
| **DC Code (SRAA)** | 266 |
| **Military** | 3 |
|  |  |
| **Total** | **342** |



*Source:* Internal USPC data.

7.  **The distribution of initial offenses, including violent offenses, for offenders in each type of case over which the Commission has jurisdiction.**

### Distribution of Initial Offenses (In Custody)

| | Offense Type | | | | |
|---|---|---|---|---|---|
| | Violent/Weapons Offenses | Sex Offenses | Drug Offenses | Property Offenses | Other |
| **Federal** | 151 | 19 | 16 | 7 | 37 |
| **DC Code (Parole)** | 389 | 65 | 2 | 12 | 7 |
| **DC Code (SRAA)** | 1216 | 146 | 12 | 97 | 20 |
| **Military** | 123 | 109 | 0 | 0 | 1 |
| **Transfer Treaty** | 12 | 2 | 6 | 0 | 0 |



**Distribution Of Initial Offenses (In Custody)**

| | Federal | DC Code (Parole) | DC Code (SRAA) | Military | Transfer Treaty |
|---|---|---|---|---|---|
| Violent/Weapon Offenses | 151 | 389 | 1216 | 123 | 12 |
| Sex Offenses | 19 | 65 | 146 | 109 | 2 |
| Drug Offenses | 16 | 2 | 12 | 0 | 6 |
| Property Offenses | 7 | 12 | 97 | 0 | 0 |
| Other | 37 | 7 | 20 | 1 | 0 |

**Comments:**

-   The USPC interprets this question to mean the initial offense for individuals that are currently serving their sentence and have not yet been released to community supervision (either parole or supervised release).

8.  **The distribution of subsequent offenses, including violent offenses, for offenders in each type of case over which the Commission has jurisdiction.**

**Distribution of Subsequent Offenses (Violators)**

| | Violent/Weapons Offenses | Offense Type Sex Offenses | Drug Offenses | Property Offenses | Other |
|---|---|---|---|---|---|
| **Federal** | 22 | 3 | 0 | 1 | 2 |
| **DC Code (Parole)** | 44 | 6 | 5 | 3 | 0 |
| **DC Code (SRAA)** | 52 | 0 | 14 | 10 | 4 |
| | | | | | |
| **Total** | **118** | **9** | **19** | **14** | **6** |



**Distribution Of Subsequent Offenses (Violators)**

| | Federal | DC Code (Parole) | DC Code (SRAA) |
|---|---|---|---|
| ■ Violent/Weapon Offenses | 22 | 44 | 52 |
| ■ Sex Offenses | 3 | 6 | 0 |
| ■ Drug Offenses | 0 | 5 | 14 |
| ■ Property Offenses | 1 | 3 | 10 |
| ■ Other | 2 | 0 | 4 |

**Comments:**

The offense data above pertains only to those individuals held in Bureau of Prisons custody on parole or supervised release violator terms as of 9/25/2021. Thus, it is not reflective of the number of revocation hearings conducted by USPC during the entire Fiscal Year as indicated in the responses to questions 2 and 6.

BOP data for military cases does not distinguish offense data for parole violators.

9. **The percentage of offenders paroled or re-paroled compared with the percentage of offenders continued to expiration of sentence (less any good time) in each type of case over which the Commission has jurisdiction.**

### Initial Parole Decisions (FY 2021)

| Jurisdiction | % Released | % CTE | % Other Decisions |
|---|---|---|---|
| Federal | 19% | 67% | 14% |
| DC Code (Parole) | 42% | 1% | 57% |

*Source:* Internal USPC Data

### Re-Parole Decisions (FY 2021)

| Jurisdiction | % Released | % CTE | % Other Decisions |
|---|---|---|---|
| Federal | 92% | 4% | 4% |
| DC Code (Parole) | 86% | 6% | 8% |

*Source:* Internal USPC Data

**Comments:**

- SRAA cases serve a determinate sentence and are not eligible for parole or re-parole.

**Definition:**

- CTE:  Continue to Expiration. This refers to a decision to deny parole and require the prisoner to serve to their maximum release date.

**10. The percentage of cases (except probable cause hearings and hearings in which a continuance was ordered) in which the primary and secondary examiner disagreed on the appropriate disposition of the case (the amount of time to be served before release), the release conditions to be imposed, or the reasons for the decision in each type of case over which the Commission has jurisdiction.**

### Split Recommendations by Examiner Panels (FY 2021)

| Jurisdiction | % Splits |
|---|---|
| Federal | 5% |
| DC Code (Parole) | 7% |
| DC Code (SRAA) | 2% |

*Source:* Internal USPC data from FY2021.

**11. The percentage of decisions within, above, or below the Commission's decision guidelines for Federal initial hearings (28 CFR 2.20) and Federal and D.C. Code revocation hearings (28 CFR 2.21).**

### Guideline Decisions (FY 2021)

| Hearing Type | % Within | % Above | % Below |
|---|---|---|---|
| **Federal Initial** | 62% | 33% | 5% |
| **Federal Revocation** | 48% | 32% | 20% |
| **DC Code (Parole) Revocation** | 56% | 12% | 32% |
| **DC Code (SRAA) Revocation** | 44% | 12% | 44% |

*Source:* Internal USPC data from FY2021.

**12. The percentage of revocation and non-revocation hearings in which the offender is accompanied by a representative in each type of case over which the Commission has jurisdiction.**

**Revocation Hearings (FY 2021)**

| Jurisdiction | % Hearings with Representative |
|---|---|
| Federal | 75% |
| DC Code (Parole) | 90% |
| DC Code (SRAA) | 82% |

*Source:* Internal USPC data from FY2021.

**Non-Revocation Hearings (FY 2021)**

| Jurisdiction | % Hearings with Representative |
|---|---|
| Federal | 27% |
| DC Code (Parole) | 43% |

*Source:* Internal USPC data from 2021.

**Comments:**

- For DC Code SRAA cases, the USPC only conducts Revocation Hearings.
- The USPC has interpreted "Non-Revocation Hearing" to include any Parole Release or Termination Hearing both of which are defined in response to Question #3.

**13. The number of administrative appeals and the action of the National Appeals Board in relation to those appeals in each type of case over which the Commission has jurisdiction.**

<u>Appeals</u>

| Jurisdiction | # of Appeals | Affirmed | Modified | Remanded |
|---|---|---|---|---|
| **Federal** | 19 | 18 | 1 | 0 |
| **DC Code (Parole)** | 8 | 8 | 0 | 0 |
| **DC Code (SRAA)** | 8 | 6 | 2 | 0 |
| **Military** | 13 | 11 | 2 | 0 |
| | | | | |
| **Total** | **48** | **43** | **5** | **0** |

*Source:* Internal USPC data.

**14. The projected number of Federal offenders that will be under the Commission's jurisdiction as of October 31, 2021.**

Total projected number of Federal offenders under USPC jurisdiction is 322.

**<u>Comments:</u>**

Presumes a 10% yearly reduction in Federal prisoners, and a 20% yearly reduction in Federal parolees.

**15. An estimate of the date on which no Federal offenders will remain under the Commission's jurisdiction.**

The estimated date on which no Federal offenders will remain under the USPC jurisdiction is 2038.

<u>**COMMENTS:**</u>

- This estimate factors in the average age, rate of parole, rate of persons granted early termination, and the actuarial life table provided by SSA.  This is a product of our best *realistic* estimate.  If this estimate were to be based off the youngest U.S. Code inmate, who is 45 years old, then the estimated date of no federal offenders would be 2056.
  - According to the SSA, a 62 year old will live for an average of 19.5 years.
  - (*See* https://www.ssa.gov/oact/STATS/table4c6.html, last visited 2/4/19)
- This estimate is based on data for currently incarcerated U.S. Code inmates who committed their offenses prior to November 1, 1987.
  - Please note that this estimate was completed as part of the 2018 Parole Commission Report and we have received no new age data in the interim.

**16. The Commission's annual expenditures for offenders in each type of case over which the Commission has jurisdiction.**

### Percentage of Offenders by Type of Case

| Type | Percentage Total |
|---|---|
| US Code | 7% |
| DC Code (Parole) | 21% |
| DC Code (SRAA) | 65% |
| Military | 7% |
| Transfer Treaty | *0% |

**Comments:**

- The USPC expenditures are not correlated with the types of cases over which the Commission has jurisdiction. The above represents each sentence type's percentage of the USPC total offender population. See question 17 for a breakdown of the USPC's expenditures.

- *As noted in the answer to question 1, there were a total of 20 Transfer Treaty prisoners confined in BOP custody at the end of FY 2021 which represents less than one-half percent (.03%) of the USPC's total population.

**17. The annual expenditures of the Commission, including travel expenses and the annual salaries of the members and staff of the Commission.**

### EXPENDITURES BY CATEGORY

| Category | | FY 2021 |
|---|---|---|
| Salaries and Benefits | $ | 6,765,000 |
| Travel | $ | 55,000 |
| Operational Expenses | $ | 4,195,000 |
| Payment to Government Entities & Other Services | $ | 1,683,000 |
| Rental Payments | $ | 2,474,000 |
| Supplies, Equipment, etc. | $ | 38,000 |
| **Total** | **$** | **11,015,000** |

*Source:* Internal USPC Data (Budget and Management).

# UNITED STATES PAROLE COMMISSION



# CONGRESSIONAL REPORT
# FY 2021(ADDENDUM)

## I.    Background for Addendum/Revision to FY 2021 Report

In December 2021, the U.S. Parole Commission (USPC) submitted its annual report to Congress for Fiscal Year 2021 which included population data for offenders under the USPC's jurisdiction. The USPC reported that there were 258 U.S. Code parole-eligible prisoners in Bureau of Prisons (BOP) custody. In its FY 2020 report, however, USPC had reported only 153 U.S. Code parole-eligible prisoners in BOP custody. Given that the population of individuals under USPC jurisdiction are all persons who committed federal offenses before November 1, 1987, and thus new cases are not likely entering the system, the USPC sought to determine the cause of the data discrepancy.

