# Exhibit 2



John B. McEntire, IV
*Senior Litigator*
10 North Post Street, Suite 700
Spokane, Washington 99201
509.624.7606
Attorney for John F. Friedlander

## Before the United States Parole Commission

| | |
|---|---|
| United States,<br><br>             Plaintiff,<br><br>   v.<br><br>John Franklin Friedlander #05167-085,<br><br>             Defendant. | Memorandum Supporting<br>Application for Mandatory Parole<br><br>FCC Lompoc – June 6, 2022 |

Exhibit 02 - Page 1

# Table of Contents

I.    Introduction ............................................................................................................. 2

II.   Background ............................................................................................................. 4

    A.    As a child, Mr. Friedlander endured one tragedy after another. ........................... 4

        1.    It started with a childhood car accident. ..................................................... 4

        2.    It continued with sexual abuse in the foster-care system. .......................... 5

        3.    It continued with abuse after his adoption. ................................................ 5

    B.    As an abused, confused, and impaired teenager, Mr. Friedlander made the tragic decision to shoot his adopted parents. ..................................................................... 7

    C.    The Government prosecuted Mr. Friedlander as an adult, relying on an abbreviated evaluation that found him beyond redemption. ....................................................... 8

    D.    These findings influenced Judge Quackenbush into imposing life, believing Mr. Friedlander would be paroled "at an appropriate time." ...................................... 9

    E.    Mr. Friedlander's accomplice went home decades ago. ..................................... 10

    F.    A psychologist reviewed Mr. Friedlander's prior evaluations; she was appalled.  11

III.  Discussion ............................................................................................................. 12

    A.    In the past decade, Mr. Friedlander has shown he does not seriously (or frequently) violate institution rules. ............................................................................................ 12

    B.    The chances Mr. Friedlander will reoffend are low. ........................................... 18

        1.    He committed this offense as a youth, and society's understanding of the adolescent brain has evolved since the 1980s. ...................................... 19

        2.    By every measure, Mr. Friedlander has overserved his range. .................. 25

        3.    Clarence White didn't hold animosity against Mr. Friedlander. ............. 27

        4.    Mr. Friedlander's remorse has deepened. ................................................. 27

        5.    He has a strong, comprehensive release plan. ........................................... 29

IV.   Conclusion ............................................................................................................ 31

Exhibit 02 - Page 2

# I.     Introduction

At age 3, John Friedlander went through a windshield during a car accident that claimed the life of his mother and two siblings. After waking from a coma, he entered the foster care system with his sole-surviving sister, Carolyn Lozier, and together they spent four long years suffering through physical and sexual abuse before being adopted by Clarence and Gloria White.

The adoption placed Mr. Friedlander in a new school on a new Native American reservation, where he endured additional years of torment from classmates for the facial scars from his accident, as well as from his 68 IQ, which placed him in the "developmentally-disabled" category. And while this abuse at school cut deeply, he suffered more from feeling unwelcome in his adopted home.

In 1987, after wrongly believing the Whites played a role in hospitalizing his sole-surviving blood sibling, he succumbed to peer influence and made the rash decision to shoot the Whites. Clarence White survived, but Gloria White did not.

Mr. Friedlander was 16-years-old at the time, and while his accomplices were charged as juveniles, he was charged as an adult. That decision was made by Judge Quackenbush, who was influenced by the opinions of psychologists who labeled Mr. Friedlander as an irredeemable sociopath. That label stuck, so while his accomplices went home decades ago, he was sentenced to life in prison. But even with

Exhibit 02 - Page 3

that sentence, Judge Quackenbush expressed a desire for Mr. Friedlander to be paroled "at an appropriate time."

How wrong they were. A psychologist just assessed Mr. Friedlander and concluded those prior psychological opinions were rushed, incomplete, and lacking the benefit of modern research into how the adolescent brain works. He was never an irredeemable sociopath, but rather a developmentally-disabled child shaped by trauma.

Sentenced to life at 16-years-old left Mr. Friedlander feeling hopeless, causing him to act out during his initial years in prison. Given his periodic infractions, the Parole Commission rightly expressed concern at prior parole hearings about Mr. Friedlander's ability to live a law-abiding life in the community.

But about eight years ago, Mr. Friedlander charted a different course. He received a mental health diagnosis; he obtained treatment; he became spiritual; and he committed to sobriety, all of which brought about positive changes. Among them: reflecting on his actions; accepting responsibility for the harm he'd caused; avoiding violence at all costs; and teaching others to do the same.

His BOP records confirm as much. After completing an alternatives-to-violence program, Mr. Friedlander become a program facilitator for others. He also *chose* to live in segregation to avoid conflict with other inmates. These actions demonstrate Mr. Friedlander differs from the infraction-prone young adult he was decades ago.

Exhibit 02 - Page 4

Given these changes, as well as his robust release plan (1 year of guaranteed housing, 24-hour supervision, and employment),[1] Mr. Friedlander asks the Parole Commission to parole him, giving him an opportunity to build a law-abiding life in the community under close supervision.

## II.    Background

A brief summary of Mr. Friedlander's history helps put this case into context.

## A.    As a child, Mr. Friedlander endured one tragedy after another.

### 1.    It started with a childhood car accident.

Mr. Friedlander was born to Colville Indian parents, Barbara and George Friedlander, on September 1, 1970.[2]

Just before his third birthday, a car accident killed his mother and two young sisters—8-months-old and 6-years-old. Unbelted, the impact sent Mr. Friedlander through the front windshield.[3] He fell into a coma, required a tracheotomy, and ultimately spent months in the hospital.[4]

---

[1] The facility where Mr. Friedlander will release to (Adult & Teen Challenge Program) gives him an opportunity to stay longer than a year if he wants.
[2] Exhibit A (Birth Certificate).
[3] Exhibit B at 9 (Presentence Investigation Report (hereinafter "PSIR")); Exhibit C at 1, ¶¶ 3-4 (Decl. of Carolyn Lozier); Exhibit D (News Clipping on Accident).
[4] Exhibit E at 6 (Report–Dr. Kele Kirschenbaum); Exhibit F at 2 (Report–Dr. Charles Tappin).

Exhibit 02 - Page 5

His physical and psychological injuries lasted beyond the hospital. He suffered severe scarring on his face, long-term speech impairments, and chronic pain.[5] And with a 68 IQ, doctors placed him in the "retarded range," although it's unclear if his low-level functioning pre-dated his accident.[6] And he later learned his mother drove drunk that evening and intended to take her life, as well as the lives of her children.[7]

### 2.    It continued with sexual abuse in the foster-care system.

After leaving the hospital, Mr. Friedlander and Carolyn Lozier, his sole-surviving sister, returned to living with their father.[8] But authorities deemed their father to be an unfit parent, so Mr. Friedlander and his sister were placed in foster care.[9]

Life in foster care did not go well. Mr. Friedlander and his sister cycled through several families, suffering horrific physical and sexual abuse for four years.[10]

### 3.    It continued with abuse after his adoption.

After years in the foster-care system, Mr. Friedlander and his sister were adopted by Clarence and Gloria White, who were enrolled members of the Colville and

---

[5] Exhibit E at 6-7, 10 (Report–Dr. Kele Kirschenbaum).
[6] Exhibit G at 2 (Report–Dr. Bruce Duthie).
[7] Exhibit E at 6 (Report–Dr. Kele Kirschenbaum).
[8] Exhibit E at 6 (Report–Dr. Kele Kirschenbaum).
[9] Exhibit E at 6 (Report–Dr. Kele Kirschenbaum).
[10] Exhibit C at 1, ¶¶ 5-8 (Decl. of Carolyn Lozier); Exhibit E at 6-7 (Report–Dr. Kele Kirschenbaum).

Exhibit 02 - Page 6

Spokane Tribes, respectively.[11] The adoption ended Mr. Friedlander and Ms. Lozier's sexual abuse. It did not, however, end Mr. Friedlander's abuse, which continued both outside—and inside—the home.

Outside the home, Mr. Friedlander's adoption placed him in the Spokane Tribe's school system. Even though Mr. Friedlander was an enrolled tribal member, he was from the Colville Indian Reservation, and so was treated by the Spokane tribal members as an outsider.[12] His classmates abused him, calling him a "minority," a "sellout," "weak," and someone who didn't belong.[13] He was mocked for his extensive facial scarring and having a "cereal-bowl style haircut."[14] His peers would steal his belongings and physically assault him, including breaking his nose and beating him with bicycle handlebars.[15] He regularly returned home from school with blood-stained clothes from the bullying he received.[16] It was relentless.

This school-based trauma caused Mr. Friedlander to act up at home, and Clarence and Gloria's response to his misbehavior left Mr. Friedlander feeling unwelcome.[17] Clarence and Gloria White took their non-adopted daughter on trips,

---

[11] Exhibit C at 1, ¶10 (Decl. of Carolyn Lozier).
[12] Exhibit E at 10 (Report–Dr. Kele Kirschenbaum).
[13] Exhibit E at 10 (Report–Dr. Kele Kirschenbaum).
[14] Exhibit E at 10 (Report–Dr. Kele Kirschenbaum).
[15] Exhibit E at 8-10 (Report–Dr. Kele Kirschenbaum).
[16] Exhibit E at 10 (Report–Dr. Kele Kirschenbaum).
[17] Exhibit C at 2, ¶¶11-14 (Decl. of Carolyn Lozier).

Exhibit 02 - Page 7

while leaving Mr. Friedlander and Ms. Lozier at home to do chores.[18] Their non-adopted daughter received regular love and attention, while Mr. Friedlander and Ms. Lozier received less love in many situations—or none at all.[19]

Wanting a home where they felt loved, Mr. Friedlander and Ms. Lozier took to running away. Ms. Lozier went first, fleeing to Spokane and then Olympia at age 13 to live with extended family.[20] Then Mr. Friedlander ran away, but was brought back by Mr. White.[21] After running away again, Colville Child Welfare Services became involved and transferred Mr. Friedlander's custody over to family in the Omak area.[22] Meanwhile, Ms. Lozier remained in the Whites' care.[23]

**B.** **As an abused, confused, and impaired teenager, Mr. Friedlander made the tragic decision to shoot his adopted parents.**

On February 13, 1987, Mr. Friedlander returned to Wellpinit.[24] He and three friends searched the town for his sister, including checking the high school.[25] Unable to locate her, Mr. Friedlander and his friends passed the time while they searched for her by drinking and using drugs.[26]

---

[18] Exhibit C at 2, ¶13 (Decl. of Carolyn Lozier).

[19] Exhibit C at 2, ¶12 (Decl. of Carolyn Lozier); Exhibit E at 8 (Report–Dr. Kele Kirschenbaum).

[20] Exhibit C at 2, ¶¶ 14-15 (Decl. of Carolyn Lozier).

[21] Exhibit E at 9 (Report–Dr. Kele Kirschenbaum).

[22] Exhibit B at 10-11 (PSIR).

[23] Exhibit E at 9 (Report–Dr. Kele Kirschenbaum).

[24] Exhibit B at 2, 5 (PSIR).

[25] Exhibit B at 2, 5 (PSIR).

[26] Exhibit B at 5 (PSIR).

Exhibit 02 - Page 8

That night, while still intoxicated, Mr. Friedlander heard his sister was in a car accident that left her in critical condition.[27] His shock turned to rage, as he wrongly believed the Whites' carelessness was to blame.[28] Mr. Friedlander's friends pressured him "to do something about it."[29]

So together, they did. Mr. Friedlander, Guy Herman, Wendy Herman, and John Tsoodle drove to the Whites' residence and took two guns from the residence.[30] Although accounts differ on who first suggested shooting Mr. White, Guy Herman and Mr. Friedlander both agree Mr. Herman initially aimed the gun at Mr. White, but ultimately handed the gun over to Mr. Friedlander, who covered his eyes and fired.[31] Ms. White was shot next.[32] Clarence White survived, but Gloria White did not.[33] Both boys were arrested shortly thereafter.[34]

**C.  The Government prosecuted Mr. Friedlander as an adult, relying on an abbreviated evaluation that found him beyond redemption.**

Although Mr. Friedlander was only 16-years-old at the time of the offense, the Government initiated federal criminal proceedings against him, seeking to charge him

---

[27] Exhibit B at 5 (PSIR).
[28] Exhibit B at 5 (PSIR); Exhibit H at 2 (Report–Dr. Lawrence Weathers).
[29] Exhibit H at 2 (Report–Dr. Lawrence Weathers).
[30] Exhibit B at 2-3, 5 (PSIR).
[31] Exhibit B at 5-7 (PSIR).
[32] Exhibit B at 6-7 (PSIR).
[33] Exhibit B at 2 (PSIR).
[34] Exhibit B at 3 (PSIR).

Exhibit 02 - Page 9

in federal court as an adult. To support the prosecution, the Government relied in-part on a psychological evaluation from Dr. David G. Grubb, who met with Mr. Friedlander for one hour, reviewed less than half of Mr. Friedlander's psychological records, and concluded in a two-and-a-half-page report that Mr. Friedlander was an irredeemable sociopath without remorse.[35]

### D.   These findings influenced Judge Quackenbush into imposing life, believing Mr. Friedlander would be paroled "at an appropriate time."

Judge Quackenbush struggled with how to handle Mr. Friedlander's case. On one hand, he found the idea of locking a child up in perpetuity without the opportunity to release after rehabilitation "inappropriate."[36] On the other hand, Judge Quackenbush recognized that leaving Mr. Friedlander in the juvenile system would mean he would be "released at age twenty-one without any provisions for supervision or guidance," which he also found inappropriate."[37] Ultimately, Judge Quackenbush was influenced by the psychological findings that Mr. Friedlander demonstrated no remorse.[38] So, on November 10, 1987, Judge Quackenbush allowed the Government to charge Mr. Friedlander as an adult.[39]

---

[35] Exhibit I (Report–Dr. David G. Grubb).
[36] Exhibit J at 6-7 (Findings of Fact and Conclusions of Law–Nov. 10, 1987).
[37] Exhibit J at 6 (Findings of Fact and Conclusions of Law–Nov. 10, 1987).
[38] Exhibit J at 5 (Findings of Fact and Conclusions of Law–Nov. 10, 1987).
[39] Exhibit J at 7 (Findings of Fact and Conclusions of Law–Nov. 10, 1987).

Exhibit 02 - Page 10

Two months later, January 20, 1988, Mr. Friedlander pleaded guilty in federal court to one count of second-degree murder (killing Gloria White), as well as one count of assault-with-intent to murder (shooting Clarence White).[40]

On March 11, 1988, Judge Quackenbush sentenced Mr. Friedlander to life. And although Judge Quackenbush imposed a life sentence, he never intended it to be as such, commenting that Mr. Friedlander would have an opportunity to be paroled "at an appropriate time."[41]

**E.    Mr. Friedlander's accomplice went home decades ago.**

As mentioned, Mr. Friedlander didn't act alone. Guy Herman talked a developmentally-disabled and intoxicated Mr. Friedlander into driving over to the Whites' residence for revenge; Mr. Herman helped Mr. Friedlander break into the Whites' residence; Mr. Herman located the guns; and Mr. Herman initially aimed a gun at Clarence White before handing it to Mr. Friedlander and telling him to "do it."[42]

Guy Herman was held accountable—just differently. On April 2, 1987, Mr. Herman pleaded guilty in Stevens County to burglary, first-degree murder, and

[40] Exhibit B at 2 (PSIR).
[41] Exhibit J at 6 (Findings of Fact and Conclusions of Law–Nov. 10, 1987).
[42] Exhibit B at 5-7 (PSIR); Exhibit H at 2 (Report–Dr. Lawrence Weathers).

Exhibit 02 - Page 11

first-degree assault.[43] He was sentenced in juvenile court to 291-364 weeks in custody

(5.5-7 years), releasing from custody roughly 28 years ago.[44]

**F.    A psychologist reviewed Mr. Friedlander's prior evaluations; she was appalled.**

In early-2021, the Federal Defenders hired Dr. Kele Kirschenbaum, a clinical

program manager and clinical professor at UCLA Geffen School of Medicine, to

evaluate Mr. Friedlander. Dr. Kirschenbaum spent days evaluating Mr. Friedlander at

FCC Lompoc (his current facility), as well as days pouring over records and the prior

reports of the mental health professionals who evaluated Mr. Friedlander back in 1987.

She was appalled at their conclusions. Specifically, Dr. Kirschenbaum noted

these professionals spent little time with Mr. Friedlander, didn't review all the relevant

records, and made sweeping findings "based on weak tests results and while

overlooking the devastating impact of repeated childhood trauma."[45] She rejects the

conclusion Mr. Friedlander is an irredeemable sociopath; by her independent

professional assessment, she finds Mr. Friedlander "at ***low risk*** of reoffending."[46]

---

[43] Exhibit B at 3 (PSIR).
[44] Exhibit B at 3 (PSIR); Exhibit K at 3 (2018 Parole Hearing Report).
[45] Exhibit E at 4-6 (Report–Dr. Kele Kirschenbaum).
[46] Exhibit E at 4 (Report–Dr. Kele Kirschenbaum).

Exhibit 02 - Page 12

### III.   Discussion

Mr. Friedlander has served over 35 years on his life sentence, so his case is governed by the mandatory parole provisions under §4206(d).[47] As such, he should be paroled unless the Parole Commission finds §4206(d)'s parole presumption is rebuffed by two criteria: 1) he has "seriously or frequently violated institution rules and regulations"; or 2) "there is a reasonable probability that he will commit" another crime. *See* 18 U.S.C. §4206(d).

Each criteria will be addressed in turn.

### A.   In the past decade, Mr. Friedlander has shown he does not seriously (or frequently) violate institution rules.

Mr. Friedlander does not present a spotless disciplinary record. Over his 35+ years in prison, he has accumulated 20 infractions.[48] Indeed, these infractions formed the core of the Parole Commission's decisions to deny Mr. Friedlander mandatory parole in 2016, 2018, and 2020, as the reviewing examiner concluded his ongoing substance abuse showed "a lack of maturity."[49]

It's a fair point. But a few additional points should help put the Parole Commission at ease:

---

[47] *See* 18 U.S.C. § 4206(d) (noting the mandatory parole provisions apply for a person who has served 30 years on a life sentence).

[48] Exhibit K at 5-7 (2018 Parole Hearing Report); Exhibit L at 6 (2020 Parole Hearing Report).

[49] Exhibit K at 10 (2018 Parole Hearing Report); Exhibit L at 10 (2020 Parole Hearing Report).

Exhibit 02 - Page 13

***First***, it helps to understand what motivated Mr. Friedlander's infractions. In March 1988, a federal judge told a 16-year-old with a 68 IQ he was being sentenced to life in prison for an offense tied to trauma, abuse, and substance abuse. Mr. Friedlander was devastated, lonely, and trying to adapt to life in prison by fitting in with other inmates.[50] To numb his feelings, he abused substances while incarcerated during his 20s and 30s.[51] Of his 20 infractions, 16 relate to substance abuse.[52]

***Second***, it helps to understand when these infractions occurred. Mr. Friedlander incurred nearly all his infractions (18 of 20) between 1995 and 2010:



---

[50] Exhibit E at 14 (Report–Dr. Kele Kirschenbaum).
[51] Exhibit E at 14 (Report–Dr. Kele Kirschenbaum).
[52] Exhibit K at 5-7 (2018 Parole Hearing Report); Exhibit L at 6 (2020 Parole Hearing Report).

Exhibit 02 - Page 14

Then, roughly eight years ago, Mr. Friedlander changed course. He was diagnosed with major depressive disorder and anxiety in late 2013, and finally began receiving mental health treatment.[53] This treatment broke Mr. Friedlander free from his cycle of substance abuse, and started him down the path towards rehabilitation. He became involved in treatment in any way he could—through group therapy, psychology courses, and self-study.[54]

Mr. Friedlander's mental health treatment allowed him to reconnect with his religious practices, and religion forced him to reckon with memories of his foster parents and to take responsibility for his crimes.[55] His church emphasized the importance of "worthiness and love for family and relationships."[56] He remembered the Whites tried to instill the same values in him.[57] Needless to say, Mr. Friedlander's conceptions of family were complicated, but through reflection, he came to recognize what he'd lost and "can never get [] back."[58] Life in foster care had been tough, but he finally understood the Whites cared for him in the "best way they could."[59]

---

[53] Exhibit M (Excerpt from BOP Health Problems List); Exhibit E at 14 (Report–Dr. Kele Kirschenbaum).

[54] Exhibit E at 13-15 (Report–Dr. Kele Kirschenbaum).

[55] *See* Exhibit N at 23 (2020 Parole Hearing Transcript); Exhibit E at 15 (Report–Dr. Kele Kirschenbaum).

[56] Exhibit E at 15 (Report–Dr. Kele Kirschenbaum).

[57] *See* Exhibit N at 23 (2020 Parole Hearing Transcript).

[58] Exhibit E at 15 (Report–Dr. Kele Kirschenbaum).

[59] Exhibit E at 8 (Report–Dr. Kele Kirschenbaum).

Exhibit 02 - Page 15

These discoveries gave Mr. Friedlander the strength and motivation to stop abusing substances. He joined Narcotics Anonymous, Alcoholics Anonymous, and other drug treatment programs in custody.[60] Beyond helping him maintain sobriety, these programs "contribute[d] to his maturity" and helped him connect with fellow inmates who were "goal-oriented and disciplined."[61] When Covid-related quarantines made group programming impossible, Mr. Friedlander was undeterred—he continued programming through self-study.[62] This programming and treatment has allowed Mr. Friedlander to remain sober for years; still, he prizes the supportive benefits of ongoing drug treatment.

Mr. Friedlander was particularly inspired by the Alternatives to Violence course he completed in early 2018.[63] Sobriety had "extinguished his aggression," and Alternatives to Violence taught him to better control his emotions through "humility and empathy."[64] His instructor noted his enthusiasm and determination to actively participate and encourage other inmates' participation, despite his shy personality.[65] Shortly after, he completed the training program to become an Alternatives to Violence

---

[60] Exhibit E at 14 (Report–Dr. Kele Kirschenbaum).
[61] Exhibit E at 14 (Report–Dr. Kele Kirschenbaum).
[62] Exhibit E at 14 (Report–Dr. Kele Kirschenbaum).
[63] Exhibit O at 1 (BOP Education Report).
[64] Exhibit E at 12-13 (Report–Dr. Kele Kirschenbaum).
[65] Exhibit P (Decl. of Brenda Challinor).

Exhibit 02 - Page 16

facilitator himself, after a total of 76 hours of coursework.[66] It was important to

Mr. Friedlander to share his discoveries with others.

In short, Mr. Friedlander began his prison sentence with many infractions,

reflecting his struggles with mental health and substance abuse. But once he learned to

control those issues, his infraction history plummeted.

This plummet matters to the Parole Commission's inquiry at the June 2022

interim hearing. That is, the Parole Commission's task is more than simply saying

"well, the frequent and serious infractions from over a decade ago end our inquiry—

parole denied."[67] Were that the case, then a spate of BOP infractions would necessarily

damn any individual from obtaining parole—no matter how old those infractions are,

and no matter what's happened since.[68]

But the Parole Commission does more than a cursory review. Congress tasked

the Parole Commission with examining all "significant developments or changes"

---

[66] Exhibit P (Decl. of Brenda Challinor).

[67] An aside: Section 4206(d) doesn't define what constitutes "serious" or "frequent" violations, which is troubling from a constitutional perspective. *See Johnson v. U.S.*, 576 U.S. 591, 595 (2015) (finding a due process violation when a person is deprived of liberty under a law "so vague that it fails to" give adequate notice of the conduct it punishes, or "so standardless that it invites arbitrary enforcement").

[68] Reading §4206(d) differently would raise additional constitutional issues. The Supreme Court held that statutes cannot constitutionally force a court to sentence a juvenile offender to life without parole, even for offenses like murder. *See Miller v. Alabama*, 567 U.S. 460, 465 (2012). It therefore follows that statutes cannot constitutionally force the Parole Commission to convert a juvenile offender's parole-eligible life sentence to life without parole.

Exhibit 02 - Page 17

since the last hearing. *See* 28 C.F.R. § 2.14 ("The purpose of an interim hearing required by 18 U.S.C. §4208(h) shall be to consider any significant developments or changes in the prisoner's status that may have occurred subsequent to the initial hearing."). Such developments necessarily include not only whether Mr. Friedlander's infractions have tapered off, but also why. Here, the tapering stems from his growth, maturity, and the impacts of positive programming and mental health treatment.