This updated report explains USPC's finding that its reliance on "snapshot" data provided by BOP for the compilation of USPC's annual reports had, in fact, created a standing discrepancy. The underlying cause of the discrepancy was that BOP's data grabs, used to collect the data that was then provided to USPC for its annual report, would include a number of persons in BOP custody serving state sentences, and thus not under the USPC's jurisdiction. In the past, data analysts at USPC and BOP, who both left their jobs in 2021, had attempted to adjust the final, reported figure for the Commission's annual report by making subtractions from the BOP data grabs. Those corrective steps, however, were also incomplete.

This Report provides amended data pertaining to U.S. Code federal prisoners who are eligible for parole (also known as "old law" federal prisoners) from Fiscal Year 2019 to the present. It also outlines USPC's efforts to ensure there are no future discrepancies concerning the population data reported by the Commission in its annual submissions to Congress. In addition, this report provides an update on the status of the parole hearings for the federal offenders that remain in BOP custody as of July 2022.

## II.    Summary of current and past data collection for U.S. Code "Old Law" prisoners

Prisoners convicted and sentenced for committing crimes in violation of the U.S. Code are designated to the Federal Bureau of Prisons (BOP) to serve their sentences. For those who are eligible for parole, the BOP calculates their parole eligibility dates. Because the BOP's database maintains sentence data for all federal prisoners, including prisoners who have yet to reach their parole eligibility date, the USPC had historically relied upon data provided by the BOP to the Commission to report upon the number of "old law" federal prisoners in custody for the Commission's annual submissions to Congress.

Each year, data analysts at BOP would provide staff at the USPC with an end of Fiscal Year "snapshot" of "old law" federal prisoners who are in BOP custody. To produce this snapshot, BOP would run a query using sentence procedure codes they developed for federal inmates. For the end of Fiscal Year 2021, the "snapshot" of U.S. Code old law prisoners produced by this query and reported to the Commission for inclusion in the annual report was 258 prisoners. Further research, however, revealed that the sentence procedure codes maintained by BOP for old law federal prisoners and for prisoners in BOP custody serving state sentences were similar,



**App. 52**

and as a result, the "snapshot" provided by BOP to USPC included a number of prisoners serving only state sentences and not under the USPC's jurisdiction. In past years, the discrepancy had been discussed between previous research analysts for USPC and BOP, and staffers had attempted to account for the over-inclusion of the snapshot data by subtracting out individuals believed to be state-sentenced inmates. Their methodology, it turns out, was not full proof, and figures reported by the Commission in FY 2020 and 2019 were too low.  Moreover, both of these analysts left their respective agencies during FY 2021, and the discrepancy was not accounted for at all in the USPC's end of FY 2021 report, producing a reported figure that was too high.

In providing this revised report to Congress, the USPC has undertaken a more comprehensive approach to analyzing the old law federal prison population which it will continue to use for future reports. The Commission has created its own database of federal inmates by reviewing actual lists of prisoners in BOP custody who have a current or prior sentence for a U.S. Code offense that occurred before November 1, 1987, and isolating those who are currently eligible for parole or re-parole. Rather than rely on snapshots provided by BOP, the Commission will regularly maintain and update this database as prisoners release from custody or are returned to custody for violations of parole. This ongoing review will consistently produce a reliable number of federal prisoners under USPC's jurisdiction.

In addition to the revised data for Fiscal Year 2021, this report provides revised data for Fiscal Years 2019 and 2020. It also provides the current number of "old law" federal prisoners as of July 2022. As noted, the Commission intends to utilize this more comprehensive analysis for future reports.

As seen below, the number of U.S. Code prisoners in BOP custody who are eligible for parole or re-parole, under the authority of the U.S. Parole Commission, was 309 at the end of Fiscal Year 2019; 257 at the end of Fiscal Year 2020; 215 at the end of Fiscal Year 2021; and currently stands at 183 as of July 2022. Because parole was abolished for federal offenses committed on or after November 1, 1987, the parole-eligible population slowly shrinks over time as the remaining prisoners get older and complete their sentences while new inmates do not enter the prison system.  Specifically, as the revised numbers below demonstrate, this prisoner population has been declining at a rate of about 40 individuals per year between 2019 and 2021, and is on track to do so again in fiscal year 2022.

### Number of US Code prisoners in custody who are eligible for parole/re-parole

| End of FY 2019 | End of FY 2020 | End of FY 2021 | Current (July 2022) |
|---|---|---|---|
| 309 | 257 | 215 | 183 |

*Source:* Review and analysis of Bureau of Prisons rosters and USPC parole decision-making databases.  These figures represent the number of prisoners who were/are serving at least one U.S. code sentence which includes eligibility for parole or re-parole.  Previously, in prior annual reports, USPC had reported 195 prisoners for FY 2019,  153 prisoners for FY 2020, and 258 prisoners for FY 2021.



**Parole Hearing Status of U.S. Code Old Law prisoner population as of April 2022**

There is no correlation between the USPC's compiling of data for its end of Fiscal Year reports for Congress, and its scheduling of hearings for old law prisoners. Federal prisoners with old law sentences are tracked by USPC staff on an ongoing basis, and when such individuals become parole-eligible, USPC staff communicate with them via the case management staff at the BOP institution where they are confined, to inform them of their parole eligibility, the paperwork they need to file in order to apply for a parole hearing, and additional upcoming hearing dates. Accordingly, the data discrepancies in the Commission's prior annual reports to Congress did not result in any prisoners being "lost" or unaccounted for by the USPC, with respect to scheduling o these inmates for parole hearings.

To provide the public with fuller transparency and accountability regarding the sound operation of the USPC's system, the Commission is also providing an analysis of the current parole hearing status of each of the U.S. Code old law prisoners in custody as of July 2022. For clarification, parole hearings are scheduled in accordance with calendar years (not fiscal years). As noted above, as of July 2022, there are 183 federal prisoners serving a sentence that includes eligibility for parole or re-parole. Pursuant to 18 U.S.C. §4208(h), once these prisoners have applied for and had an initial parole hearing, they are scheduled for subsequent hearings no later than every two years.  The hearing statuses of the 183 federal "old law" prisoners in BOP custody are as follows:

1) Prisoners who will release on parole or mandatory release prior to end of calendar year 2022 and thus are not scheduled for another hearing: **13**
2) Prisoners who already had a hearing during calendar year 2021/22 or are scheduled for a hearing to occur before the end of 2022: **104**
3) Prisoners who are not scheduled for a hearing because they have not yet reached their parole eligibility date: **20**
4) Prisoner(s) who have reached parole eligibility date but waived/declined to apply for hearing: **1**
5) Prisoners who have previously been considered for parole but waived subsequent hearings and will be scheduled upon receipt of a new parole application: **45**

**U.S. Department of Justice**
United States Parole Commission

# HISTORY OF THE FEDERAL PAROLE SYSTEM



Edward F. Reilly, Jr., Chairman

May 2003

# UNITED STATES PAROLE COMMISSION

**Commissioners**

Edward F. Reilly, Jr., Chairman

Cranston J. Mitchell

John R. Simpson

This report was prepared by Peter B. Hoffman, Ph.D.,
a consultant to the Parole Commission. It updates an
earlier history of the Parole Commission prepared by
Dr. Hoffman in 1997 when he was Staff Director of
the Parole Commission.

# HISTORY OF THE FEDERAL PAROLE SYSTEM

May 2003

## PART 1 – A CHRONOLOGICAL HISTORY OF THE FEDERAL PAROLE SYSTEM

The precursors of parole in the federal system were (1) the exercise of the Presidential power to commute sentences, and (2) the reduction in the term of imprisonment by institutional officials for good conduct. In each case, the prisoner was released from imprisonment prior to the expiration of the sentence set by the court.

Set forth below is a chronological history of the federal parole system. Significant events are shown corresponding to the date listed. At the end of each entry, the source material is shown in brackets. Entries without a bracketed citation are based either on the source described in the entry itself or on the personal knowledge of the author. The following are the primary source materials used:

| | |
|---|---|
| AGSRP | *Attorney General's Survey of Release Practices, Volumes I (Digest of Federal and State Laws on Release Procedures)* and *IV (Parole)*. (1939). U.S. Department of Justice. |
| ARUSBP | *Annual Report of the United States Board of Parole.* The year covered by the report is shown in parentheses. |
| ARUSPC | *Annual Report of the United States Parole Commission.* The year covered by the report is shown in parentheses. |
| EUSBPR | *An Evaluation of the U.S. Board of Parole Reorganization.* (1975). Management Programs and Budget Staff, Office of Management and Finance, U.S. Department of Justice. |
| FPJ | *Federal Probation Journal.* Administrative Office of the U.S. Courts. The volume and number are shown in parentheses (*e.g.,* 4/2 is Volume 4, Number 2). |
| HUSBP | *History of the United States Board of Parole.* (undated, circa 1976). A mimeographed document prepared by James C. Neagles, Staff Director of the U.S. Board of Parole. |
| PDMR *Parole* | *Decision-Making Reports.* (1973). Research Center of the National Council on Crime and Delinquency. A set of fourteen reports describing the Parole Decision-Making Project. |
| PDMSR | *Parole Decision Making: Selected Reprints.* U.S. Parole Commission. The volume number is shown in parentheses. Six volumes containing reprints of articles concerning parole decision making. Many of the articles were prepared by staff of the U.S. Parole Commission. |

4

## CHRONOLOGICAL HISTORY

| Date | Event |
|------|-------|
| 1867 | The first statute providing for the reduction of sentences of federal prisoners because of good conduct was enacted. This statute authorized a deduction of one month in each year from the term of sentence of federal prisoners confined in state jails or penitentiaries, upon the certificate of the warden or keeper with the approval of the Secretary of the Interior. [AGSRP] |
| 1870 | The Department of Justice was created. [AGSRP] |
| | The good time statute was amended to provide that the good time specified in the act of 1867 applied only to institutions in which no other good time credits were allowed. In all other cases, the deductions applicable to state prisoners were to apply. [AGSRP] |
| 1872 | The duties of the Secretary of the Interior relating to the imprisonment and discharge of federal prisoners were transferred to the Department of Justice. [AGSRP] |
| 1875 | The schedule of credits was changed so that federal prisoners in any state or territorial institution in which no system of good time credits existed might earn a credit of five days for each month in which no charge of misconduct was sustained. [AGSRP] |
| 1891 | As part of legislation providing for the establishment of federal prisons, the Attorney General was given authority for the reduction of sentences for good behavior, but not to exceed two months for the first or any succeeding year of imprisonment. [AGSRP] |
| 1902 | A general revision of the good-time credit statute was made, placing all federal prisoners, wherever confined, on an equal basis. The schedule of good-time credits was made more liberal and graduated so as to increase with the length of sentence. The credits allowed per month follow: Five days upon a sentence of not less than 6 months nor more than 1 year; six days upon a sentence of more than one year and less than 3 years; seven days on sentence of at least 3 years but less than 5 years; eight days on a sentence of at least 5 years but less than 10 years; and ten days on a sentence of 10 years or more. In addition, a prisoner in a camp or employed in prison industry could earn an additional three days per month in the first year and five days per month in each succeeding year. [AGSRP] |
| | Good-time credits are primarily under the control of the officials of the institution at which the prisoner is confined. Forfeitures for breach of institutional rules are determined by the warden after the prisoner has been given a hearing before a |