**Third**, Mr. Friedlander's February 2020 infraction (BOP staff located a buprenorphine strip among his clothes) should be viewed with caution.[69] Throughout Mr. Friedlander's tenure at the BOP, he hasn't shied away from accepting responsibility for violating institutional rules. Notably, many infractions were sustained based on his own admission.[70] Infraction reports note Mr. Friedlander was often open with BOP staff and "ma[de] no excuses for his actions"; he also openly recognized that he failed to effectively employ coping skills from his drug programming.[71]

But the February 2020 infraction was different. This infraction occurred *after* Mr. Friedlander 1) started with mental health counseling, 2) focused on spirituality, 3) completed the alternatives-to-violence program, and 4) swore off substances. He denied possessing any drugs, pleaded not guilty, and requested that BOP staff

---

[69] *See* Exhibit N at 15 (2020 Parole Hearing Transcript).
[70] Exhibit K at 5-7 (2018 Parole Hearing Report).
[71] Exhibit K at 6-7 (2018 Parole Hearing Report).

Exhibit 02 - Page 18

fingerprint the strip.[72] He was told that wasn't possible, as the strip had already been destroyed.[73] Mr. Friedlander implored the investigating officer to review the facility's surveillance footage.[74] It's unclear if they ever did. But perhaps most importantly, BOP staff performed a drug screening on Mr. Friedlander—it was negative.[75] Nevertheless, the disciplinary hearing officer sustained the infraction based solely on the strip's discovery among his clothing.[76]

A single, disputed infraction from two years ago shouldn't trouble the Parole Commission when all other evidence demonstrates Mr. Friedlander has matured and moved beyond his substance abuse issues.

**B.    The chances Mr. Friedlander will reoffend are low.**

There are several reasons Mr. Friedlander presents a low chance of recidivating. Among them: 1) society's understanding of the adolescent brain has evolved since the 1980s; 2) he's overserved his sentence by every measure; 3) Clarence White didn't hold animosity against him; 4) his remorse has deepened; and 5) his comprehensive release plan.

Each reason will be addressed in turn.

---

[72] Exhibit N at 15-16 (2020 Parole Hearing Transcript).
[73] Exhibit N at 15 (2020 Parole Hearing Transcript).
[74] Exhibit N at 15 (2020 Parole Hearing Transcript).
[75] Exhibit E at 12 (Report–Dr. Kele Kirschenbaum).
[76] Exhibit N at 16 (2020 Parole Hearing Transcript).

Exhibit 02 - Page 19

1.      **He committed this offense as a youth, and society's understanding of the adolescent brain has evolved since the 1980s.**

Since Mr. Friedlander was sentenced in the late 1980s, the sheer tonnage of what the scientific community has learned about the adolescent brain could stop a team of oxen in its tracks. And in a watershed sentence-reduction case, the Hon. Jed S. Rakoff unpacked why this increased knowledge constitutes a reason to revisit a life sentence for a juvenile offender. *See U.S. v. Ramsay*, 538 F. Supp. 3d 407 (S.D.N.Y. 2021). It may seem odd to cite a sentence reduction case in a parole proceeding. But Judge Rakoff's opinion succinctly captured the modern understanding of juvenile criminology, and those same principles apply here.

In *Ramsay*, Andrew Ramsay sold drugs for a Bronx street gang. *Id.* at 409. In an effort to remove a rival gang member and competitor in the drug trade, Mr. Ramsay attempted to shoot (and kill) Benjamin Philips. *See id.* He missed and fatally-wounded two innocent bystanders, one of whom was pregnant. The unborn child died as well, and Mr. Ramsay was convicted of murder and sentenced to life imprisonment. At the time, he was only 17-years-old. *See id.*

Thirty years later, Judge Rakoff was asked to revisit that sentence under §3582. Judge Rakoff began by acknowledging the Supreme Court's recent reminder: based on "the evolving standard of decency that mark the progress of a maturing society," "youth matters at sentencing." *Id.* at 415 (citing *Roper v. Simmons*, 543 U.S. 551, 561

Exhibit 02 - Page 20

(2005); *Jones v. Mississippi*, \_\_U.S.\_\_, 141 S. Ct. 1307, 1315 (2021)). It matters because "the distinctive attributes of youth diminish the penological justification for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." *Miller v. Alabama*, 567 U.S. 460, 465 (2012). Judge Rakoff then examined the latest research on the distinctive attributes of youth, which "can be usefully grouped into four traits: youthful offenders' immaturity, susceptibility, salvageability, and dependence." *Ramsay*, 538 F. Supp. 3d at 416-17.

### a.   Immaturity.

Judge Rakoff first examined immaturity, noting "[n]eurological studies have concluded that severe childhood trauma is associated with changes to the maturation of specific brain structures at particular ages and a person's capacity to coordinate cognition, emotion regulation, and behavior." *U.S. v. Rengifo*, \_\_F. Supp. 3d\_\_, 2021 WL 5027334 at *12 (S.D.N.Y. Oct. 29, 2021).[77] So if a child suffers severe trauma, that individual "would exhibit immature patterns of thought at older ages [more so] than someone raised in a normal American context." *Id.* (cleaned up).

This research captures Mr. Friedlander's upbringing. After a car accident at age 3 that left him comatose and hospitalized for months, Mr. Friedlander experienced

---

[77] Note: in moving through these four traits, Mr. Friedlander pulls quotes from both *Ramsay* and *Rengifo*, another case where Judge Rakoff applied the same factors to a juvenile for his involvement in a Columbian guerrilla group that took an American hostage.

Exhibit 02 - Page 21

over a decade of unrelenting physical, psychological, and sexual abuse at the hands of others. Mr. Friedlander never knew what normal was.

This trait plays a role in the parole calculus in showing he's unlikely to reoffend.

### b.   Susceptibility.

Judge Rakoff next examined susceptibility, noting research shows juveniles are "more vulnerable or susceptible to negative influences and outside peer pressures." *Rengifo*, 2021 WL 5027334 at *12; *see also Ramsay*, 538 F. Supp. 3d at 420 ("Indeed, one of the hallmarks of adolescent risk taking is that it is much more likely than that of adults to occur in the presence of peers, as evidenced in the studies of reckless driving, substance abuse, and crime.") (cleaned up).

This research captures Mr. Friedlander's offense. While emotionally charged by the (mistaken) belief the Whites' negligence had harmed his sister, he was surrounded by friends who urged him to take action. And the peer-pressure applied went far beyond verbal encouragement. Guy Herman broke into the Whites' residence alongside Mr. Friedlander, placed the pistol in Mr. Friedlander's hands, and told him to "do it."

This trait plays a role in the parole calculus in showing he's unlikely to reoffend.

### c.   Salvageability.

Judge Rakoff next examined salvageability, noting "the personality traits of juveniles are more transitory, less fixed." *Ramsay*, 538 F. Supp.3d at 422 (citing *Roper*,

Exhibit 02 - Page 22

543 U.S. at 570). This struggle to define themselves "decreases the likelihood that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character." *Id.* (cleaned up).

This research captures Mr. Friedlander's psychological evaluations. With short interviews (as abbreviated as an hour) and incomplete testing, those assessing Mr. Friedlander made bold predictions he was a sociopath. But after 30 years of research, we now know "the vast majority of adolescents who engage in criminal or delinquent behavior desist from crime as they mature," such that "most individuals identified as psychopaths at age 13 will not receive such a diagnosis as adults." *Id.*

Dr. Kirschenbaum's evaluation confirms as much. She opines Mr. Friedlander is not only "amenable to treatment," but also "highly motivated to live a safe and stable life."[78] Besides extensive clinical testing, Dr. Kirschenbaum's opinions are grounded in fact. She observed Mr. Friedlander has completed various treatment programs while incarcerated but still continues them voluntarily, finding enrichment in the classes and community among his sober peers.[79] He also completed an alternative-to-violence program and became a program facilitator, teaching others how to resolve conflict through non-violence.[80]

---

[78] Exhibit E at 4 (Report–Dr. Kele Kirschenbaum).
[79] Exhibit E at 14 (Report–Dr. Kele Kirschenbaum).
[80] Exhibit E at 12 (Report–Dr. Kele Kirschenbaum).

Exhibit 02 - Page 23

His commitment to non-violence is easier said than done. Mr. Friedlander has lost eight teeth to attacks by other inmates.[81] In 2019, an inmate beat Mr. Friedlander badly, fracturing his nose and permanently damaging his eyesight.[82] But he refused to fight back and kept silent afterward, fearing he would face retaliation or be maligned as violent.[83] These days, Mr. Friedlander avoids those with violent reputations and requests solitary confinement when feeling unsafe.[84] Indeed, there was a multi-month delay in scheduling Dr. Kirschenbaum's evaluation because Mr. Friedlander asked to be placed in solitary to avoid conflict.[85]

Mr. Friedlander's conduct not only validates the latest research showing that juveniles are salvageable, but also disproves the old psychological theories saying otherwise.

This trait plays a role in the parole calculus in showing he's unlikely to reoffend.

### d.    Dependence

Judge Rakoff finally examined dependence, noting that "relative to adults' crimes, adolescents' crimes are less a product of their choices and more a product of their environment." *Ramsay*, 538 F. Supp. 3d at 422.

---

[81] Exhibit E at 12 (Report–Dr. Kele Kirschenbaum).
[82] Exhibit E at 12 (Report–Dr. Kele Kirschenbaum); Exhibit Q (X-Ray Report from Aug. 13, 2019).
[83] Exhibit E at 12 (Report–Dr. Kele Kirschenbaum).
[84] Exhibit E at 13 (Report–Dr. Kele Kirschenbaum).
[85] *See* Exhibit E at 1, 13 (Report–Dr. Kele Kirschenbaum).

Exhibit 02 - Page 24

And as the Supreme Court acknowledged, this dependence makes adolescent offenders "less culpable because they have been dependent on others for most or all of their lives." *Id.* (citing *Roper*, 543 U.S. at 569).

These observations capture Mr. Friedlander's upbringing, where he was powerless as he was passed through the foster care system from abusive family to abusive family.

This trait plays a role in the parole calculus in showing he's unlikely to reoffend.

\*\*\*

After closely-examining these four traits in *Ramsay*, Judge Rakoff concluded "an offender's youth, combined with society's evolving understanding of the adolescent brain," can constitute a basis for a sentence reduction. *Id.* at 410. Ultimately, Judge Rakoff found 30 years in prison was enough for a juvenile offender—even for a triple homicide.

Judge Rakoff's opinion is backed by data. A 2012 Maryland Supreme Court decision resulted in the mass parole of 188 prisoners serving life sentences, mostly for murder or rape offenses. This mass-parole event shares similarities with Mr. Friedlander, as most of these 188 individuals entered custody in young adulthood and had served, on average, 39 years upon release. Six years later, these parolees had a

Exhibit 02 - Page 25

recidivism rate of less than 1%, as compared to Maryland's overall recidivism rate of nearly 40%.[86]

### 2. By every measure, Mr. Friedlander has overserved his range.

As the Parole Commission examines what's changed since Mr. Friedlander's 2020 interim hearing, one obvious change is his time in custody. To date, he has served over 35 years in prison. This sentence outstrips his accomplices' sentences, the then-mandatory sentencing guideline range, and what the parole system typically recommended as an appropriate sentencing outcome:



*Sources: Exhibit B at 3, 14 (PSIR); Exhibit K at 4 (2018 Parole Hearing Report); U.S. Sent'g Guidelines Manual (U.S. Sent'g Comm'n 1987).*

---

[86] *The Ungers, 5 Years and Counting* 3, 9-10, Just. Pol'y Inst. (2018).

Exhibit 02 - Page 26

His parole numbers are particularly striking. For his 15-year reconsideration hearing in January 2012, Mr. Friedlander's recission guidelines were recalculated to include all his disciplinary infractions thus far, resulting in an aggregate guideline range of 222+ months, plus a non-numerical mitigating factor based on his youthful age at the time of his offense.[87] 28 C.F.R. § 2.20 (h). At that time, he had served 299.5 months.

While the parole guidelines aren't mandatory, they do reflect "national paroling policy, promote a more consistent exercise of discretion, and enable fairer and more equitable decision-making" by the Parole Commission. 28 C.F.R. § 2.20(a). In light of those goals, the Parole Commission had assessed the severity and nature of all of Mr. Friedlander's prior disciplinary infractions and incorporated those into the 2012 calculation.

Since then, Mr. Friedlander has only incurred two additional infractions—one disputed, one admitted. If his guidelines were re-calculated today, his 2014 and 2020 infractions would warrant an increase of 0-60 days and 0-8 months, respectively. 28 C.F.R. § 2.36 note 1 (Administrative Infractions). At most, his guidelines range would increase by 10 months, to 232+ months. For reference, on the eve of his 2016 mandatory parole hearing, he had already served over 352 months.

This fact plays a role in the parole calculus in showing he's unlikely to reoffend.

---

[87] Exhibit K at 4 (2018 Parole Hearing Report).

Exhibit 02 - Page 27

### 3.      Clarence White didn't hold animosity against Mr. Friedlander.

As the Parole Commission examines what's changed since Mr. Friedlander's 2020 interim hearing, one change is what the victim said about him. Clarence White never wanted Mr. Friedlander to die in prison. Even before Mr. Friedlander was sentenced, Mr. White told Probation that he was "optimistic that the future will bring John back to the reservation and that he'll walk up to the house to 'see how dad is doing.'"[88]

Mr. Friedlander reciprocated that feeling. He wrote to Mr. White from prison to apologize and acknowledge Mr. White's contributions to his life, recognizing they were "raising him in the best way they could."[89]

And shortly before Mr. White passed away in 1999, he repeated to Carolyn Lozier what he told Probation years before: he hoped to repair his relationship with Mr. Friedlander upon release.[90]

This fact plays a role in the parole calculus in showing he's unlikely to reoffend.

### 4.      Mr. Friedlander's remorse has deepened.

As the Parole Commission examines what's changed since Mr. Friedlander's 2020 interim hearing, one change is his deepening remorse. Following a psychological

---

[88] Exhibit B at 10 (PSIR).
[89] Exhibit E at 8, 16 (Report–Dr. Kele Kirschenbaum).
[90] Exhibit C at 3, ¶24 (Decl. of Carolyn Lozier).

Exhibit 02 - Page 28

evaluation, Dr. Kirschenbaum found Mr. Friedlander's remorse to be genuine. She

noted he has clearly "spent significant time reflecting on his past decisions and regret

of his actions."[91] He demonstrated awareness of "the negative impact of his prior

actions, statements and ways of interacting with others," in "stark contrast" to his

teenage outlook.[92] As he took responsibility for his 1987 offenses, he began to take

responsibility for more recent misconduct too, explaining why he has admitted guilt in

most disciplinary infractions since 1998.[93] With greater maturity, his understanding of

the "gravity of his previous choices" has "deepened."[94]

     Mr. Friedlander's remorse is more than mere words. His commitments to

sobriety and non-violence are driven by his rejection of his old "way of life and

thinking."[95] He overcame his social anxieties to make the most of the Alternatives to

Violence program, so that he would never again choose violence—even to defend

himself. His efforts to recruit and support others in rehabilitative programming stem

from his hope that no one else will make the same mistakes he did. The pain and harm

he has caused follow him at every step.

---

[91] Exhibit E at 4 (Report–Dr. Kele Kirschenbaum).
[92] Exhibit E at 4 (Report–Dr. Kele Kirschenbaum).
[93] *See* Exhibit K at 5-7 (2018 Parole Hearing Report).
[94] Exhibit E at 4 (Report–Dr. Kele Kirschenbaum).
[95] *See* Exhibit E at 11 (Report–Dr. Kele Kirschenbaum).

Exhibit 02 - Page 29

**5.      He has a strong, comprehensive release plan.**

As the Parole Commission examines what's changed since Mr. Friedlander's 2020 interim hearing, one change is his release plan. If Mr. Friedlander is paroled, then he will release to the Adult & Teen Challenge Program in Spokane, where he has a pre-approved bed waiting for him.[96] The Challenge Program sets Mr. Friedlander up for success in several ways:

***First***, it provides *at least* 1.5 years of stable housing, and longer if he'd like to stay. This gives Mr. Friedlander ample time to adjust to life outside of prison and establish new habits.

***Second***, it addresses Mr. Friedlander's substance abuse history. The Challenge Program is a Washington state-licensed chemical dependency treatment program, which will ensure Mr. Friedlander gets the professional help he needs to maintain his sobriety.

***Third***, it is holistic. Most treatment programs focus on treatment; the Challenge Program does more. During the 18-month residency, participants spend lots of time on treatment, but they also work (the Challenge Program has relationships with local area business), work out (the Challenge Program has a gym), attend services (there is an on-site chapel), and address real-life problems. That is, if a participant doesn't have a

---

[96] Exhibit R (Adult & Teen Challenge Letter).

Exhibit 02 - Page 30

license, then the Challenge Program works to enroll that participant in a relicensing program. If a participant has medical appointments, then the Challenge Program arranges transportation to get that participant to those appointments. And if a participant is on supervision, then the Challenge Program works with supervising officers for on-site visits, UAs, etc.

The Challenge Program's lengthy, holistic approach yields results. In October 2019, the Challenge Program commissioned an outside group of statisticians to examine its effectiveness. The results are striking: of those who complete the program, 78.2% remain clean-and-sober.

Of course, Mr. Friedlander already possesses a strong skillset for release. During his 35+ years in prison, Mr. Friedlander has earned his GED and completed over 3000 hours of institutional programming, much of which was vocational training like welding and construction.[97] Across various jobs, "he has consistently received good work evaluations" and was described by a supervisor to be "a leader" who "does great work."[98] His work history (and ethic) while in-custody bodes well for his release to the community, where guaranteed employment through the Challenge Program awaits.

---

[97] Exhibit O (BOP Education Report).
[98] Exhibit K at 5, 9 (2018 Parole Hearing Report).

Exhibit 02 - Page 31

Finally, Carolyn Lozier (Mr. Friedlander's sister) also supports his release and will be a resource to Mr. Friedlander during his re-entry.[99] Time has eroded many of Mr. Friedlander's family connections—his father and several other relatives were killed in a car accident several years ago.[100] But Ms. Lozier remains. She is fully aware of her brother's crimes, having been the one to call the police that night in 1987,[101] and undoubtedly knows more about his childhood than anyone else. As he navigates his return to society, her support and advice will supplement the support provided at the Challenge Program.

## IV.   Conclusion

For the reasons above, Mr. Friedlander respectfully asks the Parole Commission to grant him mandatory parole.

Dated: March 28, 2022.

Federal Defenders of Eastern Washington & Idaho
s/ John B. McEntire, IV
John B. McEntire, IV, WSBA No. 39469
Federal Defenders of Eastern Washington & Idaho
10 North Post Street, Suite 700
Spokane, Washington 99201
jay_mcentire@fd.org

s/ Jaime N. Dienst Brown
Jaime N. Dienst Brown
jaime_dienst@fd.org

---

[99] Exhibit C at 3, ¶¶ 22-23 (Decl. of Carolyn Lozier).
[100] Exhibit E at 16 (Report–Dr. Kele Kirschenbaum).
[101] Exhibit B at 3 (PSIR).

Exhibit 02 - Page 32

FORM APPROVED
S. F. No. 7786—OS—9-67

WASHING | STATE DEPARTMENT OF HEALTH — B — U OF VITAL STATISTICS

CERTIFICATE OF LIVE BIRTH

TYPE, OR PRINT IN PERMANENT INK

| | LOCAL FILE NUMBER | | | | BIRTH NUMBER |
|---|---|---|---|---|---|

**CHILD**

| CHILD— NAME | FIRST | MIDDLE | LAST | DATE OF BIRTH (MONTH, DAY, YEAR) | HOUR |
|---|---|---|---|---|---|
| 1. | John F. | Seward | FRIEDLANDER | 2b September 1, 1970 | 2b 7:29 |

| SEX | THIS BIRTH— SINGLE, TWIN, TRIPLET, ETC. (SPECIFY) | IF NOT SINGLE BIRTH—BORN FIRST, SECOND, THIRD, ETC. (SPECIFY) | COUNTY OF BIRTH |
|---|---|---|---|
| 3. Male | 4a. Single | 4b. | 5a. Grant |

| CITY, TOWN, OR LOCATION OF BIRTH | INSIDE CITY LIMITS (SPECIFY YES OR NO) | HOSPITAL—NAME | (IF NOT IN HOSPITAL, GIVE STREET AND NUMBER) |
|---|---|---|---|
| 5b. Grand Coulee | 5c. Yes | 5d. Coulee General Hospital | |

**MOTHER**

| MOTHER—MAIDEN NAME | FIRST | MIDDLE | LAST | AGE (AT TIME OF THIS BIRTH) | STATE OF BIRTH (IF NOT IN U.S.A., NAME COUNTRY) |
|---|---|---|---|---|---|
| 6a. | Barbra | Jeanne | Seward | 6b. 24 | 6c. Washington |

| RESIDENCE—STATE | COUNTY | CITY, TOWN, OR LOCATION | INSIDE CITY LIMITS (SPECIFY YES OR NO) | STREET AND NUMBER |
|---|---|---|---|---|
| 7a. Washington | 7b. Okanogan | 7c. Elmer City | 7d. No | 7e. Box 238 |

**FATHER**

| FATHER—NAME | FIRST | MIDDLE | LAST | AGE (AT TIME OF THIS BIRTH) | STATE OF BIRTH (IF NOT IN U.S.A., NAME COUNTRY) |
|---|---|---|---|---|---|
| 8a. | George | Samuel | Friedlander | 8b. 23 | 8c. Washington |

| INFORMANT | | RELATION TO CHILD |
|---|---|---|
| 9a. Barbra Jeanne Seward Friedlander | | 9b. Mother |

**CERTIFIER**

| I CERTIFY THAT THE ABOVE NAMED CHILD WAS BORN ALIVE AT THE PLACE AND TIME AND ON THE DATE STATED ABOVE. | DATE SIGNED (MONTH, DAY, YEAR) | ATTENDANT—M.D., D.O., OTHER (SPECIFY) |
|---|---|---|
| 10a. SIGNATURE | 10b. 9-2-70 | 10c. M.D. |

| CERTIFIER—NAME (TYPE OR PRINT) | MAILING ADDRESS (STREET OR R.F.D. NO., CITY OR TOWN, STATE, ZIP) |
|---|---|
| 10d. M. E. Bryant, M.D. | 10e. Box K, Grand Coulee, Washington 99133 |

| REGISTRAR—SIGNATURE | DATE RECEIVED BY LOCAL REGISTRAR | | |
|---|---|---|---|
| | MONTH | DAY | YEAR |
| 11a. | 11b. | | |

## CONFIDENTIAL INFORMATION FOR MEDICAL AND HEALTH USE ONLY

**FATHER**

| RACE—FATHER | | EDUCATION—SPECIFY HIGHEST GRADE COMPLETED | | | PREVIOUS DELIVERIES—HOW MANY OTHER CHILDREN | | |
|---|---|---|---|---|---|---|---|
| WHITE, NEGRO, AMERICAN INDIAN, ETC. (SPECIFY) | | ELEMENTARY (0,1,2,3,4, . . . OR 8) | HIGH SCHOOL (1,2,3, OR 4) | COLLEGE (1,2,3,4, OR 5+) | ARE NOW LIVING | WERE BORN ALIVE— NOW DEAD | WERE BORN DEAD (FETAL DEATH AT ANY TIME AFTER CONCEPTION) |
| 12 American Indian (Colville) | | 13. | | | 14a. 2 | 14b. 0 | 14c. 1 |

**MOTHER**

| RACE—MOTHER | | EDUCATION—SPECIFY HIGHEST GRADE COMPLETED | | | DATE OF LAST LIVE BIRTH | | | DATE OF LAST FETAL DEATH | | |
|---|---|---|---|---|---|---|---|---|---|---|
| WHITE, NEGRO, AMERICAN INDIAN, ETC. (SPECIFY) | | ELEMENTARY (0,1,2,3,4, . . . OR 8) | HIGH SCHOOL (1,2,3, OR 4) | COLLEGE (1,2,3,4, OR 5+) | MONTH | DAY | YEAR | MONTH | DAY | YEAR |
| 15 American Indian (Colville) | | 16. | | | 17a. July 16, 1969 | | | 17b. Nov. 1969 | | |

| DATE LAST NORMAL MENSES BEGAN | | | MONTH OF PREGNANCY PRENATAL CARE BEGAN FIRST, SECOND, THIRD, ETC. (SPECIFY) | PRENATAL VISITS TOTAL NUMBER (IF NONE, SO STATE) | LEGITIMATE (SPECIFY YES OR NO) | BIRTH WEIGHT |
|---|---|---|---|---|---|---|
| MONTH | DAY | YEAR | | | | |
| 18. unknown | | | 19a. fifth | 19b. 3 | 20. Yes | 21. 5 lbs. 15½ oz. |

| COMPLICATIONS RELATED TO PREGNANCY | (DESCRIBE OR WRITE "NONE") | BIRTH INJURIES TO CHILD | (DESCRIBE OR WRITE "NONE") |
|---|---|---|---|
| 22. None | | 23. None | |

| COMPLICATIONS NOT RELATED TO PREGNANCY | (DESCRIBE OR WRITE "NONE") | CONGENITAL MALFORMATIONS OR ANOMALIES OF CHILD | (DESCRIBE OR WRITE "NONE") |
|---|---|---|---|
| 24. None | | 25. None | |

| COMPLICATIONS OF LABOR | (DESCRIBE OR WRITE "NONE") |
|---|---|
| 26. None | |

RECEIVED
OCT 12 1970
Colville Confederated Tribes
Nespelem, Wn.