5

disciplinary board composed of three members of the prison staff with the deputy warden or disciplinary officer acting as chairman. The prisoner has the privilege of replying and may choose some member of the staff to represent him as counsel. This board thoroughly investigates the alleged misconduct, hears the prisoner and any witnesses he may wish to present, and the members individually recommend to the warden the extent of discipline. The Bureau of Prisons issues general policies concerning the administration of good-time deductions. [AGSRP]

The Attorney General is granted authority to restore credits lost because of misconduct of prisoners in any United States penitentiary upon recommendation and evidence submitted to him by the warden in charge. As to prisoners in state or territorial institutions, restorations are governed by the rules of the particular institution. [AGSRP]

There was no post-release supervision for persons released by good time. [HUSBP]

1910    The federal parole system was created with the passage of an act authorizing the parole of prisoners sentenced to terms of one year or more. Any such prisoner was made eligible for parole upon the expiration of one-third of his or her sentence. The power to grant and revoke parole was placed in the hands of the respective boards of parole established at the several penitentiaries and prisons. The board of parole at each penitentiary was composed of the superintendent of prisons in the Department of Justice and the warden and physician of the particular penitentiary. The board of parole at any federal prison other than a penitentiary was composed of the superintendent of prisons and such officers of the particular prison as the Attorney General designated. [AGSRP]

The first person to hold the position of Superintendent of Prisons was Robert V. Ladow. [HUSBP]

A parole officer was provided for each penitentiary to supervise parolees and to perform such other duties as the board of parole might direct. It was provided that supervision of parolees might also be devolved upon the United States Marshals. [AGSRP]

The parole officer at each penitentiary served mainly as a clearing house for the volunteers and United States Marshals who had personal contact with the parolees. [ARUSBP (1970-72)]

The Act of 1910 also provided that whenever any person has been convicted of any offense against the United States and sentenced and confined in any state reformatory or institution, he becomes subject to the parole laws applicable to the inmates of such institution. [AGSRP]

6

The Act of 1910 further provided that no parole from either a state or federal institution became effective until approved by the Attorney General. [AGSRP]

Upon violation of parole, the Warden or any member of the institutional board of parole was empowered to issue a warrant for his retaking. A revocation hearing was conducted by the board of parole at the institution soon after his return. Each institution employed a parole officer (at a salary not to exceed $1,500) to assist parole applicants in obtaining employment and supervise parolees after release. U.S. Marshals were used as parole supervisors when needed. A system of monthly reports by parolees and their "first friends" was initiated. [HUSBP]

1911    The first Rules of the Board of Parole were promulgated. [HUSBP]

1913    The federal parole statute was amended so as to make prisoners serving a life term eligible for parole after the service of 15 years. [AGSRP]

No further amendments were made to the parole law until 1930. [AGSRP]

1930    The federal parole system was materially altered by legislation in 1930:

- In lieu of the several institutional parole boards, there was created a single parole board in the Department of Justice to be composed of three members appointed by the Attorney General. This board (the United States Board of Parole) was given power to grant parole without any requirement of approval by the Attorney General. Salaries for the three parole board members in 1930 were $7,500 per year each.

- Eligibility for parole of persons sentenced to federal institutions with sentences of more than one year was set at one third of the maximum sentence or 15 years in the case of a life sentence:

- "Every prisoner who has been or may hereafter be convicted of any offense against the United States and is confined in any United States penitentiary or prison, for a definite term or terms of over 1 year, or for the term of his natural life, whose record of conduct shows that he has observed the rules of the rules of such institution, and who, if sentenced for a definite term, has served one-third of the total of the term or terms for which he was sentenced, or, if sentenced for the term of his natural life has served not less than 15 years, may be released on parole" if it appears to the Board of Parole "that such applicant will live and remain at liberty without violating the laws, and if in the opinion of the Board such release is not incompatible with the welfare of society."

- A federal offender serving his sentence in a state institution was eligible for

7

parole under the same terms and conditions and by the same authority as a prisoner committed to that institution by a state court, but all such paroles were subject to approval by the United States Board of Parole. Supervision within the state was provided by state authorities. If the parolee was permitted to return to his home outside that state, his supervision was devolved upon the United States Marshal in the district in which the parolee resided.

- The legislation also provided for the transfer of the supervision of federal parolees to the probation officers that supervised probationers for the federal courts by providing that federal probation officers shall perform such duties with respect to persons on parole as the Attorney General shall request. The position of federal probation officer had been established by legislation in 1925 that for the first time authorized courts to impose probation in federal cases. As originally enacted, the probation statute required appointments for probation officers to be made by the judge of the particular district from the civil service register, but in 1930 the requirement for use of the civil service register was removed. The Bureau of Prisons (which had general oversight responsibility for the probation system) promulgated general qualifications which appointees should possess. In brief, these provided that persons selected should have physical vigor and mental adaptability, at least a high school education plus one year in college or a year's experience in organized probation work, and thorough training in the technique of social investigation. General oversight of supervision activities with respect to persons on parole was provided by the parole executive whose office was attached to the Board of Parole in Washington, D.C. [AGSRP]

Appointments to the parole board by the Attorney General were for an indefinite period. [HUSBP]

Although the Federal Probation Act was passed in 1925, the first Congressional appropriation to implement that act was in 1927, and five officers were appointed that year. Two more were appointed in 1928, including Richard A. Chappell who was later to serve on the Board of Parole. [HUSBP]

Preparation for parole was the responsibility of institutional parole officers, who, as staff members in the several institutions, participated in classification procedures, developed social histories, prepared and assembled official reports, and were responsible for social case work involving the prisoner and his or her family in the community. Under the original parole act, an institutional parole officer was appointed by the parole board at each institution. In 1930, this authority was transferred to the United States Board of Parole, but was actually exercised by the Bureau of Prisons, subject to the satisfaction of the Board of Parole. In 1930, the salary of an institutional parole officer was set at $2,000 to $2,600 per year.

8

[AGSRP]

The first offices of the Board of Parole were located in Room 201 of the Tower Building in Washington, D.C. The first three parole board members entered on duty on June 13, 1930. An executive secretary was employed to act as the administrative officer of the board. [HUSBP]

1931     In the Board's first year of operation, the Board's three members traveled as a group to hold hearings in institutions. After a short experimental period in which they discovered that two-thirds of their time was spent in travel status, they began traveling singly to conduct hearings with the vote taken later at headquarters in Washington, D.C. When traveling as a group, the Board heard an average of 40 cases per day and made on-the-spot decisions relative to parole. The Board also made decisions on federal prisoners serving sentences in state institutions. In these cases, a local board made recommendations to the Board of Parole. [HUSBP]

During the first year of operation, the Board heard a large number of offenders who had violated the National Prohibition Act. In the year or two after the Board was created, it paroled a large percentage of this type of law violator. [HUSBP]

Due to the volume of work, three secretaries were assigned to the parole board in addition to the administrative clerk. Two reporters were also employed to transcribe the Board's hearings. [HUSBP]

Legislation was enacted providing for parole for the purposes of deportation. During this year, 133 such paroles were granted. [HUSBP]

1932     Two significant amendments were made to the parole law. First, it was provided that a parolee shall continue on parole until the expiration of the maximum terms specified in his sentence without deduction for such allowance for good conduct. Previously, in the case of a person who was released on parole, good conduct deductions earned in prison operated to shorten the period of parole. Second, it was provided that any person to whom parole is not granted, but who is released prior to the expiration of the maximum term because of good-conduct deductions shall upon release be treated as if released on parole and shall be subject to all provisions of law relating to the parole of United States prisoners until the maximum term or terms specified in his sentence. [AGSRP]

Legislation creating a separate parole board for the District of Columbia removed from the federal parole board jurisdiction over prisoners confined in institutions of the District of Columbia. [HUSBP]

The National Prohibition Act was repealed and there was a dramatic reduction in the number of this type of law violator in federal prisons. The proportion of parole

9

grants to denial also declined. [HUSBP]

1933    The title of the administrative officer of the board was changed from executive secretary to parole executive. [HUSBP]

1936    James V. Bennett was promoted from Assistant Director to Director of the Bureau of Prisons, replacing Sanford Bates. The Parole Board and the Federal Probation System were still assigned to the Bureau of Prisons and thus under Mr. Bennett' supervision. [HUSBP]

Reports written during this year show that there was an emphasis by the Board to ensure that parolees were returned to their bona fide residences at the time of their release. The Board attempted to "diminish the assaults and larcenies committed against prisoners en route to their homes" by mailing most of the prisoners' money to them at their city of residence. [HUSBP]

1937    Myrl Alexander became the parole executive. Two years later he left the board and returned to his administrative duties at the Bureau of Prisons. Mr. Alexander later became the third director of the Bureau of Prisons. [HUSBP]

1938    The Federal Juvenile Delinquency Act was approved June 16, 1938. This Act provided that juveniles could be paroled by the Board of Parole at any time after commitment (i.e., that there was no minimum term of imprisonment required before the juvenile was eligible for parole consideration). [HUSBP]

1939    The Board appointed its first hearing examiner on May 21, 1939. Three were eventually appointed. Initially, they held hearings in cases of prisoners serving terms of one year and one day. [HUSBP]

Attorney General Murphy called a National Parole Conference, which was held in Washington, D.C. The conference followed a long term fact-finding project financed largely by Works Project Administration (WPA) funds. The project was directed by Wayne L. Morse, who later became a Senator of the United States, and resulted in the five-volume *Attorney General's Survey of Release Procedures*. As a result of this conference, "A Declaration of the Principles of Parole" was adopted. The conference proceedings were published as *Proceedings - National Parole Conference, Washington, D.C., April 17-18, 1939*. [HUSBP]

In contrast to the liberal trend of granting reparole, which was extended by the Board five or six years before, the Board in 1939 granted no reparoles at all and rereleased only five conditional releasees. [HUSBP]

The following were the basic parole board procedures (circa 1939):

10

- Application for Parole. A short while before a federal prisoner became eligible for parole, he is furnished with an application form. This is a very brief form on which the applicant was to enter certain information about himself, his plans, the nature of his crime, his prospective employer, and the person he desires as his parole advisor. If a prisoner does not desire to apply for parole, he is directed to sign a waiver of his right to apply for parole on a form that will be furnished to him.