CERTIFIED TO BE A TRUE & EXACT COPY
(PHOTOSTAT) OF THE DOCUMENT FILED IN
THIS OFFICE.

ATTEST: _____
ENROLLMENT OFFICER

COLVILLE CONFEDERATED TRIBES
NESPELEM, WASHINGTON 99155

Reproduced at the National Archives at Seattle



**PROB 2**
**(Rev. 4/84)**

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF WASHINGTON**
**PRESENTENCE REPORT**

| NAME (Last, First, Middle) | | | | | DICTATION DATE |
|---|---|---|---|---|---|
| FRIEDLANDER, John Franklin  aka/WHITE, John Franklin | | | | | 3-2-88 |

| ADDRESS | LEGAL RESIDENCE | SCHEDULED SENT. DATE |
|---|---|---|
| Spokane County/City Detention Center | None | 3-11-88 |
| Spokane, Washington | | **DOCKET NO.** CR-87-308-1 |
| | | **CITIZENSHIP** United States |

| AGE | RACE | DATE OF BIRTH | PLACE OF BIRTH | SEX | EDUCATION |
|---|---|---|---|---|---|
| 17 | American | 9-1-70 | Coulee Dam, WA | Male | 9th Grade |

| MARITAL STATUS | DEPENDENTS | SOC. SEC. NO. |
|---|---|---|
| Single | None | 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 |

| FBI NO. | U.S. MARSHAL NO. | OTHER IDENTIFYING NO. |
|---|---|---|
| No Return | 05167-085 | Spokane ID No. 124055 |

**OFFENSE**

Count 1 - Second Degree Murder 18 USC 1111(a) & 1153
Count 2 - Assault With Intent To Commit Murder 18 USC 113(a) & 1153

**PENALTY**

Count 1 - anytime up to life and/or $25,000 fine
Count 2 - 20 years and/or $250,000 fine -- Penalty Assessment $50 each count

| CUSTODIAL STATUS | DATE OF ARREST |
|---|---|
| In federal custody since March 31, 1987 -- no bond | 2-14-87 |

**PLEA**

Guilty to Count 1 - Second Degree Murder and Count 2 - Assault With Intent To
Commit Murder on 1-20-88 before The Honorable Justin L. Quackenbush

**VERDICT**

**DETAINERS OR CHARGES PENDING**

None

**OTHER DEFENDANTS**

| ASSISTANT U.S. ATTORNEY | DEFENSE COUNSEL |
|---|---|
| AUSA James Crum | Richard Bechtolt W 1516 Riverside Spokane, WA  99201   (phone: 509 838-3601) |

**DISPOSITION**

Count 1 - CAG for life
Count 2 - CAG for 20 years concurrent with Count 1

| SENTENCING JUDGE | DATE | PROBATION OFFICER |
|---|---|---|
| Justin L. Quackenbush | 3-11-88 | Alan T. Solinsky |

**Exhibit B-001**
**032**
Exhibit 02 - Page 34



OFFENSE:

**Prosecution Version.**   The grand jury, on November 18, 1987, returned a three count indictment against John Franklin Friedlander.  Count 1 charged Friedlander with the murder of Gloria White; Count 2 charged Friedlander with the assault of Clarence White; and Count 3 charged robbery.

On January 20, 1988, the date Friedlander plead guilty to Counts 1 and 2, an Information superseding the Indictment was filed by the United States Government.  It charged in Count 1, "on or about February 14, 1987 in the Eastern District of Washington, and within the boundaries of the Spokane Indian Reservation, in Indian country, and upon land held in trust by the United States, JOHN FRANKLIN FRIEDLANDER, aka/John Franklin White, an Indian, without just cause or excuse, willfully and with malice aforethought, did murder Gloria White, an Indian, by means and use of a .22 caliber revolver, all in violation of 18 USC 111(a) and 1153."

Count 2 of the Information superseding the Indictment read as follows:

"On or about February 14, 1987, in the Eastern District of Washington, and within the boundaries of the Spokane Indian Reservation, in Indian country, and upon land held in trust by the United States, JOHN FRANKLIN FRIEDLANDER, aka/John Franklin White, an Indian, did assault Clarence White with intent to murder the said Clarence White, an Indian, by shooting him with a .22 caliber revolver, all in violation of 18 USC 113(a) and 1153."

According to the United States Attorney's Office, who prepared a summary of facts, John Franklin Friedlander and Guy Herman, along with Wendy Herman were involved in the murder of Friedlander's adoptive mother, Gloria White and the assault on Friedlander's adoptive father, Clarence White.  This occurred on February 14, 1987 on the Spokane Indian Reservation.

On February 14, 1987 the Spokane Tribal Police received a call.  It was reported that one and possibly two deaths occurred at the residence of Clarence and Gloria White on the Spokane Indian Reservation.  Upon arrival, it was determined that Gloria White, age 40, was dead of a gunshot wound to the head.  Clarence White had been shot in the face and abdomen.  He was alive.  He was transported to a hospital.  It was also determined that White's 1983 Chevrolet was missing.

Through interviews of the juveniles who were subsequently placed in custody and others named by the juveniles, it was determined that Friedlander, Guy and Wendy Herman, and Richard Bahr came to Wellpinit from Nespelem, Washington in a stolen Ford LTD Victoria.  They arrived in Wellpinit in the early morning hours of February 13, 1987.  After arriving in Wellpinit, they went to Wellpinit High School where they attempted to contact Friedlander's sister, Carolyn White.  They were unable to contact her and proceeded to a party at a residence on the reservation at the Martha-Boardman Complex.  After arriving, John Tsoodle, aka/Moose, and three others got into the LTD to ride around.  Realizing the LTD was nearly out of gas, Friedlander suggested going to the White residence. (This was later in the evening of February 13, 1987.  Probably around 11:00 p.m. to 12:00 a.m.)

Upon arrival at the White's, Friedlander and Guy Herman got out of the vehicle and walked to the residence, leaving the others in the car.  The two entered the residence through a back glass slider door.  Once in the residence they went to the bedroom of Clarence White who was asleep.  There they apparently took a .22

magnum pistol and holster from the bedroom.  They also took two kitchen knives.
They left the house and returned to the LTD, then returned to the Healey
residence at Martha-Boardman.

At the Healey residence, three passengers got out of the car.  Friedlander, Guy
Herman, Wendy Herman, and Moose returned to the White residence.  Prior to
returning, Friedlander and Guy Herman discussed returning to the White's
residence to take money and to kill the Whites.  Friedlander had loaded the .22.
Guy Herman carried it into the house.  Friedlander took the gun from Guy Herman,
when Guy Herman said he could not shoot any one.  The two went to Clarence
White's bedroom and Friedlander shot Clarence White in the face while he lay
sleeping on his back.  Both Friedlander and Herman then went to the other end of
the house to Gloria White's room and Friedlander shot her in the face. (Also in
the room was a 12 year old nephew of Gloria's, Alex Flett)  They took her purse
from her bedroom to the kitchen from which they took her keys to the Chevrolet
and $60 to $70.  They went back to Clarence White's room where they discovered
he was still alive.  Friedlander then fired one, possibly two rounds into
Clarence White, hitting him in the abdomen area.  The two began going through
the room.  Guy Herman took a 357 magnum pistol.  At that time the phone rang and
the two left the residence.  Friedlander took the Chevrolet in which Wendy
Herman had been waiting for him.  Guy Herman attempted to take the White's
pickup but could not get it started.  He ran from the residence.

Earlier, prior to Herman and Friedlander entering the home for the second time,
Moose had taken the LTD away from the residence.  Not far down the road, the LTD
went into the ditch.  After Herman left the residence, he found the LTD and
entered it to sleep.

According to the U. S. Attorney's Office, Carolyn White, the sister of
Friedlander, who was in the house, called the Tribal Police.  An ambulance was
dispatched.  When it went by the LTD, Herman woke up, left the car, and began to
walk towards Wellpinit.  A short time later, Tribal Police cars en route to the
White residence, picked up Herman as a suspected runaway.  He was held in
custody.

Early the next morning, the Tribal Police spotted White's 1983 Chevrolet that
Friedlander and Wendy Herman had taken from the residence.  It was located at
the Martha-Boardman Complex.  At that time, Friedlander and Wendy Herman were
arrested.

Wendy Herman was charged with Taking a Motor Vehicle and processed through the
Okanogan juvenile authorities.  She originally was sentenced to a term of 18
months to be served at Echo Glen Juvenile Detention Facility at Snoqualmie,
Washington.

Guy Herman was processed through a Stevens County juvenile authorities.  Herman
plead guilty on April 2, 1987 and was sentenced that same date.  He plead to
Count 1, Burglary in the Second Degree; Count 2, Murder in the First Degree;
Count 3, Burglary in the First Degree; Count 4, Assault in the First Degree by
Compliance.  He was sentenced to a total of 291 to 364 weeks.  He will serve
approximately seven years which would place him at the age of majority when
released.  He is currently serving his sentence in Echo Glen Juvenile Facility,
Snoqualmie, Washington.

-3-

John Franklin Friedlander plead guilty to two counts of Information superseding the Indictment.  Sentencing was scheduled by the Honorable Justin L. Quackenbush to take place on March 11, 1988.

Plea Bargain Agreement.  According to both the United States Attorney's Office and the defense counsel, it was agreed the murder would be reduced from first degree to second degree.  Also, the government would not make any recommendation to specific time.  In respect to Count 3 on the original Indictment, there will be a request to dismiss this at time of sentencing.

Victim Impact Statement.  As a result of the crimes committed by John Franklin Friedlander, his adoptive mother, Gloria White, lost her life.  The adoptive father, Clarence White was seriously wounded and medical costs incurred.  The U. S. Attorney's Office does not have final figures on those medical costs.

During the course of the investigation, a meeting was held at the Spokane Tribal Courthouse with relatives of Gloria White.  In attendance were Lucille Parr, Gloria's mother, Dawn Flett, Gloria's daughter, Matilda Spearchief, a sister; and Veronica Flett, another sister.  Also present was Dave Flett, Jr., Veronica's husand.  All those present were visibly upset because of the circumstances of the crime and the loss of Gloria.  Lucille Parr indicated that the time that has gone by since the death of her daughter has not diminished her tragic loss at all.  She indicated that Gloria and Clarence had had problems with Friedlander since he began high school.  He did not do what he was told and began to experiment with drugs and drink alcohol.  She said that she had talked many times with her daughter about John being out of control.  He had run away from home on several occasions.  He finally left Wellpinit for Omak to live with his father and at times with his uncle.  She felt Gloria loved John very much and both she and Clarence tried to do everything they could to reach him but nothing seemed to work.  She felt some relief after the meeting and wanted to express her thanks to the Court for a chance to talk about her daughter and express her feelings about what the sentence should be.

Matilda Spearchief, a sister, also showed emotion and expressed anger at what had happened.  She indicated she had talked to Gloria prior to the murder and Gloria had said that John had called at different times and threatened her.  Veronica, the other sister, said essentially the same thing.  Dave Flett, Veronica's husband, said that months before the incident Gloria and Clarence began locking the doors to the house whenever John would call.  They were fearful he would somehow harm them or at least verbally abuse them if he came back to the reservation.  Dawn Flett seemed to be the most angry of all.  She is the 21 year old daughter of Gloria.  Her personality showed more anger than emotion but certainly the loss of her mother was very vivid.

All were asked what sentence they felt should be passed.  It was obviously an emotional time for all involved:  all voiced the opinion that John Friedlander should never be allowed to leave prison.  Dawn felt Friedlander took her mother's life at such an early age that he should never be allowed to spend his own time on the streets.

Defendant's Version.  John Friedlander was interviewed in the Spokane City/County Jail and was asked to talk about the events taking place before the

-4-

murder of Gloria White and the assault on Clarence White. Friedlander said the night before, or in the early morning hours of approximately February 13, 1988, he left Omak with Guy Herman, Wendy Herman, and Rick Bahr. They hitchhiked from Omak to Nespelem where they stole a car, the Ford LTD, and drove to Keller, Washington. From there they went to Wellpinit, Washington. Friedlander said Guy Herman did most of the driving until they crossed the Inchelium-Gifford Ferry and he then drove to Wellpinit. He thinks they arrived at Wellpinit at approximately 8:30 a.m. as high school was just beginning classes. They went to the high school specifically to look for John's sister, Carolyn. She wasn't there. Friedlander said that at that point none of the individuals he came with had been drinking or smoking marijuana. He said that he stayed around the school and saw some friends and then proceeded to a house located on the reservation at the Martha-Boardman Complex. He said at this time he smoked some marijuana and was "really stoned" by noon. They then proceeded to a couple other houses where friends lived. He met a friend by the name of Junior and he and Junior went to Springdale, Washington. He said they were "hot rodding" around. They went back to Junior's house at about 2:30 in the afternoon and started watching movies. About this time, Dale Sebastian, where they were watching movies, got home from school. They again returned to Springdale to find a "buyer" for alcohol. They found their "buyer" at Loon Lake, Washington where they purchased one case of Coors Light and one case of Budweiser. Friedlander said that about 12 people were in the car. They returned to the residence at the Martha-Boardman Complex at approximately 11:00 or 11:30 that evening. He cannot recall the exact time.

Friedlander said there was talk about looking for a party to attend. There was some mention of a party at Dale Healey's home near the LeBret's which is also near the White's home on the reservation. He said they did show up at that house and there were a lot of people there partying.

Friedlander said someone had mentioned to him that his sister, Carolyn White, was dead. He said he became angry at the White's for allowing his sister to be in a vehicle where there was an inexperienced driver. He said he was with Wendy Herman and another friend by the name of John and the idea came up to "scam" the White's. About the same time, Guy Herman mentioned the LTD that they had stolen from Nespelem was low on gas. They drove to the White's.

Friedlander said he and Guy Herman went into the White's house. While they were inside they took a 357 magnum and a .22 revolver. He also said it was John Tsoodle's idea to get the guns. They thought if they could steal the guns they could sell them for money. Friedlander said when they took the guns the White's didn't hear them. They left the residence. Friedlander said Tsoodle thought it might be a good idea if Friedlander and Herman returned to steal money. Tsoodle, Guy and Wendy Herman, and John left the White's residence and dropped off some people at Healey's. Guy, Wendy, John, and Tsoodle all returned to the White's.

When Friedlander returned to the White's, Guy Herman said he'd shoot the White's because of problems that John had had in the past with his adoptive parents. Friedlander said he thought Guy would in fact shoot both of the White's. When they went back into the house, Guy said that he "can't do it". Friedlander said that at that point, they had entered Clarence's bedroom. He said that he thought that if Guy and he turned their backs on Clarence, who was in bed, Clarence would shoot them. John took the gun from Guy Herman, covered his

-5-

eyes, and shot one time. (Friedlander was asked why he covered his eyes. He said he did this so Clarence White would not recognize him when he fired the gun). Friedlander said that Guy and he then went to Gloria's room. He remembers her lying on her side. He went closer to her, once again covered his eyes, and shot. (Friedlander said Gloria White was a light sleeper. He said he remembers whenever the phone would ring one time when Gloria was asleep she would wake immediately. He felt she may have heard the first shot fired in Clarence's bedroom and thought it would be in his best interest to shoot her so she wouldn't recognize him and call police.) Friedlander said that he returned to Clarence's room. He heard movement. He shot Clarence a second time. He and Guy Herman then found some keys and money. He said he heard the phone ring so he and Herman left the residence and agreed to meet back at Sebastian's near the Martha-Boardman Complex.

Because Guy Herman had some keys, Friedlander felt he could take one of the White's vehicles. He left with Wendy Herman and returned to Dale Sebastian's home. He said he cleaned up and went to sleep. He said he had gone outside the next morning and was arrested by Tribal Police.

Friedlander also said he did not know his sister, Carolyn, was alive until she walked into Court in Colville, Washington on March 31st.

In further discussion, Friedlander said that he had been hit in the past by Clarence White. He further stated that on his 15th birthday the White's did not pay any attention to him and did not buy him presents and he felt angered about this.

<u>Codefendant's Statement.</u> On February 11, 1988, Guy Herman was interviewed at Echo Glen Juvenile Institution in Snoqualmie, Washington. Herman gave much the same explanation as Friedlander regarding their trip from Omak to Nespelem where they stole the car and drove on to Wellpinit after they had gone to Keller, Washington. Herman said, once they arrived at Wellpinit, he was not with Friedlander much of the day. He said he fell asleep at a friend's house on the Indian reservation. He slept until about 11:00 at night and when he woke up he and Rick Bahr left the house where he was near the Martha-Boardman Complex to look for Friedlander. Not long after 11:00 p.m. he met John and began drinking. After drinking, driving from Ford and back to Martha-Boardman, Herman remembers the stolen Ford LTD was running out of gas. He said the conversation began about going to the White's to get gas for the stolen vehicle. Herman along with his sister, Wendy, and Friedlander drove to the White's house. Herman said Friedlander walked to the house and went to the pickup and tried to find the keys. He was with Friedlander at this point. They both went to the house and he said Friedlander slid the door open and once inside, John took two knives. He gave a knife to Herman and said "stab them". Herman said he would not do that.

Herman indicated both looked into Clarence White's room for keys to one of the vehicles. A gun was found by Herman. He said to Friedlander, "Look at this," and then went to the kitchen area where Friedlander tried to load the gun but couldn't see because of the darkness. They then returned to the car.

Herman said someone loaded the gun but he does not remember who. They left the White's property and dropped some people off who were with them. Herman said he remembers about this time that there were some

-6-

conversation about shooting kids. He said he was adamantly against shooting any children. This, according to Herman, may have come up again later when Gloria White was shot and her nephew was in the same room.

Herman said he and Friedlander, along with his sister, Wendy and one other individual continued driving around the area of White's house. He thinks Friedlander brought up the idea of shooting the White's. Whatever the case, Herman along with his sister, Wendy, and Friedlander all returned to the White's house. Wendy got into the White's automobile. (Tsoodle left in the LTD) John and Guy went back into the house. At that time, Guy had the gun. He stated they walked to Clarence's room and John said to Guy, "shoot him". Guy said that he couldn't. John then asked Herman for the gun. Herman said Friedlander walked over to the bed and attempted to fire a round at Clarence. The gun clicked when the hammer struck the chamber. Friedlander recocked the gun and shot once. Herman remembers Friedlander covering his eyes when he did this. At that point they began looking around the room for money or for valuables they could sell at a later time.

Herman said Friedlander began walking towards Gloria's room and he followed. Friedlander went into the room and stood by the bed as Herman stood in the doorway. Herman said he remembers freezing at that point as Friedlander shot off another round that struck Gloria. Friedlander then grabbed her purse and went into the kitchen and pulled out some money, and then went back to Clarence's room and Herman found some keys. He remembers looking at Clarence White and knew that he was still alive and "suffering". Herman said he turned to Friedlander and said "shoot him again." Friedlander did. He then went to the living room to look for more items to steal and the phone rang. At that point they left.

Herman said after they left the house he went to White's pickup. The keys he had did not fit the ignition. While he was trying to take the pickup, Friedlander and Wendy left the area. Herman said he then began walking down the road and found the LTD that Tsoodle had driven into the ditch. He said there were no keys in the car. He went to sleep and was awakened by an ambulance that went by. He then left the car and began walking and was picked up by the police.

When asked how he felt about the murder of Gloria White and assault on Clarence he said, "I have no feelings. I feel nothing." *(Statement of Guy Herman) JLO,*

PRIOR RECORD:

Juvenile Adjudication.

| Age | Charge | Place | Disposition |
|-----|--------|-------|-------------|
| 15 | 10-4-85: Receiving Stolen Property | Wellpinit, WA Spokane Indian Reservation | 10 days jail, 6 days suspended. $50 suspended fine. |
| 15 | 9-20-85: Runaway | Wellpinit, WA | None. |
| 15 | 10-11-85: Consumption of Alcoholic Beverage | Wellpinit, WA Spokane Indian Reservation | $100 fine plus $5 court costs |

-7-

| 15 | 7-21-86: Failure to Comply | Wellpinit, WA Spokane Indian Reservation | None. |
| 16 | 11-4-86: 2nd Degree Burglary and Criminal Trespass | Omak, WA Juvenile Court | Count 1, 0-3 mos. community supervision 0-16 hours community service and $10 fine. Count 2, same as Count 1 to run concurrent. |

As a practical matter, it appears Friedlander received three months on supervision, 16 hours community service on Count 1 and Count 2. Restitution in the amount of $90.30 to Harlin's Gun Shop was to be made.

According to police reports, Friedlander entered Harlin's Gun and Pawn Shop in Omak and was originally charged with Burglary. This was reduced to Criminal Trespass. He also entered the Farmhouse Restaurant located near Oroville, Washington. There were no other details available.

| 16 | Count 1, 2nd Degree Burglary, Count 2, First Degree Theft, Count 3, Taking Motor Vehicle Without Owner's Permission | Okanogan, WA | 2-12-87: Community supervision, period of 15 months with 92 hrs. community service. 20 dys with credit for 13 dys served. Community supervision was to begin 5-19-87. |

According to the prosecutor's file, Friedlander burglarized a residence near Okanogan, Washington and stole a 1958 Chevrolet automobile. With Friedlander was his codefendant in this case, Guy Herman. After stealing the 58' Chevrolet, subject drove to the Sky-Vu Drive-In and stole a number of VCR machines and a stereo radio cassette player along with a Cobra brand portable telephone. All were worth approximately $1,500. From there, Friedlander and Herman picked up two other juveniles and drove to Snohomish County. They were stopped in Snohomish County by Sheriff's officers and taken into custody. They were in possession of the stolen automobile and the above mentioned items. An attorney was appointed by the Court on February 12, 1987 and Friedlander was sentenced. All the VCR's and other items taken in the burglaries were recovered.

| 16 | 3-7-87: Attempted Escape and Malicious Mischief | Spokane City/County Detention Center | 4-6-87: $50 fine malicious mischief, attempted escape dismissed |

Reports from the Spokane County Juvenile Detention Center indicated Friedlander made an escape attempt from his cell previous to March 7, 1987. An employee of juvenile detention found the vent and bars removed from the lower half of Friedlander's cell. He was charged with Third Degree Malicious Mischief and Attempted Second Degree Escape.

-8-

PERSONAL AND FAMILY DATA:

John Franklin Friedlander, aka/John Franklin White is a 17 year old Colville Indian, born September 1, 1970, in Coulee Dam, Washington. George Friedlander, who resides near Omak, Washington, is John's natural father. His mother was Barbara Seward. Seward died in a car accident approximately two weeks prior to Friedlander's third birthday. He was in the car during the accident. Also in the automobile were an eight-month-old and a six-year-old sister. Both were killed. John has one natural sister, Carolyn White, who continues to reside at the Spokane Indian Reservation. She was not involved in the accident.

After the accident and Friedlander's hospitalization, he returned to his father's home, in Nespelem. There he lived with his father and grandparents. According to Mr. Friedlander, he worked at the time. He also said there was bitterness on his wife's side of the family and they wanted to take both John and Carolyn away from him. After a long court battle, the Court finally did take John from his father and placed him in foster care. John lived at several different homes over a period of approximately three years until he was finally adopted by Clarence and Gloria White when he was approximately five years old. Although George said he attempted to have visitations with his son and daughter while they were with the White's during the first three or four years, there continued to be family problems and he was unable to visit his children as often as he would have liked.

Clarence White indicated he and his wife, Gloria, adopted both John and his sister Carolyn at the same time. Clarence said they were looking for a boy to adopt and met with the Colville Indian Tribe and John was available. They had no plans of adopting two children, but did not want to separate the brother and sister so adopted Carolyn also. Clarence said the children had both been in several different Foster homes in and around the Colville Indian Reservation and they brought both children to visit them at their home prior to the adoption. Clarence could not remember exactly when the children were adopted, but it was not long after they began living in their home, probably around 1976 or 1977.

Friedlander attended Wellpinit Grade School and always went under the name of John White until he left home when he was 15. Clarence said John did an adequate job through grade school with no particular difficulties with the exception of poor grades. While John was growing up in the home, his sister Carolyn lived there along with Dawn Marie Flett, a daughter of Gloria's by a previous marriage.

Clarence described his relationship with John as very close. He and his son were avid hunters. John owned his own .38 Smith and Wesson stainless revolver and also had a custom rifle.

Clarence said he started having problems with John when he graduated from grade school and into the first year of high school. He wouldn't come home, nor would he obey any of the parents directions. He ran away from home several times until finally he left for good when he returned to the Colville Indian Reservation to live with his father.