- Information About the Prisoner. When a federal offender is committed to a penitentiary or other institution, the judge and district attorney of the committing court file reports and recommendations concerning him. In some instances, a presentence report is made by a probation officer, and in such cases the probation officer's report is also forwarded to the institution to which the offender is committed. Each prisoner is studied closely in connection with the institutional classification procedure. Reports will be filed concerning his progress by the various institutional officers from time to time. Immediately after his admission to the institution, the parole officers begin to study the family, and the social and economic conditions with which he will be faced when he is released on parole. An attempt is made to effect desirable community and home adjustments, and to prepare the community to which the offender will go for his reception.

- Hearings. Parole hearings are held at each of the federal penal and reformatory institutions four times each year, or once every three months. The hearings are usually conducted by one member of the board. They are ordinarily attended only by the member, the institutional parole officer, the applicant, and a stenographic assistant. The warden and other institutional officers ordinarily do not attend the hearings. No attorney, relative or other person may appear for or against the applicant. However, such persons may write to or interview members of the Board.

- Disposition. After the return to Washington of the board member who held the hearing, a final determination is made by the whole Board.

- Conditions of Parole. Before an offender is released on parole, he must agree to the conditions of his parole and an adviser is secured for him. An effort is made to arrange suitable employment for him. Also upon release he is given the usual gratuities which are allowed to federal offenders upon their discharge from an institution.

- Supervision. Each person released on parole is required to file with the parole executive an arrival report and subsequent written reports at intervals of not more than one month. In some cases the parolee is required to report every few days while in other cases he is required to report monthly. Each

11

report must be countersigned by the parolee's advisor. Each parolee is under the supervision of a probation officer. In some cases, the officer makes frequent visits to the parolee. In other cases, where the parolee has a strong adviser and his case is not a hazardous one, the probation officers may visit him infrequently.

- Each parolee has an adviser. In many cases, the person chosen is the person suggested by the parolee himself. In other cases, the parole executive finds it necessary to select some other person. In every case, an attempt is made to secure as adviser the person in the community in which the parolee will live who will be most able to direct him toward rehabilitation through the normal community agencies of social control.

- Violations of Parole. Sole authority to issue a warrant for the arrest of a parole violator rests with the Board of Parole or any member thereof. Such a warrant may be issued at any time prior to the expiration of the sentence if the Board or any member thereof has reliable information that the offender has violated his parole. The violation of parole interrupts the running of the sentence in the manner of an escape. The warrant may be executed by any officer of the prison from which the parolee was released or by any federal officer authorized to serve criminal process within the United States. Upon return to a federal institution, the violator is given an opportunity to appear before the Board at its next meeting. The Board may then or at any time in its discretion revoke the order and terminate such parole or modify the terms and conditions thereof. When parole is revoked, the parolee shall serve the remainder of the sentence originally imposed; and the time that the prisoner was out on parole shall not be taken into account to diminish the time for which he was sentenced.

- A federal parole violator may be reparoled at any time by the Board of Parole.
- Final Discharge. Upon the expiration of the parolee's sentence, the parole executive sends him a letter stating that he has apparently completed his parole period satisfactorily. No formal certificate of discharge is issued to him. [AGSRP]

1940    On July 1, 1940, the Federal Probation Service was transferred from the Bureau of Prisons to the Administrative Office of the United States Courts. Responsibilities of probation officers with respect to parolees continued as before. [HUSBP]

During the ten years the Probation System was under the supervision of the Bureau of Prisons, it expanded from one with eight officers in eight judicial districts to a nationwide program employing 238 officers in eighty-three United States District Courts. [FPJ: 4/2, statement by James V. Bennett, Director, U.S. Bureau of Prisons]

12

1941           In *The Pardoning Power of the President*, W.H. Humbert reported "parole authorities have handled a considerable number of federal offenders since 1910. Though release on parole does not banish prospects for a pardon, the conclusion is inescapable that such release tends to keep down the number of requests."

1942           World War II radically changed the character of the federal prison population. Substantial numbers of selective service violators and conscientious objectors were incarcerated. In 1942, the President issued Executive Order 8641 making it possible for the Attorney General to grant special paroles to prisoners who might be useful in the war effort. Extensive use was made of this authority with the parole board playing an unofficial role for the Attorney General. [HUSBP]

1943           Congress conducted hearings relative to legislation providing for a broader form of federal indeterminate sentence. The proposed legislation, entitled the "Federal Corrections Act" would have established a ten-member parole board with an adult division, a youth division, and a policy division. No legislation was enacted. [HUSBP]

1945           On August 28, 1945, the Attorney General ordered the parole board to report directly to him for administrative purposes. Staff formerly employed by the Bureau of Prisons and assigned to the Board were transferred officially to the Board on February 15, 1946. [HUSBP]

                During the year, the character of the federal prison population changed in that the number of persons who had been court-martialed by military authorities and transferred to federal prisons increased. These offenders generally had longer sentences than those imposed by civilian courts. [HUSBP]

1946           With the end of gas rationing, there was a dramatic use of automobiles over the nation. Military prisoners decreased and the number of violators of the National Motor Vehicle Theft Act rose sharply. [HUSBP]

1948           The Board of Parole was increased from three to five members by legislation enacted June 25, 1948. This increase was needed primarily because of an increase in prison population. Prior to the increase in the size of the Board, the two examiners on staff conducted approximately one third of the hearings. [HUSBP]

1950           On September 30, 1950, the *Youth Corrections Act* was passed by Congress. Under this legislation, federal offenders less than 22 years of age at the time of conviction could be sentenced to indeterminate sentences with no minimum period of parole ineligibility. The maximum period of imprisonment was fixed by statute at six years, but longer maximum terms were permitted in the case of very serious offenses. This Act contained three other significant features. First, all youth offenders must be initially released on supervision at least two years prior to the expiration of the

13

maximum sentence. Thus, each offender would be initially released with a period of supervision of at least two years. Second, it authorized a court to commit an offender for a period of observation and study prior to sentencing. Third, it provided that the parole board could grant an early discharge from parole supervision, an action that "set the conviction aside" and granted relief from various legal disabilities imposed by the conviction. The *Youth Corrections Act* was to become effective only upon the certification of the Attorney General that facilities to house such offenders were available. [HUSBP]

The *Youth Corrections Act* also changed the structure of the parole board. First, it created a three-member Youth Division within the parole board. Second, it increased the number of parole board members from five to eight. Third, it provided that all parole board members would be appointed by the President, with the advice and consent of the Senate, for six-year, staggered terms. [HUSBP]

The *Youth Corrections Act* also provided for an Advisory Corrections Council to be composed of federal judges and federal correctional officials to study and advise on correctional practices. [HUSBP]

1950    Until this year, secretaries traveled with the Board members to report institutional hearings. After six months of experimentation with recording devices, the Board adopted a system of hiring local shorthand reporters on a contract basis. [HUSBP]

1951    Until 1951, prisoners released by expiration of sentence less good time were under supervision until the expiration of their maximum sentence. Legislation approved June 29, 1951, provided that such prisoners were to be released from supervision 180 days prior to the expiration of the maximum sentence. With the implementation of this Act, the number of mandatory releasees under supervision dropped sharply. In general, prisoners with sentences of 18 months or less who were released by expiration of sentence less good time would no longer be released to supervision. [HUSBP]

Legislation approved July 31, 1951, made two changes in parole eligibility. Up to this time, adult prisoners serving sentences of more than one year were eligible for parole after service of one-third of their sentences, except for prisoners serving life sentences who were eligible after the service of 15 years. Under the revised legislation, adult prisoners serving sentences of 180 days to one year were also eligible for parole after service of one-third of their sentences. In addition, prisoners serving terms of more than forty-five years were eligible for parole after fifteen years in the same manner as prisoners serving life sentences. [HUSBP]

1953    The first presidential appointments were made to the parole board in 1953. [HUSBP]

Mr. Scovel Richardson became the first African American appointed to the parole

14

board. [HUSBP]

By order of the Attorney General dated October 15, 1953, juveniles committed by the District of Columbia Juvenile Court to the National Training School for Boys came under the parole jurisdiction of the federal parole board. Prior to this time, the District of Columbia Visiting Committee had acted as the paroling authority for such juveniles. [HUSBP]

The Board hired its first staff director (Dr. Conway Esselstyn). [HUSBP]

1954    On January 15, 1954, the Youth Corrections Act was made available to the federal courts east of the Mississippi River. [HUSBP]

1955    During 1955, the parole board began paroling prisoners to outstanding local detainers if they were otherwise considered to be suitable for parole. Previously, an outstanding detainer had acted as a bar to parole. [HUSBP]

Dr. Conway Esselstyn, the Board's first staff director, resigned and was replaced by James Neagles, who served as staff director until 1976. [HUSBP]

1956    The Attorney General called the second National Conference on Parole, which was held in Washington, D.C., on April 9-11, 1956. The Conference was sponsored by the federal parole board and the National Probation and Parole Association. Approximately 500 delegates attended. Out of this conference came *Parole in Principle and Practice: A Manual and Report*. One of the recommendations of this conference was that release from prison by expiration of sentence less good time be termed "mandatory release" rather than "conditional release." The U.S. Board of Parole implemented this recommendation. [HUSBP]