During the interview with John Friedlander for this investigation, he made some accusations about physical abuse. Further, Friedlander seems obsessed about the fact that on his 15th birthday he was forgotten by the White's. Clarence indicated both accusations were ridiculous. He did not deny spanking John on a

few occasions while he was growing up, but there was never any abuse. (Stevens County Child Protective Services had been contacted on two occasions in the past regarding possible abuse at the White's home. They found neither accusation to be accurate.) Clarence went on to say that Friedlander was not a very bright young man. He said that instruction given to him when hunting or at other times had to be repeated several times in order for John to understand. Clarence always thought this was a drawback, but feels that he never negatively brought that out to John. He thought he was a "good kid" until he left grade school. He said Gloria and John never got along very well, particularly after grade school. He said he felt he was closest to John of anyone in the family.

After the shooting, Clarence said he battled internally a long time about what he had done wrong. He finally realized he didn't do anything wrong and has come to the conclusion that John is the one who did the wrong doing. He said he isn't necessarily concerned about how long John might spend in prison. He hopes somebody "fixes his head" because he fears he will go out and kill someone again. He is optimistic that the future will bring John back to the reservation and that he'll walk up to the house to "see how dad is doing." Clarence doesn't think John feels anything that he did was wrong as he hasn't yet comprehended it.

John was approximately 15-and-a-half when he ran away from the White's residence for the last time. John lived with his natural father for approximately eight months. George said he began having control problems with him and it was decided that he, John, would then move in with his uncle, Ron. That lasted for approximately three months. Ron Friedlander said it appeared John began losing control and using alcohol and drugs. It was because of Ron Friedlander that John took a psychiatric test and was to enter a drug rehabilitation program in the Tri-Cities. This was to occur approximately 25 to 30 days before the shooting incident.

While John was living with George and Ron, he did attend St. Maries Mission and Omak Alternative High School for intermittent periods of time.

George talked about the White's. He said he had heard stories that Clarence had beaten John. As mentioned earlier, these accusations turned out to be unfounded. George indicated he felt both Clarence and Gloria, overall, were very good parents. He knew Gloria. He said she was "a good woman, and loved John".

After John left the White's and Spokane Indian Reservation to return to Colville and his natural father, the Colville Indian Child Development Center became involved because of Friedlander's age. It appears their first contact was on May 15, 1986 when a placement summary indicated "a minor child was placed in foster care because he refused to go with his parents, Gloria and Clarence White. John ran away and said he would run away again. The placement at that time was with biological parental uncle, Ron Friedlander." At that time, John was attending school at St. Maries Mission.

On October 21, 1985 George Friedlander requested temporary custody of John from Clarence and Gloria White. John lived with George for some time. Social Workers were informed on February 26, 1986 that George Friedlander was not to have contact with John White per a Court Order prior to the adoption of

-10-

Friedlander by the White's.  From that time, February of 86' at least through March of 86', John lived with his uncle, Archie Friedlander.  The reports go on to say that John would not return home because of the alleged abuse from Clarence.  A hearing was held through the Tribal Court and it found that "Friedlander could be a minor in need of care."  Further, "the custody of care would be in the hands of Child Welfare Services and disposition hearing would be held on May 5, 1986."

On May 5, 1986, the Order of Disposition Hearing was filed on the Colville Indian Reservation.  It was found that Friedlander should attend school, have contact once a month with parents Gloria and Clarence White, attend alcohol education, not run away from present placement -- which at that time was Mike Joseph, a cousin; also have twice a month contact with Marty Widdifield, the caseworker involved.  That order of review hearing was filed August 13, 1986. It was about this same time that Friedlander was evaluated for drug/alcohol treatment at the mid-Columbia Hospital in Richland, Washington.  (This will be covered in the Mental and Emotional section of this report)

Twice, Eloise King director of Child Welfare Services on the reservation, remembers working with Friedlander.  The agency knew Friedlander was out of control and difficult to handle.  On the other hand they did feel there was a possibility of child abuse on the Spokane Reservation.  They felt that it was their duty to work the best they could in placing Friedlander in a good environment.  Their attempts centered around Friedlander's natural father and the relatives on that side of the family.  Unfortunately, the last placement was with a cousin, Michael Joseph.  It now appears Friedlander could do about anything he wished when he was with his cousin.  There was apparently drug and alcohol abuse during that period of time.  That was the last official placement for Friedlander prior to the murder.  Although enrolled in schools at different times while on the Colville Indian Reservation, his attendance was sporadic.

Parents and Siblings.  Friedlander's natural father, George Friedlander, is 42 years old and resides on Moxie Flats, approximately five miles from Omak, Washington.  He is currently unemployed, but does have sporadic employment with the Colville Indian Tribe.  Although, for the most part, George did not raise his son, he is extremely interested in the present case.  He said he feels badly that his son plead guilty.  Mr. Friedlander feels Clarence White may have beat-up John and because of this the shooting incident took place.

Subject's natural mother, Barbara Seward, was killed in 1973 in a car accident near Keller, Washington.  Subject's adoptive father, Clarence White, is 43 years old and continues to live on the Spokane Indian Reservation.  Clarence at one time worked for Western Nuclear Uranium Mine as a security guard.  This is located on the Spokane Indian Reservation.  He was laid off that job and is now collecting unemployment.  He hopes to go to work as a mechanic after joining the union in Spokane sometime this spring.

Subject's adoptive mother, was 40 years old, when she died of the gunshot wound.

Subject has one natural sister, Carolyn White, who continues to live on the reservation.  She no longer lives at the White residence.

Marital.  Subject has never been married.

Education.  John attended Wellpinit Grade School at Wellpinit, Washington.  He attended Wellpinit High School for approximately one month before running away from the Whites.

After returning to the Colville reservation, subject attended St. Maries Mission from March 26, 1986 through June of 86'.  He was in the ninth grade.  Although records were not complete, it appeared subject did receive some credits, but his attendance was sporadic.

Friedlander next enrolled at Omak Alternative High School on September 4, 1986.  He left February 6, 1987, just prior to the shooting.  His attendance at this school was sporadic and no high school credits were given.  The records from that school were sent to Lake Rosevelt at Coulee Dam, but it appears he never actually attended that school.

Employment.  For a short period of time in July of 1984, subject worked on a tribal project through the CETA Program.  He also worked on an apple orchard in September through November of 1985 at Omak, Washington.  There is no other indication of employment.

HEALTH:

Physical.  Friedlander is described as 5'6" tall, 154 pounds, with black hair and brown eyes.  He was given a complete physical on September 28, 1987 by Dr. Jeffrey J. Graham, Md.  Dr. Graham is a neurologist in Spokane and is a member of Inland Pediatrics.  Dr. Graham was the same doctor who attended John when he was three years old and involved in the automobile accident when his mother died.  A September 28, 1987 physical said, "at the present time John does not complain of any headaches.  He has no seizures.  He has no blackouts.  -- John had an EEG done today which is within normal limits and also had a CT Scan with and without contrast which is within normal limits.  --At this time I didn't find any neuralgic problems with John."

Friedlander has admitted to the abuse of alcohol and marijuana from approximately two years prior to his arrest to the date of his arrest.  Others on the Spokane reservation and Colville reservation noted the problem also.  It was because of this that Ron Friedlander, John's uncle, attempted to place him at the mid-Columbia Hospital in Richland, Washington.  It appears this was preliminarily for an eventual inpatient stay at that program.  He was admitted on August 22, 1986 and discharged August 29, 1986.  The discharge diagnosis showed "a conduct disorder, socialized, non-aggressive with depressive features, alcohol abuse intermittent."  His general function related that "Friedlander was unable to adjust to school, peer group, and parental control."  It appears Friedlander was to return to that program in either December of 86' or January of 87' but this was never realized.  The final recommendation from mid-Columbia indicated that Friedlander should live in a group home due to history of poor impulse control and has need for highly structured setting.

It should be noted in the report from mid-Columbia that there is mention of the fact that, "based on psychological testing and interview, there was no evidence of any impairment that can be attributed to brain damage."  This report was signed by Dr. Bruce Duthie, PhD.  This coincides with the physical exam given to Friedlander by Dr. Graham in September of 1987.

<u>Mental and Emotional.</u>   There are several psychiatric evaluations completed on Friedlander.  Instead of going into too much detail, these reports are attached to the presentence report.  For the most part, the Court is aware of these reports as is the United States and defense counsel.

In general terms, the psychological evaluation completed in Richland, Washington in August of 1986 by Dr. Lewis Dunlap shows a verbal IQ of 69, a performance IQ of 70, and full-scale IQ of 68.  His verbal and full-scale IQ range were reported to be in the retarded range of intellectual functioning as performance IQ are in the borderline retarded range.  Based on a wide range achievement test, John has the equivalent of sixth grade in reading, spelling, and arithmetic.

In approximately April of 1987, another battery of tests were administered to Friedlander.  These were completed by Dr. Lawrence Weathers.  Dr. Weathers IQ testing indicates a verbal score of 72, a performance score of 73 and a full-scale score of 71.

In general, the three psychiatric reports attached indicate unlikelihood of rehabilitation and continued danger to society.  In all probability, there is a high likelihood of more violent behavior in the future.

FINANCIAL CONDITION:

As a result of the death of his natural mother, the house in Elmer City, Washington was left to both John and his sister Carolyn.  Further, when he turns 18, there is to be some trust monies set aside for Friedlander.  The exact amount of these monies are unknown.

At the present time, subject has no assets or liabilities.

EVALUATION:

<u>Probation Officer's Assessment.</u>  Before the Court is John Franklin Friedlander, aka/John Franklin White.  He plead guilty to Premeditated Murder, second degree and Assault With Intent To Commit Murder.

Friedlander does not deny his involvement in the charges.  He has been very cooperative and stated in as much detail as possible exactly what happened the night of the shooting and the day leading up to that event.  Friedlander does not try to shift the responsibility of the murder and assault on anyone but himself.  It appears from the discussions between he and Guy Herman prior to entering the home, at least the second time, that the shooting was premeditated. It was a senseless act by Friedlander.  All indications show Gloria White's role as a mother appears to be more than adequate for the needs of Friedlander.  She and Clarence decided to adopt him along with his sister at an early age. Although there were come accusations by Friedlander that he was physically abused by Clarence, none of those accusations ever came to light regarding Gloria.  He took her life at a prime time, when she was 40 years old.  His reason for murdering Gloria was as senseless as the crime itself.  In some ways, it was no more than an execution--an execution that took place simply so that she would not call the police.

-13-

Through grade school, there appeared to be no real indication of Friedlander's violence.  Although he did not do well academically in school, there are no reports of acting out or violent behavior.  After he began high school, a rebellious attitude became apparent and Clarence and Gloria had a difficult time controlling him.  This was to culminate in his running away from home when he was 15 years old and returning to the Colville Indian Reservation where he lived with his natural father, George, and other relatives.  During that time, Child Welfare Development from the Colville Tribe became involved in his case and tried to do the best they could in placing him with responsible adults. Unfortunately, no one could control the behavior of Friedlander and his free spirit.  His lack of control, along with drug and alcohol abuse, ended in the tragedy that now brings him before your honor.

In talking with Friedlander, there seems to be little if any remorse for what he has done.  Clarence White, who seems to know him best, feels that at this point, Friedlander does not understand what he has done.

Psychiatric reports seem to indicate Friedlander will continue to act out violently and will be a danger to society for many years to come.

Parole Guidelines/Sentencing Data.   Salient factor score: 4; offense category Count 1, Murder, Category 8, Count 2 Assault, Category 7; adult guideline range: Count 1 Murder, 150 plus months (12.5 years), Count 2, Assault, 78 to 110 months (6.5 years to 9.1 years).

According to the administrative office statistics for all U. S. District Court sentencing in ending the 12 month period June 30, 1987, 28 defendants were sentenced on second degree charges.  Twenty-three of the 28 were sentenced to an average length of prison 139 months or 11.6 years.  This was 82.1 percent of all defendants sentenced.  One received a split sentence and six defendants were sentenced for indeterminate sentences.  One individual received a 36 month probation.

In the Eastern District of Washington for the 12 month period ending June 30, 1987, one person was sentenced under the homicide statutes for a period of six months.

Respectfully submitted,

ALAN T. SOLINSKY
U. S. Probation Officer

ATS:dlb

Attachment

I, Carolyn Lozier, state the following:

1.  I am over 18 and competent to testify.

2.  I am John Franklin Friedlander's biological sister.

3.  When we were small children (John was 3-years-old, I was 4-years-old), our family was in a horrific car crash. It claimed the lives of our mother (Barbara), as well as our little sister (Cindy). Cindy was only 2-years-old.

4.  John was badly-injured (he went through the windshield), but survived.

5.  After losing our mother, we were placed in foster care. We never received an explanation why our father (George) couldn't—or wouldn't— continue to care for us.

6.  After being placed in foster care, we moved between 3-4 different families over a four-year period.

7.  Those years were horrible for both of us. None of our foster parents loved us, and not having parental love after experiencing such tragedy hurt us both quite badly.

8.  But it wasn't just a lack of love. Both John and I were physically and sexually abused by our foster parents during that timeframe.

9.  We never received any counseling for these events—that is, either the loss of our family or the abuse.

10. When I was 8-years-old and John was 7-years-old, we were adopted by Clarence and Gloria White. Clarence was enrolled with the Colville Tribe; Gloria was enrolled with the Spokane Tribe.

Declaration
– 1 –

Exhibit C-001
046
Exhibit 02 - Page 48

11.    Clarence and Gloria had a daughter (Dawn), who was four years older than us (12) at the time of our adoption.

12.    Clarence and Gloria loved Dawn, but did not treat us the same. We were outcasts.

13.    There were many times when Gloria would take Dawn places, but would leave John and me home to do chores.

14.    After years of difficult times with the White family, John and I could not take it anymore and decided to leave.

15.    I first ran away when I was 13-years-old. I went to Spokane and then to Olympia to live with extended family.

16.    After I came back, John ran away to live with our father (George). He was about 14-years-old at the time.

17.    John eventually returned to see me. When he did, John was told I was in an accident and was dead or hospitalized, and Clarence and Gloria were to blame. He became enraged. This is when the shooting happened.

18.    Both John and I were in special education growing up. My guess is because we were so behind in school from being moved around in the foster care system so much.

19.    John is a bit "slow," but I'm not sure if that's because he was born that way or it's because of the car accident.

20.    I remain in touch with John to this day, although we've lost track of each other on occasion when he gets transferred from one BOP facility to another.

Declaration
– 2 –

Exhibit C-002
047
Exhibit 02 - Page 49

21. John has become a very spiritual man. He has also become a very peaceful man.

22. John made a horrible, emotional mistake when he was 17-years-old. He is over 50-years-old now, and he would like to reunite with me and live a life in peace outside of custody.

23. If released, I will help ensure my brother receives the care and support he needs.

24. In 1999, I spoke with Clarence White (our adopted father) before he passed. He conveyed forgiveness to John for his conduct. He also hoped that John would come and visit him when he was released so they could repair their relationship.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 25, 2022.

Declaration
– 3 –

**Exhibit C-003**
**048**
Exhibit 02 - Page 50

# Car accident claims mother, two daughters

Requiem Mass was celebrated August 18 at Nespelem Catholic Church for Mrs. Barbara Friedlander, 27, Elmer City, and her two daughters, Michelle Laverne and Candace Laverne who died in a car accident August 16. Burial was in the Nespelem Catholic Church.

Mrs. Friedlander was born on March 24, 1946 in Nespelem. She attended Grand Coulee High School. In February 1967 she married George Samuel Friedlander in Nespelem. She had lived in the Grand Coulee area most of her life, and had lived in Elmer City for the last five years.

Candace Lavette, 5, was born Feb. 13, 1968, in Grand Coulee. Michelle Laverne, three months, was born May 8, 1973, in Grand Coulee.

Mrs. Friedlander is survived by her husband, George; a daughter, Carolyn, and a son, John, all of Elmer City; her father, John Seward, Grand Coulee; a sister, Rita S. Circle, Belvedere; and two brothers, Dennis L. Quill, Belevedere, and Joe L. Quill, Seattle.

Besides their mother's relatives, the girls are survived by paternal grandparents, Mr. and Mrs. George Friedlander, Nespelem, and numerous aunts and uncles.

Exhibit D-001
049
Exhibit 02 - Page 51



Exhibit 02 - Page 52



Re: Mr. John Friedlander
Page 3 of 16

Exhibit 02 - Page 54

Re: Mr. John Friedlander
Page 4 of 16

Re: Mr. John Friedlander
Page 5 of 16

Exhibit 02 - Page 56

Re: Mr. John Friedlander
Page 6 of 16

Exhibit 02 - Page 57

Re: Mr. John Friedlander
Page 7 of 16

Re: Mr. John Friedlander
Page 8 of 16

Exhibit 02 - Page 59

Re: Mr. John Friedlander
Page 9 of 16

Exhibit 02 - Page 60

Re: Mr. John Friedlander
Page 10 of 16



Re: Mr. John Friedlander
Page 11 of 16

Exhibit 02 - Page 62

Re: Mr. John Friedlander
Page 12 of 16

Exhibit 02 - Page 63

Re: Mr. John Friedlander
Page 13 of 16

Re: Mr. John Friedlander
Page 14 of 16



Re: Mr. John Friedlander
Page 15 of 16



Re: Mr. John Friedlander
Page 16 of 16



Exhibit 02 - Page 68

Exhibit 02 - Page 69



Exhibit 02 - Page 70



Exhibit 02 - Page 71



Exhibit 02 - Page 72

Exhibit 02 - Page 73

Exhibit 02 - Page 74

Exhibit 02 - Page 75





Exhibit 02 - Page 77



Exhibit 02 - Page 78



Exhibit 02 - Page 79



4

*DIPLO*
*PSYCH*
VERNE E
THOMAS
MARK L.
HOWARD
DAVID G

DAVID D

Exhibit 02 - Page 81



Exhibit I-003
081
Exhibit 02 - Page 83

FILED IN THE
U.S. DISTRICT COURT
Eastern District of Washington

NOV 1 0 1987

JAMES R. LARSEN, Clerk

Deputy

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

UNITED STATES OF AMERICA,      )
                               )    Mag. #87-0096A-01 JLQ
               Plaintiff,      )
                               )    November 10, 1987
        vs.                    )    Spokane, Washington
                               )
JOHN FRANKLIN FRIEDLANDER,     )
aka JOHN FRANKLIN WHITE,       )    FINDINGS OF FACT AND
                               )    CONCLUSIONS   OF   LAW
               Defendant.      )
                               )

     The attached verbatim transcript of proceedings, as

amended, shall constitute the Findings of Fact and

Conclusions of Law.

     DATED this _10th_ day of November, 1987.


                    JUSTIN L. QUACKENBUSH
                    United States District Judge

Reproduced at the National Archives at Seattle

NOVEMBER 10, 1987
10:30 o'clock, AM

THE COURT:  This is a difficult case for the
court, and I am, of course, guided by and bound by the
provisions of 18 United States Code Section 5032.  The
question is whether the transfer of Mr. Friedlander to adult
court is in the interests of justice, and the statute sets
forth certain factors that the court should consider.

There are those, such as the District Judge in
Wyoming in the BNS case, who feel that the policy behind the
adoption of the Juvenile Justice Act is that society's
interest in punishing criminal activity is outweighed by its
interests in rehabilitating the youthful offender.

I have also read Judge Burns' decision from the
District of Oregon, which I believe he decided in 1979.
Judge Burns observed that where a realistic chance for
rehabilitation exists, the balance ought not to tip in
recognition of the general societal interest subsumed in the
broadest sense of the word "justice."  I will review these
factors in this opinion, which will be the opinion of the
court.

I am, of course, first required to look at Mr.
Friedlander's age.  He is now seventeen, having reached that
age on September first of this year.  If the events took place

Exhibit J-002
083
Exhibit 02 - Page 85

in February of 1987, Mr. Friedlander was then some sixteen and a half years old.

His social background has been difficult, to say the least. He lost his mother in a srious automobile accident and evidently one or two sisters in that same accident when he was aged three. Mr. Friedlander was seriously injured, and Dr. Wert raised questions as to whether or not there was brain damage. I believe Dr. Wert concluded based upon, I believe it was the Halstead-Reitan Test, that he felt there was evidence of brain damage on the left side, or left lobe brain damage. However, the subsequent CAT-scan tests did not confrim or establish brain damage and to the contrary, are negative.

Mr. Friedlander, the father, evidently did not provide adequate care for Mr. Friedlander. When he was approximately six, he was adopted by Mr. and Mrs. White, and he lived with them until approximately age sixteen, when he left the White home and went to live with his father, and that was not in Mr. Friedlander's best interests.

The Whites attempted to provide appropriately for Mr. Friedlander, both physically and through appropriate train-ing, and treated Mr. Friedlander as much as they could as their own child. Mr. Friedlander did fairly well; his grades reflect he did average in school. But commencing at the time

Reproduced at the National Archives at Seattle

1  that he left the White residence, his life was one of

2  non-conformance, some violations of the law, use of marijuana,

3  excessive consumption of alcohol, living more or less with

4  this girlfriend.

5         The offenses alleged here are the most egregious,

6  of course, that being the murder of Mrs. White and the

7  attempted murder and shooting of Mr. White. While that is not

8  the sole concern of the court, it is in this case one that

9  greatly concerns the court. There is no evidence in this

10 record that Mrs. White did anything but expend her best

11 efforts on behalf of Mr. Friedlander, no evidence whatsoever

12 that Mrs. White treated Mr. Friedlander other than she would

13 her own natural son.

14        I must consider Mr. Friedlander's prior record,

15 and he did develop a record and pattern of criminal offenses

16 as soon as he left the White home. Those offenses are set

17 forth in the exhibit before the court, being Exhibit No. 14.

18        I accept Dr. Jorgensen's testimony, which is

19 really undisputed as to Mr. Friedlander's present intellectual

20 development. His IQ ratings are somewhat low, and I think the

21 Doctor testified that they are below what Mr. Friedlander

22 could actually accomplish, and that is consistent with Mr.

23 Friedlander's grades. He seemed to be able to keep up in

24 grade school and that portion of high school that he attended.

25 There was discussion that his IQ range might put him in the

1   simplistic category of mildly retarded, but the rest of the

2   evidence before the court does not indicate that in fact Mr.

3   Friedlander is retarded in fact, either physiologically or

4   psychologically.

5           I must also consider the nature of the past

6   treatment and Mr. Friedlander's response.  He was handled, of

7   course, as a juvenile for these various offenses reflected on

8   his record, and his response was uncooperative, evidenced by

9   his violation and disregard of any of the terms of probation.

10          I likewise must consider the availability of

11  juvenile programs, and as Mr. Bechtolt points out, the

12  testimony of Mr. Shugruw indicates that whether Mr.

13  Friedlander is handled as a juvenile or as an adult that he

14  would probably be placed in the California Youth facility

15  under a contract with the State of California.  I am satisfied

16  that the evidence shows that Mr. Friedlander has an

17  anti-social personality disorder as defined by the experts,

18  and that is typified by the evidence of his manipulation and

19  abuse of individuals without any particular guilt or remorse.

20          I have considered in making this determination

21  that there has been no evidence of guilt or remorse other than

22  the one statement that Mr. Friedlander made to Mrs. Peters.

23  The evidence shows that he has been out of control.  He has

24  lived as an adult; however, in that adult lifestyle, his

25  conduct has evidenced lack of self-restraint and internal

ORAL OPINION
Reproduced at the National Archives at Seattle

Exhibit J-005
086
Exhibit 02 - Page 88

1  control, including difficulty in controlling his temper.  I am

2  satisfied from the testimony of the experts that this

3  anti-social personality disorder is a condition which is

4  difficult to treat.  I am satisfied that long-term treatment

5  is required.

6           I conclude that because I feel that Mr.

7  Friedlander is not likely to submit himself to the normal and

8  social mores, the controls that exist, Dr. Jorgensen concluded

9  that Mr. Friedlander is probably a danger to society, and I

10 agree with Dr. Jorgensen's conclusion.  I am satisfied that

11 there is a need for long-term supervision in Mr. Friedlander's

12 case, not only for the protection of society, and I feel

13 long-term supervision is required for that purpose, but also

14 to afford Mr. Friedlander the opportunity for rehabilitation.

15 I feel that Mr. Friedlander would be a risk to society if he

16 was merely treated as a juvenile and released at age

17 twenty-one.

18          As I have indicated, I feel that he is going to

19 be treated for rehabilitation purposes the same whether he is

20 transferred to adult court or is treated as a juvenile. I feel

21 that this case is an inappropriate one to have Mr. Friedlander

22 released at age twenty-one without any provisions for

23 supervision or guidance, such as would be the case if he were

24 treated as an adult and then paroled at an appropriate time.