Congress enacted the Uniform Narcotic Control Act. This Act provided for mandatory minimum terms of imprisonment for certain drug offenders. In addition, such offenders were made ineligible for parole consideration. [HUSBP]
On October 4, 1956, the Youth Corrections Act was made available to the federal courts west of the Mississippi River. [HUSBP]

1958    On August 25, 1958, Congress approved legislation that allowed courts to impose an adult sentence on which the prisoner would be eligible for parole consideration after serving less than one-third of the maximum sentence. That is, in addition to the traditional sentencing procedure under which the prisoner had to serve one-third of the maximum sentence before being eligible for parole, the court could now impose (1) a sentence with a period of parole ineligibility that was less than one-third of the maximum sentence, or (2) a sentence with no period of parole ineligibility. In addition, this legislation authorized a court to commit an adult offender for a period of observation and study prior to sentencing, a provision that earlier had been

15

available only for youthful offenders. Furthermore, this legislation provided for the judicial sentencing institutes for federal judges. Finally, this legislation authorized the parole board to terminate releasees from active supervision prior to the expiration of their maximum sentences. [HUSBP]

In addition, legislation passed in 1958 authorized the courts to use the provisions of the *Youth Corrections Act* in certain cases for persons who were less than 26 years of age at the time of conviction. [HUSBP]

1959    This first federal judicial sentencing institute was held at Boulder, Colorado. A primary topic was the issue of unwarranted sentencing disparity. [HUSBP]

Congress passed the *Labor-Management Reporting and Disclosure Act*. This legislation barred certain individuals with criminal records from serving in certain labor or labor-management positions. The federal parole board was given the authority to conduct a hearing for any person who applied for relief from the disabilities imposed by this legislation, and to grant exemptions from these disabilities in deserving cases. [HUSBP]

The *Annual Report of the U.S. Board of Parole* describes the second phase of a research study on offenders sentenced under the *Youth Corrections Act* (pertaining to prison programming). [ARUSBP (1959)]

The *Annual Report of the U.S. Board of Parole* also notes the parole board's evaluation of recidivism statistics indicates that (1) maturation appears to be a significant factor in rehabilitation in that adult offenders have lower recidivism rates than youth offenders, and (2) most parole violations occur within the first or second year after parole and the number of warrants issued in the fifth year after parole is "practically non-existent." [ARUSBP (1959)]

1961    In accordance with an opinion handed down by the Court of Appeals for the District of Columbia, the parole board adopted procedures allowing alleged parole/mandatory release violators to have an attorney and/or voluntary witnesses present at a revocation hearing conducted upon return to a federal institution. [HUSBP]

1962    The parole board began making use of a new program initiated by the Bureau of Prisons, involving the establishment of pre-release guidance centers in the community to which the prisoner was to be released. Centers were first opened in New York City, Chicago, and Los Angeles. The parole board could parole an individual with the understanding that the individual would reside in a pre-release center from two to four months prior to parole. Subsequently, additional pre-release centers were opened in other cities. Eventually, state and privately-operated centers were used on a contract basis. [HUSBP]

16

1963    In accordance with an opinion handed down by the Court of Appeals for the District of Columbia, the parole board adopted procedures providing for preliminary interviews for alleged parole/mandatory violators in the community in which the alleged violation occurred. In addition, "local" revocation hearings, revocation hearings in the community in which the alleged violation occurred, were authorized to facilitate the appearance of voluntary witnesses. [HUSBP]

1966    The Board cooperated with the Bureau of Prisons in the Bureau's development of work-release programs. Selected prisoners were permitted to leave the institution or a pre-release center to work in private industry or, in some cases, to attend a trade school or college. Such placements generally were made within six months of a projected release date. [HUSBP]

1967    Congress passed the *Narcotic Addict Rehabilitation Act*, which had provisions for civil commitment of narcotic addicts as well as special provisions for those convicted of criminal offenses. Under this Act, the maximum period of imprisonment on a criminal commitment was fixed by the court with parole eligibility after six months in treatment. A certificate of release readiness from the Surgeon General was a prerequisite for parole. [HUSBP]

        Congress also passed legislation transferring responsibility for D.C. youth offenders confined in the D.C. Youth Center from the federal parole board to the District of Columbia government. Supervision of such cases also was transferred from U.S. Probation Officers to the District of Columbia government. [HUSBP]

1968    The parole board adopted a procedure for a "dispositional review" where a parolee or mandatory releasee was serving a subsequent sentence and a violator warrant was lodged as a detainer. Such a review could include a hearing at the place of confinement if the parole board determined such a hearing was indicated. [HUSBP]

        The National Training School for Boys was closed, and juveniles committed by the District of Columbia Juvenile Court were placed in D.C. institutions. Accordingly, the federal parole board had no further jurisdiction over D.C. juvenile offenders. [HUSBP]

1969    The parole board requested and received a grant from the Law Enforcement Assistance Administration for a large scale, three-year study of parole decision-making. This study, under the co-directorship of Don M. Gottfredson, Director of the National Council on Crime and Delinquency Research Center, and Leslie T. Wilkins, a professor at the School of Criminal Justice, State University of New York at Albany, led to a major revision in parole board practice. [HUSBP]

1970    The parole board hired its first legal counsel (Joseph Barry). [HUSBP]

17

1971  The parole board increased its complement of hearing examiners to eight. A schedule was adopted under which parole board members conducted about one-third of the hearings and hearing examiners conducted about two-thirds of the hearings. This allowed parole board members more time for voting on cases. In general, decisions were made by a concurrence of two parole board members. If the hearing was conducted by a parole board member, the parole board member hearing the case cast the first vote. The case file was then circulated among other parole board members at the parole board's office in Washington, D.C., until a concurrence of two votes was obtained. If the hearing was conducted by a hearing examiner, the examiner made a recommendation but did not vote. The case file was then circulated among the parole board members at the parole board's office in Washington, D.C., until a concurrence of two votes was obtained. [HUSBP]

Congress passed legislation authorizing the parole board to impose a special condition that a parolee or mandatory releasee reside in and/or participate in a program of a community treatment center (formerly called a pre-release guidance center) as a special condition of parole. This special condition could be used, in some cases, as an alternative to parole revocation. [HUSBP]

Congress amended the *Criminal Justice Act* to provide for court-appointed counsel for alleged parole and mandatory release violators who could not afford to hire their own attorney. [HUSBP]

Congress also passed legislation authorizing hearing examiners to conduct initial and revocation hearings for youth offenders. [HUSBP]

1972  The parole board began a pilot project that included the following goals: (1) the development of explicit paroling policy guidelines to provide greater consistency and equity in parole decision-making; (2) the provision of well-reasoned, written decisions; (3) more timely decisions; (4) the development of procedures to provide the opportunity for representatives to appear at parole hearings; (5) the development of a two-level appellate process to provide greater due process; and (6) increased liaison between the Board and related agencies. Key features of this project were the decentralization of the parole board into five regions (each headed by a board member) with the Chairman and two other members forming a National Appeals Board in Washington, D.C.; the use of explicit guidelines for parole decision-making; hearings conducted by panels of two hearing examiners with review by the regional parole board member on the record; and the provision of written reasons for parole decisions. [EUSBPR]

The first hearings under this reorganization project were conducted at the Kennedy Youth Center in Morgantown, West Virginia in October 1972. [EUSBPR]

The pilot project comprised five Federal institutions in the northeast region of the

18

country. They were the Penitentiary, Lewisburg, Pennsylvania; the Kennedy Youth Center, Morgantown, West Virginia; the Reformatory for Women, Alderson, West Virginia; the Reformatory, Petersburg, Virginia, and the Correctional Institution, Danbury, Connecticut. [ARUSBP (1972-73)].

The parole board established a Research Unit and hired its first Research Director (Peter Hoffman). [ARUSBP (1970-72)]

The explicit paroling policy guidelines adopted by the parole board were developed in cooperation with a project funded by the Law Enforcement Assistance Administration and conducted by the National Council on Crime and Delinquency. The guidelines were in the form of a two-dimensional grid. The seriousness of the prisoner's current offense (offense severity) was considered on the vertical axis with six categories (later increased to seven and then eight categories). The prisoner's likelihood of recidivism (parole prognosis) was considered on the horizontal axis with four categories. The dimension of parole prognosis was determined by use of a "salient factor score," an empirically derived parole prediction instrument. The intersections of the vertical and horizontal axes formed a grid containing time ranges (such as 12-18 months). The time range set forth the parole board's policy on the customary time to be served before release for a prisoner having that offense seriousness and parole prognosis, assuming good institutional conduct. Decisions outside the guidelines may be made for good cause and upon the provision of case-specific written reasons. For example, misconduct in the institution might warrant a decision above the applicable guideline range, and exceptionally good participation in institutional programs might warrant a decision below the applicable guideline range. [PDMR]

The parole board implemented the procedures for due process in the revocation of parole set forth in *Morrissey vs. Brewer*, 408 U.S. 471, 92 S. Ct. 2593. [ARUSBP (1972-73)]

1973    In May 1973, Maurice Sigler, Chairman of the U.S. Board of Parole, submitted the Board's reorganization proposal to the Department of Justice. In July 1973, this proposal was approved by Attorney General Elliot Richardson. [EUSBPR]

The Research Center of the National Council on Crime and Delinquency published a fourteen-volume set of reports on the Federal Parole Decision-Making Project. [PDMR]

1974    Regional offices were established in Philadelphia, Pennsylvania, Atlanta Georgia, Dallas, Texas, Kansas City, Missouri, and Burlingame, California. Each regional office included a parole board member, five hearing examiners, two case analysts, and clerical staff. [EUSBPR]

19

The parole board's budget for Fiscal Year 74 was $2,025,000, up from 1,391,000 in Fiscal Year 73 and from approximately $500,000 in 1965. The increase from Fiscal Year 73 to Fiscal Year 74 included the cost of implementing the reorganization. Personnel increased from 48 positions in Fiscal Year 65 to 125 positions in Fiscal Year 74. [EUSBPR]

1975    Each regional office has approximately 20 employees. A typical regional office is staffed with a Board member acting as the Regional Director, an administrative hearing examiner and four hearing examiners, a pre-release analyst, a post-release analyst, and administrative and clerical support personnel. [EUSBPR]

Hearing examiner panels, each consisting of two persons, conduct parole interviews at each institution within the region. At the conclusion of each interview, the examiners inform the prisoner of the recommended (tentative) parole decision. If the recommendations of the examiners differ, the prisoner is informed of both recommendations. All panel decisions are reviewed in the regional office by an administrative hearing examiner and the regional board member. It is the regional board member who makes the final decision, subject to certain limitations (if the regional board member wishes to alter a panel recommendation by more than six months, the case must be sent to the national board members for review). After a decision is made, a Notice of Action is mailed to the prisoner within 15 working days of the hearing. If the prisoner is not granted parole at that time, the reasons are given as part of the Notice of Action. If the prisoner is dissatisfied with the decision, he or she has available a two-step administrative appeal process. [EUSBPR]

According to a report of field visits by Department of Justice Management Programs and Budget staff --

*       The average hearing lasted 30 minutes. Revocation hearings took anywhere from 45 to 90 minutes. The hearing began with a review of the inmate's file by one hearing examiner while the other examiner dictated the results of the last hearing. The review usually took 10 to 15 minutes. The offender's prior criminal history was closely examined during the file review. After the file was reviewed by one examiner, he provided a brief summary of the file to the other examiner, who had completed dictating the results of the previous hearing.