25          I recall specifically the discussions I had with

1   the various experts and those particularly with Dr. Wert, who

2   I was impressed with.  We talked about the penological

3   philosophy that seems to exist today, that being of locking

4   people up without any opportunity while they are in custody to

5   earn credit or reward for sincere efforts on the part of the

6   individual to rehabilitate himself and to prepare himself to

7   be released to society.  I think that philosophy is

8   inappropriate.

9        Unfortunately, even under the Parole Commission

10  procedures that now exist and would cover Mr. Friedlander, if

11  he is convicted, the Parole Commission really doesn't give

12  much credit to an individual on the determinate term for

13  sincere efforts made by individuals to rehabilitate themselves

14  or to prepare themselves for release to society.

15       There is, of course, under 4205(b)(2), under the

16  Adult Sentencing Procedures, the opportunity of the court to

17  give the Parole Commission complete freedom in making

18  determinations as to a parole date for an individual such as

19  Mr. Friedlander, and I think that since I find that it is

20  necessary, not only for protection of society, but in Mr.

21  Friedlander's best interests to have supervision after he is

22  released, I conclude that the factors that I have discussed

23  dictate that the interests of justice require that I transfer

24  Mr. Friedlander as an adult to this court for prosecution as

25  the Executive Branch feels is appropriate.

1      Those will be the findings of the court.

2

3

4 DATED: _November 10 1987_

5

6

7

8       JUSTIN L. QUACKENBUSH
       U.S. District Court Judge
9

10

11       - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Reproduced at the National Archives at Seattle

Exhibit J-008
089
Exhibit 02 - Page 91

U.S. Department of Justice                           **Notice of Action**
United States Parole Commission
90 K Street, N.E., 3rd Floor
Washington, D.C. 20530

| | |
|---|---|
| Name:  FRIEDLANDER, John | Institution: Tucson FCI |
| Register Number:  05167-085 | Date:      June 11, 2018 |

As a result of the hearing conducted on May 21, 2018, the following action was ordered:

Deny mandatory parole. Continue to Expiration.

**REASONS**:

The Commission's previous reasons are still appropriate in that you have frequently and seriously violated the rules of the institution by amassing 19 DHO level infractions primarily for 100 and 200 level misconduct.  Further, the most recent infraction was approximately four years ago for consuming alcohol and being intoxicated.  This type of behavior indicates a lack of maturity on your part and highlights your inability to follow the rules of the institution.  This is a further indication that there is a high probability that you will not follow the laws upon release from prison.

**You have also been scheduled for a statutory interim hearing during May 2020.  At that time, your case will be reviewed again pursuant to 18 U.S.C. §4206(d).**

The above is an Original Jurisdiction decision and is appealable to the Commission under 28 C.F.R. §2.27.

You may obtain appeal forms from your caseworker or supervising officer and they must be filed with the Commission within thirty days of the date this Notice was sent.

Copies of this Notice are sent to your institution and to your supervising officer.  In certain cases, copies may also be sent to the sentencing court.  You are responsible for advising any others you wish to notify.

cc:     Designation & Sentence Computation Ctr
        U.S. Armed Forces Reserve Complex
        Grand Prairie Office Complex
        346 Marine Forces Drive
        Grand Prairie, TX  75051

FRIEDLANDER 05167-085                                    1                              Clerk:  MDB

U.S. Department of Justice                                    **Notice of Action**
United States Parole Commission
90 K Street, N.E., 3rd Floor
Washington, D.C.  20530

---

Name:  FRIEDLANDER, John                    Institution: Tucson FCI

Register Number:  05167-085                 Date:     June 11, 2018

---

As a result of the hearing conducted on May 21, 2018, the following action was ordered:

No change in deny mandatory parole. Continue to expiration.

**REASONS**:

The Commission's previous reasons are still appropriate in that you have frequently and seriously violated the rules of the institution by amassing 19 DHO level infractions primarily for 100 and 200 level misconduct.  Further, the most recent infraction was approximately four years ago for consuming alcohol and being intoxicated.  This type of behavior indicates a lack of maturity on your part and highlights your inability to follow the rules of the institution.  This is a further indication that there is a high probability that you will not follow the laws upon release from prison.

**You have also been scheduled for a statutory interim hearing during May 2020.  At that time, your case will be reviewed again pursuant to 18 U.S.C. §4206(d).**

The above is an Original Jurisdiction decision and is appealable to the Commission under 28 C.F.R. §2.27.

You may obtain appeal forms from your caseworker or supervising officer and they must be filed with the Commission within thirty days of the date this Notice was sent.

Copies of this Notice are sent to your institution and to your supervising officer.  In certain cases, copies may also be sent to the sentencing court.  You are responsible for advising any others you wish to notify.

cc:     Designation & Sentence Computation Ctr
        U.S. Armed Forces Reserve Complex
        Grand Prairie Office Complex
        346 Marine Forces Drive
        Grand Prairie, TX  75051

# SIH Following Denial of Mandatory Parole
# Prehearing and Summary

## Part One: Prehearing Assessment

**Offense of Conviction:** Second Degree Murder, Assault with Intent to Commit Murder

| | |
|---|---|
| **Name:** Friedlander, John | **BOP Institution:** Tucson FCI |
| **Reg. No:** 05167-085 | **Full Term Date:** LIFE |
| **Assessment Date:** 5/4/2018 | **Two-Thirds Date:** 2/17/2017 |
| **MR Date (if release at 2/3 not granted):** N/A | **Sentence Length:** LIFE |
| **Months in Custody:** 376 as of 6/14/2018 | **Reviewer:** Sarah Asbury-Baca |

**NOTE: This case has been designated Original Jurisdiction.**

## I.    Codefendants:

The following information is the last known information regarding the subject's codefendants:

1.  Guy Herman: Convicted as a juvenile through the Stevens County, WA juvenile justice system for First Degree Murder, First Degree Assault by Compliance and Burglary.  He was sentenced to 291 - 364 weeks (approximately 7 years) which would have taken him to the age of majority when released.  He served his sentence at the Echo Glen Juvenile Facility in Snoqualmie, WA.

2.  Wendy Herman: Charged with Taking a Motor Vehicle and processed through the Okanogan Juvenile Authorities.  She was sentenced to 18 months to be served at Echo Glen Juvenile Facility.

3.  John Tsoodle: No sentencing information available.

## II.    Victim information:

There is a letter from a concerned citizen on side three of the file opposing the subject's release which was received in advance of the Initial Hearing in 1996.  More importantly, there is a letter from the victims' biological daughter dated 10/24/1996, wherein she expresses her opposition to parole and indicates her fear for herself and family if the subject is released.  Her letter also provides some insight into the devastation the shooting has caused her father, Clarence White.  There is also several other letters in opposition to parole (most recent dated 4/18/2016) and several signed petitions with signatures of numerous persons opposed to parole.

A memo in the file from Victim Witness Coordinator Amanda Pyron dated 2/14/2012 indicates she attempted to contact victim Dawn Fleet but the telephone number in the file was not in service and a search to obtain new information provided no results.  This case will gain be referred to the Commission's Victim Witness Unit for further update as deemed necessary.

## III.    Summary of the confining offense(s) and prior decisions of the Commission:

On 3/11/1988, the subject appeared the U.S. District Court for the Eastern District of Washington and was convicted of Second Degree Murder and Assault With Intent to Commit Murder.   He was sentenced to LIFE in prison with an additional sentence of 20 years, to run concurrent.

The details of the offense indicate that on 2/14/1987, the 16-year-old subject, shot and murdered his adoptive mother, Gloria White, and shot and attempted to murder his adoptive father, Clarence White. A subsequent investigation revealed that on 2/13/1987, while driving a stolen car and upon realizing the vehicle was about to run out of gas, the subject and codefendants Guy Herman, Wendy Herman and John Tsoodle went to the home of the

---

**Exhibit K-003**
**092**
Exhibit 02 - Page 94

subject's adoptive parents.  The subject and Guy Herman got out while the others remained in the vehicle.  The two entered the White residence through a glass slider door and once inside, they went to the bedroom of Clarence White who was asleep.  There they took a .22 caliber pistol from the bedroom and two kitchen knives.  They left the residence, got back in the stolen car and drove to a party.

All four of the above named individuals returned to the White residence in the early morning hours of 2/14/1987.  Prior to returning, however, the subject and Guy Herman had discussed returning to the residence to take money and to kill the Whites.  Guy Herman carried the loaded .22 into the residence but the subject then took the gun from him once Herman admitted he could not shoot anyone.  The two then went to Clarence White's bedroom and the subject shot Clarence White in the face while he lay sleeping on his back.  Both the subject and Guy Herman then went to the other end of the house to Gloria White's room and the subject shot her in the face.  They took her purse from her bedroom to the kitchen and from the purse they took her keys to a Chevrolet vehicle and $60 to $70.

They then went back to Clarence White's room and discovered he was still alive, at which time the subject fired one, possibly two rounds into Clarence White, hitting him in the abdomen area.  The two then went through the room and Guy Herman took a .357 Magnum pistol.  The phone rang causing the two to leave the residence.  The subject drove off in the vehicle where Wendy Herman and John Tsoodle had been waiting for him.  Guy Herman attempted to take the White's pickup but could not get it started, so he ended up running from the residence.

Initial Hearing
On 11/5/1996, the Commission conducted an Initial Hearing. The offense severity was Category Eight because it involved murder.  The subject's SFS was 6 and his base guidelines were 120+ months.  The Commission added rescission guidelines of 8-18 months for an Attempted Escape and one non-drug related administrative infraction, for an aggregate guideline range of 128+ months.  The decision more than 48 months above the minimum guideline range was warranted because the subject was involved in the murder or attempted murder of two individual who were in the house asleep at the time of the shooting. In a Notice of Action dated 11/26/1996, the Commission ordered a 15-Year Reconsideration Hearing.

Interim Hearings
On 10/16/2000, the Commission conducted a Combine Statutory Interim Hearing (SIH)/Rescission hearing. In a Notice of Action dated 11/6/2000, the Commission ordered no change in the previous decision to continue to a 15-Year Reconsideration Hearing in November 2011.  Additionally, the Commission added rescission guidelines of 64-150 months, which included a Category Seven Assault, seven drug related infractions, and one non-drug related infraction.

The Commission conducted subsequent SIHs On 8/13/2002, 7/21/2004, 6/8/2006, 5/6/2008, and 6/23/2010. In Notices of Action following each of these hearings, the Commission ordered no change in the previous decision to continue to a 15-Year Reconsideration in November 2011.  The Commission added rescission guidelines of 0-2 months following the July 2004 SIH. The examiner identified additional rescission conduct at the June 2010 SIH but opted not to add rescission guidelines due to the fact that the next hearing would be the 15-year reconsideration hearing and all guidelines would be calculated again.

15-Year Reconsideration Hearing
On 1/31/2012, a 15-Year Reconsideration hearing was held.  In a Notice of Action dated 2/24/2012, the Commission ordered to continue to expiration.  The offense severity continued to be Category Eight and the aggregate guideline range was 222+ months.

---

Friedlander 05167-085

On 6/11/2014, the Commission conducted an additional SIH. In a Notice of Action dated 7/7/2014, the Commission ordered no change in previous decision to continue to expiration. The subject was scheduled for a SIH in June 2016.

Mandatory Parole Hearing
On 6/7/2016, the Commission conducted a Mandatory Parole Hearing. In a Notice of Action dated 8/23/2016, the Commission ordered to deny mandatory parole and continue to expiration. The reasons given were as follows:

> "You have frequently and seriously violated the rules of the institution by amassing 19 DHO level infractions primarily for 100 and 200 level misconduct. Further, the most recent infraction was approximately two years ago for consuming alcohol and being intoxicated. This type of behavior indicates a lack of maturity on your part and highlights your inability to follow the rules of the institution. This is a further indication that there is a high probability that you will not follow the laws upon release from prison."

On 2/20/2018, the subject applied for parole via form I-24. He indicated that he would be represented by Mrs. Shamens and requested disclosure of his institutional file.

**IV.    Summary of the prisoner's institutional conduct during this period of incarceration:**
A BOP Progress report dated 2/2/2018 was reviewed. The subject's current work detail is the FCI Landscape Crew. He has consistently received good work evaluations. The subject has worked throughout his time in prison but has had substantial gaps in employment on several occasions for over a year. The subject has completed Drug Education and Non-Residential Drug Treatment.

Throughout his confinement, the subject has completed over 2,400 hours of programming. That program includes the following: GED classes (427 hours), Welding (860 hours), Building Trades (385 hours), Typing (90 hours), ACE Education classes (666 hours), Parenting (24 hours), Nutrition (3 hours), SHU Education classes (24 hours), Geography (11 hours), and Drug Education.

Since his last hearing, the subject has completed an addition 66 hours worth of programming including the following courses: Alternatives to Violence, Communication Skills, Advanced Alternatives to Violence, Improve Self-Esteem, Basic Alternatives to Violence, Setting Goals, and Beginning Spanish. The subject did not complete the Challenge Program after beginning it in 2012. He was also discharged from the Code Program for unknown reasons in 2006.

The subject does not have any new disciplinary infractions since 2014. However, he incurred numerous disciplinary infractions throughout his time in prison and appeared to suffer from narcotics addiction. The subject's 19 DHO level infractions are outlined below.
1.    **Use of Drugs/Alcohol (Code 112)** – Incident Report No. 1095459
       On 7/26/2014, inmate admitted being intoxicated and tested positive for alcohol via breathalyzer test.
       Sanction: DS 30 days, LP Comm 1 year, LP Phone 1 year

2.    **Use of Drugs/Alcohol (Code 112)** – Incident Report No. 1874729
       On 5/14/2009, inmate admitted being intoxicated. The subject stated that use heroin to kill in order to kill pain that he felt from his stomach illness.

---

Friedlander 05167-085

<u>Sanction</u>: FF SGT 40 days, LP Comm 90 days, LP Visit 5 years

3.   **Use of Drugs/Alcohol (Code 112)** – Incident Report No. 1813816
     On 12/17/2008, inmate tested positive for narcotics. The subject states that he sometimes takes
     unauthorized drugs in order to kill pain that he receives in his stomach.
     <u>Sanction</u>: FF SGT 40 days, LP Visit 5 years, LP Phone 1 year

4.   **Use of Drugs/Alcohol (Code 112)** – Incident Report No. 1796862
     On 10/29/2008, inmate admitted using narcotics.
     <u>Sanction</u>: DS 30 days, FF SGT 40 days LP Visit 2 years

5.   **Possessing Intoxicants (Code 222)** – Incident Report No. 1776188
     On 9/8/2008, inmate possessed intoxicants
     <u>Sanction</u>: DS 30 days, LP Comm 120 days

6.   **Use of Drugs/Alcohol (Code 112)** – Incident Report No. 1765144
     On 8/4/2008, inmate was intoxicated and waived his appearance at the DHO Hearing.
     <u>Sanction</u>: DS 60 days, FF SGT 60 days, LP Visit 1 year

7.   **Fighting With Another Person (Code 201)** – Incident Report No. 1696299
     On 7/26/2008, inmate admitted being intoxicated and tested positive for alcohol via breathalyzer test.
     <u>Sanction</u>: DS 15 days, FF SGT 30 days

8.   **Possessing Intoxicants (Code 222)** – Incident Report No. 1543835
     On 12/10/2006, inmate possessed intoxicants. The subject fully admitted to abusing alcohol while
     confined. He indicated that he makes no excuses for his actions in light of all the programs he
     completed that have taught him how to address his risk of relapse when he is feeling bad about a
     situation. However, he indicated that he gave in to his addiction in lieu of applying those tools learned
     in those programs.
     <u>Sanction</u>: DS 14 days, FF SGT 27 days LP Comm 120 days

9.   **Fighting With Another Person (Code 201)** – Incident Report No. 1095459
     On 4/4/2003, inmate was in a multi-inmate fight in G Unit at USP Marion. The subject's report
     indicating that the subject received a laceration to his lip and contusions to his hand. The subject wrote
     a letter on 4/6/03 that he was involved in the incident. The other inmate received injuries of a similar
     nature. The subject indicated that he had to defend for his life. He also pointed out that he had a cut
     lip, a bloody nose and a broken bone in his hand.
     <u>Sanction</u>: DS 21 days, LP Comm 1 year, LP Phone 1 year

10.  **Refused Work Assignment (Code 306)** – Incident Report No. 915818
     On 9/31/2001, the subject refused to accept placement in general population.
     <u>Sanction</u>: DS 15 days

11.  **Possessing Intoxicants, Possessing Unauthorized Item (Code 222 and 305)** –Report No. 795040
     On 7/4/2000, inmate possessed intoxicants. The subject fully admitted to abusing alcohol while
     confined. He indicated that he makes no excuses for his actions in light of all the programs he

---

Exhibit K-006
095
Exhibit 02 - Page 97

completed that have taught him how to address his risk of relapse when he is feeling bad about a situation. However, he indicated that he gave in to his addiction in lieu of applying those tools learned in those programs.
<u>Sanction</u>: DS 14 days, FF SGT 27 days LP Comm 120 days

12. **Possessing Intoxicants (Code 222)** – Incident Report No. 1543835
On 12/10/2006, inmate possessed intoxicants. Additional details unknown.
<u>Sanction</u>: DS 45 days, FF SGT 27 days

13. **Use of Drugs/Alcohol (Code 112)** – Incident Report No. 668589
On 3/19/1999, inmate admitted smoking heroin after testing positive for illegal drugs.
<u>Sanction</u>: DS 60 days, FF SGT 60 days, LP Visit 1 year

14. **Use of Drugs/Alcohol (Code 112)** – Incident Report No. 658436
On 2/5/1999, inmate admitted smoking heroin after testing positive for illegal drugs.
<u>Sanction</u>: DS 30 days, FF SGT 30 days LP Visit 180 days

15. **Use of Drugs/Alcohol (Code 112)** – Incident Report No. 588075
On 4/26/1998, inmate admitted smoking heroin after testing positive for illegal drugs.
<u>Sanction</u>: DS 60 days, FF SGT 200 days

16. **Use of Drugs/Alcohol (Code 112)** – Incident Report No. 567167
On 1/30/1998, inmate admitted smoking heroin after testing positive for illegal drugs.
<u>Sanction</u>: DS 45 days, FF SGT 150 days LP 365 days

17. **Fighting With Another Person (Code 201)** – Incident Report No. 549761
On 12/26/1997, inmate was in a fight, claimed it was horseplay only.
<u>Sanction</u>: DS 21 days, FF SGT 15 days, change quarters

18. **Possessing Intoxicants (Code 222)** – Incident Report No. 514572
On 8/18/1997, inmate positive for opiates/heroin.
<u>Sanction</u>: DS 45 days, FF SGT 100 days

19. **Possessing Intoxicants (Code 222)** – Incident Report No. 485441
On 3/11/1997, inmate positive for opiates/heroin.
<u>Sanction</u>: DS 30 days, FF SGT 30days

**V.     Prisoner's release plan (as indicated in the most recent BOP progress report):**
Upon release, he plans to live with his father, George Friedlander, at 376 Gold Lake Road, Nespelem, Washington 99155. Mr. Friedlander can be reached at (509) 634-1890.

**VI.     Standard(s) for release at this hearing:**
Pursuant to 18 U.S.C. §4206(d), the prisoner must be released at the two-thirds date unless the Commission determines that the prisoner has frequently or seriously violated institution rules or regulations or that there is a reasonable probability that he will commit any Federal, State or local crime.

Exhibit K-007
096
Exhibit 02 - Page 98

At a Statutory Interim Hearing following denial of mandatory parole, the Commission need not conduct a *de novo* review of the entire case. Rather, the Commission must consider whether there have been significant development's or changes in a prisoner's status to warrant a change in the previous decision. The Commission may order either 1) no change in the previous decision to deny mandatory parole or 2) advance the decision to continue to expiration and grant mandatory parole effective ___.

**VII.   Prehearing Examiner's Evaluation:**
The subject is a 47-year-old man serving a LIFE sentence for a 1987 conviction of Second Degree Murder and Assault with Intent to Commit Murder.  He committed the instant offense at age 16.  The Commission's last decision was to deny parole and continue to expiration.

The subject has 19 DHO level infractions since beginning his confinement, the most recent of which occurred in 2014. The subject works for the landscape crew and receives good work evaluations.  He has been in custody for 376 months as of 6/14/2018.

SAB
May 4, 2018


**Part Two: Hearing Summary**

**Date of Hearing:** 5/22/2018
**Location of Hearing:** FCI Tucson
**Hearing Examiner:** Oscar L. Vela

    **I.   Name of prisoner's representative and Information provided: (if prisoner waived representative, type "waived"):**  BOP Landscape Supervisor Trisha Shannon.   Rep. Shannon stated the subject applies his faith in all aspects of his life and tries hard to better himself.  Rep. Shannon stated she has seen the change in the subject.  He does whatever is asked of him and follows the rules of the institution.

    **II.  Victim Information considered by the Examiner:**

Though requested at the pre-hearing stage, the Examiner did not receive any additional information from any victim representative prior to or during the hearing.

    **III. Information provided by the Prisoner at the hearing:**  A Summary of the instant offense was read and the subject was given the opportunity to make a statement.  He stated he is remorseful and will do whatever he can to make amends to the victim's family and to his community.  He spends everyday trying to better himself and look for the good in others.  He stated he is a changed person. His emotions were mixed as a child and he didn't understand being spanked was not abuse.  He was drunk the night the offense happened and he does not remember much.

---

**Exhibit K-008**
**097**
Exhibit 02 - Page 99

The subject stated he is a changed man.  He wants to help build his community and teach others what he has learned in the alternatives to violence classes, especially the youth.  He wants to give his knowledge to others so they don't go down his same path.

**Work:** The subject works as landscape staff.  Rep. Shannon stated the subject is considered a leader and does great work.

**Discipline:** The subject has 19 DHO level infractions (see above).  His last DHO was in July, 2014.

**Programming:** The subject has completed the non-res drug program; resolving conflicts, alternatives to violence, communication skills and numerous other programs.  He stated he has almost completed the alternatives to violence facilitator class.  The subject said he looks forward to teaching the class.

**IV. Information provided by hearing participants other than those listed above**
   **(e.g. prisoner's case manager):** CM Frisbee stated the subject is very respectful, takes direction very well and has applied himself regarding programming.  CM Frisbee stated the subject is doing well, maintains good behavior and she has not heard anything negative from staff or inmates.

**V.  Release plan presented at the hearing:** He will live with his uncle, Wesley Friedlander at 376 Gold Lake Road, Nespelem, WA 99155

**VI. Options of the Commission at this hearing:**
If the Commission finds that the prisoner should be released pursuant to 18 U.S.C. §4206(d), it shall order mandatory parole at the two-thirds date or, if the two-thirds date has already passed, grant mandatory parole effective on a specific date as soon as is practicable.

If the Commission finds that the prisoner should be denied release under 18 U.S.C. §4206(d), it shall order to deny mandatory parole and continue to expiration. If the prisoner has more than 2 years remaining until his statutory/mandatory release date as indicated in the pre-hearing assessment, the prisoner shall be eligible for a Statutory Interim Hearing in 24 months and, at that time,  shall be reviewed again for release under 18 U.S.C. 4206(d). If this prisoner has 2 years or less until his statutory/mandatory release date, the Commission shall order continue to expiration without any further consideration for release.

**VII.   Hearing Examiner's Evaluation of the case:** The subject is a 47 year old male appearing before the Commission for an SIH followed Mandatory Parole denial.  While he has incurred 19 DHO infractions, he has been incident free since 2014 and has programmed extremely well.  This Examiner finds the subject's testimony to be genuine and his remorse truthful.  The instant offense occurred when the subject was 16 years old.  He has been in custody for 376 months (31 years, 4 months).  His past discipline will never change.  What has changed is his attitude and behavior.  The combination of compliant behavior and programming over the past 4 years causes this Examiner to believe that parole at this time is appropriate as his risk is as low as it may ever be and there is not a reasonable probability that he will commit future crimes.

Exhibit K-009
098
Exhibit 02 - Page 100

**VIII.   Hearing Examiner's Recommendation:**

Mandatory Parole effective 2/17/2019.

**IX. Reasons to deny release (if recommending release, type N/A):** N/A

**X.   Special Conditions (if recommending denial, type N/A):** Drug/Alcohol Treatment

**XI. Examiner signature block:**

*[signature]*

**Oscar L. Vela, Hearing Examiner**

**XII.    Additional comments by the Executive Reviewer:** Examiner Pacholski, dated 6/5/18; I disagree
with the Hearing Examiner's recommendation and believe the reasons identified by the Commission
at the last hearing are still appropriate. Our subject still is a risk and even though two years have
passed there still is a likelihood that the subject would not obey the law.

**Hearing Examiner's Recommendation:** Deny mandatory parole. Continue to Expiration. You will be
scheduled for a Statutory Interim Hearing during 6/2018 and, at that time,  will again be reviewed for
release pursuant to 18 U.S.C. §4206(d).