*       Prior to the interview with the inmate, the hearing panel discussed the inmate's progress with the institutional case manager. At the beginning of the interview with the inmate, the hearing examiner carefully explained the Board's procedures to the inmate and his right to appeal the decision. The principal discussion points initiated by the hearing examiners were: the validation of the salient factor score, the inmate's offense and the surrounding circumstances of the crime, and his institutional behavior and program participation.

20

- The inmate's remarks usually began with a description of the mitigating circumstances of his offense and past criminal behavior. This was most often followed by the inmate's statements regarding his participation in institutional programs and his motivation to become a better citizen. The period of time for the discussion with the inmate ranged from five to 15 minutes. When an inmate's representative was present, the discussion period required as much as one-half hour.

- Following the inmate's discussion, he was asked if he had any questions he would like to ask the panel. If not, he left the room and the hearing examiners discussed the case. In most instances, the decision-making process, which takes from two to five minutes, was a straightforward application of the guidelines and salient factors to the individual case.

- The inmate returned to the hearing room and was advised of the panel's tentative decision. When parole was approved, the discussion continued on the completion and validation of the release plan. When parole was denied, the examiners advised the inmate of the reasons and the right to appeal the decision. The process of advising the inmate of the decision required approximately five minutes.

- Most representatives who were observed by the evaluation teams were institutional staff; however, relatives, prospective employers, and educators have appeared at a number of hearings. Generally, hearing examiners and Bureau of Prisons institutional staff agree that the inmate representative does not have a major effect on parole decisions; however, the representatives can have a positive effect on the inmate's attitude. Cases have occurred where Bureau of Prisons institutional staff members serving as inmates' representatives have directly contradicted the observations and recommendations of the inmate's caseworker. In these instances, the examiner stated that the representative can have a major impact on their decision. [EUSBPR]

1976        The *Parole Commission and Reorganization Act* (Public Law 94-233) became effective on May 14, 1976. A major revision of the statutes pertaining to parole, this Act retitled the agency as the United States Parole Commission. The primary provisions of this Act are listed below.

- The U.S. Parole Commission is created with a membership of nine Commissioners. The Youth Correction Division was eliminated and its duties absorbed within the new Commission.

21

**App. 75**

- No fewer than five regions are mandated; a Regional Commissioner is placed in charge of each. Three Commissioners are assigned to a National Appeals Board. Authority and responsibilities of the Commission, the Chairman, and the Regional Commissioners are set forth.

- Eligibility for parole for prisoners with long sentences, including life terms, is reduced to ten years, from the previous fifteen years.

- Explicit Guidelines for Decision-Making are mandated.

- Reasons for denial of parole must be provided to the prisoner in writing. Decisions outside the guidelines must be for "good cause" and must contain specific written reasons for such departure.

- Parole applicants have a right to examine their own case file (with limited exceptions) prior to the hearing.

- Parole applicants may be accompanied at their hearings by a representative of their choice, who may make a statement on the applicant's behalf.

- If a prisoner's sentence is less than seven years, he must be reviewed no later than at 18 month intervals after the initial hearing. If this sentence is seven years or more, he must be reviewed no later than at 24 month intervals following the initial hearing.

- Prisoners with terms of five years or more and satisfactory institutional conduct must be paroled after service of two-thirds of the term, unless the Commission finds that there is a "reasonable probability" of further crime.

- A two-level appeal system is mandated.

- Regular and special conditions of release set by the Commission may be modified only after an opportunity has been offered to the releasee to comment on the proposed modifications. Such modifications are also appealable.

- The Commission must review a parolee's progress under supervision after two years and at least annually thereafter, and may terminate supervision prior to completion of the sentenced term. Termination of supervision ends the jurisdiction of the Commission over the releasee.

- After five years of supervision in the community, the Commission must terminate jurisdiction unless it finds, after a hearing, that there is a likelihood of further crime. Such decision is appealable.

22

- At the discretion of the Commission, alleged violators may be summoned to a hearing in lieu of being arrested on a warrant, and may be released under supervision pending a revocation hearing.

- Reviews of parole violation warrants placed as a detainer, while a prisoner is serving a subsequent sentence, must be reviewed within 180 days and a decision made with regard to disposition of the warrant.

- Alleged parole violators have the right to confront "adverse" witnesses at a preliminary interview and any revocation hearing held in the local community. At such interview or at any revocation hearing, the prisoner may be represented by an attorney (either retained or appointed). Voluntary witnesses may also be present.

- A preliminary interview is not necessary if the releasee has been convicted of a crime while under supervision.

- The Commission may subpoena witnesses in revocation proceedings.

- Following revocation, the parolee receives credit for time under supervision in the community unless he has been convicted of a crime committed while under supervision. If he absconded from supervision, he is credited with the time from the date of release to supervision to the date of such absconding.

- Attorney representation, privately retained or court appointed, is permitted in any revocation proceeding and at any termination hearing scheduled after five years on parole. [ARUSPC (1976-78)]

1977    The Parole Commission modified the permissible grounds for a prisoner's appeal to make them more specific. The modified grounds for appeal are:

- That the guidelines were incorrectly applied.

- That a decision outside the guidelines was not supported by the reasons of facts as stated.

- That especially mitigating circumstances justify a different decision.

- That a decision was based on erroneous information and the actual facts justify a different decision.

- That the Commission did not follow correct procedure in deciding the case,

23

and a different decision would have resulted if the error had not occurred.

* There was significant information in existence but not know at the time of the hearing.

* There are compelling reasons why a more lenient decision should be rendered on grounds of compassion. [ARUSPC (1976-78)]

Mexico and the United States signed a treaty for the mutual exchange of prisoners incarcerated for crimes while transient aliens within each nation's jurisdiction. The Commission's legal staff participated with the State Department and other units of the Department of Justice in the development of prisoner transfer treaties and implementing legislation. In December 1977, 154 U.S. citizens convicted of crimes in Mexico were transferred to the United States. A special docket was set up to provide prompt parole hearings to these cases. Shortly thereafter, Canada and Bolivia followed this precedent by establishing similar treaties with the United States. [ARUSPC (1976-78)]

After a pilot test of the concept in the Parole Commission's Western Region, the Commission implemented a new procedure that has come to be called "presumptive parole." The purpose of the presumptive parole procedure is to provide the prisoner at the beginning of his sentence a date on which it is presumed that release will take place, provided the prisoner maintains a good institutional adjustment and has developed adequate release plans. This procedure is designed to remove much of the dysfunctional uncertainty and anxiety surrounding the parole process, while retaining the flexibility to deal with substantial changes in circumstances. Presumptive parole procedures went into effect in September 1977. All prisoners with seven years or less (regardless of sentence procedure) and all prisoners with no minimum sentences are heard within 120 days of commitment or as soon thereafter as practicable. A presumptive release date may be set up to four years from the date of the initial hearing (previously, parole dates were set up to six months from the date of the hearing). If a presumptive release date is not set within four years from the date of the initial hearing, the prisoner will be continued to a reconsideration hearing four years from the date of the initial hearing (a "four-year reconsideration hearing"). In addition, interim hearings are conducted as required by statute to consider whether there are any substantial positive or negative changes in circumstances (*e.g.*, outstanding institutional program achievement, disciplinary infractions) that may warrant modifying the presumptive release date originally set. In addition, a prerelease record review is conducted to ensure that the conditions of the presumptive release date (good institutional conduct and a suitable release plan) have been satisfied. Failure to satisfy these conditions may result in retardation of the release date or the scheduling of a rescission hearing. [ARUSPC (1976-78)]

1978    The Parole Commission published *Federal Parole Decision Making: Selected*

24

*Reprints, Volume I.* [PDMSR (1)]

In October 1978, the Commission began a periodic review of its paroling policy guidelines at 28 C.F.R. 2.20 and 2.21. In addition to its usual publishing and posting of the proposal, copies were sent to over 1,000 interested persons. Public hearings were held in Atlanta, Denver, and Washington, D.C., and at the Atlanta and Englewood facilities of the Bureau of Prisons. Testimony was received from 69 witnesses, generating over 3,000 pages of transcript. Those giving their views included representatives from the Judiciary, defense and prosecution attorneys, federal prisoners, enforcement agencies, the Bureau of Prisons, the Probation Service, state correctional systems, and scholars. As a result of this effort, certain listed offense behaviors were defined more specifically, certain previously unlisted offense behaviors were added to the guidelines, and certain offense behaviors were moved from one category to another or subdivided. The revised paroling policy guidelines became effective June 4, 1979. [ARUSPC (1978-80)]

1979    Decision guidelines were established for decisions to retard or rescind a parole on account of institutional misconduct. These guidelines are set forth at 28 C.F.R. 2.36. [ARUSPC (1978-80)]

Decision guidelines were established to reward sustained superior program achievement by a reduction from a previously established presumptive release date. The advancement for superior program achievement under these guidelines was deliberately kept modest. It is the intent of the Commission to encourage voluntary program participation, not superficial attendance in programs merely in an attempt to impress the parole decision-makers. These guidelines are set forth at 28 C.F.R. 2.60. [ARUSPC (1978-80)]