**Reasons to deny release (if recommending release, type N/A):** The Commission's previous reasons are
still appropriate in that you have frequently and seriously violated the rules of the institution by amassing 19
DHO level infractions primarily for 100 and 200 level misconduct.  Further, the most recent infraction was
approximately four years ago for consuming alcohol and being intoxicated.  This type of behavior indicates
a lack of maturity on your part and highlights your inability to follow the rules of the institution.  This is a
further indication that there is a high probability that you will not follow the laws upon release from prison.

**Special Conditions (if recommending denial, type N/A):** N/A

**Exhibit K-010**
**099**
Exhibit 02 - Page 101

U.S. Department of Justice
United States Parole Commission
90 K Street, N.E., 3rd Floor
Washington, D.C. 20530

# Notice of Action

---

Name: FRIEDLANDER, JOHN

Register Number: 05167-085

Institution: Lompoc USP

Date: May 20, 2020

---

As a result of the hearing conducted on April 22, 2020, the following action was ordered:

No change in previous decision to deny mandatory parole. Continue to expiration.

The Parole Commission has decided to continue you to the expiration of your sentence. If the two-thirds date of your sentence (30 years in the case of a sentence of 45 years or more) precedes the mandatory release date calculated by the Bureau of Prisons, the Commission will conduct a record review of your case approximately 9 months prior to the two-thirds date. If a parole is not ordered as a result of the record review, the Commission will conduct a hearing for you. The purpose of the review or hearing is to determine whether there is a reasonable probability that you will commit any Federal, State, or local crime, or whether you have frequently or seriously violated the rules of the institution. See 28 C.F.R. § 2.53(a). If parole is denied, you will be continued until the expiration of your sentence less good time.

The Bureau of Prisons is requested to forward a copy of the prisoner's progress report approximately 9 months prior to the scheduled two-thirds date.

**REASONS:**

The Commission continues to find that you have frequently and seriously violated the rules of the institution, including 20 DHO level infractions for mainly 100 and 200 level misconduct. One of these serious violations of the rules of the institution was committed since your last hearing and within three months of this hearing, and involved you being found in possession of an Opioid Narcotic drug. The Commission continues to find this evidence of frequent, serious, and now recent serious violations demonstrates your lack of maturity and your inability to follow the institutional rules, and creates a reasonable probability you will commit any Federal, State, or local crime if released at this time.

You will be scheduled for a statutory interim hearing in April 2022. At that time, you will again be considered for release pursuant to 18 U.S.C. §4206(d).

THE ABOVE IS AN ORIGINAL JURISDICTION DECISION AND IS APPEALABLE TO THE COMMISSION UNDER 28 C.F.R. §2.27.

Copies of this Notice are sent to your institution and to your supervising officer. In certain cases, copies may also be sent to the sentencing court. You are responsible for advising any others you wish to notify.

---

FRIEDLANDER, JOHN Reg. No. 05167-085 DCDC No.
Page **1** of **2**

**Exhibit L-001**
**100**
Exhibit 02 - Page 102

U.S. Department of Justice
United States Parole Commission
90 K Street, N.E., 3rd Floor
Washington, D.C. 20530

**Notice of Action**

cc:
U.S. Probation Officer
Eastern District of Washington
P.O. Box 306
Spokane, WA 99210-0306

Alpha Team
Designation & Sentence Computation Ctr
U.S. Armed Forces Reserve Complex
Grand Prairie Office Complex
346 Marine Forces Drive
Grand Prairie, TX 75051

CMC
Lompoc USP
3901 Klein Blvd.
Lompoc, CA 93436

mdr

FRIEDLANDER, JOHN Reg. No. 05167-085 DCDC No.
Page **2** of **2**

Exhibit L-002
101
Exhibit 02 - Page 103

# NON-REVOCATION
## Pre-Hearing Assessment and Hearing Summary

| | |
|---|---|
| **Offender Name** | FRIEDLANDER, JOHN |
| **Register Number** | 05167-085 |
| **Institution** | Lompoc USP |
| **Type of Hearing** | Mandatory Parole Hearing |
| **Hearing Format** | In-Person |
| **Date of Pre-hearing Assessment** | April 20, 2020 |
| **Name of Pre-hearing Examiner** | Kubic, Scott |
| **Offense(s) of Conviction** | Second Degree Murder and Assault With Intent to Commit Murder. |
| **Length of Sentence(s)** | LIFE with an additional 20 years, concurrent. |
| **Full Term Date** | Life |
| **Mandatory Release Date** | |
| **Two-Thirds Date (if applicable)** | February 12, 2017 |
| **Months-in-custody** | 398 months as of 4/14/2020 |
| **Fines/Restitution/Court Assessment** | $100 assessment; expired, per most recent progress report. |
| **Detainer** | none |

**Additional Text re: Sentence Information:** This case remains designated Original Jurisdiction.

**Prior Action:** Portions of the following were taken from a prehearing assessment dated 5/4/2018, and updated.

On 3/11/1988, the subject appeared the U.S. District Court for the Eastern District of Washington and was convicted of Second Degree Murder and Assault With Intent to Commit Murder. He was sentenced to 5/4LIFE in prison with an additional sentence of 20 years, to run concurrent.

The details of the offense indicate that on 2/14/1987, the 16-year-old subject, shot and murdered his adoptive mother, Gloria White, and shot and attempted to murder his adoptive father, Clarence White. A subsequent investigation revealed that on 2/13/1987, while driving a stolen car and upon realizing the vehicle was about to run out of gas, the subject and codefendants Guy Herman, Wendy Herman and John Tsoodle went to the home of the subject's adoptive parents. The subject and Guy Herman got out while the others remained in the vehicle. The two entered the White residence through a glass slider door and once inside, they went to the bedroom of Clarence White who was asleep. There they took a .22 caliber pistol from the bedroom and two kitchen knives. They left the residence, got back in the stolen car and drove to a party.

All four of the above named individuals returned to the White residence in the early morning hours of 2/14/1987. Prior to returning, however, the subject and Guy Herman had discussed returning to the residence to take money and to kill the Whites. Guy Herman carried the loaded .22 into the residence but the subject then took the gun from him once Herman admitted he could not shoot anyone. The two then went to Clarence White's bedroom and the subject shot Clarence

---

FRIEDLANDER, JOHN Reg. No. 05167-085 DCDC No.
Page **1** of **8**

Exhibit L-003
102
Exhibit 02 - Page 104

## NON-REVOCATION
### Pre-Hearing Assessment and Hearing Summary

White in the face while he lay sleeping on his back. Both the subject and Guy Herman then went to the other end of the house to Gloria White's room and the subject shot her in the face. They took her purse from her bedroom to the kitchen and from the purse they took her keys to a Chevrolet vehicle and $60 to $70.

They then went back to Clarence White's room and discovered he was still alive, at which time the subject fired one, possibly two rounds into Clarence White, hitting him in the abdomen area. The two then went through the room and Guy Herman took a .357 Magnum pistol. The phone rang causing the two to leave the residence. The subject drove off in the vehicle where Wendy Herman and John Tsoodle had been waiting for him. Guy Herman attempted to take the White's pickup but could not get it started, so he ended up running from the residence.

Initial Hearing
On 11/5/1996, the Commission conducted an Initial Hearing. The offense severity was Category Eight because it involved murder. The subject's SFS was 6 and his base guidelines were 120+ months. The Commission added rescission guidelines of 8-18 months for an Attempted Escape and one non-drug related administrative infraction, for an aggregate guideline range of 128+ months. The decision more than 48 months above the minimum guideline range was warranted because the subject was involved in the murder or attempted murder of two individual who were in the house asleep at the time of the shooting. In a Notice of Action dated 11/26/1996, the Commission ordered a 15-Year Reconsideration Hearing.

Interim Hearings
On 10/16/2000, the Commission conducted a Combine Statutory Interim Hearing (SIH)/Rescission hearing. In a Notice of Action dated 11/6/2000, the Commission ordered no change in the previous decision to continue to a 15-Year Reconsideration Hearing in November 2011. Additionally, the Commission added rescission guidelines of 64-150 months, which included a Category Seven Assault, seven drug related infractions, and one non-drug related infraction.

The Commission conducted subsequent SIHs On 8/13/2002, 7/21/2004, 6/8/2006, 5/6/2008, and 6/23/2010. In Notices of Action following each of these hearings, the Commission ordered no change in the previous decision to continue to a 15-Year Reconsideration in November 2011. The Commission added rescission guidelines of 0-2 months following the July 2004 SIH. The examiner identified additional rescission conduct at the June 2010 SIH but opted not to add rescission guidelines due to the fact that the next hearing would be the 15-year reconsideration hearing and all guidelines would be calculated again.

15-Year Reconsideration Hearing
On 1/31/2012, a 15-Year Reconsideration hearing was held. In a Notice of Action dated 2/24/2012, the Commission ordered to continue to expiration. The offense severity continued to be Category Eight and the aggregate guideline range was 222+ months.

On 6/11/2014, the Commission conducted an additional SIH. In a Notice of Action dated 7/7/2014, the Commission ordered no change in previous decision to continue to expiration. The subject was scheduled for a SIH in June 2016.

---

Exhibit L-004
103
Exhibit 02 - Page 105

# NON-REVOCATION
## Pre-Hearing Assessment and Hearing Summary

Mandatory Parole Hearing
On 6/7/2016, the Commission conducted a Mandatory Parole Hearing. In a Notice of Action
dated 8/23/2016, the Commission ordered to deny mandatory parole and continue to expiration.
The reasons given were as follows:

"You have frequently and seriously violated the rules of the institution by amassing 19 DHO
level infractions primarily for 100 and 200 level misconduct. Further, the most recent infraction
was approximately two years ago for consuming alcohol and being intoxicated. This type of
behavior indicates a lack of maturity on your part and highlights your inability to follow the rules
of the institution. This is a further indication that there is a high probability that you will not
follow the laws upon release from prison."

The Commission conducted a Statutory Interim Hearing following denial of 2/3 parole on
5/21/2018 and, by Notice of Action dated 6/11/2018, ordered no change in the previous decision
to deny 2/3 parole and continue to expiration. The Commission found the previous reasons to
deny 2/3 parole were still appropriate in that the subject had frequently and seriously violated the
rules of the institution by amassing 19 DHO level infractions, primarily for 100 and 200 level
misconduct. It was noted the most recent infraction (at the time of the of Statutory Interim
Hearing following denial of 2/3 parole) had occurred four years earlier and involved consuming
alcohol and being intoxicated. The Commission found it still demonstrated a lack of maturity and
still highlighted his inability to follow the rules of the institution.

The subject completed a parole application on 2/3/2020, wherein he indicated no representative
and a request to inspect his institutional file. It is unclear if he has been granted an opportunity to
review his institutional file.

**Co-defendants:** The following information is the last known information regarding the subject's
codefendants:
1. Guy Herman: Convicted as a juvenile through the Stevens County, WA juvenile justice system
for First Degree Murder, First Degree Assault by Compliance and Burglary. He was sentenced to
291 - 364 weeks (approximately 7 years) which would have taken him to the age of majority
when released. He served his sentence at the Echo Glen Juvenile Facility in Snoqualmie, WA.
2. Wendy Herman: Charged with Taking a Motor Vehicle and processed through the Okanogan
Juvenile Authorities. She was sentenced to 18 months to be served at Echo Glen Juvenile
Facility.
3. John Tsoodle: No sentencing information available.

**Victim Information:** The case involves a crime of violence and victim notification is required.
There are victims registered with the BOP.

Also, there is a letter from a concerned citizen on side three of the file opposing the subject's
release which was received in advance of the Initial Hearing in 1996. More importantly, there is
a letter from the victims' biological daughter dated 10/24/1996, wherein she expresses her
opposition to parole and indicates her fear for herself and family if the subject is released. Her
letter also provides some insight into the devastation the shooting has caused her father, Clarence

---

Exhibit L-005
104
Exhibit 02 - Page 106

# NON-REVOCATION
## Pre-Hearing Assessment and Hearing Summary

White. There is also several other letters in opposition to parole (most recent dated 4/18/2016) and several signed petitions with signatures of numerous persons opposed to parole.

A memo in the file from Victim Witness Coordinator Amanda Pyron dated 2/14/2012 indicates she attempted to contact victim Dawn Fleet but the telephone number in the file was not in service and a search to obtain new information provided no results.

Letters were sent to victims Dawn Pullin (formerly Fleet) and Patricia Peone in April 2016. The Commission did receive a letter dated 4/18/2016 from Patricia Peoone (who's husband was a friend of Mr. and Mrs. White). She describes the subject a troubled child who never seemed able to accept responsibility for his actions. She described the scene of the crime as so horrific that the EMT riding with the ambulance driver quit her job. She also describes the devastating impact of the crime on the family.

Most recently, the Commission sent another letter to Dawn Pullin, but there is no indication a response was ever received.

This examiner has advised the Commission's VWS of the upcoming hearing for victim notification purposes.

**Guidelines:**
**Summary of the prisoner's institutional misconduct during this period of incarceration (include a list of all incident reports that have occurred during the current period of confinement that resulted in findings of guilt by a Disciplinary Hearing Officer and/or any new criminal conduct that has occured):**

Infraction Number: 1
BOP/DOC Incident Report Number: 3365326
Date of Incident Report: February 13, 2020
Date of DHO/Adjustment Board hearing: February 13, 2020
Description of Behavior: Possessing Drugs (113) - the subject denied the conduct but was found guilty by the DHO of possessing narcotics. Specifically, Buprenorphine, an opioid used to treat opioid use disorder. He was sanctioned to 60 days DS; 90 days (each) loss of commissary and phone; and 1 year (each) loss of visiting and visitors.

**Options of the Commission at this hearing:**

If the Commission finds that the prisoner should be released pursuant to 18 U.S.C. 4206(d), it shall order mandatory parole at the two-thirds date or, if the two-thirds date has already passed, grant mandatory parole effective on a specific date as soon as is practicable.

If the Commission finds that the prisoner should be denied release under 18 U.S.C. 4206(d), it shall order to deny mandatory parole and continue to expiration. If the prisoner has more than 2 years remaining until his statutory/mandatory release date as indicated in the pre-hearing assessment, the prisoner shall be eligible for a Statutory Interim Hearing in 24 months and, at

**Exhibit L-006**
**105**
Exhibit 02 - Page 107

## NON-REVOCATION
### Pre-Hearing Assessment and Hearing Summary

that time, shall be reviewed again for release under 18 U.S.C. 4206(d). If this prisoner has 2 years or less until his statutory/mandatory release date, the Commission shall order continue to expiration without any further consideration for release.

**Summary of Prisoner's Program Achievement:** Since the last hearing on 5/21/2018, the subject completed 22 hours of educational programming, including Resolving Conflict, Alternatives to Violence Facilitator, and Introduction to Education Opportunity.

**Release Plans:** The subject intends to reside with his Uncle, Wesley Friedlander, in Nespelem, WA.

**Other Risk Relevant Factors to Consider:** As indicated above, the Commission initially denied 2/3 parole in 2016 based on frequent and serious violations of the rules of the institution, including 19 DHO level infractions mainly for 100 and 200 level misconduct. The Commission noted, specifically, the last infraction had occurred 2 years earlier (July 2014) and involved use of intoxicants, which was found to demonstrate the subject lacked maturity, an inability to follow institutional rules, and was found to create a probability he would not obey the law if released.

At the subsequent follow-up Statutory Interim Hearing following denial of 2/3 parole in 2016, the Commission continued to find the same reasons were still applicable (i.e., serious and frequent violations of the rules of the institution (19 DHO level infractions with the most recent for using intoxicants now 4 years earlier)).

Since the last hearing and more specifically, within 2 month of the date of this hearing, the subject was found in possession of narcotics (Buprenorphine, an opioid used to treat opioid use disorder). This now brings the total of DHO level infractions up to 20 and would appear to presumptively support a conclusion there remains a reasonable probability the subject would commit a Federal, State, or local crime if released on the basis of recent, frequent, and serious violations of the rules of the institution.

**Pre-Hearing Examiner's Evaluation:** The subject is 49 and he has been in custody 398 months as of 4/14/2020. The current decision is to deny 2/3 parole and continue to expiration. This is the second Statutory Interim Hearing following denial of 2/3 parole.

As indicated above, on 2/13/2020 (approximately 2 months from the date of this hearing), the subject was once again found in possession of narcotics (Buprenorphine).

### HEARING SUMMARY

**Date of Hearing ........................................:** April 22, 2020
**Name of Hearing Examiner ....................:** Kubic, Scott
**Location of Hearing ...............................:** Lompoc USP, 3901 Klein Blvd. Lompoc, CA 93436
**Hearing Format .......................................:** In-Person
**Hearing Type ...........................................:** Mandatory Parole Hearing

Exhibit L-007
106
Exhibit 02 - Page 108

# NON-REVOCATION
## Pre-Hearing Assessment and Hearing Summary

**Modification(s) to sentence information from pre-hearing assessment:**
None

**Victim information considered:**
The Examiner received following additional information from victim(s) or victim representative(s) prior to or during the hearing.

**Representative:** The prisoner went forward without a representative.

**Summary of Representative's Statement:**

**Summary of Prisoner's statements** (include responses to incident reports in this section unless it is a rescission hearing. If rescission hearing, use the following section): The subject admits to his base offense and states he has remorse for what he did. He said there is not a day that goes by that he doesn't feel sorry what he did. He said he has always wanted to show that he has changed. He understands it is not likely to get forgiveness. He said he wrote a letter to his adoptive father before he took his life. He said it meant a lot to him that he was able to apologize to his adoptive father (surviving victim) before he died. He claims his adoptive father changed his will to include him (our subject) but, after his death, other family fought it in probate court. He said he is really sorry for what he did.

We discussed the disciplinary infraction committed since the last hearing (which doesn't carry any rescission guidelines as this is a Statutory Interim Hearing following denial of 2/3 parole). Specifically, on 2/13/2020, the subject was found in possession of Buprenorphine, an opioid used to treat opioid disorder. The subject denied the conduct before the DHO and he continued to deny the conduct at this hearing, stating he would never risk his chance of freedom due to drug use/possession. He was told they found the drugs concealed in his pants, but he claims to have no knowledge of that or how it got there. He said it's "not in his character."

This examiner asked him how possessing a narcotic would be considered "not in his character" considering the fact that at the time of his original 2/3 parole hearing in 2016, the Commission concluded he had committed (at that time) 19 DHO level infractions, most of which involved either alcohol use/possession and/or drug use/possession. He acknowledged his history of similar infractions, but just continued to maintain his innocence on this last one in 2020.

In closing, the subject stated he had another Native American friend who had three counts of Murder II and received a 40 year sentence under the new law. He said his friend asked him why his sentence is so much longer, to which, our subject stated he didn't know. Despite this, the subject said, even if not released, he is still thankful he was able to reach out to his adoptive father prior to his death. He wants to help youth in the community to avoid the same path of drugs and alcohol, and instill in them that actions have consequences. He said he thinks about what he did every day and he can't change it. He said he is really sorry.

**Summary of Prisoner's program achievement:** Since the last hearing on 5/21/2018, the subject completed 22 hours of educational programming, including Resolving Conflict,

Exhibit L-008
107
Exhibit 02 - Page 109

## NON-REVOCATION
### Pre-Hearing Assessment and Hearing Summary

Alternatives to Violence (in which he acted as a facilitator), and Introduction to Education Opportunity. In addition, not listed on the educational transcript, the subject stated he has been participating in Behavioral Therapy class through Psychology over the last few months.

**Description of prisoner's release plan:** The subject stated he inherited 1,400 of land from his biological mother and father in Nespelem, WA. His Uncle, Wesley Friedlander currently resides on the property. The subject stated his intent to put a house on the land upon his release.

The subject is 49 and claims no medical or mental health issues at this time. He intends to work upon his release, using skills he developed while in prison, including welding and carpentry.

**Guidelines:** Agree with the guideline calculation in the pre-hearing assessment.

**Explanation of the modification of the overall guideline made at the Hearing (if applicable):**

**Authorized Actions at the Hearing:**
If the Commission finds that the prisoner should be released pursuant to 18 U.S.C. §4206(d), it shall order mandatory parole at the two-thirds date or, if the two-thirds date has already passed, grant mandatory parole effective on a specific date as soon as is practicable.

If the Commission finds that the prisoner should be denied release under 18 U.S.C. §4206(d), it shall order to deny mandatory parole and continue to expiration. If the prisoner has more than 2 years remaining until his statutory/mandatory release date as indicated in the pre-hearing assessment, the prisoner shall be eligible for a Statutory Interim Hearing in 24 months and, at that time, shall be reviewed again for release under 18 U.S.C. 4206(d). If this prisoner has 2 years or less until his statutory/mandatory release date, the Commission shall order continue to expiration without any further consideration for release.

**Hearing Examiner's Evaluation of the Case:** The subject is 49 and he has been in custody 398 months as of 4/14/2020. The current decision is to deny 2/3 parole and continue to expiration. This is the second Statutory Interim Hearing following denial of 2/3 parole.

Regarding Victim Participation, the Commission's Victim Witness Specialist informed this examiner prior to this hearing that she heard from one of the victims, Patricia Peone, who asked the Commission to consider the letter she previously wrote in April 2016. The letter can be found on side three of the Commission's file and a brief summary of which is contained in Victim section of the prehearing assessment above.

The Commission initially denied 2/3 parole in 2016, after concluding the subject had both seriously and frequently violated the rules of the institution. At that time, the Commission noted 19 DHO level infractions mainly for 100 and 200 level misconduct. The Commission noted, specifically, the last infraction had occurred 2 years earlier (July 2014) and involved use of intoxicants, which was found to demonstrate the subject lacked maturity, an inability to follow institutional rules, and was found to create a probability he would not obey the law if released.

At the subsequent follow-up Statutory Interim Hearing following denial of 2/3 parole in 2016,

---

Exhibit L-009
108
Exhibit 02 - Page 110

## NON-REVOCATION
## Pre-Hearing Assessment and Hearing Summary

the Commission continued to find the same reasons were still applicable (i.e., serious and frequent violations of the rules of the institution (19 DHO level infractions with the most recent for using intoxicants now 4 years earlier)).

Since the last hearing and more specifically, only about 2 months prior to this hearing, the subject was found in possession of narcotics (Buprenorphine, an opioid used to treat opioid use disorder). This now brings the total of DHO level infractions up to 20. This examiner finds the commission of another drug-related DHO level infraction since the last hearing is evidence there remains a reasonable probability the subject would commit a Federal, State or local crime if released at this time. As such, this examiner recommends no change in the previous decision to deny 2/3 parole and continue to expiration.

**Hearing Examiner's Recommendation:**
>   A. Re: Release:
>
>>   No change in the previous decision to deny 2/3 parole and continue to expiration.
>>
>>   Reasons: The Commission continues to find that you have frequently and seriously violated the rules of the institution, including 20 DHO level infractions for mainly 100 and 200 level misconduct. One of these serious violations of the rules of the institution was committed since your last hearing and within three months of this hearing, and involved you being found in possession of an Opioid Narcotic drug. The Commission continues to find this evidence of frequent, serious, and now recent serious violations demonstrates your lack of maturity and your inability to follow the institutional rules, and creates a reasonable probability you will commit any Federal, State, or local crime if released at this time.
>
>   B. Re: Special Conditions:
>
>>   None.

**Guideline Departures:** There is no guideline for this hearing type.

**Superior Program Achievement:** Superior program achievement award does not apply to this type of hearing.

**Statutory Interim Hearing Date:** You will be scheduled for a statutory interim hearing in April 2022. At that time, you will again be considered for release pursuant to 18 U.S.C. §4206(d).