1980    The Parole Commission's presumptive release date procedures were expanded. Under the revised procedures, presumptive release dates are set up to ten years from the date of the initial hearing. A defendant who does not receive a presumptive release date will be scheduled for a ten-year reconsideration hearing. Procedures for interim hearings, as required by statute, to review the case for any significant changes in circumstances are unchanged. [ARUSPC (1978-80)]

From April 9-11, 1980, the Parole Commission, in joint sponsorship with the National Institute of Corrections, conducted the Third National Parole Symposium. The conference was held at the University of Maryland at College Park. United States District Judge Frank A. Kaufman, Governor Brendan T. Byrne of New Jersey, and Charles Silberman, author of Criminal Violence, Criminal Justice, were featured speakers. Approximately 250 persons attended. The proceedings of the conference were published as *Parole in the 1980's: Proceedings of the National Parole Symposium.* [ARUSPC (1978-80)]

The Parole Commission published *Federal Parole Decision Making: Selected Reprints, Volume II.* [PDMSR (2)]

1981      The Parole Commission published *Federal Parole Decision Making: Selected Reprints, Volume III.* [PDMSR (3)]

Effective August 31, 1981, the Parole Commission, as a result of a research study, revised its Salient factor Score, an actuarial device used in determining risk of recidivism. The new Salient Factor Score (SFS 81) includes six items, which, when added together, produce a score with a range from zero to ten points. The higher the score, the higher is the likelihood of favorable outcome. SFS 81 demonstrates predictive validity and stability equivalent to that of the seven-item predictive device previously used by the Commission. Of prime importance, the revised device holds promise for greater scoring reliability and ease of scoring. [ARUSPC (1980-83)]

1982      The Parole Commission published the first *Rules and Procedures Manual*, which consolidated the Parole Commission's rules (28 C.F.R. 2.1 *et seq.*) with the accompanying procedures. Previously, these had been published separately.

The Parole Commission published *Federal Parole Decision Making: Selected Reprints, Volume IV.* [PDMSR (4)]

1983      Effective January 31, 1983, the Parole Commission revised its offense severity scale. The revision, which used the format of the proposed revision of the federal criminal code, was designed to make the severity scale more comprehensive, to improve its clarity and organization, and to reflect changes in Commission policy for particular offenses. [ARUSPC (1980-83)]

1984      The *Comprehensive Crime Control Act of 1984* (Public Law 98-473, October 12, 1984) was passed. This legislation provided for the creation of a United States Sentencing Commission to promulgate explicit decision guidelines (by May 1, 1986) to be used by Federal judges in making sentencing decisions. The Chairman of the Parole Commission serves as an *ex officio*, non voting member of the Sentencing Commission. The Parole Commission was to be abolished five years from the date the sentencing guidelines took effect. During the five-year transition period, the Parole Commission was to continue in existence to handle cases of parole eligible defendants convicted of offenses committed before November 1, 1987. Cases sentenced under the new law would serve determinate sentences with limited reduction for good time (about 15%). For such cases, post-release supervision would be called supervised release rather than parole, and decisions regarding the conditions of supervised release and revocation would be made by the courts rather than by the Parole Commission. This legislation also repealed *Youth Corrections Act.* The legislation did not, however, affect parole eligibility for military code or D.C. Code offenders or the Parole Commission's responsibility for making parole release decisions for military code and D.C. Code offenders confined in Bureau of Prisons

26

institutions.

The *Comprehensive Crime Control Act of 1984* also eliminated the Parole Commission's intermediate administrative appeal (regional appeal), providing a one-step rather than a two-step administrative appeal. [ARUSPC (1986-87)]

The Parole Commission published *Federal Parole Decision Making: Selected Reprints, Volume V.* [PDMSR (5)]

1985    Due to a delay in the appointment of the first members of the Sentencing Commission, legislation was enacted that extended the date for the first sentencing guidelines by one year (until May 1, 1987).

1986    The Parole Commission sought various legislative initiatives to facilitate the transition between the current and new systems. Legislation was enacted (Public Law 99-646, November 10, 1986) containing two provisions that afforded the Parole Commission flexibility to facilitate its phase out. First, the legislation eliminated the requirement of "no less than five regions." Second, it authorized hearings conducted by one examiner (with the requirement of a panel of two hearing examiners met by a review on the record by the second examiner). [ARUSPC (1985-86)]

The Parole Commission also provided assistance to the newly created Sentencing Commission. As the move toward the establishment of federal sentencing guidelines was based, in large part, on the successful development and use of federal parole guidelines, much of the research conducted and experience gained in the parole context was directly relevant to the sentencing guidelines' effort. The Parole Commission provided a number of data bases for the Sentencing Commission's use, and staffs of both agencies met regularly to examine the data, review the documentation, and discuss the empirical findings. [ARUSPC (1985-86)]

The Parole Commission published *Federal Parole Decision Making: Selected Reprints, Volume VI.* [PDMSR (6)]

In March 1986, the Parole Commission implemented an experimental program, called Special Curfew Parole, to provide a substitute for Community Treatment Center residence for the 60-day period preceding the otherwise scheduled parole release date. This program, a joint effort of the Parole Commission, the U.S. Bureau of Prisons, and the U.S. Probation System, was designed for prisoners who were transferred to Community Treatment Centers for a 30-120 day period prior to parole, but who no longer required the support services provided there. Under this program, a qualified prisoner could have his release date advanced by up to 60 days on the condition that he remain at his place of residence between the hours of 9:00 p.m. and 6:00 a.m. each night unless given permission in advance by his probation officer. The Probation Service provided high-activity supervision of the parolee during this period (at least weekly in person contact as well as monitoring compliance with the

27

curfew by random telephone calls). Failure to comply with this special condition could result in imposition of Community Treatment Center residence as a condition of parole or revocation of parole and return to prison. Implemented as a cost-reduction procedure through which the Bureau of Prisons could reduce the number and expense of inmates confined in Community Treatment Centers, this project saved over one million dollars in its first eighteen months of operation. [ARUSPC (1985-86)]

In collaboration with the Bureau of Prisons and the National Institute of Justice, the Parole Commission initiated an experimental program in which selected prisoners would have their parole dates advanced if they volunteered to complete 400 hours of "reparative work." Reparative work is defined as unpaid volunteer work for public or nonprofit private agencies (such as the Volunteers of America, the Salvation Army, or Goodwill Industries). The purpose of the project was to develop an alternative form of punishment that returned something of value to the community and, at the same time, saved prison bed space. During the first phase of the project, 100 prisoners in selected cities each completed the 400 hours of reparative work while residing in halfway houses. These prisoners logged 38,481 hours of unpaid service, work which would have cost the participating agencies over $168,000 for paid employees to perform. In return, release dates were advanced by 5,538 days, providing a substantial savings in prison bed space. Upon release, some parolees were offered full-time paid positions with the agencies they had worked for in the program. A second phase of the program was begun at the Federal Correctional Institution at Forth Worth. In this phase, a limited number of prisoners performed reparative work in the community while still residing at the institution. [ARUSPC (1985-86)]

1987    On April 14, 1987, the U.S. Sentencing Commission transmitted its initial sentencing guidelines to Congress. These guidelines took effect, as scheduled, on November 1, 1987, and applied to all defendants whose offenses were committed on or after that date.

The Bureau of Prisons reported that the cumulative savings from the Special Curfew Parole Project exceeded two million dollars and requested that the program be extended indefinitely. [ARUSPC (1986-87)]

The Parole Commission was accredited by the American Correctional Association's Commission on Accreditation.

The Parole Commission initiated a "Community Control Project," a joint effort with the Bureau of Prisons and U.S. Probation System, using electronic monitoring to ensure compliance with a curfew. Because of population pressures, the Bureau of Prisons was placing offenders in halfway houses up to six months prior to release even if there was no treatment need for such placement. Under this experimental

28

program, selected low-treatment-need offenders were released to the community up to 180 days prior to their normally scheduled parole date with a curfew, electronic monitoring, and intensive supervision substituted for Community Treatment Center placement. Two districts (Southern District of Florida and Central District of California) were selected for this project. [ARUSPC (1986-87)]

The Reparative Work Project was terminated. During the two phases, 132 offenders each performed 400 hours of reparative work and had their parole dates advanced by up to 60 days. A total of 51,281 hours of unpaid community service work was completed and participants had their parole dates advanced by a total of 7,458 days. The value of the work done was estimated to be over $225,000 (for paid employees to have done the same work) and the project was well received by the non-profit agencies involved. Despite these positive findings, the project was terminated because the Bureau of Prisons did not believe that the staff time needed to monitor the project could be spared given the current level of overcrowding. [ARUSPC (1986-87)]

1988    The Special Curfew Parole Project continued. The cumulative number of offenders participating reached 3,000. Very few problems were reported and the revocation rate for violations occurring while on curfew parole was less than three percent. [ARUSPC (1987-88)]

The Community Control Project continued. To date, 120 offenders have participated in this project. During the year, the project was expanded to four additional districts. [ARUSPC (1987-88)]

The *Anti-Drug Abuse Act of 1988* gave the Parole Commission jurisdiction over new-law transfer treaty cases (transfer treaty cases in which the offense was committed on or after November 1, 1987). In such cases, the Parole Commission is to determine the release date by applying the sentencing guidelines promulgated by the U.S. Sentencing Commission. [ARUSPC (1987-88)]

The *Anti-Drug Abuse Act of 1988* also gave the Parole Commission continuing responsibility over all state defendants who are accepted into the U.S. Marshals Service Witness Protection Program. Once a state defendant is accepted into this program, the Parole Commission assumes jurisdiction over the case.

Fifty percent of the initial hearings conducted in Fiscal Year 1988 involved offenders with drug-related convictions, 26% involved property crimes, and another 11% involved crimes of violence (murder, kidnapping, arson, robbery, and assault). [ARUSPC (1987-88)]

The Commission's had 179 authorized positions (Commissioners and staff) and a budget of $11,665,000.