_____                                    _____

Hearing Examiner                                                                Date

_____

FRIEDLANDER, JOHN Reg. No. 05167-085 DCDC No.
Page **8** of 8

Exhibit L-010
109
Exhibit 02 - Page 111

Reg #:  05167-085                Inmate Name:   FRIEDLANDER, JOHN FRANKLIN

| Description | Axis | Code Type | Code | Diag. Date | Status | Status Date |
|---|---|---|---|---|---|---|
| **Major depressive disorder** | | | | | | |
| 01/08/2014 16:48 EST  De Guzman, A. MD | I | ICD-9 | 296.2 | 12/20/2013 | Remission | 01/08/2014 |
| 12/20/2013 13:24 EST  Giron, Leonardo MD/CD | I | ICD-9 | 296.2 | 12/20/2013 | Current | 12/20/2013 |
| **Anxiety state, unspecified** | | | | | | |
| 10/21/2016 16:10 EST  De Guzman, A. MD | I | ICD-9 | 300.00 | 10/09/2013 | Remission | 10/21/2016 |
| 10/09/2013 20:33 EST  Fitzgerald, Leslie PA-C | I | ICD-9 | 300.00 | 10/09/2013 | Current | 10/09/2013 |
| **External hemorrhoids without mention of comp** | | | | | | |
| 09/01/2017 13:52 EST  De Guzman, A. MD | III | ICD-9 | 455.3 | 10/30/2012 | Remission | 09/01/2017 |
| 10/30/2012 16:40 EST  Grasley, Andrew M.D. | III | ICD-9 | 455.3 | 10/30/2012 | Current | 10/30/2012 |
| **Otitis externa** | | | | | | |
| 07/20/2020 20:26 EST  Watson, William MD | | ICD-10 | H6090 | 03/09/2020 | Remission | 07/20/2020 |
| 03/09/2020 11:52 EST  Hoen, Liza PA-C | | ICD-10 | H6090 | 03/09/2020 | Current | 07/20/2020 |

# Resolved

| Description | Axis | Code Type | Code | Diag. Date | Status | Status Date |
|---|---|---|---|---|---|---|
| **Hepatitis C, chronic w/o mention of hepatic coma** | | | | | | |
| 02/23/2016 07:20 EST  SYSTEM | III | ICD-9 | 070.54 | 06/30/2008 | Resolved | 10/26/2015 |
| 10/26/2015 16:49 EST  De Guzman, A. MD | III | ICD-9 | 070.54 | 06/30/2008 | Remission | 10/26/2015 |
| 04/28/2015 16:17 EST  Cox, J. NP-C | III | ICD-9 | 070.54 | 06/30/2008 | Resolved | 04/28/2015 |
| 07/26/2012 16:14 EST  Grasley, Andrew M.D. | III | ICD-9 | 070.54 | 06/30/2008 | Current | 06/30/2008 |
| 06/30/2008 10:18 EST  Cruz, Pablo MD | III | ICD-9 | 070.54 | 06/30/2008 | Current | 06/30/2008 |
| elevation of ALT x 3 ,genotype -2 v.l.->700,000. | | | | | | |
| **Dermatophytosis groin & perianal (Tinea cruris)** | | | | | | |
| 02/23/2016 07:20 EST  SYSTEM | III | ICD-9 | 110.3 | 03/28/2012 | Resolved | 01/28/2013 |
| right inner thigh | | | | | | |
| 01/28/2013 11:45 EST  Grasley, Andrew M.D. | III | ICD-9 | 110.3 | 03/28/2012 | Resolved | 01/28/2013 |
| right inner thigh | | | | | | |
| 03/28/2012 12:36 EST  Corbin, Patricia PA-C | III | ICD-9 | 110.3 | 03/28/2012 | Current | 03/28/2012 |
| right inner thigh | | | | | | |
| **Blepharitis, unspecified** | | | | | | |
| 02/23/2016 07:20 EST  SYSTEM | III | ICD-9 | 373.00 | 02/06/2009 | Resolved | 02/06/2009 |
| 12/27/2010 15:08 EST  Carver, Robert M.D. | III | ICD-9 | 373.00 | 02/06/2009 | Resolved | 02/06/2009 |
| 02/06/2009 13:58 EST  Bryant, A. PA-C | III | ICD-9 | 373.00 | 02/06/2009 | Current | 02/06/2009 |
| **Chalazion** | | | | | | |
| 02/23/2016 07:20 EST  SYSTEM | III | ICD-9 | 373.2 | 02/06/2009 | Resolved | 02/06/2009 |
| 12/27/2010 15:08 EST  Carver, Robert M.D. | III | ICD-9 | 373.2 | 02/06/2009 | Resolved | 02/06/2009 |

**Exhibit M-001**
**110**
Exhibit 02 - Page 112



COURT REPORTING

LEGAL VIDEOGRAPHY

VIDEOCONFERENCING

TRIAL PRESENTATION

MOCK JURY SERVICES

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS



(800) 528-3335

NAEGELIUSA.COM

IN RE: JOHN FRANKLIN FRIEDLANDER

BOP NO. 05167-085

---

**STATUTORY INTERIM HEARING**

**HELD VIRTUALLY ON**
**WEDNESDAY, APRIL 22, 2020**
**10:18 A.M.**

**BEFORE**
**SCOTT KUBRICK**
**HEARING EXAMINER**

Exhibit N-001
111
Exhibit 02 - Page 113

1                    **STATUTORY INTERIM HEARING**

2                        **HELD VIRTUALLY ON**

3                    **WEDNESDAY, APRIL 22, 2020**

4                            **10:18 A.M.**

5                              **BEFORE**

6                          **SCOTT KUBRICK**

7                       **HEARING EXAMINER**

8

9          **THE HEARING EXAMINER:**  All right.  So good

10  morning.  My name is Scott Kubrick.  I'm a Hearing Examiner

11  with the Parole Commission.  I'm here to conduct a Statutory

12  Interim Hearing following denial of two-thirds parole in

13  your case.

14          Can you tell me your name for the record, please?

15          **THE DEFENDANT:**  John Friedlander.

16          **THE HEARING EXAMINER:**  And, Mr. Friedlander,

17  what's your register number, your federal number?

18          **THE DEFENDANT:**  05167-085.

19          **THE HEARING EXAMINER:**  All right.  Thank you.

20          All right.  Now, as I mentioned to you, this is a

21  Statutory Interim Hearing following a denial of two-thirds

22  parole in your case.  We used to call it mandatory parole,

23  we're now calling it two-thirds parole.  It's just a little

24  bit more descriptive, I think.  Mandatory parole often got

25  confused with other types of release methods.  And we wanted



1  to, you know, we -- we just started this year just referring

2  to it as two-thirds parole because that's really what it is.

3          And the -- when I say that it's a Statutory

4  Interim Hearing following denial of two-thirds parole in

5  your case, that's exactly what -- what this is.  So as you

6  know, you had a -- a two-thirds parole hearing back in 2016.

7  The decision from that was to deny mandatory parole and

8  continue to expiration.

9          You've since had, I think, one -- I think you had

10 one prior Statutory Interim Hearing.  So this is your second

11 Statutory Interim Hearing following that denial of two-

12 thirds parole; is that correct?

13          **THE DEFENDANT:**  Yes.

14          **THE HEARING EXAMINER:**  Okay.  All right.

15          So the purpose of today's hearing is -- is not so

16 much to go back and -- and revisit the decision to deny

17 mandatory parole in your case, but rather the purpose of a

18 Statutory Interim Hearing is to take a look to see if

19 there's been any significant changes or developments in your

20 case since your last hearing that merits a different

21 decision.  And so that's primarily what we're going to focus

22 on today.

23          We're still going to be using the same two

24 criteria under 4206(d).  That's 18 U.S.C. 4206(d).  And --

25 and those criteria indicate that mandatory parole shall be



1  denied following a hearing if the Commission finds that

2  you've either seriously or frequently violated the rules of

3  the institution or if we find there are other case-specific

4  factors that create a reasonable probability that you would

5  commit any federal, state or local crime upon your release.

6         And as you may recall, the -- the Commission

7  denied two-thirds parole for you back in -- in 2016

8  initially because the Commission found that you had

9  frequently and seriously violated the rules of the

10 institution.  At that time, you had incurred 19 DHO-level

11 infractions primarily for 100 and 200 level misconduct.

12        Furthermore, the -- the Commission found that the

13 -- the most recent infraction, at that time, had occurred

14 about two years prior to your 2016 hearing.  And that was

15 for consuming alcohol and being intoxicated.  The Commission

16 found that this type of behavior indicated a lack of

17 maturity on your part and highlighted your inability to

18 follow the rules of the institution.

19        The Commission found that it further -- was

20 further indication that there would be a high probability

21 that you would not follow the laws if you were released from

22 prison.

23        The Commission conducted a Statutory Interim

24 Hearing following denial of that two-thirds parole date in

25 2018.  And at that time, the Commission found that there had



1  been no significant -- significant changes or developments

2  in your case that merited a different decision.

3          The Commission continued to rely upon the same

4  reason that was provided at the 2016 hearing.  And,

5  specifically, that was that you had had frequently and

6  seriously violated the rules of the institution as it  -- as

7  indicated by those 19 DHO-level infractions.

8          We did indicate that four years had passed since

9  your -- since your last DHO-level infraction at the time of

10 your last hearing, but the Commission still found that there

11 was -- there were no changes that merited a different

12 decision.

13         So that kind of brings us up to the current

14 hearing.  And so now, what we're going to focus on is how

15 you've been doing over the last couple years.  And we're

16 going to focus in, specifically, as to whether there's been

17 any significant changes or developments in your case since

18 your last hearing that merits a different decision.

19         Do you have any questions so far?

20         **THE DEFENDANT:**  Yeah.  About a couple -- about

21 three -- about three parole hearings ago before the -- the

22 hearing started, one of the examiners had told me that I was

23 given a life -- a life sentence for second degree murder

24 which consist of 30 years.  And then one examiner when I had

25 about 25 years in, back then he told me that I was at the



1  end of my sentence.  So my question is, is there any time in

2  the future that I will reach that point?

3          **THE HEARING EXAMINER:**  From an actual date

4  standpoint, no.  You're now beyond -- your two-thirds parole

5  date passed on February 12th, 2017.  That was kind of the

6  last possible date that -- that actually was a finite date

7  that -- that you had in your case.  You're serving a life

8  sentence, so your two-thirds date is -- is calculated after

9  the service of 30 years on a life sentence.  So that 30-year

10 mark, you hit that on February 12th, 2017.

11          However, once -- once the Commission denied the

12 two-thirds parole in your case, there -- there is no

13 statutory release date beyond that.  It's just you're --

14 you're now just serving just life.  And -- but the -- the

15 Commission does provide for I guess you could say a -- a

16 relief valve of some sorts by allowing you to have a hearing

17 every two years where we're going to continue to apply those

18 same two criteria under 4206(d).  And that -- that

19 corresponds with mandatory parole or two-thirds parole in

20 your case.

21          So, you know, the -- the statement that you're at

22 the end of your sentence, in my opinion, was inaccurate

23 because it didn't take into consideration the fact that the

24 Commission still had discretion when you reached that two-

25 thirds parole date in your case as to whether or not you'd



NAEGELI DEPOSITION & TRIAL    (800)528-3335    NAEGELIUSA.COM

1  be paroled.

2         So to answer your question, unfortunately, no.  I

3  mean, there's no specific date that -- that you have coming

4  up that -- that would, you know, require release or anything

5  like that.  Does that answer your question?

6         **THE DEFENDANT:**  Yeah.  I had another question.  So

7  every hearing all my shots for the last 33 years are going

8  to be held against me?

9         **THE HEARING OFFICER:**  Well, keep in mind that --

10 that the actual statute under 4206(d) that I'm referring to,

11 it's a -- it's a relatively short statute.  There's not a

12 whole lot of meat to it I guess you could say.  It's only a

13 few sentences long.  But it -- but it basically says

14 specifically that if after a -- a hearing the Commission

15 finds that you have frequently or seriously violated the

16 rules of the institution or, like I said, or if we find

17 other case-specific factors that indicate a reasonable

18 probability that you would violate the law if you were

19 released, it says that the Commission shall deny mandatory

20 parole or, in the new terminology, two-thirds parole.  It

21 doesn't say the Commission may deny.  It doesn't say the

22 Commission can deny.  It says that if the Commission makes

23 that determination that it shall deny mandatory parole.

24         So technically speaking, to answer your question,

25 yes.  I mean, the Commission can hold those DHO-level



NAEGELI DEPOSITION & TRIAL    (800)528-3335  NAEGELIUSA.COM

1  infractions over your head and hold you responsible for them

2  at every two-thirds parole hearing, statutory hearing --

3  Statutory Interim Hearing that you have from this point

4  forward.

5          There's no statute of limitations that's provided

6  in that statute.  And what I mean by that is there's no time

7  limit that's set to say, you know, well, you can only

8  consider something to be a serious or frequent violation for

9  so many years before you can no longer consider it.  There's

10 nothing like that in the language of the statute itself.

11         So now, that doesn't mean that the Commission

12 doesn't reverse course at some point in the future in cases

13 where someone can establish that they can, you know, go a

14 long period of time without violating the rules of the

15 institution.

16         Does that answer your question?

17         **THE DEFENDANT:**  Yeah.  The one thing I'm kind of

18 confused of is at any time is the statutory good time have

19 an effect on my sentence or --

20         **THE HEARING OFFICER:**  Not on a life sentence, no.

21 I mean, there's really nothing to deduct that statutory good

22 time from because, you know, we don't know -- because now

23 from -- from this point, you know, from February 12th of

24 2017 on you're -- you're just kind of like -- it's almost

25 like you're -- you're -- you're now just kind of floating in



**NAEGELI** DEPOSITION & TRIAL    **(800)528-3335**    NAEGELIUSA.COM

1  open water.  You know, I mean, there's no land in sight.

2          And I -- I don't mean to be so negative about it,

3  but that's kind of a good analogy because it's, you know,

4  you don't have any finite actual date to look forward to in

5  the future.  And so there's no date that -- that statutory

6  good time can be deduct -- deducted from.

7          So it's really inconsequential.  But along the

8  same lines, if you have been doing a lot of programming or

9  other things that is, you know, giving you this maybe extra

10 good time or that sort of thing, that might be a factor to

11 demonstrate that you're a good candidate for the release.

12 But in -- in terms of actually reducing a release date,

13 there -- there's really nothing to subtract that -- that --

14 those days from.  Do -- do you know what I mean?

15          **THE DEFENDANT:**  Yeah, because years ago they had

16 me make up the statutory good time that I lost.  And then I

17 wondered why would they have you make -- make up the

18 statutory good time I lost because of some shots that I got,

19 but then -- then it doesn't have any effect on my sentence -

20 - I mean, time.

21          **THE HEARING OFFICER:**  Yeah, unfortunately it

22 really doesn't.  Yeah.  I mean, I don't know if it has any

23 other specific meaning within the BOP.  I don't know if,

24 like, maybe it might be a consideration in your custody

25 level or anything like that.  I -- I just don't know, you



NAEGELI DEPOSITION & TRIAL    CELEBRATING 40 YEARS IN BUSINESS    (800)528-3335    NAEGELIUSA.COM

 1   know.  I mean, but -- but for our purposes it doesn't really

 2   have any -- any benefit to you.

 3           **THE DEFENDANT:**  Okay.  Thank you.

 4           **THE HEARING OFFICER:**  Okay.  All right.  So I am -

 5   - I was just going to go through some of the just -- I'm not

 6   going to read the entire details of your offense into the

 7   record, but I was just going to go over some of the details

 8   of your sentence and your offense and then give you an

 9   opportunity, if you'd like, to make another statement about

10   it.

11           But you initially appeared in 1988 in the U.S.

12   District Court for the Eastern District of Washington.  You

13   were convicted of second degree murder and assault with

14   intent to commit murder.  You were sentenced to life in

15   prison with an additional 20 years to run concurrent.

16           The details indicate that in February 1987, you

17   were 16 at that time, but you shot and murdered your adopted

18   mother, Gloria White, and you shot and attempted to murder

19   your adopted father.

20           I can go through the -- the actual details of the

21   offense if you'd like for me to.  Do -- do you feel that

22   that's necessary for me to go and read all the offense

23   details?

24           **THE DEFENDANT:**  No.

25           **THE HEARING OFFICER:**  Okay.  Do you -- do you



1  admit to that or do you deny committing that offense?

2           **THE DEFENDANT:**  No, I -- I have remorse for what I

3  did.  I -- I'm guilty, you know.  There isn't a day that

4  goes by that I don't feel sorry for what I did and for the

5  pain I have caused my adopted family's -- family members to

6  go -- to go through, you know.  And I have a lot of remorse,

7  though, you know.

8           And I always wanted to be able to show that I have

9  changed.  And I know that it's hard to say I -- I will

10 forgive you for, you know, for what you had did, you know.

11 My -- my adopted family -- their family members, you know,

12 because I did write a letter.  I did write a letter before

13 my adopted father I was told had taken his life.  And I

14 apologized to him.  And he had put me in his will that he

15 had made, but his in-laws and his family members, they had

16 went to probate and told them that they -- they're --

17 they're contesting the -- the decision of the probate

18 hearing.

19           And -- but all that matters to me is that I was  -

20 - I was able to apologize to my adopted father.  And -- and

21 that much, you know, I love him for that much for, you know,

22 at least having it in his heart to somewhat forgive me.  And

23 -- and I know he can't have -- get his in-laws and his

24 family members to agree with him.  But I heard the story of

25 why he had taken his life.



NAEGELI DEPOSITION & TRIAL   CELEBRATING 40 YEARS IN BUSINESS   (800)528-3335   NAEGELIUSA.COM

1    But I live with this every day because I feel the

2  guilt and I feel the remorse.  And I wish there was some way

3  I could let -- let the family members know, you know, that I

4  am really sorry for what I did.

5         THE HEARING OFFICER:  Okay.  All right.  So let's

6  talk a little bit about your institutional adjustments since

7  your last hearing.  I wanted to first talk about -- it looks

8  like you've completed some -- some programing since your

9  last hearing.  I -- I counted about 22 hours of educational

10 programming including Resolving Conflict, Alternatives to

11 Violence facilitator and Introduction to Education

12 Opportunity.  Does that sound accurate?

13         THE DEFENDANT:  Yes.

14         THE HEARING OFFICER:  What's the Alternative to  -

15 - to Violence facilitator?  You acted as a facilitator for

16 that program?

17         THE DEFENDANT:  Yes, I have.

18         THE HEARING OFFICER:  Okay.  Does that sound like

19 a -- is that an accurate description of what you've been

20 involved in since your last hearing or there are other

21 programs?  Because I know the educational transcript doesn't

22 always reflect everything that you've done from a

23 programming standpoint.

24         THE DEFENDANT:  I have taken some psychology

25 courses in the last two months from this psychologist, Ms.



NAEGELI DEPOSITION & TRIAL   (800)528-3335   NAEGELIUSA.COM

1  Rillo (phonetic), and did cover some areas in cognitive

2  behavioral therapy.  And it kind of covers some of the stuff

3  in -- in other directions than Alternative to Violence does.

4  It still points out that -- to resolve conflict without

5  violence.

6          THE HEARING OFFICER:  Okay.

7          THE DEFENDANT:  But it's --

8          THE HEARING OFFICER:  Now, is that -- is that

9  through psychology here at Lompoc?

10          THE DEFENDANT:  Yeah.

11          THE HEARING OFFICER:  Okay.  And you said that's

12  been for -- about how long have you been doing that?

13          THE DEFENDANT:  I've been doing that for the last

14  two months.

15          THE HEARING OFFICER:  All right.  Is that

16  something that you find helpful?

17          THE DEFENDANT:  Yes, it -- yes, it is.  I -- I --

18  I would have been able to graduate in How to Fill Out a

19  Resume and Money Smart, but some situations have taken

20  place.  So I'm still offered to take them classes still --

21          THE HEARING OFFICER:  Okay.

22          THE DEFENDANT:  -- through reentry affairs.

23          THE HEARING OFFICER:  All right.  So I mentioned

24  to you previously, I -- I kind went through some of the --

25  the details of what the Commission found in determining that



NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

1  -- that you were not a suitable candidate for two-thirds

2  parole from your last two hearings, and I did that for a

3  reason.

4          As I indicated again, the Commission found that

5  your 2016 two-thirds parole hearing that -- that you -- you

6  were denied mandatory parole, essentially, based on the --

7  the fact that the Commission found that the 19 DHO-level

8  infractions you had committed up until that point did

9  constitute frequent and serious violations of the rules of

10  the institution.  That's one of the two criteria under

11  4206(d) that specifically says if the Commission finds that

12  either one of those are applicable that we shall deny

13  mandatory parole.  And that's, indeed, what the Commission

14  did.

15          And then at your Statutory Interim Hearing that

16  you had two years later in 2018, you had not incurred any

17  additional disciplinary infractions at that time, but the

18  Commission still relied upon the -- the statutory criteria

19  under 4206(d) and basically said we find that there's no

20  change in the previous decision because you still had those

21  19 DHO-level infractions.

22          Now, there has been a change since your last

23  hearing.  And that is that you've now incurred another --

24  another DHO-level infraction since your last hearing,

25  specifically within, basically, the last two months prior,



NAEGELI DEPOSITION & TRIAL     (800)528-3335     NAEGELIUSA.COM

1  you know, the two months leading up to this hearing.

2          You were found guilty by the DHO for possessing

3  narcotics.  This is a 113.  It's a 100-level shot.

4  Specifically, you were found in possession of buprenorphine

5  which is an opioid used to treat opioid use disorder.

6          Now, you -- I believe you denied that before the

7  DHO; is that correct?

8          **THE DEFENDANT:**  Yes, I have because, first of all,

9  I would never risk losing my chance at -- to get my freedom

10  for drugs or alcohol or to commit some prohibited act.  I

11  would never do that.

12          I was told they found it concealed within my

13  pants, which I knew nothing about.  I asked them to check

14  the cameras.  And I asked them if they could fingerprint --

15  print the drugs they had found just so I can prove my

16  innocence.  And they said that the drugs were destroyed by

17  the lieutenant because he had put his fingerprints all over

18  the drugs to see what they were.

19          So he asked me how I -- I -- I was going to plead

20  and I told him not guilty because, you know, this is not in

21  my character before the Parole Board or to risk my sobriety

22  because I'm -- I'm not a person -- once I start to do

23  something good, I follow through.  I would not throw all

24  that away just so I could look good in another criminal

25  inmate, in their mind, you know, because I have tried all



1  these years going through these -- these programs that I --

2  I completed.

3          And he said -- the DHO officer said that -- he

4  asked me, "Well, what proof do you have?"  And all I could

5  tell him was, "If you fingerprint the drug in the package

6  they were put in, you will see that they're not my

7  fingerprints."

8          And I -- I don't have one shot where it says that

9  I had destroyed some clothing or anything in record.  And I

10 showed him that, you know.  I -- I'm not that kind of

11 person.

12          THE HEARING OFFICER:  Well, right.  Now, you say -

13 -

14          THE DEFENDANT:  And he said --

15          THE HEARING OFFICER:  Go ahead, I'm sorry.

16          THE DEFENDANT:  So he says, "Well, I'm still going

17 to find you guilty because that's what our -- our -- our

18 policy says in the DHO that if -- if it's on your person,

19 then you're guilty."

20          THE HEARING OFFICER:  Right.

21          THE DEFENDANT:  And it --

22          THE HEARING OFFICER:  And for -- for --

23          THE DEFENDANT:  So --

24          THE HEARING OFFICER:  Oh, go ahead, I'm sorry.  I

25 thought you were done.



1    **THE DEFENDANT:**  So I -- I could not appeal it

2  because that appeal would take from anywhere from six months

3  to a year.  And -- and that it would -- I would still be

4  looking guilty here as, I assume, that's what everyone is

5  seeing me as right now because of my past history of

6  incident reports for drug abuse, a problem that I used to

7  have.

8    **THE HEARING OFFICER:**  Right.  Yeah.  And that's

9  -- and that's -- and that's what I was going to state.  You

10  know, you had said that this was something that was not in

11  your character, but I was going to dispute that because, you

12  know, because, you know, I know that there had been a big

13  gap in -- in time, you know, five-and-a-half years or so

14  between your last infraction for, you know, for using

15  intoxicants.  But, you know, but prior to that it was very,

16  you know, kind of a regular thing for -- for a while that

17  you would be found with drugs or test positive or, you know,

18  using intoxicants.

19    So I mean, from that standpoint, I find that, you

20  know, this current possession that happened a couple months

21  ago here is very much in keeping with your prior pattern of

22  possession and use.

23    Keep in mind also for these types of proceedings,

24  the evidentiary standard that the -- the DHO uses,

25  preponderance of the evidence, is the same evidentiary of



1  standard that -- that we use in making findings of

2  violations.  So from that standpoint, we do find that the

3  DHO's finding of guilt by a preponderance of evidence in

4  your case is sufficient evidence of guilt for the purpose of

5  our proceeding.

6         So I would agree with the DHO that, you know, if -

7  - if the drug is found on your person that you're guilty.

8  And for the purpose of today's proceeding, you know, we're

9  going to consider that -- that you are you guilty of that  -

10 - of that conduct.

11        And so you know, to kind of put that in the

12 context of the decisions from the last two hearings, you

13 know, as I indicated, at your two-thirds parole hearing in

14 2016, you know, the Commission made it clear that it had

15 been two -- two years since your last disciplinary

16 infraction at that time.  But we still found that -- that

17 you were not a good candidate for two-thirds parole.

18        Two years later, still no additional disciplinary

19 infractions, but the Commission still found that even that

20 four-year gap of time was still sufficient to find that you

21 had seriously and frequently violated the rules of the

22 institution.

23        And here we are now at this proceeding and now

24 it's -- you now have a disciplinary infraction that's

25 occurred, you know, within the last three months.  And --



1  and so that most certainly is going to -- to be viewed

2  disfavorably at this -- at this proceeding.  I can -- I can

3  say that with a reasonable amount of certainty.

4        So tell me about your release plan.  Do you have a

5  -- a place to reside?