29

1989   The Parole Commission began an Intensive Supervision Project with the U.S. Probation Office for the District of Maryland for high risk cases. [ARUSPC (1988-89)]

    The number of hearings conducted by the Parole Commission began to decline as the sentencing guidelines took effect for defendants who committed offenses on or after November 1, 1987. In Fiscal Years 1987 and 1988, the Commission conducted 19,796 and 20,465 hearings, respectively. In Fiscal Year 1989, the number of hearings declined to 16,619. [ARUSPC (1988-89)]

1990   The *Judicial Improvements Act of 1990* extended the life of the Parole Commission by an additional five years until November 1, 1997, because the *Comprehensive Crime Control Act of 1984* had failed to make adequate provision for the handling of old-law cases. Retrospective abolition of parole release consideration (for defendants who had already committed their offenses) would raise a serious constitutional issue under the *ex post facto* clause. [ARUSPC (1989-90)]

    The Parole Commission has jurisdiction over the following cases: (1) "Old Law" Cases (persons sentenced to prison terms of more than one year for offenses committed prior to November 1, 1987, unless sentenced under a statute expressly prohibiting parole eligibility); (2) Transfer Treaty Cases (persons transferred to the United States from foreign countries to complete service of a foreign sentence, regardless of the date of the offense); (3) State Witness Protection Cases (probationers and parolees serving state sentences who are transferred to federal jurisdiction because of participation in the Federal Witness Protection Program, regardless of the date of the offense); (4) D.C. Code Offenders in Federal Institutions (persons sentenced under the District of Columbia Code who are confined in correctional facilities of the U.S. Bureau of Prisons, regardless of the date of the offense); and (5) Military Offenders in Federal Institutions (persons convicted of military offenses who are confined in correctional facilities of the U.S. Bureau of Prisons, regardless of the date of the offense).

    The number of Parole Commission hearings continued to decline as the sentencing guidelines were applied to new-law cases by the courts. There were 13,568 hearings conducted in Fiscal Year 1990. This included 903 hearings for D.C. Code offenders housed in federal institutions. [ARUSPC (1989-90)]

    The Parole Commission was re-accredited by the American Correctional Association's Commission on Accreditation.

1991   The Parole Commission's workload continued to decline. In Fiscal Year 1991, 10,720 hearings were conducted. [ARUSPC (1990-91)]

30

In August 1991, as part of its phase down effort, the Parole Commission closed its Philadelphia and Atlanta Regional Offices and consolidated these operations in a new Eastern Regional Office, co-housed with the Headquarters Office in Chevy Chase, Maryland. [ARUSPC (1990-91)]

The Special Curfew Parole Project, which had started in 1986, reached a cumulative total of 3,500 cases. As electronic monitoring (started under the Community Control Project) became available in each judicial district, it replaced the curfew parole project. [ARUSPC (1990-91)]

Due to the Parole Commission's phase down, its research unit was eliminated. [ARUSPC (1990-91)]

1992    The Parole Commission, in cooperation with the U.S. Probation Service, developed an experimental project to place technical parole violators in "sanction centers," rather than return them to prison. In 1992, two sanction centers were opened, one in the Baltimore, Maryland, area and one in the Washington, D.C. area. [ARUSPC (1991-92)]

The Parole Commission's Intensive Supervision Project in Hyattsville and Baltimore, Maryland, which had started in 1988, was terminated due to the downsizing of the Commission. An evaluation of the Hyattsville project, prepared by the National Center on Institutions and Alternatives, concluded that the early intervention and increased surveillance of the project provided a tool for preventing escalating criminal behavior. [ARUSPC (1991-92)]

1993    The number of hearing conducted in Fiscal Year 1993 was 6,769, down from 9,307 hearings in Fiscal Year 1992, and slightly less than one half of the 13,568 hearings conducted in Fiscal Year 1990. [ARUSPC (1992-93)]

1994    As part of its phase-down effort, the Commission closed its Dallas Regional Offices and consolidated that operation in its Eastern Regional Office co-housed with the Headquarters Office in Chevy Chase, Maryland. This closing resulted in a savings of more than one million dollars in operating funds and reduced the number of Commission personnel by 22 positions. The Commission also eliminated a number of mid-management positions. [ARUSPC (1993-94)]

Given the requirement for the downsizing of the Commission, the Commission began using single hearing examiners to conduct parole hearings. From 1974 to 1994, hearings had been conducted by two-person panels of hearing examiners. Under the revised procedure, a second examiner would review the case record and hearing summary at the Commission's office. [ARUSPC (1993-94)]

The Parole Commission was re-accredited by the American Correctional

31

Association's Commission on Accreditation.

1995      The Parole Commission revised the Salient Factor Score by adding an additional item for older offenders. The revised Salient Factor Score was designated as SFS 95.

The Parole Commission published a *Desk Book on Training and Reference Materials* as part of a program of staff training.

1996      The Parole Commission closed its Kansas City Regional Office and consolidated that operation in its Eastern Regional Office co-housed with the Headquarters Office in Chevy Chase, Maryland. As with the closing of the Dallas Regional Office in 1993, this closing resulted in a savings of more than one million dollars in operating funds and reduced the number of Commission personnel by 22 positions. With the closing of this office, all Commission functions are conducted from its Chevy Chase, Maryland, office.

Congress passed the *Parole Commission Phaseout Act of 1996.* This Act extended the life of the Parole Commission by an additional five years (until November 1, 2002). In addition, it reinstated the twelve-year limitation on total service as a Parole Commissioner, and provided for the reduction in the number of Parole Commissioners to two Commissioners on December 31, 1999, and to one Commissioner on December 31, 2001. Furthermore, it required the Attorney General to report to the Congress annually, beginning in May 1998, as to whether it is more cost effective for the Parole Commission to remain a separate agency or whether its functions should be transferred elsewhere. If the Attorney General recommends incorporating the Commission's functions in another component of the Department of Justice, the Attorney General's plan shall take effect in November of the year in which it is submitted unless Congress, by law, provides otherwise. If the Commission's functions are transferred to another component within the Department of Justice, all laws pertaining to these functions remain in effect notwithstanding the November 1, 2002, termination date for the Commission set forth elsewhere in the legislation.

The Parole Commission, with the assistance of a grant from the Office For Victims of Crime, established two Victim/Witness Coordinator positions, and developed a program to enhance the Commission's responsiveness to victims and witnesses at revocation hearings.

Due to the phasing down of the Parole Commission, the Commission had 48 positions (Commissioners and staff) at the end of 1996, a substantial reduction from 145 positions in 1992. At the beginning of 1996, there were six Parole Commissioners. By the end of 1996, this number was reduced to three due to resignations and the provisions of the *Parole Commission Phaseout Act of 1996.* The Commission's budget was $5,446,000.

32

1997    The Parole Commission began an experimental project in which parole hearings are conducted using video-conferencing equipment. In February 1997, the first hearings in this project were conducted for prisoners at the Federal Correctional Institution in Oakdale, Louisiana.

*The National Capital Revitalization and Self-Government Improvement Act of 1997* gave the Parole Commission several additional responsibilities. First, it provided for the abolition of the District of Columbia Board of Parole by August 5, 2000 and the transfer of its responsibilities to the U.S. Parole Commission. The Act required the Parole Commission to assume jurisdiction by August 5, 1998 over all parole release decisions for felony prisoners confined under D.C. Code felony sentences, and to assume jurisdiction by August 5, 2000 over parole and mandatory release supervision and revocation decisions for all persons serving D.C. Code felony sentences. Second, the Act required the District of Columbia to move to a determinate sentencing system (at least for certain offenses), provided for terms of supervised release to follow these determinate sentences, and gave the Parole Commission ongoing responsibility for supervision and revocation decisions for D.C. Code offenders subject to terms of supervised release under the new determinate sentencing system. Third, it increased the authorized size of the Commission to five Commissioners.

The Parole Commission was re-accredited by the American Correctional Association's Commission on Accreditation.

1998    The Parole Commission revised the Salient Factor Score by increasing the weight given to prior commitments and age at offense, and deleting the drug-abuse item. The revised Salient Factor Score was designated as SFS 98.

The Parole Commission assumed jurisdiction over parole grant hearings for D.C. Code felony offenders confined in District of Columbia Institutions (effective August 5, 1998). The District of Columbia Board of Parole continued to make post-release supervision and revocation decisions for D.C. Code cases.

2000    The Parole Commission assumed jurisdiction over supervision and revocation decisions for D.C. Code parolees and mandatory releasees (effective August 5, 2000). The District of Columbia Board of Parole was abolished.

The District of Columbia moved to a determinate sentencing system for all D.C. Code offenses committed on or after August 5, 2000 (*The Sentencing Reform Amendment Act of 2000*). (As the law was signed at 5:00 p.m. on August 11, 2001, offenses committed on or after August 5, 2001 but before 5:00 p.m. on August 11, 2001 may be subject to the provisions of the *ex post facto* clause.). Court-imposed terms of supervised release are mandatory for felony offenders sentenced to imprisonment. For felony offenders sentenced to imprisonment for more than one year, the length of the term of supervised release is fixed by statute at five years (if

33

the maximum term of imprisonment authorized for the offense is twenty-five years or more) or three years (if the maximum term of imprisonment authorized for the offense is more than one year but less than twenty-five years), except in the case of certain sexual offenses for which longer terms of supervised release are authorized. By statute, the Parole Commission is responsible for supervision and revocation decisions for these offenders.

2001    The first D.C. Code determinate-sentence offenders were released on supervised release under the jurisdiction of the Parole Commission.

The Parole Commission began using its hearing examiners to conduct probable cause hearings in D.C. Code parole violation cases. Previously, probable cause hearings for alleged D.C. Code parole violators had been conducted by personnel of the Court Services and Offender Supervision Agency.

The Commission re-established the position of research director.

In FY 2001, the Commission had an authorized total of 81 positions (Commissioners and staff) and a budget of $8,836,000.

2002    Due to the additional responsibilities given the Parole Commission by *The National Capital Revitalization and Self-Government Improvement Act of 1997*, the Commission was authorized a total of 100 positions (Commissioners and staff) for FY 2002 and a budget of $9,876,000.

The Parole Commission published a revised *Desk Book on Training and Reference Materials* for hearing examiners and analysts as part of a program of staff training.

The *21St Century Department of Justice Appropriations Authorization Act of 2002* extended the life of the Parole Commission until November 1, 2005.

34