6        **THE DEFENDANT:**  Yeah.  I -- I inherited with my

7  older sister, me and her share, half is hers and half --

8  half is mine, 1,400 acres of land from my father, my -- my

9  biological mother, my biological --

10        **THE HEARING OFFICER:**  From your -- and this is

11  your biological father?

12        **THE DEFENDANT:**  Yeah.  I -- I got -- I would have

13  been able to show you today in person if it was a regular

14  hearing.  But Fabian, my -- my case manager, I had showed

15  him the documents from the -- the -- the court -- the

16  probate court back home.  And only reason why I haven't had

17  to try and put a house on there yet is because I don't have

18  no release date.  So I cannot have them put a house on there

19  until I -- I get a release date some -- sometime in the

20  future.  And --

21        **THE HEARING OFFICER:**  And where is that land

22  located?

23        **THE DEFENDANT:**  It's on the Colville Indian

24  Reservation in the state of Washington.  It's northeast.

25        **THE HEARING OFFICER:**  Is that the -- the Nespelem?



NAEGELI DEPOSITION & TRIAL    (800) 528-3335    NAEGELIUSA.COM

 1  Is that -- I don't know how -- how you pronounce it.

 2          THE DEFENDANT:   Nespelem.

 3          THE HEARING OFFICER:   Nespelem?   Okay.

 4          THE DEFENDANT:   Nespelem.

 5          THE HEARING OFFICER:   Now, your current progress

 6  report indicates -- does -- does -- do you have an uncle by

 7  the name of Wesley Friedlander that -- that currently he --

 8  he resides on the property?

 9          THE DEFENDANT:   Yeah.

10          THE HEARING OFFICER:   Okay.   And is he -- would he

11  be the one then that would -- that would build the house or,

12  I mean, how -- how would that happen if you had a release

13  date?

14          THE DEFENDANT:   If I had a release date, I would

15  ask him at first -- because my father, George Friedlander,

16  he passed away with my baby sister and a couple other family

17  members that died from a car accident.   He put the house in

18  me and my Uncle Wesley's name to live there.   And -- but if

19  I was able to get my freedom, I'd probably stay there with

20  him for a little while and -- and have a -- because I --

21  1,400 acres of land, you know, that's only 20 acres where

22  that -- where he is at -- what -- that I own a part of that

23  land.

24          THE HEARING OFFICER:   Okay.

25          THE DEFENDANT:   And --



1          THE HEARING OFFICER:  Okay.  And -- and you're 49

2   now; is that right?

3          THE DEFENDANT:  Yes.

4          THE HEARING OFFICER:  And do you have any medical

5   issues that we need to be aware of?

6          THE DEFENDANT:  Not right now.

7          THE HEARING OFFICER:  Okay.  All right.  And --

8   and do you have any mental health diagnosis or anything, any

9   mental health issues?

10          THE DEFENDANT:  No.  No, sir, I don't.

11          THE HEARING OFFICER:  Okay.  Do you work at -- in

12   the institution now?

13          THE DEFENDANT:  Yeah.  I work at the sweat lodge

14   as -- as a landscaper.

15          THE HEARING OFFICER:  And do you intend to work

16   when you release?

17          THE DEFENDANT:  Yes, I do, sir.

18          THE HEARING OFFICER:  All right.  And what -- do

19   you -- do you have any leads or anything on -- on

20   employment?

21          THE DEFENDANT:  Well, I'm a certified welder and

22   I'm a certified carpenter as you will see in my file.  And

23   I've been working landscape in other institutions for over

24   five-and-a-half years.

25          THE HEARING OFFICER:  Okay.  All right.  And --



1  and, Mr. Roberts, I know you're not his current case

2  manager, but was there anything specifically from your

3  review of the file that you feel is important for me to

4  consider today?

5         MR. ROBERTS:  Yes.  I show no (indiscernible) on

6  February 13th.  He did receive a DHO sanction for possession

7  of narcotics.  And as of right now, my records have shown

8  that he has taken one educational course since being here at

9  FCC Lompoc.  And it is Intro to Education Opportunities.

10         THE HEARING OFFICER:  Okay.  And are you currently

11  in the -- in the SHU, Mr. Friedlander?

12         THE DEFENDANT:  Yes, I am.

13         THE HEARING OFFICER:  And that's as a result of

14  this -- this recent narcotics shot?

15         THE DEFENDANT:  Yes.

16         THE HEARING OFFICER:  All right.  When -- when are

17  you due for release from the special housing unit?

18         THE DEFENDANT:  If we were not lockdown, I would

19  be released this Thursday.

20         THE HEARING OFFICER:  Oh, I see.  So it's because

21  of the quarantine you're going to remain there then until

22  that's over?

23         THE DEFENDANT:  Yes.

24         THE HEARING OFFICER:  Okay.  All right.  Any --

25  any last statement that you want me to consider today?



1          **THE DEFENDANT:**  Yeah.  I -- I had a Native

2   American friend, and he has three counts of murder in the

3   first degree and he -- he got sentenced to 40 years under

4   the new law.  And he asked me why is my sentence worse than

5   his, and I told him I don't know.

6          But no matter what, I have remorse for what I had

7   done.  And like I told you, I had written to my adopted

8   father.  I had written to my adopted father and apologized

9   to him.  And I -- I told him no matter what, if the Parole

10  Board doesn't give my freedom, I'm thankful for one thing

11  and that's knowing the knowledge of the information about

12  eternal life that my adopted parents have taught me, which

13  is eternal life -- eternal life without suffering was mine

14  all along.  Never was I separated from the source.

15          And I'm thankful for them of giving me this

16  guidance.  And I'm thankful for them for helping me see who

17  I am, that I have knowledge today and that -- and that I

18  want to share it with the world.

19          And if I was able to get my freedom, I would like

20  to help the youth out there, so that they won't feel like

21  they have to sell their life short to drugs, alcohol or a

22  crime.  And if they choose to take that path in life, I want

23  them to know that their actions will have consequences that

24  would -- that will lead them here, within the prison walls

25  here.



NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

Exhibit N-023

133

Exhibit 02 - Page 135

1          And I know that I can never give their -- reverse

2  time and give -- make this it did not happen, but, you know,

3  every day I go through these feelings of love that I still

4  have for them because I know before that day happened, when

5  I had taken a life and tried to take my adopted father's

6  also I know they had love for me, you know.  And I just

7  want, you know, the adopted families of my adopted parent  -

8  - relatives to know that I'm really sorry and -- and his in-

9  laws as well.

10          **THE HEARING OFFICER:**  Okay.  All right.  So I'm

11  going to go off the record then for a few moments to think

12  about your case, Mr. Friedlander.  And I'm going to blank

13  out the screen, so don't be concerned if it goes dark.

14          **THE DEFENDANT:**  Okay.  Thank you.

15          **THE HEARING OFFICER:**  I'm going to stop the

16  recording.  I'm going to turn the mic off on this end as

17  well.  But when you -- when you see me again, I'll let you

18  know then what my recommendation is going to be.  Okay, sir?

19          **THE DEFENDANT:**  All right.  Thanks.

20          **THE HEARING OFFICER:**  All right.  Thank you.

21  Going off the record.

22          **(WHEREUPON, a recess was taken.)**

23          **THE HEARING OFFICER:**  Okay.  We are back on the

24  record with -- with my findings and my recommendation.

25          And, you know, I -- I went through during the



1  hearing, Mr. Friedlander, you know the specific reasons that

2  the Commission made the determinations that we made in the,

3  you know, over the last two -- two hearings.  And -- and at

4  this time, I do find that there has been no new favorable

5  significant changes or developments in your case to merit a

6  different decision.

7          I continue to find that you have both frequently

8  and seriously violated the rules of the institution as

9  indicated by the -- by the previous disciplinary infractions

10 that were identified at your 2018 and also your 2016

11 hearings.

12         You know, under the 4206(d) statute, those are

13 still applicable today, and I find that they still suggest a

14 likelihood that you would not obey the law if you were

15 released at this time.

16         But you add to that, now since your last hearing,

17 a new disciplinary infraction for drug possession which, you

18 know, occurred just a little over two months ago.  So you

19 know, I can now include on that list not only have you -- is

20 there a history that you've both frequently and seriously

21 violated the rules of the institution, but now I can add

22 that you've recently violated with -- with a serious rule

23 and -- rule violation.

24         All of this, in my opinion, I -- I find merits a

25 recommendation that there be no change in the previous



 1  decision to deny two-thirds parole in your case and that you

 2  be continued to the expiration of your sentence.

 3          This is just a recommendation.  It's not the final

 4  decision.  A commissioner is going to review my

 5  recommendation and make a final decision in a Notice of

 6  Action in about 21 days.

 7          Do you have any questions or any comments for the

 8  record?

 9          **THE DEFENDANT:**  No.  Thank you.

10          **THE HEARING OFFICER:**  Okay.  All right.  That

11  completes your hearing then, Mr. Friedlander.  Good luck to

12  you.  Be on the lookout for that final decision.

13          Thank you, Mr. Roberts, as well, for -- for

14  sitting in for the case manager.  And that completes your

15  hearing.  Thank you.

16          **MR. ROBERTS:**  All right.  Thank you, sir.

17          **(WHEREUPON, the hearing was concluded.)**

18

19

20

21

22

23

24

25



1                        CERTIFICATE

2

3          I, Lisa Kane, do hereby certify that the

4   proceeding named herein was professionally transcribed on
    the date set forth in the certificate herein; that I

5   transcribed all testimony adduced and other oral

6   proceedings had in the foregoing matter; and that the
    foregoing transcript pages constitute a full, true, and

7   correct record of such testimony adduced and oral

8   proceeding had and of the whole thereof.

9

10         IN WITNESS HEREOF, I have hereunto set my

11  hand this 4th day of November, 2021.

12

13

14

15        _Lisa Kane_____

16                        Lisa Kane

17

18

19

20

21

22

23

24

25

```
  SETAP          *      INMATE EDUCATION DATA      *    10-14-2020
PAGE 001          *           TRANSCRIPT          *    14:13:04


  REGISTER NO: 05167-085     NAME..: FRIEDLANDER            FUNC: PRT
  FORMAT.....: TRANSCRIPT     RSP OF: LOM-LOMPOC USP


-------------------------- EDUCATION INFORMATION --------------------------
FACL ASSIGNMENT DESCRIPTION              START DATE/TIME STOP DATE/TIME
LOM  ESL HAS   ENGLISH PROFICIENT        06-18-1991 1412 CURRENT
LOM  GED EARNED GED EARNED IN BOP        11-08-1994 1136 CURRENT

--------------------------- EDUCATION COURSES ---------------------------
SUB-FACL   DESCRIPTION              START DATE  STOP DATE EVNT AC LV  HRS
LOM        INTRO TO EDUCATION OPPORTUNITY 07-26-2019 07-26-2019  P  C  P    2
TCN        ALTERN VIOLENCE FACILITATOR    04-29-2018 05-01-2018  P  C  P   18
TCN        RES CONFLICT EL RIO (RPP6-PG)  05-21-2018 05-21-2018  P  C  P    2
TCN        COMM SKILLS-EL RIO (RPP6-PG)   04-23-2018 04-23-2018  P  C  P    2
TCN        ADVANCED ALTERNATIVE VIOLENCE  04-08-2018 04-10-2018  P  C  P   18
TCN        IMPR SELF-ESTEEM-EL RIO (RPP6) 03-26-2018 03-26-2018  P  C  P    2
TCN        BASIC ALTERNATIVE TO VIOLENCE  03-09-2018 03-11-2018  P  C  P   18
TCN        SETTING GOALS-EL RIO (RPP6-PG) 02-26-2018 03-06-2018  P  C  P    2
TCN        BEGINNING SPANISH II           11-21-2017 01-23-2018  P  C  P    8
TCN        COMM SKILLS-EL RIO (RPP6-PG)   01-22-2018 01-22-2018  P  C  P    2
TCN        BEGINNING SPANISH ONE          09-07-2017 11-07-2017  P  C  P   16
TCN        DIRTY JOBS SEASON IV ACE CLASS 06-02-2014 06-14-2014  P  C  P    6
TCN        DIRTY JOBS#7 DVD ACE           06-02-2014 06-14-2014  P  C  P   10
TCN        DISCOVERY ATLAS GEOGRAPHY DVD  06-02-2014 06-14-2014  P  C  P   11
TCN        DINERS,DRIVE-IN,DIVES DVD ACE  06-02-2014 06-14-2014  P  C  P    5
SHE        NUTRITION CLASS FCI A&O        08-22-2012 09-13-2012  P  C  P    3
HAZ CHG    (PG)PCTC-TOP 25 JOB INTRVW     04-05-2012 04-05-2012  P  C  E    2
HAZ CHG    (PG) PCTC-BALANCING YOUR LIFE  03-06-2012 03-06-2012  P  C  E    2
MCR        BEADING CLASS MON/TUES 6-8 PM  11-26-2008 01-08-2009  P  C  P    4
BSY        SHU-ACE BANKING LANGUAGE       04-11-2008 04-21-2008  P  C  P    4
BSY        SHU-ACE GOV'T LANGUAGE BASICS  04-11-2008 04-21-2008  P  C  P    4
BSY        SHU-ACE COMPUTER SOFTWARE      04-11-2008 04-21-2008  P  C  P    4
BSY        SHU-ACE TRANSPORTATION LANG.   04-01-2008 04-11-2008  P  C  P    4
BSY        SHU-ACE CONSUMER RIGHTS        04-01-2008 04-11-2008  P  C  P    4
BSY        SHU-ACE EMERGENCY SERVICE LANG 04-01-2008 04-11-2008  P  C  P    4
BSY        SHU-ACE DRIVER'S LICENSE LANG  04-01-2008 04-11-2008  P  C  P    4
MAR        ACE - RUSSIA'S WAR             05-22-2006 08-01-2006  P  C  F   16
MAR        IN CELL VIDEO/STY ASTRONOMY    05-22-2006 07-03-2006  P  C  F   12
MAR        ACE CIVIL WAR HISTORY          11-07-2005 01-06-2006  P  C  P   20
MAR        USP PARENTING PROGRAM          01-31-2005 05-02-2005  P  C  P   24
MAR        ACE/EARTH REVEALED/GEOLOGY     09-07-2004 12-03-2004  P  C  P   52
MAR        ACE/THE WORLD OF CHEMISTRY     04-05-2004 07-02-2004  P  C  P   52
MAR        ACE/CURRENT EVENTS SUMMER SEM  08-04-2003 10-31-2003  P  C  P   52
MAR        ACE/MECHANICAL UNIVERSE PT 2   08-04-2003 10-31-2003  P  C  P   52
MAR        ACE/CIVIL RIGHTS HIST. PT I    03-03-2003 05-16-2003  P  C  P   50
MAR        ACE/CURRENT EVENTS SPRING SEM  03-03-2003 05-30-2003  P  C  P   52
MAR        ACE/MECHANICAL UNIVERSE PT I   03-03-2003 05-30-2003  P  C  P   52
MAR        ACE/CURRENT EVENTS FALL SEM.   09-30-2002 01-03-2003  P  C  P   52
MAR        ACE WEST TRADITION HISTORY PT2 09-30-2002 01-03-2003  P  C  P   52
MAR        ACE/CURRENT EVENTS SPRING SEM  03-01-2002 06-03-2002  P  C  P   48

  G0002      MORE PAGES TO FOLLOW . . .
```

```
 SETAP          *          INMATE EDUCATION DATA          *     10-14-2020
PAGE 002 OF 002 *                TRANSCRIPT               *     14:13:04


   REGISTER NO: 05167-085     NAME..: FRIEDLANDER              FUNC: PRT
   FORMAT.....: TRANSCRIPT    RSP OF: LOM-LOMPOC USP


---------------------------   EDUCATION COURSES  -----------------------------
SUB-FACL   DESCRIPTION                  START DATE  STOP DATE EVNT AC LV  HRS
MAR        ACE WEST TRADITION HISTORY PT1 03-01-2002 06-03-2002  P  C  P   52
MAR        ACE ETHICS/CURRENT EVENTS     05-01-2000 07-07-2000  P  C  F   40
MAR        ACE LOST CIVILIZATIONS HISTORY 04-10-2000 06-16-2000  P  C  F   40
SHE        TYPING FCI 7:30-9 AM MON-FRI  11-17-1997 03-23-1998  P  W  I   90
SHE        BUILDING TRADES FCI PM        06-08-1995 11-08-1995  P  C  M  385
SHE        GED TEST SESSION              11-08-1994 11-08-1994  P  C  P    8
SHE        GED AFTERNOON                 06-10-1991 10-22-1991  P  W  V  284
ENG        GED CLASS-MOD 5               04-06-1991 05-06-1991  P  W  I   20
ENG        WELDING VT - MODS 3 & 4       05-05-1990 05-06-1991  P  W  I  860
ENG        GED CLASS-MOD 5               05-05-1990 09-08-1990  P  W  V   75
ENG        GED CLASS-MOD 4               04-07-1990 05-05-1990  C  W  I   40
ENG        ADULT BASIC EDUCATION-MOD 3   03-14-1990 03-24-1990  P  C  P   16
ENG        ABE MOD 2                     02-12-1990 03-14-1990  C  W  I   40
ENG        ABE MOD 1                     09-09-1989 12-09-1989  P  W  V  120
ENG        ADMISSION AND ORIENTATION     08-28-1989 08-28-1989  P  C  P    6
TCN        ABE M-F 8:30-10:30 A.M.       06-26-1989 08-24-1989  P  W  V   76
TCN        ABE M-F 8:30-10:30 A.M.       05-01-1989 06-26-1989  P  W  V   70
TCN        ABE M-F 6:00- 8:00 P.M.       03-06-1989 05-01-1989  P  W  V   80


---------------------------   HIGH TEST SCORES  -----------------------------
TEST       SUBTEST       SCORE     TEST DATE      TEST FACL   FORM     STATE
ABLE       LANGUAGE       9.0      04-05-1990     SHE
           NUMBER OPR    10.2      04-05-1990     SHE
           PROB SOLV      9.7      04-05-1990     SHE
           READ COMP      8.4      04-05-1990     SHE
           SPELLING      13.0      04-05-1990     SHE
           VOCABULARY     7.0      04-05-1990     SHE
GED        AVERAGE       46.0      11-03-1994     SHE         PASS     WA
           LIT/ARTS      48.0      05-13-1993     SHE         AJ       OR
           MATH          41.0      11-03-1994     SHE         AM       WA
           SCIENCE       46.0      05-13-1993     SHE         AL       OR
           SOC STUDY     47.0      05-13-1993     SHE         AJ       OR
           WRITING       48.0      11-03-1994     SHE         AM       WA






 G0000     TRANSACTION SUCCESSFULLY COMPLETED
```

## DECLARATION

I am Brenda G. Challinor.  I have been employed as a mitigation specialist with the Federal Defenders of Eastern Washington and Idaho at Spokane since January 2016.

In that capacity, I have been involved in the John Friedlander case (docket number CR-87-308-JLQ-1).  I make the following declaration based upon my personal knowledge and am competent to testify to the same:

- I spoke with Mr. Friedlander on March 16, 2021, during an attorney/client telephone call which was arranged through his case manager at USP Lompoc, Brigido Gomez.
- Mr. Friedlander reported participation in the Bureau of Prisons Alternatives to Violence program at FCI Tucson.  Mr. Friedlander advised the program equipped him to make important life changes.
- Mr. Friedlander provided copies of his certificates of completion on March 19, 2021.
- I examined the certificates and confirmed Mr. Friedlander successfully completed all segments of the Alternatives to Violence Program at FCI Tucson:
    - Alternatives to Violence, *Basic* – March 9, 10, 11, 2018 (18 hours)
    - Alternatives to Violence, *Advanced* – April 8, 9, 10, 2018 (18 hours)
    - Alternatives to Violence, *Facilitator* – July 10, 13-15, 2018 (40 hours)
- I communicated with one of the four course instructors, Ms. Jane Kroesen.
- Ms. Kroesen confirmed she had taught the classes.  She recalled Mr. Friedlander and noted he had performed well.  She described him as a shy man who had gone outside his comfort zone to actively participate.  Ms. Kroesen observed he had been so enthusiastic about the program that he had recruited other inmates, particularly Native American inmates, to participate.  She verified he also became a facilitator.  Ms. Kroesen expressed her willingness to write a letter on Mr. Friedlander's behalf.
- On April 7, 2021, I received a telephone call from the reentry affairs coordinator at FCI Tucson.  She explained Ms. Kroesen had checked to ascertain she could write a letter on behalf of Mr. Friedlander and was told she was not authorized to write a letter and if she persisted she would be prohibited from teaching at any Bureau of Prisons facility in the future.  The coordinator maintained there was no mechanism through which a positive letter could be submitted on Mr. Friedlander's behalf.
- I expressed to her the insurmountable difficulties for inmates who have been incarcerated for decades and in that time have lost all ability to maintain a support system for themselves in the community and that this reality gives extra importance to their positive programming in the prison system.  She acknowledged the reality but offered no remedy for it.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 24, 2022

*Brenda G. Challinor*

Brenda G. Challinor

StatRad Exam Requisition                                            Page 1 of 2



## USP Lompoc LOM

| | | | | |
|---|---|---|---|---|
| Patient: | **FRIEDLANDER, JOHN (Male)** | | DOB: | 09/01/70 |
| Register#: | **05167-085** | | Age: | 48 |
| Date: | 08/13/19 10:10 | | Status: | OP |
| Slicecount: | : 6 | | | |
| History: | Trauma to head, face and nose, exam includes nasal x2 and SMV views | | | |
| Priors: | | | | |
| Exams: | FILM FACIAL BONES, FILM NASAL BONE | | | |
| Referring Phy: | | | | |
| Ordering Phy: | | | | |
| Ordering Phy #: | | | | |
| Accession Numbers: 202#BOP00101178 | | | | |

### Final Report

**Exam: FILM FACIAL BONES**

**Indication: Trauma to head, face and nose, exam includes nasal x2 and SMV views**

**Technique: 6 views of the facial bones**

**Comparison: None**

**Findings: There is suggestion of a nondisplaced proximal nasal bone fracture. There is a cerclage wire in the mental portion of mandible. The remaining bones are in anatomic alignment. The frontal, ethmoid, and maxillary sinuses are clear. The mastoid air cells are aerated. No significant soft tissue abnormality.**

**Impression:**
**There is suggestion of a nondisplaced proximal nasal bone fracture. Recommend correlation with clinical exam.**

**Exam: FILM NASAL BONE**

**Indication: Trauma to head, face and nose, exam includes nasal x2 and SMV views**

**Technique: 3 views of the nasal bone**

**Comparison: None**

**Findings: There is suggestion of a nondisplaced proximal nasal bone fracture. The frontal, ethmoid, and maxillary sinuses are clear. The mastoid air cells are aerated. No significant soft tissue abnormality.**

**Impression:**

Exhibit Q-001
141
Exhibit 02 - Page 143

StatRad Exam Requisition                                                    Page 2 of 2

**There is suggestion of a nondisplaced proximal nasal bone fracture. Recommend correlation with clinical exam.**

Radiologist:                    Patrick Choi, M.D.

Study ready at 10:10 and initial results transmitted at 18:17

Exhibit Q-002
142
Exhibit 02 - Page 144


**Adult & Teen Challenge**
Pacific Northwest

tcpnw.com | 509-244-5610
2400 N Craig Rd., Spokane WA 99224

March 4, 2022

**RE:** John Friedlander

Dear U.S. Parole Commission:

I write concerning Mr. John Friedlander, a federal inmate housed at USP Lompoc in California.

I am aware that Mr. Friedlander has a parole hearing scheduled for June 2022, and that he has been incarcerated with the Federal Bureau of Prisons for many decades. I also am aware his conviction stems from a tragic murder which occurred when he was a juvenile.

I am a program coordinator with Adult and Teen Challenge in Spokane, Washington. We operate our 50-bed residential recovery and discipleship program on rural property located 11 miles outside of Spokane proper, and have done so since 1983. Adult and Teen Challenge is faith-based and provides a year-long program of holistic treatment for substance abuse and addiction, as well other serious life-controlling issues. The program intensively addresses multiple facets of wellness and prepares the men to live successfully in the community following their period of residency. During treatment, they engage in work, chemical dependency counseling, skills and spiritual training, volunteer activities, and resolving barriers to successful living (i.e., obtaining a valid driver's license or a GED, healing relationships).

I interviewed Mr. Friedlander and find him to be appropriate for our program. I believe our supportive structure will be ideal for him as he transitions back to society after many years of incarceration. He is enthusiastic about joining us and feels it will be beneficial to him. I am confident that we can help turn Mr. Friedlander's life into one that has hope, healing, and restoration. I hope you will make the decision to parole Mr. Friedlander into our program at the earliest opportunity.

Sincerely,

Stan Hough

Program Coordinator, Spokane Men's Center